**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Nicholas B. Vislocky, Esq.
1251 Avenue of the Americas, 17th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)
 -and-
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)
*Proposed Counsel to the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Binder & Binder – The National Social Security Disability Advocates (NY), LLC, *et al.*,[1] | Case No. 14-23728 (RDD) |
| | (Joint Administration Requested) |
| Debtors. | |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING POST-PETITION SENIOR SECURED FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION, AND (IV) MODIFYING THE AUTOMATIC STAY

The debtors and debtors in possession (collectively, the "Debtors") in the above-

captioned cases (the "Chapter 11 Cases") submit this motion (the "Motion") for entry of an

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: (1) Binder & Binder - The National Social Security Disability Advocates (NY), LLC (1450); (2) SSDI Holdings, Inc. (3038); (3) Binder & Binder - The National Social Security Disability Advocates LLC (8580); (4) The Rep for Vets LLC (6421); (5) National Veterans Disability Advocates LLC (dba The Rep for Vets LLC) (7468); (6) The Social Security Express Ltd. (4960); (7) Binder & Binder - The National Social Security Disability Advocates (AZ), LLC (5887); (8) Binder & Binder - The National Social Security Disability Advocates (CA), LLC (1456); (9) Binder & Binder - The National Social Security Disability Advocates (CO), LLC (0945); (10) Binder & Binder - The National Social Security Disability Advocates (CT), LLC (0206); (11) Binder & Binder - The National Social Security Disability Advocates (FL), LLC (1455); (12) Binder & Binder - The National Social Security Disability Advocates (GA), LLC (4768);   (13) Binder & Binder - The National Social Security Disability Advocates (IL), LLC (1457); (14) Binder & Binder - The National Social Security Disability Advocates (MD), LLC (3760); (15) Binder & Binder - The National Social Security Disability Advocates (MO), LLC (2108); (16) Binder & Binder - The National Social Security Disability Advocates (NJ), LLC (1454); (17) Binder & Binder - The National Social Security Disability Advocates (NC), LLC (1460); (18) Binder & Binder - The National Social Security Disability Advocates (OH), LLC (7827); (19) Binder & Binder - The National Social Security Disability Advocates (PA), LLC (1453); (20) Binder & Binder - The National Social Security Disability Advocates (TX), LLC (1458); (21) Binder & Binder - The National Social Security Disability Advocates VA, LLC (7875); (22) Binder & Binder - The National Social Security Disability Advocates (WA), LLC (0225); (23) Binder & Binder - The National Social Security Disability Advocates (LA), LLC (8426); (24) Binder & Binder - The National Social Security Disability Advocates (MI), LLC (8762); and (25) Binder & Binder - The National Social Security Disability Advocates (DC), LLC (5265); (together, the "Debtors").

interim order (the "<u>Interim Order</u>") (a) authorizing the Debtors to obtain post-petition senior secured financing pursuant to sections 105, 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503(b), and 507 of the Bankruptcy Code, (b) authorizing the Debtors to use the cash collateral of their pre-petition secured lenders ("<u>Cash Collateral</u>"), (c) authorizing the Debtors to provide their pre-petition secured lenders adequate protection pursuant to sections 361, 363, and 364 of the Bankruptcy Code, and (d) modifying the automatic stay, and (e) scheduling a final hearing pursuant to Bankruptcy Rule 4001 (the "<u>Final Hearing</u>"); and, following the Final Hearing, entry of an order granting the relief requested herein on a final basis (the "<u>Final Order</u>" and collectively with the Interim Order, the "<u>DIP Orders</u>").  In support of this Motion, the Debtors rely upon the *Declaration of William A. Brandt, Jr. Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Chapter 11 Petitions and First Day Motions* (the "<u>Brandt Declaration</u>") and respectfully state as follows:

## <u>JURISDICTION</u>

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The legal bases for the relief requested herein are sections 105, 361, 362, 363, 503(b), and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6003, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "<u>Local Rules</u>").

## BACKGROUND

3.      On December 18, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of unsecured creditors (a "Committee") has been appointed in the Chapter 11 Cases.

4.      The factual background regarding the Debtors' operations and capital structure and the commencement of these Chapter 11 Cases is more fully described in the Brandt Declaration, which is incorporated herein by reference.

### A.      Overview and Nature of the Debtors' Business

5.      The Debtors are the nation's largest provider of social security disability and veterans' benefits advocacy services.  While most other advocacy firms outsource cases that are not in their core region, the Debtors leverage their national footprint to service all of their cases in-house and provide the same level of advocacy expertise regardless of where a client is located. The Debtors have 40 years of experience helping disabled individuals obtain disability benefits through programs administered by the Social Security Administration ("SSA") as well as helping veterans apply for disability and related benefits.

6.      There are two primary programs through which the SSA provides disability benefits: the Social Security Disability Insurance Program and the Supplemental Security Income Program.  Each of these programs provides monthly benefits to retired workers, their spouses and children, and survivors of deceased insured workers.  In addition, the federal government provides benefits for U.S. Armed Forces veterans with disabilities resulting from a

disease or injury incurred or aggravated during active military service (and some disabilities that may arise post-service) through its Veterans Affairs Disability Benefits Program. Since 1979, the Company has handled over 300,000 Social Security Disability Insurance Program, Supplemental Security Income Program, and Veterans Affairs Disability Benefits Program cases ("SSA Cases").

**B.    Prepetition Secured Debt**

7.    Binder & Binder – The National Social Security Disability Advocates, LLC ("SSDA") is the borrower under a prepetition senior secured financing facility (the "Prepetition Facility") consisting of a revolving credit facility in the maximum principal amount of $8 million (the "Prepetition Revolver") and a term loan in the original principal amount of $29 million (the "Prepetition Term Loan"). All other Debtors, except for nine Debtors formed after the implementation of the Prepetition Facility (the "Non-Guarantor Debtors"),[2] have guarantied SSDA's indebtedness under the Prepetition Facility (the Debtors other than SSDA and the Non-Guarantor Debtors are the "Guarantor Debtors").

8.    Capital One, N.A. ("Capital One") and U.S. Bank National Association ("U.S. Bank" and collectively with Capital One, the "Prepetition Lenders") are the lenders under the Prepetition Facility. U.S. Bank serves as administrative and collateral agent for the Prepetition Lenders. As of the Petition Date, there were amounts outstanding of $6,499,733 under the Prepetition Revolver and $16,548,500 under the Prepetition Term Loan. U.S. Bank, as agent for the Prepetition Lenders, holds a security interest in substantially all of the assets of SSDA and

---

[2]    The Non-Guarantor Debtors include Binder & Binder - The National Social Security Disability Advocates (AZ), LLC (5887); Binder & Binder - The National Social Security Disability Advocates (CT), LLC (0206); Binder & Binder - The National Social Security Disability Advocates (MD), LLC (3760); Binder & Binder - The National Social Security Disability Advocates (MO), LLC (2108); Binder & Binder - The National Social Security Disability Advocates (OH), LLC (7827); Binder & Binder - The National Social Security Disability Advocates VA, LLC (7875); Binder & Binder - The National Social Security Disability Advocates (LA), LLC (8426); Binder & Binder - The National Social Security Disability Advocates (MI), LLC (8762); and Binder & Binder - The National Social Security Disability Advocates (DC), LLC (5265)

the Guarantor Debtors (the "Prepetition Collateral") as security for the Debtors' obligations

under the Prepetition Facility (the "Prepetition Liens").

