**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Nicholas B. Vislocky, Esq.
1251 Avenue of the Americas, 17th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Binder & Binder – The National Social Security Disability Advocates (NY), LLC, *et al.*,[1] | Case No. 14-23728 (RDD) |
| | (Joint Administration Requested) |
| Debtors. | |

## DECLARATION OF WILLIAM A. BRANDT, JR. PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

William A. Brandt, Jr. declares as follows, pursuant to 28 U.S.C. § 1746:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: (1) Binder & Binder - The National Social Security Disability Advocates (NY), LLC (1450); (2) SSDI Holdings, Inc. (3038); (3) Binder & Binder - The National Social Security Disability Advocates LLC (8580); (4) The Rep for Vets LLC (6421); (5) National Veterans Disability Advocates LLC (dba The Rep for Vets LLC) (7468); (6) The Social Security Express Ltd. (4960); (7) Binder & Binder - The National Social Security Disability Advocates (AZ), LLC (5887); (8) Binder & Binder - The National Social Security Disability Advocates (CA), LLC (1456); (9) Binder & Binder - The National Social Security Disability Advocates (CO), LLC (0945); (10) Binder & Binder - The National Social Security Disability Advocates (CT), LLC (0206); (11) Binder & Binder - The National Social Security Disability Advocates (FL), LLC (1455); (12) Binder & Binder - The National Social Security Disability Advocates (GA), LLC (4768);   (13) Binder & Binder - The National Social Security Disability Advocates (IL), LLC (1457); (14) Binder & Binder - The National Social Security Disability Advocates (MD), LLC (3760); (15) Binder & Binder - The National Social Security Disability Advocates (MO), LLC (2108); (16) Binder & Binder - The National Social Security Disability Advocates (NJ), LLC (1454); (17) Binder & Binder - The National Social Security Disability Advocates (NC), LLC (1460); (18) Binder & Binder - The National Social Security Disability Advocates (OH), LLC (7827); (19) Binder & Binder - The National Social Security Disability Advocates (PA), LLC (1453); (20) Binder & Binder - The National Social Security Disability Advocates (TX), LLC (1458); (21) Binder & Binder - The National Social Security Disability Advocates VA, LLC (7875); (22) Binder & Binder - The National Social Security Disability Advocates (WA), LLC (0225); (23) Binder & Binder - The National Social Security Disability Advocates (LA), LLC (8426); (24) Binder & Binder - The National Social Security Disability Advocates (MI), LLC (8762); and (25) Binder & Binder - The National Social Security Disability Advocates (DC), LLC (5265); (together, the "Debtors").

1.      I am the Chief Restructuring Officer (the "CRO") of Binder & Binder – The National Social Security Disability Advocates, LLC and certain of its affiliates and subsidiaries (collectively, the "Debtors" or the "Company").  The Debtors' corporate headquarters are located at 300 Rabro Drive East, Hauppauge, New York, 11788.  I am authorized to submit this Declaration on behalf of the Debtors, and if called upon, I could and would testify competently to the facts set forth herein.

2.      I am the President and Chief Executive Officer of Development Specialists, Inc. ("DSI"), a firm specializing in the provision of management, consulting, and turnaround assistance to troubled or reorganizing enterprises.  Since July 22, 2014, DSI has provided financial and operational consulting services to the Company.  Since that time, I have met with the Company's senior management on multiple occasions, consulted with the Company's legal and financial advisors, familiarized myself with the Company's books and records, and reviewed numerous documents maintained by the Company.  I was formally appointed by the Company's Board of Directors (the "Board") to serve as the Company's CRO on September 26, 2014.    As such, I am familiar with the Company's business and financial affairs.  Together with the other members of the Company's senior management team, I am responsible for, among other things, devising and implementing strategies for the Company, including: (i) understanding and shaping the business and financial affairs of the Company; (ii) developing a cash flow analysis and assessing the current liquidity position of the Company; (iii) exploring and implementing various restructuring strategies for the Company; and (iv) serving as a principal contact with the Company's creditors and vendors.

3.      I submit this declaration (the "Declaration") in accordance with Rule 1007-2(a) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") in

support of the Debtors' voluntary petitions for relief under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and the motions and applications filed concurrently herewith (collectively, the "First Day Motions").

4.      I have reviewed the First Day Motions or have otherwise had their contents explained to me by the Company's legal and/or financial advisors.  To the best of my knowledge, information, and belief formed after reasonable inquiry, and as set forth more fully below, I believe that approval of the relief requested in the First Day Pleadings is necessary to minimize disruption to the Debtors' business operations, permit a smooth and effective transition into chapter 11, and preserve and maximize the value of the Debtors' estates.  I also believe that absent immediate access to financing and authority to make certain essential payments and otherwise continue operating their business in the ordinary course, as described in greater detail in the First Day Motions, the Debtors would suffer immediate and irreparable harm to the detriment of their estates, creditors, and other stakeholders – including approximately 973 employees and the claimants in over 57,000 active cases.

5.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' business operations, my review of relevant documents, information provided to me or verified by other managers or employees or the Debtors' professional advisors, including Lowenstein Sandler LLP ("Lowenstein Sandler") and other personnel of DSI, my opinion based upon my experience, and/or my personal knowledge of the Debtors' business records.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.

6.      The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the Petition Date, no request has been made for the appointment of a trustee or examiner, and no official committee has been appointed by the Office of the United States Trustee.

## **INTRODUCTION**

7.      In order to enable the Debtors to minimize the adverse effects of the commencement of these Chapter 11 Cases on their business and to ensure there is no disruption in the Debtors' ability to continue to manage more than 57,000 active cases on behalf of disability claimants, , the Debtors have requested various types of relief in the First Day Motions. The First Day Motions seek relief intended to, among other things, (a) ensure the Debtors' ability to continue their representation of disability claimants; (b) maintain vendor confidence and employee morale; (c) ensure the continuation of the Debtors' cash management systems and other business operations; (d) secure the necessary postpetition liquidity necessary to fund the Debtors' operations; and (e) establish procedures to streamline routine tasks in the administration of these Chapter 11 Cases.  The relief sought in the First Day Motions is critical to the success of these Chapter 11 Cases.

8.      Part I of this Declaration sets forth the information required by Rule 1007-2(a)(1) of the Local Rules regarding the nature of the Debtors and their businesses and a concise statement of the circumstances leading to the commencement of these Chapter 11 Cases.  Several schedules are attached to this Declaration, which provide additional information required by Local Rule 1007-2(a).

9.      Part II of this Declaration describes the relief requested in the First Day Motions. I have read, and certify the contents of, each First Day Motion and believe that the relief sought

therein (i) is necessary to preserve and maximize the value and productivity of the Debtors' operations, (ii) is integral to the successful reorganization of the Debtors, (iii) serves the best interests of the Debtors and their estates, clients, employees, creditors, and other stakeholders, and (iv) with respect to all non-administrative matters, is necessary to avoid immediate and irreparable harm.