**C.    The Chapter 11 Cases**

9.    The Debtors' revenue declined during the first quarter of 2013 as a result of the

federal sequestration, a temporary curtailment of certain federal spending.  Although benefits

payments under the various programs operated by the Social Security Administration were

exempt from the funding cuts implemented as part of the federal sequestration, workflow

disruptions at the SSA and uncertainty as to how the sequestration might impact new claims

delayed the processing of claims and the payment of fees to advocates, even for cases already

successfully adjudicated.  Claims processing times eventually returned to normal levels later in

2013, but the federal government shutdown in October 2013 yet again caused delays in case

resolution.

10.    During the shutdown, the SSA and VA continued to conduct hearings, but the

shutdown caused significant delays in their issuance of post-hearing decisions.  As a result, the

Debtors' rate of successful adjudications dropped significantly in the fourth quarter of 2013, with

revenues falling short of projections by approximately 20%.  Although the sequestration and

shutdown were not recurring events, the resulting disruption in the Debtors' operating cash flow

and the post-shutdown lag in case adjudication have severely impacted the Debtors' operating

performance and liquidity, necessitating a financial restructuring.

**D.    The DIP Credit Facility**

11.    The ability to use Cash Collateral and obtain postpetition financing under the DIP

Credit Facility is essential to the Debtors' ability to operate in chapter 11 and preserve the value

of their estates.  As described more fully in the Brandt Declaration, the Debtors have faced

significant operational and liquidity pressure over the past twelve months. Despite efforts by the

Debtors' management and advisors to improve the Debtors' financial position, it eventually

became clear that a financial restructuring was not possible outside of a chapter 11 proceeding.

To that end, the Debtors focused their efforts on obtaining appropriate post-petition financing to

fund their operations during the Chapter 11 Cases.

12.    Despite these efforts, the Debtors were unable to locate a lender willing to extend

credit on a junior secured or unsecured basis. Moreover, the Debtors were unable to locate an

alternate lender willing to extend sufficient credit to replace the Prepetition Facilities. The

Debtors negotiated the terms of a potential alternate senior secured credit facility, but ultimately

determined that the costs, distraction, and uncertainty of a priming dispute, coupled with the

costs and uncertainty of contested proceedings regarding the use of Cash Collateral, would

outweigh the benefits of such a facility.

13.    Pursuant to Bankruptcy Rules 4001(c)(1)(B)(i)-(xi) and 4001(b)(1)(B)(i)-(iv) and

Local Bankruptcy Rule 4001(b)(1)(B)(i)-(iv) and 4001-2(a)(i), a summary of the key terms of the

DIP Credit Facility, together with references to the related pages of the term sheet annexed

hereto as **Exhibit A** (the "DIP Term Sheet"), is as follows:[3]

| CONCISE STATEMENT OF MATERIAL TERMS OF THE DIP CREDIT FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[4] | |
| --- | --- |
| TERM | DESCRIPTION |
| **Borrowers**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Binder & Binder – The National Social Security Disability Advocates LLC, a Delaware limited liability company, and its subsidiaries, jointly and severally, in their capacities as borrowers and debtors in possession |

---

[3]    The Debtors and the DIP Lenders are in the process of preparing the definitive documentation for the DIP Credit Facility, and anticipate filing the form of credit agreement for the DIP Credit Facility (the "DIP Credit Agreement") and Interim Order on the docket prior to the interim hearing on this Motion. The DIP Term Sheet and the above summary are qualified in all respects by the DIP Credit Agreement and Interim Order, which will supersede the DIP Term Sheet.

[4]    Capitalized terms used in the Concise Statement but not otherwise defined in this Motion have the meanings ascribed thereto in the DIP Term Sheet. The description of the key terms of the DIP Credit Facility in this section is intended only as a summary. Parties are encouraged to review the DIP Term Sheet (and the DIP Credit Agreement and proposed Interim Order, once filed) for the complete terms of the DIP Credit Facility.

| CONCISE STATEMENT OF MATERIAL TERMS OF THE DIP CREDIT FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[4] | |
|---|---|
| **TERM** | **DESCRIPTION** |
| Term Sheet p.2 | |
| **Guarantors** *Bankruptcy Rule 4001(c)(1)(B)* Term Sheet p.3 | SSDI Holdings, Inc., in its capacity as a guarantor and debtor in possession.  The guaranty shall be secured by a first priority security interests in and liens on all assets of the guarantor. |
| **DIP Lenders** *Bankruptcy Rule 4001(c)(1)(B)* Term Sheet p.3 | U.S. Bank National Association and Capital One N.A.  U.S. Bank is also the DIP Agent. |
| **Use of Proceeds** *Bankruptcy Rule 4001(c)(1)(B)* Term Sheet pp. 5-7 | Proceeds of the DIP Credit Facility will be used during the Availability Period for the following, but in each case in accordance with and subject to the Budget: (i) with respect to proceeds of the DIP Credit Facility (other than  Sublimit Loans), to repay the Pre-petition  Obligations  in  full  and (ii) with respect to Sublimit Loans, in each case in accordance with the terms of the DIP Loan Documents, the Interim Order and the Final Order (and in any event in the aggregate amount not to exceed the Sublimit), (A) to pay working capital and other general corporate needs of Borrowers in the ordinary course of business; (B) to pay postpetition fees and expenses related to the DIP Credit Facility; (C) to pay fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee or agent thereof; and (D) for payment of professional fees pursuant to a carve-out and payment procedures acceptable to Borrowers, DIP Agent and DIP Lenders.  For the avoidance of doubt, repayment of the Roll-up DIP Obligations shall not reduce sums available for Sublimit Loans.   The foregoing shall not apply to amounts in the Wind-Down Fund (as defined below), the use of which is detailed in the "Wind-Down Expense Account" paragraph set forth below. Wind-Down Expense Account: Commencing in June 2015, and during each month thereafter, so long as no event of default has occurred and is continuing or would result therefrom, Borrowers may fund from Excess Cash Payments a wind-down account (the "Wind-Down Fund") so long as any amounts paid into the Wind-Down Fund in any given month, when aggregated with all amounts paid into the Wind-Down Fund during the Bankruptcy Proceeding on a cumulative basis, do not exceed (after giving effect to such payment) the amount set forth on Schedule 2 attached hereto opposite such month.   For the avoidance of doubt, in no event shall the aggregate amount in the Wind-Down Fund since the Petition Date (on a cumulative basis) exceed $2,500,000 in the aggregate.  The Wind-Down Fund shall be (1) a separate account and hold only amounts paid into the Wind-Down Fund in accordance with this paragraph and (2) established and maintained with and under the control of a DIP Lender.  The Wind-Down Fund and all amounts from time to time on deposit in the Wind-Down Fund shall be additional security for the payment and performance of the DIP Obligation and shall not be subject to any carve-out.  The Loan Parties may not access the Wind-Down Fund or any funds therein until the DIP Obligations are paid in full and the DIP Loan Agreement   has   been   terminated; provided,  however,  that  upon   the occurrence of an Event of Default that results in either (i) the acceleration of the DIP Obligations or (ii) DIP Lenders no longer advancing any Sublimit Loans, and so long has Borrowers have first used all cash on hand, Borrowers may access amounts in the Wind-Down Fund which shall be used by Borrowers solely to pay (A) payroll, payroll taxes and benefits and (B) hearing related costs.  Borrowers shall submit a written request to DIP Agent to request funds from the Wind-Down Fund prior to payment in full of the DIP Obligations and termination of the DIP Credit Agreement, which written notice shall include a detailed description and certification of an officer of Borrowers regarding the use of the requested amounts.  Upon |