## PART I

**A.    Overview and Nature of the Debtors' Business**

10.    Founded in 1979 by brothers Harry and Charles Binder, Binder & Binder – The National Social Security Disability Advocates, LLC and its subsidiaries are the nation's largest provider of social security disability and veterans' benefits advocacy services, with operating scale and efficiencies unrivaled by its competitors in the highly fragmented advocacy market. While most other advocacy firms outsource or refer cases that are not in their core region, the Debtors  leverage their national footprint to service all of their cases in-house and provide the same level of advocacy expertise regardless of where a client is located.

11.    The Company has 40 years of experience helping disabled individuals obtain disability benefits through programs administered by the Social Security Administration ("SSA") as well as helping veterans apply for disability and related benefits through programs administered by the Department of Veterans Affairs (the "VA").  There are two primary programs through which the SSA provides disability benefits: the Social Security Disability Insurance Program and the Supplemental Security Income Program.  Each of these programs provides monthly benefits to disabled workers and their spouses, children, and survivors.  In addition, the VA provides benefits for U.S. Armed Forces veterans with disabilities resulting from diseases or injuries incurred or aggravated during active military service (and some disabilities that arise post-service) through its Veterans Affairs Disability Benefits Program.

Since 1979, the Company has handled over 300,000 disability cases under programs operated by the SSA ("SSA Cases") and the VA ("VA Cases" and collectively with SSA Cases, "SSA/VA Cases")

12.     In 2010, H.I.G. Capital, LLC ("HIG") acquired a controlling equity interest in the Company.  In connection with the acquisition, the Debtors obtained secured financing in the approximate amount of $38 million.

13.     Currently, the Debtors employ approximately 973 employees in 35 offices across the United States.  This national footprint has allowed the Company to provide services for disability claimants nationwide.

14.     The Debtors' 973 employees are members of United Service Workers, IUJAT, Local 455 (the "Union").[2]  The Debtors and the Union are parties to two collective bargaining agreements dated October 1, 2012 (the "CBAs").[3]  The CBAs will expire by their terms on December 31, 2015.

15.     The Company is presently representing disability claimants in more than 57,000 active SSA/VA Cases.  Upon intake, each SSA/VA Case is assigned to an employee who serves as the advocate of record before the SSA or VA, as applicable (the "Advocate").

16.     In many instances, an Advocate's representation of a disability claimant seeking an award under an SSA program is a multi-phase process.  The first phase  involves the completion and compilation of forms, medical records, information releases, and a written explanation of the disability from a doctor ("Phase One" or the "Initial Application Phase").  The claimant's initial application is submitted for consideration to an SSA office and reviewed by an

---

[2] The principal office for the Union is located at 138-50 Queens Boulevard, Briarwood, New York 11435.
[3] For additional information related to the CBAs see the *Debtors' Motion for Entry of an Order Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Reimbursable Employee Expenses and Other Employee Compensation, (B) Honor Certain Employee Benefits and (C) Granting Related Relief* filed concurrently herewith.

examiner and medical expert. It may take from three to six months to receive a decision on the initial application. If the initial application is denied, the claimant may appeal and obtain a second review by a different examiner and medical expert. The reconsideration of the initial application can take, on average, three to five months. Upon a second denial of the initial application, the claimant enters the second phase of the process, the Hearing Phase. The claimant must appeal the denial on reconsideration to the SSA's Office of Disability Adjudication and Review, where an Administrative Law Judge hears the appeal ("Phase Two" or the "Hearing Phase"). The Hearing Phase consists of a formal hearing, submission of additional medical records in support of the claim, and a decision by the assigned Administrative Law Judge. While claimants in Phase Two can expect to wait up to thirteen months for a hearing and decision, on average, the historical success rate of cases in Phase Two is substantially higher than Phase One. This increase is likely attributable to the fact that many more claimants seek third-party representation in Phase Two after denial of their initial application. The SSA estimates that more than 85% of claimants choose to be represented by third-party advocates, such as the Debtors, after the denial of their initial application. The Debtors' success rate has historically been, and consistently remains, two to three times greater in the Hearing Phase than the Initial Application phase. The third and final phase at the SSA level is the appeal of a denial by the Administrative Law Judge to the Appeals Council ("Phase Three" or the "Appeals Council Phase"). The Appeals Council may find that the decision of the Administrative Law Judge should be affirmed, overturned, or remanded for reconsideration. A decision from the Appeals Council may take up to nine months on average. Where claimants are still denied benefits after appealing to the Appeals Council, their only remaining avenue for relief is by seeking judicial review in federal court. The Debtors do not represent claimants in the judicial

review process.  The Debtors have, however, established longstanding relationships with entities providing legal services for the prosecution of claimants' cases in federal court.

17.     The disability claims process is lengthy and arduous, with decisions at the Hearing phase taking up to two years, and over three years if judicial review is necessary.  Given the complexity of the SSA process, the length of time it may take to receive a final decision, and the increased probability of a final decision being favorable with third-party representation, the Debtors' services are, in many cases, essential to preserving disability claimants' livelihood.

18.     Pursuant to SSA and VA regulations, the Advocate is entitled to certain fees in connection with its successful adjudication of an assigned SSA/VA Case (the "SSA/VA Fees").  As a condition of employment by the Company, each Advocate has assigned to the Company its rights to any SSA/VA Fees earned in connection with the SSA/VA Cases.  The collection of SSA/VA Fees is the Debtors' primary source of revenue.  The Debtors do not collect any revenue on an SSA/VA Case until a favorable decision is issued.  As a result, the Debtors' cash flow is dependent in large part upon the speed with which the federal government considers and adjudicates the SSA/VA Cases.

19.     A number of factors have increased the delay between favorable decisions in SSA/VA Cases and the disbursement of the related SSA/VA Fees.  First, the federal sequestration and temporary shutdown in 2013, while temporary, were unexpected and detrimentally impacted the speed of case dispositions and payment of SSA/VA Fees, thus disrupting the Company's revenue stream and contributing to the Company's financial distress.  Second, more stringent standards in evaluating SSA/VA Cases in the earlier phases have negatively impactedthe speed of case disposition and payment of SSA/VA Fees.

20.     For fiscal year 2013, the Debtors generated approximately $83.7 million of revenue, of which approximately $83.4 million (99.68%) came from SSA/VA Fees.   The Debtors generate additional revenue, totaling approximately 0.32% of total revenue, from other services, including a co-branded debit card program with Esquire Bank for claimants who do not have bank accounts, and a lead generation service for providers of Medicare supplemental insurance programs.