| CONCISE STATEMENT OF MATERIAL TERMS OF THE DIP CREDIT FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[4] | |
|---|---|
| **TERM** | **DESCRIPTION** |
| | the occurrence of the DIP Termination Date (other than as a result of the acceleration of maturity of the DIP Credit Facility resulting from the occurrence of non-material events of default to be agreed upon by Borrowers, DIP Agent and DIP Lenders), DIP Agent may, without further notice to or order of the Bankruptcy Court or further notice to any other person, apply the amounts then on deposit in the Wind-Down Fund to the DIP Obligations in such order as determined by DIP Agent in its sole discretion. |
| **Amount and Structure of DIP Credit Facility** *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(1)* <br><br> Term Sheet pp. 3-4 | A revolving credit facility (the "DIP Credit Facility" and the loans under the DIP Credit Facility, the "DIP Loans") in an aggregate principal amount not to exceed $[26,000,000]*, subject to reduction as set forth herein (the "DIP Facility Cap"). The indebtedness and obligations of Borrowers under the DIP Credit Facility shall be joint and several. The amount of the DIP Loans available to Borrowers under the DIP Credit Facility will be limited to (a) amounts used to repay in full the Pre-petition Obligations and (b) amounts and purposes identified in the Budget and subject to variances as set forth below and compliance with the terms and conditions set forth below, which shall not otherwise exceed $3,000,000 (the "Sublimit" and such DIP Loans, the "Sublimit Loans"). The Sublimit shall be reduced by $250,000 commencing on September 1, 2015 and then every six months thereafter. Each such reduction shall also reduce the DIP Facility Cap. The DIP Credit Facility is conditioned upon DIP Agent, for the benefit of DIP Lenders, obtaining a first priority perfected lien on, and security interest in, all of Borrowers' and Guarantor's personal and real property assets as provided in the "Collateral, Security and Superpriority Claims" paragraph below. In addition, DIP Agent and DIP Lenders shall be entitled to assign and/or participate in the DIP Credit Facility with additional lenders. <br><br> *The amount of the DIP Facility Cap shall be equal to the Pre-petition Obligations plus the $3,000,000 Sublimit. <br><br> Upon entry of the Interim Order, to the extent the conditions precedent to the Closing shall have been satisfied, but prior to entry of the Final Order, amounts under the DIP Credit Facility will be limited to $[TBD], a portion of which shall be funded at the Closing in an amount equal to at least $[TBD] (the "Initial DIP Loan"), which Initial DIP Loan shall be used to repay in full the Pre-petition Obligations. DIP Loans will be made for the purposes provided in the "Use of Proceeds" paragraph below not inconsistent with the Budget Amounts repaid with respect to Sublimit Loans may be reborrowed (from time to time) up to the Sublimit, subject to compliance with the applicable conditions to borrowing. Amounts repaid with respect to the portion of the Initial DIP Loan used to repay the Pre-petition Obligations (such amounts, the "Roll-up DIP Obligations") may not be reborrowed, and shall permanently reduce the DIP Facility Cap. <br><br> Following the disbursement of the Initial DIP Loan, DIP Loans up to the Sublimit may be drawn during the period from and including the Closing up to but excluding the DIP Termination Date (as defined below) (such period, the "Availability Period"). The DIP Credit Facility will terminate and the DIP Obligations shall be due and payable in full at the end of the Availability Period. <br><br> For the avoidance of doubt, in no event shall Borrowers have any right to request, nor shall any of DIP Agent, DIP Lenders, Pre-petition Agent, Pre-petition L/C Issuer or Pre-petition Lenders have any obligation to issue, any letters of credit at any time. |
| **Roll-Up Provisions** *Local Rule 4001-2(a)(7)* <br><br> Term Sheet pp. 3-4 | Upon entry of the Interim Order, to the extent the conditions precedent to the Closing shall have been satisfied, but prior to entry of the Final Order, amounts under the DIP Credit Facility will be limited to $[TBD], a portion of which shall be funded at the Closing in an amount equal to at least $[TBD] (the "Initial DIP Loan"), which Initial DIP Loan shall be used to repay in full the Pre-petition Obligations. DIP Loans will be made for the purposes provided in the "Use of Proceeds" paragraph below not inconsistent with the |