**B.     Summary of the Debtors' Corporate Structure**

21.     SSDI Holdings, Inc. ("SSDI") is a privately held Delaware corporation owned by (a) HIG Binder, LLC, which holds 15,000 shares of Series A Preferred Stock, (b) Stellus Capital Investment Corporation, as successor-in-interest to D.E. Shaw Direct Capital Portfolios, L.L.C. Co., which holds 750 shares of Series A Preferred Stock, (c) Charles Binder, who holds 1,687.5 shares of Common Stock and 1,389.11 shares of Series B Preferred Stock, and (d) Harry Binder, who holds 5,062.5 shares of Common Stock and 4,167.82 shares of Series B Preferred Stock. SSDI is the sole member of Binder & Binder – The National Social Security Disability Advocates, LLC ("SSDA"), a Delaware limited liability company that in turn is the sole member of each of the remaining Debtors (collectively, the "SSDA Subsidiaries").

**C.     Summary of the Debtors' Prepetition Capital Structure**

*(i)     Secured Obligations*

22.     Pursuant to a Loan Agreement dated as of August 27, 2010 and the other loan, guaranty, and security documents related thereto, SSDA is the sole borrower under a prepetition senior secured financing facility (the "Prepetition Facility") consisting of a revolving credit facility in the maximum principal amount of $8 million (the "Prepetition Revolver") and a term loan in the original principal amount of $29 million (the "Prepetition Term Loan").   All other

Debtors, except for nine Debtors formed after the origination of the Prepetition Facility (the "Non-Guarantor Debtors"),[4] have guarantied SSDA's indebtedness under the Prepetition Facility (the Debtors other than SSDA and the Non-Guarantor Debtors are the "Guarantor Debtors").

23.    Capital One, N.A. and U.S. Bank National Association ("U.S. Bank") are the lenders under the Prepetition Facility.  U.S. Bank serves as administrative and collateral agent for the Prepetition Lenders.  As of the Petition Date, $6,499,733 was outstanding under the Prepetition Revolver and $16,548,500 was outstanding under the Prepetition Term Loan (collectively, the "Senior Secured Debt").  U.S. Bank, as agent for the Prepetition Lenders, holds a security interest in substantially all of the assets of SSDA and the Guarantor Debtors (the "Prepetition Collateral") as security for the Debtors' obligations under the Prepetition Facility (the "Prepetition Liens").

*(ii)    Unsecured Obligations*

(a)    Mezzanine Debt

24.    SSDI and SSDA, as well as certain guarantors, as borrowers, and D.E. Shaw Direct Capital Portfolios, L.L.C. Co. (now Stellus Capital Investment Corporation) as lender ("Stellus" or the "Subordinated Lender") are parties to a certain Investment Agreement dated as of August 27, 2010 (the "Prepetition Subordinated Investment Agreement").

25.    In connection with the Prepetition Subordinated Investment Agreement, SSDA, as borrower, issued a subordinated PIK promissory note to the Subordinated Lender (the

---

4    The Non-Guarantor Debtors include Binder & Binder - The National Social Security Disability Advocates (AZ), LLC (5887); Binder & Binder - The National Social Security Disability Advocates (CT), LLC (0206); Binder & Binder - The National Social Security Disability Advocates (MD), LLC (3760); Binder & Binder - The National Social Security Disability Advocates (MO), LLC (2108); Binder & Binder - The National Social Security Disability Advocates (OH), LLC (7827); Binder & Binder - The National Social Security Disability Advocates VA, LLC (7875); Binder & Binder - The National Social Security Disability Advocates (LA), LLC (8426); Binder & Binder - The National Social Security Disability Advocates (MI), LLC (8762); and Binder & Binder - The National Social Security Disability Advocates (DC), LLC (5265)

"Prepetition Subordinated Note") pursuant to which the Subordinated Lender provided the Company with unsecured subordinated debt in the amount of $13 million.

26.     The Subordinated Lender agreed to subordinate the $13 million loan to the Senior Secured Debt pursuant to a Subordination Agreement dated as of August 27, 2010 (the "Prepetition Subordination Agreement" and together with all related documents and agreements, the "Prepetition Subordinated Credit Documents").

27.     As of the Petition Date, $16,748,577.70 was outstanding under the Prepetition Subordinated Credit Documents, comprised of $13,401,573.06 in principal and $3,347,004.64 in PIK interest accrued through November 2014.

(b)     Trade Debt

28.     As of the Petition Date, the Debtors owe approximately [$6 million] in trade debt. A substantial portion of the trade debt relates to advertising and media provider costs.  The Debtors have not engaged in any additional advertising since late summer 2014 and, as such, advertising expenses have been significantly reduced.

**E.     Events Leading to the Commencement of These Chapter 11 Cases**

29.     The Debtors' revenue declined during the first quarter of 2013 as a result of the federal sequestration, a temporary curtailment of certain federal spending.  Although benefits payments under the various programs operated by the SSA were exempt from the funding cuts implemented as part of the federal sequestration, workflow disruptions at the SSA and uncertainty as to how the sequestration might impact new claims delayed the processing of claims and the payment of fees to advocates, even for cases already successfully adjudicated. Claims processing times eventually returned to normal levels later in 2013, but the federal government shutdown in October 2013 yet again caused delays in case resolution.

30.    During the shutdown, the SSA and VA continued to conduct hearings, but the shutdown caused significant delays in their issuance of post-hearing decisions.  As a result, the Debtors' rate of successful adjudications dropped significantly in the fourth quarter of 2013, with revenues falling short of projections by approximately 20%.  Although the sequestration and shutdown were not recurring events, the resulting disruption in the Debtors' operating cash flow and the post-shutdown lag in case adjudication have severely impacted the Debtors' operating performance and liquidity, necessitating a financial restructuring.

31.    Facing a liquidity crisis in early 2014, the Debtors engaged Lincoln International LLC to solicit incremental financing or a capital infusion.  That endeavor, however, did not yield tangible results.  As a result, the Debtors retained DSI in July 2014 to explore their strategic alternatives and undertake an operational restructuring.  In light of the Debtors' continued inability to service the Senior Secured Debt, the Debtors determined, in an exercise of their business judgment, that  it was necessary to commence these Chapter 11 Cases.

32.    During the course of these Chapter 11 Cases, the Debtors seek to protect, preserve, restructure, and maximize the value of their business for the benefit of their claimants, creditors, employees, and other stakeholders.  The Debtors intend to explore all strategic alternatives for the optimal resolution of these Chapter 11 Cases.

33.    While resolution of these Chapter 11 Cases is the ultimate goal of the Debtors' postpetition operation of their business, the Debtors' ability to seamlessly continue servicing the more than 57,000 active SSA/VA Cases presently pending is of paramount concern at the outset of these Chapter 11 Cases. As such, the Debtors have taken numerous measures to ensure that the interests of the disability claimants are not jeopardized in any way by the filing of these Chapter 11 Cases.