| CONCISE STATEMENT OF MATERIAL TERMS OF THE DIP CREDIT FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[4] | |
|---|---|
| **TERM** | **DESCRIPTION** |
| | Budget Amounts repaid with respect to Sublimit Loans may be reborrowed (from time to time) up to the Sublimit, subject to compliance with the applicable conditions to borrowing. Amounts repaid with respect to the portion of the Initial DIP Loan used to repay the Pre-petition Obligations (such amounts, the "Roll-up DIP Obligations") may not be reborrowed, and shall permanently reduce the DIP Facility Cap. |
| **Maturity and Termination Date** *Bankruptcy Rule 4001(c)(1)(B)* Term Sheet p. 4 | The DIP Credit Facility shall mature (the "DIP Termination Date") on the earliest to occur of: (a) the date that is 18 months following the Petition Date, (b) the effective date of a sale of the assets of any borrower or guarantor pursuant to section 363 of the Bankruptcy Code, (c) the effective date of a Plan, (d) the conversion of the Bankruptcy Case to a proceeding under Chapter 7 of the Bankruptcy Code, (e) the dismissal of the Bankruptcy Case or (f) acceleration of maturity of the DIP Credit Facility by DIP Agent or DIP Lenders due to the occurrence of an event of default under the DIP Loan Documents (as defined below). All outstanding indebtedness under the DIP Credit Facility and all other DIP Obligations (as defined below) shall be due and payable in full on the DIP Termination Date. |
| **Fees** *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(3)* Term Sheet p.7 | (1) On the date of Closing, Borrowers shall pay DIP Agent, for the ratable benefit of DIP Lenders, a commitment fee of $100,000, which shall be fully earned on the date of Closing and shall be non-refundable. (2) With regard to the Sublimit Loans only, Borrowers shall pay DIP Agent, for the ratable benefit of DIP Lenders, an unused line fee of three quarters of one percent (0.75%) per annum (calculated and payable monthly) of the amount by which the Sublimit exceeds the average outstanding amount of the Sublimit Loans in any month |
| **Interest Rates** *Bankruptcy Rule 4001(c)(1)(B)* Term Sheet pp. 7-8 | Interest on the outstanding balance of the DIP Credit Facility shall be payable monthly in arrears at an annual rate of the Base Rate plus 4.25%, calculated each month on the basis of the actual number of days elapsed and a 360-day year. From and after the occurrence of a default or an event of default under any of the DIP Loan Documents, a default rate of interest of an additional five percent (5.0%) per annum over the rate otherwise applicable shall be payable on demand on the outstanding balance (including any accrued and unpaid interest, fees and reimbursements) of the DIP Credit Facility and all other DIP Obligations. |
| **Prepayments** *Local Rule 4001-2(a)(13)* Term Sheet pp. 5-6 | Mandatory prepayments of the DIP Loans (including timing, amounts and application thereof) to be determined by DIP Agent and DIP Lenders, but in any event shall include the following prepayments: (1)     The Loan Parties shall be required to repay the Roll-up DIP Obligations so that, as of any test date, payments applied to the Roll-up DIP Obligations on a cumulative basis since the Petition Date shall equal at least the amount set forth on Schedule 1 attached hereto opposite such date. The Loan Parties' compliance shall be tested monthly as of the last day of each calendar month commencing on May 31, 2015. (2)     The Loan Parties may not have on hand cash in excess of $750,000 in the aggregate (the "Maximum Cash Amount") as of the close of the business Monday of each week (or if not a business day, the next business day) (each, a "Measuring Day"), which shall be determined based upon the Borrowers' book balances as of such Measuring Day. If the Loan Parties on a Measuring Day have cash on hand in excess of the Maximum Cash Amount, Borrowers shall pay to DIP Agent prior to the close of business on the next business day (each, an "Excess Cash Payment Date") an amount equal to such excess (the "Excess Cash" and each payment, an "Excess Cash Payment"). Excess Cash Payments will be applied to |

| **CONCISE STATEMENT OF MATERIAL TERMS OF THE DIP CREDIT FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[4]** | |
| --- | --- |
| **TERM** | **DESCRIPTION** |
| | the DIP Loans as follows (less contributions to the Wind-Down Fund to the extent permitted below): first, to the outstanding principal balance of the Sublimit Loans and, second, to the outstanding principal balance of the Roll-up DIP Obligations. The Loan Parties shall deliver to DIP Agent (i) on the business day immediately following each Excess Cash Payment Date or if no Excess Cash Payment is required to be paid in any calendar week, then on Wednesday of such calendar week, evidence of: (1) the Borrowers' book balance as of the Measuring Day in such calendar week, which shall include all receipts and disbursements received and made during such immediately preceding week; and (2) any Excess Cash Payments required to be delivered to DIP Agent on the Excess Cash Payment Date during such week, if any. For the avoidance of doubt, the Loan Parties only need to report cash in excess of the Maximum Cash Amount and remit Excess Cash Payments once a week based on the Borrowers' book balances on the Measuring Day of each week. |
| **Collateral and Priority** *Bankruptcy Rule 4001(c)(1)(B)(ii); Local Rule 4001-2(a)(4)* Term Sheet pp. 8-9 | To secure the DIP Credit Facility and advances made by DIP Agent and DIP Lenders to Borrowers and the obligations of Borrowers and Guarantor to DIP Agent and DIP Lenders, DIP Agent, on its behalf and on behalf of the DIP Lenders, will receive a duly-perfected, first-priority security interest in, and priming lien on, all of the existing and after-acquired (pre-petition and post-petition) tangible and intangible assets of Borrowers and Guarantor (collectively, the "DIP Collateral") subject to mutually acceptable permitted liens ("Permitted Liens"), including, without limitation, accounts receivable, inventory, machinery, equipment, real estate, general intangibles and all claims that the Loan Parties have or may have against any person or entity, including, without limitation, claims pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code. All obligations of Borrowers under the DIP Credit Facility and Guarantor under the DIP Guaranties, including, without limitation, all DIP Loans, all interest and fees in connection therewith and all other indebtedness, obligations and liabilities of Borrowers and Guarantor to DIP Agent and DIP Lenders (collectively, the "DIP Obligations") shall be (a) secured: (i) pursuant to section 364(d) of the Bankruptcy Code, by a first-priority, senior priming perfected lien on, and security interest in, all property of Borrowers and Guarantor, subject only to Permitted Liens; and (ii) pursuant to section 364(c) of the Bankruptcy Code, by a first-priority, perfected lien on, and security interest in, all property of Borrowers and Guarantor that is not subject to any valid, duly-perfected lien of any party (such liens and security interests, collectively, the "DIP Liens"); and (b) accorded priority under section 364(c) of the Bankruptcy Code over any and all administrative expenses of the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code. The foregoing notwithstanding, however, the security shall be subject to a carve-out for the U.S. Trustee's fees and professional fees of Loan Parties' professionals and professionals retained by a statutory committee, if any, in an amount and subject to procedures acceptable to Borrowers, DIP Agent and DIP Lenders. The DIP Liens on the DIP Collateral of Borrowers and Guarantor shall be effective and perfected as of the entry of the Interim Order and without necessity of the execution, filing or recording of mortgages, security agreements, pledge agreements, control agreements, financing statements or other agreements. However, the Agent may, in its discretion, require the execution, filing or recording of any or all of the documents described in the preceding sentence. |
| **Adequate Protection** *Bankruptcy Rule 4001(c)(i)(B)(v); Local Rule 4001-* | TBD |