34.     The Debtors have gone to great lengths to ensure that adequate funds are set aside and reserved for the complete adjudication of the active SSA/VA Cases.  The Debtors have sought permission from multiple potential lenders and negotiated, as part of their postpetition financing, to make ongoing contributions from cash receipts to an account that will be maintained to ensure adequate funding to pay the ordinary administrative costs and expenses related to the adjudication of the SSA/VA Cases after the full repayment or other maturity of the Debtors' postpetition financing facility.

35.     Further, recognizing that their revenue is tied to the continued intake and processing of SSA/VA Cases and receipt of SSA/VA Fees, the Debtors are negotiating actively and in good faith with their Advocates and Union employees to provide postpetition compensation and benefits comparable to prepetition wages in return for their continued service.

36.     The Debtors believe that these collective measures will not only ensure the successful resolution of these Chapter 11 Cases, but also preserve the crucial interests of the 57,000 disability claimants currently relying on the Debtors to adjudicate their SSA/VA Cases and aid them in obtaining the benefits essential to their livelihood.

**F.      Other Information Required Pursuant To Local Bankruptcy Rule 1007-2**

37.     No disclosure pursuant to Local Bankruptcy Rule 1007-2(a)(2) is required because these cases were not originally filed under chapter 7 or chapter 13.

38.     Pursuant to Local Bankruptcy Rule 1007-2(a)(3), to the best of my knowledge, information and belief, no committee was formed prior to the order for relief in these Chapter 11 Cases.

39.     Pursuant to Local Bankruptcy Rule 1007-2(a)(4), lists containing information for each of the Debtors' twenty (20) largest known non-insider unsecured creditors (not including

secured creditors who may have deficiency claims) is annexed hereto as Exhibit A.  The Debtors reserve their rights to dispute the amount or validity of all such claims.

40.     Pursuant to Local Bankruptcy Rule 1007-2(a)(5), lists containing information for each of the Debtors' top five (5) secured creditors is annexed hereto as Exhibit B.  The lists include the amount of the claim, a brief description and an estimate of the value of the collateral securing the claim, and whether such claim or lien is disputed.  The Debtors reserve their rights to dispute the amount and/or secured status of these claims except as set forth in the Order (I) Approving Postpetition Senior Secured Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection, and (IV) Modifying the Automatic Stay.

41.     Pursuant to Local Bankruptcy Rule 1007-2(a)(6), a summary of the assets and liabilities of the Debtors on an unaudited basis as of the Petition Date is annexed hereto as Exhibit C.

42.     No shares of stock, debentures or other securities of the Debtors are publicly held. Accordingly, I am advised by counsel that Local Bankruptcy Rule 1007-2(a)(7) is inapplicable in these cases.

43.     Pursuant to Local Bankruptcy Rule 1007-2(a)(8), lists of all of the Debtors' property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity is annexed hereto as Exhibit D.

44.     Pursuant to Local Bankruptcy Rule 1007-2(a)(9), lists of all of the Debtors' leased premises are annexed hereto as Exhibit E.  To the best of my knowledge, information and belief, the Debtors do not own any real property.

45.     Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the location of the Debtors' substantial  assets, books and records is as set forth on Exhibit F annexed hereto.  To the best of

my knowledge, information and belief, the Debtors do not hold any property outside the territorial limits of the United States.

46.     Pursuant to Local Bankruptcy Rule 1007-2(a)(11), to the best of my knowledge, information  and belief, other than these Chapter 11 Cases, the Debtors are not a party to any pending actions where a judgment against the Debtors may be imminent.

47.     Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the names of the Debtors' officers, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience is annexed hereto as Exhibit G.

48.     Pursuant to Local Bankruptcy Rule 1007-2(b), a schedule setting forth, for the thirty (30) day period following the filing of the Chapter 11 petitions: (i) the amount paid or proposed to be paid in payroll, including fees, salaries of employees (exclusive of officers, directors, stockholders, and partners); (ii) the amount to be paid or proposed to be paid for services to officers, stockholders, directors, and financial or business consultants retained by the Debtors; and (iii) estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid (other than professional fees), and any other information relevant to an understanding of the foregoing, is annexed hereto as Exhibit H.

## PART II

## SUMMARY OF FIRST-DAY MOTIONS

**A.     Debtors' Motion for Entry of an Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing the Joint Administration of Their Chapter 11 Cases (the "Joint Administration Motion")**

49.     The Debtors are twenty-five affiliates, as that term is defined in section 101(2) of the Bankruptcy Code.  On the Petition Date, the Debtors sought the joint administration and consolidation of their Chapter 11 Cases for procedural purposes only, pursuant to section 105(a)

of the Bankruptcy Code and Rule 1015(b) of the Bankruptcy Rules.  The Debtors believe that, in light of their affiliated status and interrelated business operations, the joint handling of the administrative matters respecting these Chapter 11 Cases – including, without limitation, the use of a single docket for matters occurring in the administration of the estates and the combining of notices to creditors – will aid in expediting these Chapter 11 Cases and rendering their administration more efficient and economical.

50.    The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these Chapter 11 Cases will affect more than one of the Debtors.  The failure to jointly administer these cases would result in numerous duplicative pleadings being filed for each issue to be served upon separate service lists.  Such duplication of substantially identical documents would be extremely wasteful.

51.    Joint administration will permit the Clerk of this Court (the "Clerk's Office") to use a single general docket for all of these Chapter 11 Cases and to combine notices to creditors of each Debtor's estate and other parties-in-interest.  Joint administration will also protect parties-in-interest by ensuring that parties-in-interest in each Chapter 11 Case will be apprised of the various matters before the Court in the other Chapter 11 Cases.

52.    The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration of these Chapter 11 Cases because each creditor may still file its claim against a particular estate.  In fact, the rights of all creditors will be enhanced by the reduced costs that will result from the joint administration of these Chapter 11 Cases.  The Court will also be relieved of the burden of entering duplicative orders and maintaining redundant files.

53.    For these reasons, the relief requested in the Joint Administration Motion is in the best interests of the Debtors and their estates.    Accordingly, on behalf of the Debtors, I

respectfully submit that the relief requested in the Joint Administration Motion should be granted.

**B.     Application for Entry of an Order Authorizing and Approving Employment of BMC Group, Inc. as Claims and Noticing Agent for the Debtors Effective as of the Petition Date (the "<u>BMC Retention Application</u>")**

54.     Pursuant to the BMC Retention Application, the Debtors seek authority to retain BMC Group, Inc. ("<u>BMC</u>") as claims and noticing agent in the Chapter 11 Cases.  The Debtors' estates and their creditors and other stakeholders will benefit from BMC's services.  The Debtors anticipate that there will be an extensive list of parties to be noticed during the Chapter 11 Cases. In view of the number of potential claimants, the Debtors have determined that the appointment of a claims and noticing agent is necessary to minimize the administrative burden on the Debtors' personnel and case professionals.  BMC specializes in noticing, claims processing, and other administrative tasks necessary to operate large, complex chapter 11 cases effectively.  It is my understanding that BMC is fully equipped to manage the claims process and provide notice to creditors and other interested parties in the Chapter 11 Cases.  Therefore, on behalf of the Debtors, I respectfully submit that the BMC Retention Application should be approved.