| CONCISE STATEMENT OF MATERIAL TERMS OF THE DIP CREDIT FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[4] | |
|---|---|
| **TERM** | **DESCRIPTION** |
| *2(a)(5)* | |
| **Indemnification of any Entity** *Bankruptcy Rule 4001(c)(1)(B)(ix)* <br><br> Term Sheet p.20 | Other than for acts of gross negligence, fraud or willful misconduct by the indemnified parties herein, Borrowers and Guarantor agree to indemnify Agent, DIP Agent, Lenders and DIP Lenders, their respective directors, managers officers, employees, agents, auditors, accountants, appraisers, consultants, counsel and affiliates from, and agree to hold each of them harmless against, any and all losses, liabilities, claims, damages or expenses including amounts paid in settlement, incurred by any of them arising out of or by reason of any investigation, litigation or other proceeding brought or threatened by any third party relating to any loan made or proposed to be made, or any other transaction contemplated, hereunder. |
| **Carve-Out** *Local Rule 4001-2(a)(5)* <br><br> Term Sheet p.9 | The security for the DIP Credit Facility shall be subject to a carve-out for the U.S. Trustee's fees and professional fees of Loan Parties' professionals and professionals retained by a statutory committee, if any, in an amount and subject to procedures acceptable to Borrowers, DIP Agent and DIP Lenders. |
| **Conditions to Closing** *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2),2(h)* <br><br> Term Sheet pp. 17-19 | The DIP Loan Documents will contain customary conditions for financings of this type and other conditions deemed by DIP Agent and DIP Lenders in their discretion to be appropriate, and in any event including, without limitation, the following: <br><br> (1) The DIP Loan Documents shall be in form and substance satisfactory to DIP Agent and DIP Lenders and their counsel in their sole discretion; <br><br> (2) DIP Agent shall have received an initial 13-week cash flow setting forth all forecasted receipts and disbursements on a weekly basis for the 13-week period beginning the week of the Petition Date, broken down by week, including the anticipated weekly uses of the proceeds of the DIP Credit Facility for such period, which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and capital expenditures, fees and expenses relating to the DIP Credit Facility, fees and expenses related to the Bankruptcy Case, and working capital and other general corporate needs, which forecast shall be in form and substance satisfactory to DIP Agent in its sole discretion and acceptable to Borrowers and Guarantor (the "Initial DIP Budget" and together with the Updated DIP Budget, the "Budget"); <br><br> (3) DIP Agent shall have received a key employee incentive program for the Loan Parties and their Subsidiaries, which shall be in form and substance satisfactory to DIP Agent in its sole discretion (the "KEIP"), and the Loan Parties shall have filed with their first day motions a motion for an order approving the KEIP; <br><br> (4) All first day motions filed by the Loan Parties and related orders entered by the Bankruptcy Court in the Bankruptcy Case, if not related to the DIP Credit Facility, shall be in form and substance reasonably satisfactory to DIP Agent; <br><br> (5) The Bankruptcy Court shall have entered the Interim Order within five (5) business days following the Petition Date, in form and substance satisfactory to the DIP Agent; provided however that a reasonable delay due to the Bankruptcy Court's schedule as a result of the December holidays shall be permissible; <br><br> (6) DIP Agent, for the benefit of DIP Lenders, shall have a valid and perfected lien on, and security interest in, the DIP Collateral on the basis and with the priority set forth herein; and <br><br> (7) Release of claims in favor of Pre-petition Agent, Pre-petition L/C Issuer, Pre-petition Lenders, DIP Agent and DIP Lenders, including, without limitation, any claims pursuant to |

| CONCISE STATEMENT OF MATERIAL TERMS OF THE DIP CREDIT FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[4] | |
|---|---|
| **TERM** | **DESCRIPTION** |
|  | or arising under sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code. |
|  | In addition to the satisfaction of the conditions on the Closing, the DIP Credit Agreement will contain additional conditions for each incurrence of DIP Loans customary for financings of this type, including, without limitation, the following: |
|  | (1)   Immediately prior to and following the funding of any DIP Loan, there shall exist no event of default or any event that, with the passing of time or the giving of notice or both, would become an event of default under the DIP Loan Documents; |
|  | (2)   The representations and warranties of the Loan Parties in the DIP Loan Documents shall be true and correct in all material respects; |
|  | (3)   The making of such DIP Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently by any court of competent jurisdiction; |
|  | (4)   There shall have occurred no material adverse effect (as defined and agreed to by Borrowers, DIP Agent and DIP Lenders); and |
|  | (5)   The Interim Order (with respect to DIP Loans made prior to entry of the Final Order) or the Final Order, as the case may be, shall be in full force and effect and shall not have been reversed, vacated or stayed. |
| **Covenants**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(8)*<br><br>Term Sheet pp. 9-11 | **Reporting:**<br><br>Daily: Each Measuring Day, the Loan Parties shall deliver to DIP Agent a report of the Loan Parties daily cash balance as of the immediately preceding Business Day, as detailed in the "Mandatory Prepayments" section above with respect to the Excess Cash Payments.<br><br>Weekly: Borrowers shall deliver to the DIP Agent on Wednesday of each calendar week (for the immediately preceding calendar week) a report documenting and detailing:<br><br>(1)  all cash receipts by the Loan Parties;<br><br>(2)  all payments and disbursements made by the Loan Parties;<br><br>(3)  an updated weekly actual performance compared to the Budget on both an aggregate basis and a line-item by line-item basis (each particular line-item set forth on the Budget being referred to herein as a "Budgeted Item"), stating all variances and providing a narrative discussion and analysis by management with respect to any and all variances;<br><br>(4)  the number of employees employed by the Loan Parties, any third party on any Loan Party's behalf, or otherwise for the benefit of the Loan Parties; and<br><br>(5)  the number of Leased Locations (as defined below).<br><br>Other:   The Loan Parties shall deliver internally prepared monthly consolidated unaudited financial statements within 30 days of the end of each calendar month.<br><br>All reports and financial statements to be in form and scope acceptable to DIP Agent and DIP Lenders, and, as applicable, compared to Budget and prior comparable period.  In |