**C.     Debtors' Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs and Granting Related Relief (the "<u>Schedule Extension Motion</u>")**

55.     By the Schedule Extension Motion, the Debtors request entry of an order granting a 32-day extension of the time to file their statements of financial affairs and schedules of assets, liabilities, executory contracts, and unexpired liabilities (collectively, the "<u>Statements and Schedules</u>"), for a total of 46 days after the Petition Date.  The Debtors have thousands of potential creditors, and the breadth of the Debtors' business operations require the Debtors to maintain voluminous books and records and complex accounting systems.  Given the size,

complexity, and geographic scope of the Debtors' operations, as well as the number of potential

creditors, I respectfully submit that the large amount of information that must be assembled to

prepare the Statements and Schedules, and the hundreds of employee and advisor hours required

to complete them, would be unnecessarily burdensome to the Debtors during the first 14 days of

the Chapter 11 Cases.  The Debtors are sensitive to the need to complete their Statements and

Schedules as soon as possible, and intend to do so before the proposed deadline, if possible.

56.     I believe that the relief requested in the Schedule Extension Motion is in the best

interests of the Debtors' estates, claimants, employees, creditors, and all parties-in-interest, and

will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

Accordingly, on behalf of the Debtors, I respectfully submit that the Schedule Extension Motion

should be granted.

**D.     Debtors' Motion for Entry of an Order (A) Waiving the Requirement That Each
        Debtor File a List of Creditors, (B) Authorizing Service of a Consolidated List of
        Top 20 Unsecured Creditors, (C) Approving Notice, Case Management, and
        Administrative Procedures, (D) Authorizing Maintenance of Consolidated List of
        Creditors in Lieu of Matrix, and (E) Granting Related Relief (the "<u>Matrix and Case
        Management Motion</u>")**

57.     By the Matrix and Case Management Motion, the Debtors request that the Court

(a) waive the requirement that each Debtor file a separate list of creditors, (b) authorize the

service of all pleadings on a consolidated list of the Debtors' twenty largest unsecured creditors,

(c) approve notice, case management, and administrative procedures for the conduct of the

Chapter 11 Cases, (d) authorize maintenance of consolidated list of creditors in lieu of matrix,

and (e) and grant certain other relief necessary to effectuate the foregoing.

58.     After consultation with BMC, the Debtors believe that preparing a consolidated

creditor list in the same format the Debtors currently maintain in the ordinary course of business

will enable BMC to give notice promptly to all applicable parties.  In addition, because BMC

will receive an electronic list of creditors and use that list to provide notice in the Debtors' cases, filing a separate list of all creditors of the Debtors would serve no useful purpose. The Debtors therefore request that the Court waive the requirement under Bankruptcy Rule 1007(a)(1) to file a list of the Debtors' creditors. The Debtors also request leave to maintain a consolidate creditor list in electronic format only, in lieu of filing separate creditor matrices, and (until the appointment of a statutory committee of unsecured creditors) to serve all pleadings filed in the Chapter 11 Cases on their twenty largest unsecured creditors on a consolidated basis.

59.     As previously stated, the Debtors have thousands of potential creditors, and the breadth of the Debtors' business operations require the Debtors to maintain voluminous books and records, and complex accounting systems. Given the size and scope of the Debtors' operations and the number of creditors, I believe that the costs of preparing and filing a separate list of creditors would unnecessarily consume estate assets with no corresponding benefit. Enabling BMC to maintain an electronic list of creditors serves the same purpose with reduced incremental cost.

60.     The Matrix and Case Management Motion also requests approval of certain case management and notice procedures designed to streamline routine tasks in the Chapter 11 Cases. I believe, after consultation with BMC, that these procedures will help to reduce the costs associated with effectuating proper service of pleadings in the Chapter 11 Cases and are in the best interests of the Debtors and their estates.

61.     I believe that the relief requested in the Matrix and Case Management Motion is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

Accordingly, on behalf of the Debtors, I respectfully submit that the Matrix and Case Management Motion should be granted.

**E.     Debtors' Motion for Entry of an Order Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Reimbursable Employee Expenses and Other Employee Compensation, (B) Honor Certain Employee Benefits and (C) Granting Related Relief (the "Wage Motion")**

62.      Currently, the Debtors employ approximately 973 employees, which is only slightly reduced from the typical 1,000 workers employed.  The continued, uninterrupted, faithful and diligent service of the Debtors' remaining employees is absolutely essential to the Debtors' continuing operations and a successful chapter 11 process.  To minimize the personal hardship the employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain the employees' morale during this critical time, the Debtors, by this Motion, seek authority, (i) authorizing, but not directing, the Debtors to: (a) pay and/or perform, as applicable, Compensation Obligations up to the statutory cap set forth in the Bankruptcy Code that (i) were or are due and payable and relate to the period prior to the Petition Date, and/or (ii) are or become due and payable or relate to the period after the Petition Date; (b) maintain and continue to honor practices, programs, and policies for Employees such as the Welfare Fund, Health Benefits Contributions, the Security Fund, the Leave Policy, Insurance Benefits and related Monthly Benefits, as they were in effect as of the Petition Date, and as such may be modified, amended or supplemented from time to time in the ordinary course, including without limitation, the continuation and maintenance of the Leave Policy (collectively, the "Employee Benefit Obligations"); (c) reimburse Employees for Reimbursable Business Expenses; (d) continue to pay and/or contest in good faith, all amounts related to workers' compensation claims that arose prepetition (the "Workers' Compensation Obligations"); (e) pay all related Payroll Taxes, Deductions, and any other related prepetition withholdings and payroll related taxes (the

"Employee-Related Taxes") associated with the Compensation Obligations and the Employee Benefit Obligations, all of which are described herein, including any third parties that provide or aid in the monitoring, processing or administration of the Prepetition Obligations; (f) continue to pay Processing Costs in the ordinary course of business; (ii) authorizing the Debtors' financial institutions and/or banks (the "Banks") to receive, process, honor and pay all of the Debtors' prepetition checks and fund transfers on account of any of the Prepetition Obligations; (iii) prohibiting the Banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for the Prepetition Obligations; and (iv) authorizing the Debtors to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Obligations to replace any prepetition checks or fund transfer requests that may be dishonored, rejected, or reversed.