| CONCISE STATEMENT OF MATERIAL TERMS OF THE DIP CREDIT FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[4] | |
|---|---|
| **TERM** | **DESCRIPTION** |
| | addition, DIP Agent may require such other daily, weekly and monthly reporting of information that any of them deems necessary.<br><br>**Budget Reporting:**<br><br>Borrowers shall deliver to DIP Agent and DIP Lenders every four weeks an updated 13-week cash flow forecast in form and detail substantially similar to the Initial Budget each of which Budget shall be approved by DIP Agent in writing (each an "Updated Budget"; the Initial Budget and each Updated Budget, the "Budgets" and individually as a "Budget"). The initial four week period of the Initial Budget and Updated Budgets shall constitute a Test Period.<br><br>**Financial Covenants:**<br><br>Excess Cash. As detailed in the "Mandatory Prepayments" section above, the Loan Parties shall remit weekly on the next business day following the Measurement Day of the week the Excess Cash Payment. Any cash on hand held by Borrowers (subject to the cap in the immediately preceding sentence) shall not impair or otherwise reduce Borrowers' ability to borrow up to the full Sublimit amount, subject to compliance with the applicable conditions to borrowing.<br><br>Budget Variances. Borrowers and Guarantor shall comply with the Budget. Borrowers and Guarantor shall be deemed to be in compliance with the Budget so long as:<br><br>(1)    cash receipts are not less than the cash receipts projected in the Budget for any Test Period, tested every four weeks; provided that there shall be an allowed 12% variance to the aggregate amount of cash receipts scheduled to be received during any Test Period as set forth in the Budget for such Test Period; and<br><br>(2)    cash disbursements (on a Budgeted Item basis) to not exceed the cash disbursements projected in the Budget for any Test Period; provided that there shall be an allowed variance of the greater of 10% and $10,000 for the amount of disbursements for each Budgeted Item scheduled to be made during any Test Period as set forth in the Budget for such Test Period. For the avoidance of doubt, Borrowers' failure to timely make any and all payments to DIP Agent and DIP Lenders required under the DIP Loan Documents and the Budget (including, without limitation, any and all mandatory prepayments), shall not be subject to any variance but shall constitute an event of default under the DIP Loan Documents. |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001- 2(a)(10)*<br><br>Term Sheet pp. 12-14 | The Loan Parties shall be in default upon, among other defaults customary for financings of this type, the following, subject to a reasonable notice and cure periods agreeable to Borrowers, DIP Agent and DIP Lenders:<br><br>o      The violation of any provision of any DIP Loan Document or the Interim Order or the Final Order (as applicable);<br><br>o      Any change in control of any Loan Party, with the definition of "change in control" to be mutually agreeable to Borrowers, DIP Agent and DIP Lenders;<br><br>o      The filing of an adversary proceeding by any party in interest against DIP Agent, any DIP Lender, Pre-petition Agent, Pre-petition L/C Issuer, any Pre-petition Lender or any of their respective interests for any reason;<br><br>o      The payment of any advertising costs or expenses or any other disbursements |

| CONCISE STATEMENT OF MATERIAL TERMS OF THE DIP CREDIT FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[4] | |
|---|---|
| **TERM** | **DESCRIPTION** |
| | relating to or constituting advertising, excluding any amounts paid pursuant to existing case referral programs or practices; |
| | o     the filing of a motion to sell substantially all of the Loan Parties' assets, so as to constitute the Borrowers' business, that does not provide for the indefeasible payment of the DIP Obligations in full, in cash on the sale closing date, except with respect to de minimis assets to the extent contemplated in the Budget; |
| | o     the lapse or termination of Loan Parties' exclusive periods to file and solicit a plan pursuant to section 1121 of the Bankruptcy Code; |
| | o     the filing of a plan by the Loan Parties that does not provide for the indefeasible payment of the DIP Obligations in full pursuant to the terms of such plan as agreed to by Borrowers, DIP Agent and DIP Lenders, and which plan shall otherwise be satisfactory to DIP Agent and Borrowers; |
| | o     the entry of an order appointing a trustee or an examiner; |
| | o     the automatic stay is lifted as to any party in order to permit foreclosure on a material portion of the DIP Collateral (e.g., $75,000 per quarter); provided that a claim under a Loan Parties' insurance policy will not be deemed to be a foreclosure of DIP Collateral, without the prior written consent of DIP Agent; |
| | o     entry of an order by a court of competent jurisdiction amending, supplementing, or otherwise modifying the Interim Order or the Final order without DIP Agent's prior written consent; |
| | o     the filing of any motion or other pleading by any committee or by any one or more of the Loan Parties seeking, or otherwise consenting to, any of the matters set forth in above; |
| | o     any default under any guaranty or any other document, instrument or agreement executed or delivered by Guarantor or any other guarantor; or |
| | o     such other defaults determined by DIP Agent and DIP Lenders and agreeable to the Borrowers. |
| **Change of Control** *Local Rule 4001-2(a)(11)* Term Sheet p.12 | Change in control is an event of default. |
| **Deadline or Requirement for Sale of Property** *Local Rule 4001-2(a)(12)* | Not applicable. |
| **Restrictions on Funding Certain Activities** *Local Rule 4001-2(a)(9)* | TBD |
| **Funding of Non-Debtor Affiliates** | Not applicable. |

| CONCISE STATEMENT OF MATERIAL TERMS OF THE DIP CREDIT FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[4] | |
|---|---|
| **TERM** | **DESCRIPTION** |
| **with Cash Collateral or Loan** <br> *Local Rule 4001-2(a)(15)* | |
| **Automatic Stay** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* <br><br> Term Sheet p.16 | The DIP Credit Agreement will contain remedies following the occurrence of a default or "termination event" that are customary for financings of this type and in any event will include, without limitation, the following: <br><br> •     Enforcement of liens on the DIP Collateral; <br><br> •     Offsetting of amounts on deposit in the Loan Parties' deposit accounts; <br><br> •     Ability to apply for the appointment of a receiver by any court of competent jurisdiction, to which the Loan Parties shall not object or contest; and <br><br> •     Lifting of automatic stay as to DIP Agent and DIP Lenders subject to a notice period agreeable to Borrowers, DIP Agent and DIP Lenders. |

## RELIEF REQUESTED

14.    By this Motion, the Debtors request (a) entry of the Interim Order, (i) approving the DIP Financing, (ii) authorizing the Debtors to use the Cash Collateral, (iii) authorizing the Debtors to provide adequate protection for the use of the Cash Collateral, (iv) modifying the automatic stay, and (v) scheduling the Final Hearing; and (b) following the Final Hearing, entry of an order granting the relief requested herein on a final basis.

## BASIS FOR RELIEF

15.    The Court should approve the DIP Credit Facility and authorize the Debtors to use Cash Collateral on the terms set forth herein and in the DIP Term Sheet (and, once finalized, the DIP Credit Agreement and DIP Orders) because (a) the Debtors are unable to obtain financing on an unsecured, administrative priority basis; (b) the terms of the DIP Credit Facility are on par with market terms for similar debtors; and (c) approval of the DIP Credit Facility and authorization to use Cash Collateral are in the best interests of the Debtors' estates and all of the stakeholders in the Chapter 11 Cases.

I.    **THE PREPETITION LENDERS HAVE CONDITIONALLY CONSENTED TO THE DEBTORS' USE OF CASH COLLATERAL.**

16.    A chapter 11 debtor may not use cash collateral unless "(A) each entity that has an interest in such collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  The Debtors require the use of Cash Collateral to fund their operations.  In the absence of the immediate authorization to use Cash Collateral, the Debtors' ability to continue operating in the ordinary course of business will be jeopardized and the failure to do so would no doubt result in immediate and irreparable harm to the Debtors' estates, claimants, employees, and all other stakeholders by virtue of the loss of significant going-concern value.  Thus, the Debtors' immediate use of Cash Collateral is essential in order to enable the Debtors to meet the obligations of their ordinary operating costs and expenses during the pendency of the Chapter 11 Cases.  Among other things, the use of Cash Collateral will enable the Debtors to maintain business relationships with their vendors and claimants, pay their employees, and satisfy other ordinary operational costs that are essential to preserve estate value by continuing to operate their business in the ordinary course.