63.     Except for nine employees, payment of pre-petition wages did not exceed the sum of $12,475 per employee allowable as a priority claim under sections 507(a)(4) and (5) of the Bankruptcy Code.  As of the Petition Date, nine Employees are owed a total of approximately $174,640 in pre-petition obligations, inclusive of wages and accrued Leave Days (as defined in the Wages Motion).  The Debtors do not seek authority, by way of the Wage Motion, to pay pre-petition obligations to these nine Employees to the extent they exceed the statutory cap

64.     The Debtors seek the relief requested in the Wage Motion because they believe, and I agree, that any delay in paying the obligations set forth in the Wage Motion could severely disrupt the Debtors' relationship with their employees and irreparably impair the employees' morale at the very time that their dedication, confidence and cooperation are most critical. Further, because the payroll scheduled for December 26, 2014 must be funded on December 24, 2014, the Employees would suffer undue harm if payroll was not made.

65.     The Debtors face the risk that their operations may be severely impaired if the Wage Motion is not granted.  At this critical stage, the Debtors simply cannot risk the substantial and further disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure to pay the employee obligations in the ordinary course of their business during the pendency of these Chapter 11 Cases.

66.     For these reasons, I believe that the relief requested in the Wage Motion is in the best interests of the Debtors and their estates, and will enable the Debtors to continue to operate their business in chapter 11 without disastrous disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Wage Motion should be granted.

**F.     Debtors' Motion for Entry of Interim and Final Order Authorizing the Debtors to (I) Maintain Their Existing Bank Accounts and Cash Management System; (II) Continue to Use Their Existing Business Forms and Records; and (III) Maintain Existing Investment Practices (the "Cash Management Motion").**

67.     The Debtors seek entry of an order waiving certain of the United States Trustee's investment guidelines and authorizing the Debtors to (i) maintain their existing bank accounts and cash management system, (ii) continue pre-petition practices of remitting excess or misdirected SSA/VA Fees to the appropriate authority or entity, (iii) continue to use their existing business forms and records, and (iv) and maintain existing investment practices.  .

68.     In the ordinary course of their business, the Debtors utilize a well-managed cash management system to collect, transfer and disburse funds generated by their operations.  The Cash Management System (as defined in the Cash Management Motion), consisting of, among other things, 21 active accounts, is specifically tailored to meet the Debtors' current operating needs, enabling the Debtors to centrally control and monitor corporate funds and available cash, as well as to keep accurate account balances and presentment information.

69.     If the Debtors are required to open separate accounts as debtors-in-possession and modify the Cash Management System in accordance with the U.S. Trustee Guidelines, such process would necessitate opening new accounts for collections, cash concentration, and disbursements.   In fact, the Debtors would need to reconfigure dozens of direct debit arrangement and internal fund transfer practices.   Thus, the Debtors' accounting, and bookkeeping employees would be forced to focus exclusively on immediately opening new bank accounts, instead of on their daily responsibilities during this critical juncture of the Chapter 11 Cases.   The opening of new bank accounts would certainly increase operating costs, thereby negatively impacting the Debtors' cash flow.   Most importantly, delays that would result from opening new accounts, revising cash management procedures, and implementing new information technology protocols would negatively impact the Debtors' ability to operate their businesses while pursuing these arrangements.

70.     I believe the Debtors' continued use of the Cash Management System will greatly facilitate their transition into the Chapter 11 Cases by, among other things, avoiding administrative inefficiencies and expenses, minimizing delays in payment of post-petition debts, and providing important internal controls.   Given the substantial economic scale and geographic reach of the Debtors' business operations, I believe that any disruption to the Cash Management System could impede a successful restructuring of the Debtors' businesses.

71.     In order to minimize expenses to the Debtors' estates, the Debtors also request authorization to continue to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders and invoices) and check stock existing immediately prior to the Petition Date, without reference to the Debtor's status as debtors in possession.   I believe that changing correspondence and business forms would be expensive, unnecessary and burdensome

to the Debtors' estates and disruptive to the Debtors' business operations and would not confer

any benefit upon the Debtors, their estates, their creditors or those dealing with the Debtors.

72.    Accordingly, I believe that the relief requested in the Cash Management Motion is

in the best interests of the Debtors' estates and will enable the Debtors to operate their businesses

in chapter 11 without disruption.  Therefore, on behalf of the Debtors, I respectfully submit that

the Cash Management Motion should be granted.

**G.    Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility
Companies from Discontinuing, Altering or Refusing Service on Account of
Prepetition Invoices, (II) Deeming the Utility Companies to Have Adequate
Assurance of Future Payment and (III) Establishing Procedures for Resolving
Requests for Additional Assurance and Scheduling a Final Hearing (the "<u>Utilities
Motion</u>")**

73.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders

(i) prohibiting all utility companies (collectively, the "<u>Utility Companies</u>") from discontinuing,

altering or refusing services to the Debtors on account of prepetition invoices, (ii) deeming the

Utility Companies to have adequate assurance of future performance on the basis of payment of

a security deposit (the "<u>Utility Deposit</u>") and (iii) establishing procedures for resolving requests

for additional assurance of payment..

74.    The Debtors are responsible for certain utility services at certain office locations

where they do business.  Specifically, in the operation of their businesses, the Debtors incur

utility expenses for telephone, internet, and cable services in the ordinary course of business.

These utility services are provided by certain Utility Companies, including those listed on

Exhibit C to the Utilities Motion.  On average, the Debtors spend approximately $164,433.04

each month on utility costs at their facilities.  The Debtors seek to provide adequate assurance to

a non-exhaustive list of the Utility Companies.  The estimated amount of the two-week deposit

for each is attached to the Utilities Motion as Exhibit C.

75.     Uninterrupted utility services are essential to the continuation of Debtors' on-going operations and to the success of the Debtors' chapter 11 efforts.  The Debtors' operations will be negatively impacted if one or more Utility Company refuses or discontinues utility services for even a brief period of time.  Accordingly, any interruption of utility services, even for a brief period of time, would negatively impact the Debtors' customer relationships, revenues and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  It is, therefore, critical that utility services continue uninterrupted during these Chapter 11 Cases.  I believe that it is therefore critical that utility services provided to the Debtors continue uninterrupted.

76.     In accordance with section 366(c)(1)(A) of the Bankruptcy Code, the Debtors propose to provide additional assurance of payment as set forth in the Utilities Motion.  Specifically, the Debtors propose to issue, within ten (10) business days after the date of entry of the interim order granting the Utilities Motion, a Utility Deposit that is equal to approximately two (2) weeks the estimated average monthly utility consumption to each Utility Company as indicated on Exhibit C to the Utilities Motion.

77.     Additionally, the Debtors seek to establish reasonable procedures by which Utility Companies may request additional adequate assurance of future payment, in the event that a Utility Company believes that the Utility Deposit does not provide them with satisfactory adequate assurances.  I believe that the procedures set forth in the Utilities Motion are reasonable and, upon information and belief, have been adopted in other bankruptcy proceedings, and provide an orderly process for providing adequate assurance of payment to the Utility Companies, without risking irreparable harm to the estate.  Without such procedures, the Debtors could be forced to address numerous requests by Utility Companies in a haphazard manner at a

critical period, while the Debtors are trying to conduct these Chapter 11 Cases. The Debtors could be forced to capitulate to almost any demands made by their Utility Companies, or face the discontinuation of utility service and a potential shutdown of their business. The orderly process contemplated by the procedures set forth in the Utilities Motion will avert such a potentially disastrous outcome, enabling the Debtors to make a smooth transition into chapter 11, while ensuring a fair process for providing adequate assurance to the Utility Companies to the extent required.