17.    In connection with their entry into the DIP Credit Facility, U.S. Bank and Capital One (in their capacity as postpetition lenders, the "DIP Lenders") have proposed, subject to final documentation, to consent to the Debtors' use of the Cash Collateral, subject to the limitations set forth in the DIP Term Sheet.  The Debtors anticipate that the DIP Lenders' consent to the Debtors' use of Cash Collateral will be conditioned upon the granting of adequate protection.  As discussed below, the Debtors propose to provide the Prepetition Lenders with adequate protection with respect to the use of the Cash Collateral.  Accordingly, the Court should

authorize the Debtors to use Cash Collateral on the terms set forth in the DIP Term Sheet (and, once finalized, the DIP Credit Agreement and DIP Orders).

## II.      THE PROPOSED ADEQUATE PROTECTION IS APPROPRIATE.

18.      Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Permissible forms of adequate protection include periodic cash payments, additional liens, replacement liens, and other forms of relief.  11 U.S.C. § 361.  The purpose of adequate protection is to protect a secured creditor from diminution in the value of its property interest in its collateral during the period of use, sale, or lease.  In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); see also Delbridge v. Production Credit Assoc. and Fed. Land Bank, 104 B.R. 824, 827-28 (E.D. Mich. 1989); In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990).  The appropriate form of adequate protection must be determined on a case-by-case basis.  See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472, 474 (8th Cir. 1985).

19.      Pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, the Prepetition Lenders are entitled to adequate protection of their interests in their respective Prepetition Collateral, including the Cash Collateral, for and equal in amount to the aggregate diminution in the value (each such diminution, a "Diminution in Value") of their security interests in the Prepetition Collateral as a result of, among other things, the Debtors' sale, lease, or use thereof and the imposition of the automatic stay.

20.      The Prepetition Lenders have proposed to consent to the Debtors' use of Cash Collateral.  As adequate protection, the Debtors propose to grant to the Prepetition Lenders the

following liens, claims, and other protections, solely to the extent of any Diminution in Value

and subject, in each instance, to the Carve-Out (collectively, the "Adequate Protection"):[5]

> (a)     the Prepetition Lenders shall have valid, perfected, enforceable replacement liens on the DIP Collateral, subject only to the DIP Liens and the Carve-Out (the "Adequate Protection Liens"); and
>
> (b)     the Prepetition Lenders shall have a superpriority administrative expense claim, senior in priority to all other administrative expense claims and subject only to the Carve-Out (the "Adequate Protection Administrative Claims").

21.     The Prepetition Lenders have proposed to consent to the Debtors' use of Cash

Collateral.  The Debtors respectfully submit that the Adequate Protection will sufficiently protect

the Prepetition Lenders' interests in the Prepetition Collateral from any Diminution in Value and

should be approved.

## III.     THE DIP FINANCING SHOULD BE APPROVED.

22.     Approval of the DIP Credit Facility is needed to provide the Debtors with

immediate and ongoing access to liquidity to pay their current and ongoing operating expenses,

including postpetition (and, to the extent unpaid on the Petition Date and authorized by the

Court, prepetition) wages and salaries, taxes, vendor obligations, and other operational costs such

as rent and utilities.   The inability to access postpetition liquidity would bring the Debtors'

operations – and the tens of thousands of claimants' cases currently pending – to an immediate

halt, to the severe detriment of the Debtors' estates, claimants, creditors, employees, and all other

stakeholders.   The funding to be provided by the DIP Credit Facility and the use of Cash

Collateral will enable the Debtors to continue to service claimants and resolve cases, pay

employees and vendors, and otherwise seamlessly operate their business in the ordinary course

---

[5]     The description of the Adequate Protection in this section is intended only as a summary.   Parties are encouraged to review the DIP Credit Agreement and DIP Orders in full for the complete terms of the Adequate Protection.

during the Chapter 11 Cases, thereby preserving and enhancing the value of their estates for the benefit of all stakeholders.

23.     Most crucially, the liquidity provided by the DIP Credit Facility will provide confidence to the Debtors' employees, whose services are essential to the Debtors' business, and to the tens of thousands of claimants they serve.  Absent the ability to pay employees in the ordinary course of business, the Debtors would face the prospect of wholesale attrition of the very personnel responsible for performing the services that produce the Debtors' cash flow. Such a scenario would likely force the Chapter 11 Cases into immediate dismissal or conversion, destroying estate value and causing severe prejudice to claimants whose cases would be disrupted.  Accordingly, the Debtors submit that the DIP Credit Facility is essential to preserve estate value for the benefit of all stakeholders.

**B.      The proposed liens and superpriority administrative expense claims are appropriate.**

24.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).  Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.  11 U.S.C. § 364(d).   The Debtors propose to obtain financing

under the DIP Credit Facility by providing the DIP Lenders, inter alia, superpriority claims and security interests pursuant to sections 364(c)(1)–(3) and 364(d) of the Bankruptcy Code.

25.    The Debtors' liquidity needs can be satisfied only if the Debtors are immediately authorized to obtain postpetition financing on an interim basis under the DIP Credit Facility to fund their operations.    Despite their best efforts, the Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1) or as an administrative expense under sections 364(a) or (b) of the Bankruptcy Code.  See 11 U.S.C. §§ 503(b)(1), 364(a)-(b).  The Debtors have not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

26.    Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with several parties, including the DIP Lenders, extensively, in good faith, and at arms'-length.  Provided that a debtor's judgment in choosing its postpetition financing does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. See, e.g., In re Barbara K. Enters., Inc., Case No. 08-11474, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y., June 16, 2008);  In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest"); see also Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Berry Good, LLC, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008).

27.     Section 364(d) of the Bankruptcy Code does not require a debtor to seek alternative financing from every possible lender; rather, the debtor need only demonstrate that it undertook sufficient efforts to obtain financing without the need to grant a senior lien.  In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 n. 44 (Bankr. S.D.N.Y. 2010) (noting that courts require only a showing of "reasonable effort" to obtain alternative credit with lesser security); In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position"); see also Snowshoe Co., 789 F.2d at 1088 (unsuccessful contact with other financial institutions in the geographic area was sufficient to demonstrate that credit was unavailable absent senior lien).

28.     The Prepetition Collateral is encumbered in its entirety by the existing Prepetition Liens.  The Debtors, despite reasonable efforts, have been unable to procure alternative postpetition financing absent the proposed superpriority claims and DIP Liens.  The Debtors respectfully submit that because the circumstances of these cases require the Debtors to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, their entry into the DIP Financing reflects an exercise of their sound business judgment.  11 U.S.C. § 364(c)-(d).