78.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion should be granted.

**H.    Debtors' Motion for Entry of an Order (A) Authorizing the Payment of Prepetition Income, Franchise, Corporate, Excise, and Other Taxes and Governmental Charges, (B) Authorizing Banks and Financial Institutions to Honor and Process All Checks and Wire Transfers Related Thereto, and (C) Granting Related Relief (the "Tax Motion")**

79.    By this Motion, the Debtors seek entry of an order granting them the authority, in their discretion, to pay to the relevant Authorities any accrued and outstanding Taxes in the ordinary course of business during the pendency of these Chapter 11 Cases without regard to whether such Taxes accrued or arose before or after the Petition Date.

80.    To implement the relief requested herein, the Debtors further request that any order approving this Motion authorize banks and other financial institutions to honor and process transfers, deposits, or checks issued by any of the Debtors on account of any prepetition Taxes that have not cleared as of the Petition Date, and to rely on the representations of the Debtors as to which checks are issued and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

81.     I believe that, among other things, the Debtors' successful reorganization will require good standing within the states in which they do business and a complete devotion of effort by their officers and directors to these Chapter 11 Cases. Given that the Debtors operate in numerous locations, there is a significant number of Authorities with which the Debtors interact. If any of the Authorities attempt to exercise certain remedies against the Debtors on account of unpaid Taxes, it could have the devastating effect of distracting the attention of the Debtors' management and professionals away from the important task of the Debtors' successful reorganization. Any regulatory dispute or delinquency that could impact the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole, which, in turn, could significantly reduce the value of the Debtors' assets.

82.     The Debtors must continue to pay the Taxes to continue operating in certain jurisdictions and to avoid costly distractions during these Chapter 11 Cases. Specifically, the Debtors' failure to pay the Taxes could affect adversely the Debtors' business operations because the Authorities could suspend the Debtors' operations, file liens, or seek to lift the automatic stay. In addition, certain Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes that undoubtedly would distract those individuals from their duties related to the Debtors' restructuring. The Debtors can afford neither distraction of their officers and professionals nor interruption of their operations at this critical time.

83.     For these reasons, I believe that the relief requested in the Tax Motion is in the best interests of the Debtors and their estates. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Tax Motion should be granted.

I.      **Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 363(c)(2) (I) Authorizing the Debtors to (a) Maintain Prepetition Insurance Coverage and Pay All Related Obligations Thereunder, (B) Maintain Prepetition Premium Financing Agreement, Pay All Obligations Thereunder and Continue Grant of Security Interests to Premium Finance Companies, and (C) Enter Into New Insurance Policies and (II) Authorizing and Directing Financial Institutions to Honor Related Checks and Transfers (the "<u>Insurance Motion</u>")**

84.     The Debtors, by way of the Insurance Motion, seek (i) authorizing, but not directing, the Debtors to (a) maintain prepetition insurance coverage and pay all related obligations thereunder and brokers' fees in connection therewith, (b) maintain prepetition premium financing agreements, pay all obligations thereunder and grant security interests to premium finance companies, and (c) enter into new insurance policies, and (ii) authorizing and directing financial institutions to honor related checks and transfers.

85.     Debtors are a party six insurance policies.  The premiums for the Insurance Policies are paid through two premium financing agreements.  The total amount to be financed under the APF Insurance Financing Agreement is $185,955.32.  The total amount to be financed under the AFCO Insurance Financing Agreement is $165,602.  Both the APF Insurance Financing Agreement and AFCO Insurance Financing Agreement include security provisions which grant to APF and AFCO, respectively, security interests in all proceeds from the respective Insurance Policies among other things.  The Debtors' Insurance Policies expire on August 27, 2015.

86.     Maintenance of the Insurance Policies, and thus continued payment under the Premium Finance Agreements, is essential to the continued operation of the Debtors' businesses and is required under the United States Trustee's Operating Guidelines for Chapter 11 Cases and applicable state and federal law.  The insurance coverage provided under the Debtors' Insurance Policies is essential for preserving the Debtors' businesses, properties, and assets, and, in many

cases, such coverage is required by various regulations, laws, and contracts that govern the Debtors' businesses. If the Debtors do not continue to perform their obligations under the Insurance Policies and the Premium Finance Agreements, their coverage under the Insurance Policies could be voided. This would cause serious and irreparable harm to the Debtors' business and restructuring efforts, as it may expose the Debtors to higher costs and increased risks of loss, at a minimum

87.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion should be granted.

**J.      Debtors' Motion Requesting Approval of Procedures for Rejection of Unexpired Leases and Executory Contracts and Abandonment of De Minimis Personal Property Related Thereto (the "<u>Rejection Procedures Motion</u>")**

88.     By the Rejection Procedures Motion, the Debtors seek approval of streamlined procedures for the rejection of executory contracts and unexpired leases and the abandonment of de minimis personal property related thereto. Pursuant to the proposed procedures, the Debtors would not be required to file a separate motion to reject any contract or lease. Rather, the procedures would authorize the Debtors to file and serve upon the counterparty and counsel for the Creditors' Committee a notice identifying the contract or lease to be rejected, the counterparties thereto, the deadline for objecting to rejection, and the proposed effective date of rejection. The proposed procedures would also establish a deadline (the later of (a) the general bar date, if any, established in the Chapter 11 Cases and (b) thirty days after the effective date of rejection) for filing proofs of claim on account of damages arising out of the rejection of a contract or lease. In addition to the streamlined rejection procedures, the Debtors also seek leave to reject property they determine, in their business judgment, to be of little or no value to the estate.

89.     I believe the relief requested in the Rejection Procedures Motion will enable the Debtors to efficiently reject unneeded contracts and leases without the necessity of duplicative motion practice, while simultaneously protecting the due process rights of the counterparties to such contracts and leases.   Accordingly, I respectfully submit that the Rejection Procedures Motion should be granted.

**K.     Debtors' Motion for Order Approving Rejection of Certain Unexpired Leases of Non-Residential Real Property and Agreements as of Petition Date and Abandonment of De Minimis Property Related Thereto (the "<u>Lease Rejection Motion</u>")**

90.     Prior to the commencement of the Chapter 11 Cases, the Debtors determined that they no longer required use of their offices in Atlanta, Georgia; Brooklyn, New York; Chicago, Illinois; Newark, New Jersey; Raleigh, North Carolina; or Seattle, Washington (the "<u>Closed Offices</u>").  On or prior to the Petition Date, the Debtors vacated the Closed Offices.  The Debtors do not believe they would realize any value by assuming and assigning the Leases to third parties.  The Debtors have also determined that the Closed Offices may contain certain personal property of little or no value (the "<u>Related Property</u>").   Accordingly, by the Lease Rejection Motion, the Debtors seek to reject the leases for the Closed Offices, effective as of the Petition Date, and seek approval to abandon the Related Property at the time they surrender the Closed Offices.