29.     Moreover, based upon the Debtors' current asset valuation, the Debtors believe that the DIP Credit Facility will be oversecured post-closing.  Consummation of the DIP Credit Facility is in the best interest of the Debtors' estates, their employees, claimants, and creditors, and all other parties-in-interest in these Chapter 11 Cases and is consistent with the Debtors' exercise of their business judgment and fiduciary duty.  Accordingly, the DIP Lenders and all obligations incurred under the DIP Credit Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.  11 U.S.C. § 364(e).

**C.     The repayment of a portion of the Prepetition Facility with the proceeds of the DIP Credit Facility is appropriate.**

30.     The terms and conditions of the DIP Credit Facility are fair and reasonable, and were negotiated extensively and at arms' length between the Debtors and the DIP Lenders.  As additional consideration for entering into the DIP Credit Facility, the DIP Lenders have required that approximately $23,048,233 of the proceeds of the DIP Credit Facility be used to repay the Debtors' obligations under the Prepetition Facility upon entry of the Interim Order.

31.     Similar financings have been approved under interim DIP financing orders in many other cases in this District.  See, e.g., In re St. Vincents Catholic Med. Ctrs., 2010 Bankr. LEXIS 6178, *6 (Bankr. S.D.N.Y. Apr. 16, 2010); In re Uno Restaurant Holdings Corp., Case No. 10-10209 (MG) (Bankr. S.D.N.Y. Jan. 20, 2010) [D.I. 40]; In re Tronox Inc., Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Jan. 12, 2009); In re Lyondell Chemical Co., Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) [D.I. 79].  The Debtors submit that because the repayment of their obligations under the Prepetition Facilities with the proceeds of the DIP Credit Facility is a condition to obtaining the DIP Credit Facility, such payment is necessary and appropriate under the circumstances of these Chapter 11 Cases.  Accordingly, the Debtors respectfully request that the Court authorize them, on an interim basis, to utilize $23,048,233 of the proceeds of the DIP Credit Facility to repay amounts owing under the Prepetition Facility, subject to the Court's right to unwind such payments after notice and a hearing pursuant to Local Rule 4001-2(k)(3).

**IV.     THE AUTOMATIC STAY SHOULD BE MODIFIED ON A LIMITED BASIS.**

32.     A limited modification of the automatic stay is necessary to (i) permit the Debtors to grant the security interests, liens, and superpriority claims described above with respect to the DIP Lenders and the Prepetition Lenders; (ii) permit the Debtors and the DIP Lenders to take

such actions as may be necessary to ensure the perfection and priority thereof; (iii) permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an event of default under the definitive documentation for the DIP Credit Facility, after the expiration of the applicable grace period (if any), or the occurrence of a termination event under the documentation for the DIP Credit Facility, (a) certain immediate remedies, as further detailed in the DIP Term Sheet, with respect to the DIP Credit Facility and (b) certain other remedies under the DIP Credit Agreement, DIP Orders, and other documents governing the DIP Credit Facility, after giving a Carve-Out Trigger Notice in accordance with the Interim Order; and (iv) implement the terms of the proposed DIP Orders immediately.  Stay modifications of this kind are ordinary and standard features of postpetition debtor-in-possession financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances.  Accordingly, in conjunction with approval of the DIP Credit Facility, the Debtors respectfully request that the Court modify the automatic stay as set forth herein.

## <u>REQUEST FOR INTERIM APPROVAL</u>

33.     Bankruptcy Rule 4001 provides that final hearings on motions to use cash collateral or obtain post-petition financing may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on such motions and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

34.     Pursuant to Bankruptcy Rule 4001, the Debtors request that the Court conduct an expedited preliminary hearing on the Motion and on an interim basis (i) authorize the Debtors to use the Cash Collateral of the Prepetition Lenders and (ii) approve the DIP Financing, in order to (a) maintain and finance the ongoing operations of the Debtors in the ordinary course of business

during the pendency of the Chapter 11 Cases and (b) avoid immediate and irreparable harm and prejudice to the Debtors' estates, all parties in interest, and the public. Furthermore, the Debtors request that the Court schedule the Final Hearing on the relief requested herein.

35.     Absent authorization from the Court to use Cash Collateral and access the DIP Financing on an interim basis pending a Final Hearing, the Debtors will be immediately and irreparably be harmed as a result of an inability to operate their business in the ordinary course. Without the liquidity provided by the use of Cash Collateral and the DIP Financing, the Debtors' businesses will be brought to an immediate halt leading to the loss of significant value and the Debtors' ability to maintain business relationships with their vendors, suppliers, and patients and to meet payroll and other operating expenses will be compromised. In short, serious, immediate and irreparable harm to the Debtors and their estates would occur, with disastrous consequences for the Debtors, their estates, and creditors, if the Debtors do not obtain the immediate relief requested herein.

## REQUEST FOR FINAL HEARING

36.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable but within approximately thirty (30) days of the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

## REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

37.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Pursuant to Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth

above, the proposed granting of Adequate Protection Liens and the Adequate Protection Superpriority Claim is essential to prevent potentially irreparable damage to the Debtors' operations, value, and ability to reorganize. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## **NOTICE**

38.     Notice of this Motion has been given to (i) Counsel to Capital One Bank, N.A., McCarter & English, LLP, Four Gateway Center, 100 Mulberry St., Newark, New Jersey 07102, Attn: Joseph Lubertazzi, Jr. (jlubertazzi@mccarter.com); (ii) Counsel to US Bank National Association, Katten Muchin Rosenman LLP, 525 West Monroe Street, Chicago, Illinois 60661, Attn: Kenneth J. Ottaviano (kenneth.ottaviano@kattenlaw.com); (iii) Stellus Capital Investment Corporation, Moore & Van Allen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202, Attn: Stephen E. Gruendel (stevegruendel@mvalaw.com); (iv) AON Risk Services – Jacksonville, 13901 Sutton Park Drive S, STE 300, Jacksonville, Florida 32224; (v) AFCO Credit Corporation, 14 Wall Street, Suite 8A-19, New York, New York 10005; (vi) the Debtors' twenty largest unsecured creditors; (vii) the Office of the United States Trustee for the Southern District of New York; (viii) the Internal Revenue Service; and (ix) those parties who have filed a notice of appearance and request for service of pleadings in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

*[ signature page follows ]*

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order and, following the Final Hearing, entry of a Final Order.


Dated:  December 19, 2014


Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

 */s/ Kenneth A. Rosen*
Kenneth A. Rosen, Esq.
Nicholas B. Vislocky, Esq.
1251 Avenue of the Americas, 17th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors*
*and Debtors-in Possession*