91.     I believe that the relief sought in the Lease Rejection Motion is essential to maintaining the value of the Debtors' estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Lease Rejection Motion should be granted.

**L.      Debtors' Motion for Entry of an Order Authorizing Debtors to Employ and Compensate Professionals Utilized in the Ordinary Course of Business (the "<u>OCP Motion</u>")**

92.      By the OCP Motion, the Debtors seek entry of an order authorizing the retention of those Ordinary Course Professionals identified on Exhibit A to the OCP Motion, as of the Petition Date, without the submission of separate employment applications, declarations, and the issuance of separate retention orders for each such individual professional.   The Debtors also seek, pursuant to the procedures described below, authority to (a) employ additional Ordinary Course Professionals not listed on Exhibit A and (b) compensate all Ordinary Course Professionals.

93.      The Debtors request authority, but not direction, to pay each Ordinary Course Professional, without a prior motion to the Court, 100% of the fees incurred and disbursements requested per month, up to the sum identified for each Ordinary Course Professional in Exhibit A (the "<u>Ordinary Course Professional Fee Cap</u>").   However, the Debtors will not make such payment without receipt of an appropriate invoice setting forth, in reasonable detail, the nature of the services provided and disbursements incurred by the Ordinary Course Professional.  In the event that an Ordinary Course Professional's fees and disbursements exceed the Ordinary Court Professional Fee Cap, then such Ordinary Course Professional must file a fee application with this Court for approval of such fees and expenses in accordance with sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Fee Guidelines promulgated by the Executive Office of the United States Trustee, and any Order Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals entered in the Chapter 11 Cases (the "<u>Interim Compensation Order</u>").

94.     The Debtors submit that the employment of the Ordinary Course Professionals and the payment of monthly compensation, on the basis set forth in the OCP motion, are in the best interests of their estates and creditors.   The relief requested will save the estates the substantial expenses associated with applying separately for the employment of each professional.   Further, the requested relief will avoid additional fees for the preparation and prosecution of interim fee applications.   Likewise, the procedures outlined above will relieve the Court and the United States Trustee of the burden of reviewing numerous fee applications involving relatively small amounts of fees and expenses, while ensuring the appropriate oversight of the Debtors' use of the Ordinary Course Professionals.

95.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion should be granted.

**M.      Debtors' Motion for Entry of Interim and Final Orders (I) Approving Post-Petition Senior Secured Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection, and (IV) Modifying the Automatic Stay (the "DIP Financing Motion")**

96.     The Debtors are parties to a prepetition senior secured financing facility (the "Prepetition Facility") consisting of a revolving credit facility in the maximum principal amount of $8 million (the "Prepetition Revolver") and a term loan in the original principal amount of $29 million (the "Prepetition Term Loan").   All other Debtors, except for nine Debtors formed after the implementation of the Prepetition Facility (the "Non-Guarantor Debtors"),[5] have guarantied

---

[5]     The Non-Guarantor Debtors include Binder & Binder - The National Social Security Disability Advocates (AZ), LLC (5887); Binder & Binder - The National Social Security Disability Advocates (CT), LLC (0206); Binder & Binder - The National Social Security Disability Advocates (MD), LLC (3760); Binder & Binder - The National Social Security Disability Advocates (MO), LLC (2108); Binder & Binder - The National Social Security Disability Advocates (OH), LLC (7827); Binder & Binder - The National Social Security Disability Advocates VA, LLC (7875); Binder & Binder - The National Social Security Disability Advocates (LA), LLC (8426); Binder & Binder - The National Social Security Disability Advocates (MI), LLC (8762); and Binder & Binder - The National Social Security Disability Advocates (DC), LLC (5265)

SSDA's indebtedness under the Prepetition Facility (the Debtors other than SSDA and the Non-Guarantor Debtors are the "Guarantor Debtors").

97.     Capital One, N.A. ("Capital One") and U.S. Bank National Association ("U.S. Bank" and collectively with Capital One, the "Prepetition Lenders") are the lenders under the Prepetition Facility.  U.S. Bank serves as administrative and collateral agent for the Prepetition Lenders.  As of the Petition Date, $6,499,733 was outstanding under the Prepetition Revolver and $16,548,500 was outstanding under the Prepetition Term Loan.  U.S. Bank, as agent for the Prepetition Lenders, holds a security interest in substantially all of the assets of SSDA and the Guarantor Debtors (the "Prepetition Collateral") as security for the Debtors' obligations under the Prepetition Facility (the "Prepetition Liens").

98.     As described more fully above, the Debtors have faced significant operational and liquidity pressure over the past twelve months.  Despite efforts by the Debtors' management and advisors to improve the Debtors' financial position, it eventually became clear that a financial restructuring was not possible outside of a chapter 11 proceeding.  The Debtors do not have sufficient unencumbered cash to operate in chapter 11.  Moreover, the Debtors cannot fund their immediate liquidity needs solely from the use of the Prepetition Lenders' cash collateral ("Cash Collateral").  The ability to use cash collateral and obtain postpetition financing is essential to the Debtors' ability to operate in chapter 11 and preserve the value of their estates.

99.     Despite their efforts to secure alternative postpetition financing, the Debtors were unable to locate a lender willing to extend credit on a junior secured or unsecured basis.  The Debtors explored alternative postpetition financing proposals, but ultimately determined that the costs, distraction, and uncertainty of a priming dispute, coupled with the costs and uncertainty of

contested proceedings regarding the use of Cash Collateral, would outweigh the benefits of such a facility.

100.    The key terms of the DIP Facility are set forth at length in the DIP Financing Motion and the term sheet annexed thereto.   Among those terms, the lenders under the DIP Facility have required, as a condition to lending, that the Debtors use a portion of the proceeds of the DIP Facility to repay the amounts outstanding under the Prepetition Facility.   Absent such repayment, the Debtors would be unable to obtain credit under the DIP Facility and thus would be unable to fund their ongoing liquidity needs to sustain their operations.   Accordingly, I believe the relief requested in the DIP Financing Motion is necessary and appropriate and should be approved.

[ *signature page follows* ]

I certify under penalty of perjury that, to the best of my knowledge, information and belief, the statements set forth in this Declaration are true and correct.

Dated: December 18, 2014

> **Binder & Binder – The National Social Security Disability Advocates (NY), LLC,** *et al.*
>
> By:  William A. Brandt, Jr., Esq.
> Its:  Chief Restructuring Officer