**POST-PETITION REVOLVING CREDIT AND SECURITY AGREEMENT**

**THIS POST-PETITION REVOLVING CREDIT AND SECURITY AGREEMENT** (this "**Agreement**") dated as of December 23, 2014 is entered into among BINDER & BINDER - THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (CA), LLC, BINDER & BINDER THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (CO), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (FL), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (GA), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (IL), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (NC), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (NJ), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (NY), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (PA), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (TX), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (WA), LLC, THE SOCIAL SECURITY EXPRESS LTD., THE REP FOR VETS LLC, NATIONAL VETERANS DISABILITY ADVOCATES LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (AZ), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (CT), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (DC), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (LA), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (MD), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (MI), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (MO), LLC, BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (OH), LLC, and BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES VA, LLC, as debtors and debtors-in-possession (individually and collectively, the "**Borrower**"), U.S. BANK NATIONAL ASSOCIATION ("**U.S. Bank**"), as administrative agent for the Lenders (in such capacity, "**Agent**"), and the lenders from time to time parties hereto (collectively, "**Lenders**").  When the context requires, as used herein, the term "Agent" shall mean "Agent on behalf of itself and the Lenders".

WHEREAS, each Borrower commenced a case (collectively, the "**Bankruptcy Case**") under Chapter 11 of Title 11, United States Code (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (together with any other court having jurisdiction over the Bankruptcy Case or any proceedings therein from time to time, the "**Bankruptcy Court**") and Borrower is continuing to operate its business and manage its properties as a debtor and debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrower has requested that Lenders make available to Borrower a revolving credit facility (the "**Revolving Facility**") in a maximum principal amount at any time

outstanding of up to **Twenty Six Million Dollars ($26,000,000)**[*] (the "**Facility Cap**"), the proceeds of which shall be used by Borrower exclusively for the following purposes: (a) for general working capital purposes and other lawful purposes as permitted under this Agreement and in all cases in accordance with the Budget subject to variances permitted under this Agreement (which may include certain prepetition expenses approved by the Bankruptcy Court provided that the incurrence or payment thereof is not otherwise violative of this Agreement, the Financing Orders, any other order of the Bankruptcy Court or applicable law); (b) to repay the Prepetition Senior Debt, including, without limitation, the Prepetition Loans and all accrued and unpaid interest, fees, costs, expenses, indemnities and premiums thereon or with respect thereto and all other amounts due and payable thereon or with respect thereto; (c) to pay Permitted Expenses; and (d) to pay any of the Obligations, including, without limitation, to the extent permitted under this Agreement, postpetition fees and expenses of Agent, Lenders and L/C Issuer related to the Obligations; and

WHEREAS, Lenders are willing to make the Revolving Facility available to Borrower upon the terms and subject to the conditions set forth in this Agreement, and subject to the terms and conditions set forth in the Financing Orders.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, Agent, Borrower and Lenders hereby agree as follows:

## I.    DEFINITIONS

For purposes of this Agreement, in addition to the definitions above and elsewhere in this Agreement, the terms listed in Appendix A hereto shall have the meanings given such terms in Appendix A, which is incorporated herein and made a part hereof.  All capitalized terms used which are not specifically defined (including, without limitation, Goods, Fixtures, General Intangibles, Chattel Paper, Investment Property, Documents, Commercial Tort Claims, Instruments, Deposit Accounts, Letter-of-Credit Rights, Proceeds and Supporting Obligations) shall have meanings provided in Article 9 of the UCC in effect on the date hereof (or as amended and in effect from time to time as approved by Agent) to the extent the same are used or defined therein.  Unless otherwise specified herein or in Appendix A, any agreement or contract referred to herein or in Appendix A shall mean such agreement as modified, amended or supplemented from time to time in writing.  Unless otherwise specified, as used in the DIP Loan Documents or in any certificate, report, instrument or other document made or delivered pursuant to any of the DIP Loan Documents, all accounting terms not defined in Appendix A or elsewhere in this Agreement shall have the meanings given to such terms in and shall be interpreted in accordance with GAAP.

---

[*]  The amount of the Pre-petition Senior Debt (principal amount of 23,048,232.75 plus all fees, costs and expenses), plus the $3,000,000 Incremental Commitment.

## II.    ADVANCES, PAYMENT AND INTEREST

### 2.1  The Revolving Facility; Letters of Credit

(a)    Subject to the provisions of this Agreement and the Financing Orders, each Lender shall make available to Borrower its Pro Rata Share of the Initial Advance in accordance with the immediately succeeding sentence and each Lender shall make available to Borrower its Pro Rata Share of Incremental Advances under the Revolving Facility from time to time during the Term, provided that, notwithstanding any other provision of this Agreement and the Financing Orders, (i) the Pro Rata Share of Incremental Advances of any Lender shall not at any time exceed such Lender's Incremental Commitment under the Revolving Facility, (ii) the aggregate amount of all Advances at any one time outstanding under the Revolving Facility shall not exceed the lesser of (x) the Facility Cap then in effect, less the amount of the then outstanding Letter of Credit Usage and the current Carve-Out that has not been funded, or (y) the amount Borrower is permitted to borrow at such time in accordance with the Budget (subject to variances permitted under this Agreement) and (iii) the aggregate amount of all Incremental Advances at any one time outstanding shall not exceed the lesser of (x) the Incremental Commitment then in effect, less the amount of the then outstanding Letter of Credit Usage and the current Carve-Out that has not been funded, or (y) the amount Borrower is permitted to borrow at such time in accordance with the Budget (subject to variances permitted in this Agreement).  Subject to the provisions of this Agreement, upon entry of the Interim Financing Order and satisfaction of all conditions set forth in Sections 4.1 and 4.2, each Lender shall make available to Borrower its Pro Rata Share of the Initial Advance to repay the Prepetition Senior Debt, including, without limitation, the Prepetition Loans and all accrued and unpaid interest, fees, costs, expenses, indemnities and premiums thereon or with respect thereto and all other amounts due and payable thereon or with respect thereto (which Advance may be effected by a book entry only between Lenders and Agent, for itself and as agent for the Prepetition Secured Parties).  The obligations of the Lenders under the Revolving Facility shall be several, and not joint or joint and several.  The Incremental Advances under the Revolving Facility are a revolving credit facility, which may be drawn, repaid and redrawn, from time to time as permitted under this Agreement and the Financing Orders.  Any determination as to whether there is availability for Advances shall be made by Agent in its sole discretion.  Unless otherwise permitted by Agent, each Advance shall be in an amount of at least $50,000 and in increments of $50,000 in excess thereof.  Amounts paid or prepaid to reduce or otherwise in respect of the Initial Advance may not be reborrowed and shall permanently reduce the Facility Cap.

(b)    Agent shall have the right to establish and readjust from time to time, in its sole credit judgment, reserves against the amount available to be advanced to Borrower hereunder, including without limitation, reserves with respect to the Permitted Expenses (including, without limitation, the current Carve-Out that has not been funded), which reserves shall have the effect of reducing the amounts otherwise eligible to be disbursed to Borrower under the Revolving Facility pursuant to this Agreement.

(c)    Subject to the terms and conditions set forth in this Agreement, the Financing Orders, any other DIP Loan Document and on Appendix B hereto, Borrower shall have the right to request Letters of Credit, and Agent and the Lenders, without any obligation to do so, may in their sole and absolute discretion cause the L/C Issuer to issue and each Lender

thereupon agrees, to purchase participations in Letters of Credit in respect of Borrower. In no event shall Agent or Lenders have any obligation to cause the L/C Issuer to issue Letters of Credit.

## 2.2 The Advances; Maturity

All Advances and all other outstanding Obligations under the Revolving Facility shall be immediately due and payable in full in cash, if not earlier in accordance with the terms of this Agreement and the Financing Orders, without further application to or order of the Bankruptcy Court, on the earliest of (i) acceleration of maturity of the Obligations upon the occurrence of an Event of Default, (ii) the last day of the Term, (iii) the effective date of a plan of reorganization approved by an order of the Bankruptcy Court, (iv) the effective date of any Sale pursuant to Section 363 of the Bankruptcy Code, (v) the conversion of the Bankruptcy Case to a proceeding under Chapter 7 of the Bankruptcy Code, and (vi) an order is entered by the Bankruptcy Court dismissing the Bankruptcy Case which does not contain a provision for termination of the Agreement and Payment in Full of all Obligations hereunder prior to such dismissal (such earlier date being the "**Revolving Facility Maturity Date**").

## 2.3 Interest on the Advances

Subject to Section 3.5, interest on outstanding Advances under the Revolving Facility shall be payable monthly in arrears on the first day of each calendar month at an annual rate equal to the Base Rate plus four and one-quarter percent (4.25%), calculated on the basis of a 360-day year and for the actual number of calendar days elapsed in each interest calculation period. Interest accrued on each Advance under the Revolving Facility shall be due and payable on the first day of each calendar month, in accordance with the procedures provided for in Section 2.6, commencing January 1, 2015, and continuing until the later of the expiration of the Term or the full performance and irrevocable Payment in Full of the Obligations and termination of this Agreement.

## 2.4 Revolving Facility Disbursements; Requirement to Deliver Borrowing Certificate

(a) Borrower may give Agent irrevocable written notice requesting an Advance under the Revolving Facility by delivering to Agent by 11:00 a.m. (Minneapolis, MN time) on the proposed Business Day on which such requested Advance is to be made (the "**Borrowing Date**"), a completed Borrowing Certificate and relevant supporting documentation reasonably satisfactory to Agent which shall specify:

(i) the proposed Borrowing Date of such Advance, which shall be a Business Day; and

(ii) the aggregate principal amount of such requested Advance.

Each time a request for an Advance is made, Borrower shall deliver to Agent a Borrowing Certificate.

(b)     Upon receipt of a Borrowing Certificate given to it requesting an Advance, Agent shall notify each Lender by 12:00 noon (Minneapolis, MN time) on the date of receipt of such Borrowing Certificate by Agent (which must be a Business Day) of the contents thereof and of such Lender's Pro Rata Share of such Advance.

(c)     Not later than 2:00 p.m. (Minneapolis, MN time) on the date of each Advance, each Lender shall (except as provided in subsection (d) of this Section) make available its Pro Rata Share of such Advance, in U.S. dollars in immediately available funds to the Agent at its address specified in Section 13.5 or such other address that Agent may designate in writing from time to time. Unless Agent determines that any applicable condition specified in Section 4.1 and 4.2 has not been satisfied, Agent will make the funds so received from the Lenders available to Borrower by 4:00 p.m. (Minneapolis, MN time) by disbursing the proceeds of the requested Advance to the Borrower's account set forth on Schedule 2.4 (or such other account mutually agreed upon in writing between the Agent and Borrower) via Federal fund wire transfer. Agent shall not be required to make any amount available to Borrower hereunder except to the extent Agent shall have received such amounts from Lenders as set forth herein, provided, however, that unless the Agent shall have been notified by a Lender prior to the time an Advance is to be made hereunder that such Lender does not intend to make its Pro Rata Share of such Advance available to Agent, Agent may assume that such Lender has made such Pro Rata Share available to Agent prior to such time, and Agent may (but shall not be obligated to) in reliance upon such assumption make available to Borrower a corresponding amount. If such corresponding amount is not in fact made available to Agent by such Lender and Agent has made such amount available to Borrower, then the applicable Lender and Borrower severally agree to pay to Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to Borrower to but excluding the date of payment to Agent, at (i) in the case of a payment to be made by such Lender, a rate per annum equal to the Fed Funds Rate and (ii) in the case of a payment to be made by Borrower, the interest rate set forth in Section 2.3. If Borrower and such Lender shall pay such interest to Agent for the same or an overlapping period, Agent shall promptly remit to Borrower the amount of such interest paid by the Borrower for such period.  Any payment by Borrower shall be without prejudice to any claim Borrower may have against a Lender that shall have failed to make such payment to Agent.

(d)     If a Lender makes a new Advance under this Agreement on a day on which Borrower is required to or has elected to repay all or any part of an outstanding Loan from such Lender, such Lender shall apply the proceeds of its new Advance to make such repayment and only an amount equal to the difference (if any) between the amount being borrowed and the amount being repaid shall be made available by such Lender to Borrower as provided in Section 2.04(c), or remitted by Borrower to Agent as provided in this Agreement, as the case may be.

(e)     Borrower hereby irrevocably authorizes Agent and Lenders to rely on telephonic, telegraphic, telecopy, telex or written instructions of any person identifying himself or herself an officer certified to Agent and Lenders as an authorized officer of Borrower, or any other individual from time to time authorized to act on behalf of the Borrower pursuant to a resolution adopted by Borrower's governing body and certified by the Secretary or other officer of Borrower and delivered to Agent and each of the Lenders (each, an "**Authorized**

**Officer**"), with respect to any request to make an Advance or a repayment hereunder, and on any signature which Agent or such Lender, as the case may be, believes to be genuine, and Borrower shall be bound thereby in the same manner as if such individual were actually authorized or such signature were genuine.   Borrower also hereby agrees to defend and indemnify Agent and each Lender and hold Agent and each Lender harmless from and against any and all claims, demands, damages, liabilities, losses, costs and expenses (including, without limitation, attorneys' fees and expenses) relating to or arising out of or in connection with the acceptance of instructions purportedly given by any Authorized Officer for making Advances or repayments hereunder; provided that, Borrower shall have no obligation to defend, indemnify or hold harmless Agent or any Lender with respect to any such claims, demands, damages, liabilities, losses, cost or expenses caused or arising out of the gross negligence or willful misconduct of Agent or any Lender as determined by a court of competent jurisdiction in a final, nonappealable order.

## 2.5   [Intentionally Omitted]

## 2.6   Promise to Pay; Manner of Payment

Borrower absolutely and unconditionally promises to pay principal, interest and all other amounts and Obligations payable hereunder, or under any other DIP Loan Document, without any right of rescission and without any deduction whatsoever, including any deduction for any setoff, counterclaim or recoupment, and notwithstanding any damage to, defects in or destruction of the Collateral or any other event, including obsolescence of any property or improvements.   All payments made by Borrower (other than payments automatically paid through Advances under the Revolving Facility as provided herein), shall be made only by wire transfer on the date when due, without offset or counterclaim, in U.S. Dollars, in immediately available funds to such account as may be indicated in writing by Agent to Borrower from time to time.   Any such payment received after 12:00 noon (Minneapolis, MN time) on the date when due shall be deemed received on the following Business Day.   Whenever any payment hereunder shall be stated to be due or shall become due and payable on a day other than a Business Day, the due date thereof shall be extended to, and such payment shall be made on, the next succeeding Business Day, and such extension of time in such case shall be included in the computation of payment of any interest (at the interest rate then in effect during such extension) and/or fees, as the case may be.

## 2.7   Mandatory Prepayments

(a)     Except with respect to payments made to the Wind-Down Fund in accordance with Section 2.14, in addition to and without limiting any provision of any DIP Loan Document, Borrower shall prepay the Obligations in the amount by which the Borrower's book balance of cash on hand as of the close of business on Monday of each week (or if a Monday is not a Business Day, the next Business Day) ("**Measurement Day**") exceeds $750,000 in the aggregate ("**Excess Cash Payments**").   Such Excess Cash Payment shall be made by the close of business on the following Business Day of each week ("**Excess Cash Payment Date**") and shall first be applied to repay the outstanding Incremental Advances and thereafter to the outstanding

Initial Advance.  Any prepayments of the Initial Advance shall be a permanent reduction of the Initial Advance and related Initial Commitment.  Any prepayments of the Incremental Advance shall not be a permanent reduction of the Incremental Commitment.

(b)   There shall be a permanent reduction in the Incremental Commitment in the amount of $250,000 on each of September 1, 2015 and March 1, 2016.  Simultaneously with each such permanent reduction, Borrower shall repay the then outstanding Incremental Loans in an amount sufficient to reduce the then outstanding Incremental Advances to or below such reduced Incremental Commitment.

(c)   Borrower shall repay the Initial Advance in such amounts, including Excess Cash Payments that are applied to the Initial Advance, so that as of each date set forth in the table below, all payments, including Excess Cash Payments that are applied to the Initial Advance, and amounts applied to repay the Initial Advance since the Closing Date shall equal or exceed the amount set forth opposite such date:

| Repayment Test Dates | Minimum Cumulative Repayments |
| --- | --- |
| May 31, 2015 | $1,800,000 |
| June 30, 2015 | $3,100,000 |
| July 31, 2015 | $4,900,000 |
| August 31, 2015 | $6,900,000 |
| September 30, 2015 | $8,300,000 |
| October 31, 2015 | $8,800,000 |
| November 30, 2015 | $10,400,000 |
| December 31, 2015 | $11,700,000 |
| January 31, 2016 | $14,000,000 |
| February 29, 2016 | $16,200,000 |
| March 31, 2016 | $16,800,000 |
| April 30, 2016 | $17,800,000 |
| May 31, 2016 | $19,100,000 |
| June 30, 2016 | $19,200,000 |
| July 31, 2016 | $20,700,000 |
| August 31, 2016 | $22,000,000 |

The remaining principal amount of the Initial Advance shall be due and payable in full on the Revolving Facility Maturity Date.  Any and all payments and prepayments of the Initial Advance shall be a permanent reduction of the Initial Advance and related Initial Commitment.  For the

avoidance of doubt, Borrower's failure to comply with this Section 2.7(c) shall constitute an Event of Default under Section 8.1(a)(i).

**2.8  Payments by Agent**

Should any amount required to be paid under any DIP Loan Document or the Financing Orders be unpaid, such amount may be paid by Agent, on behalf of itself and Lenders, which payment shall be deemed a request for an Advance under the Revolving Facility as of the date such payment is due after the expiration of any applicable cure period, and Borrower irrevocably authorizes disbursement of any such funds to Agent, for the benefit of itself and Lenders, by way of direct payment of the relevant amount, interest or Obligations without necessity of any demand.  No payment or prepayment of any amount by Agent, Lenders or any other Person shall entitle any Person to be subrogated to the rights of Agent or Lenders under any DIP Loan Document unless and until the Obligations have been fully performed and Paid in Full in cash and this Agreement has been terminated.

**2.9  Other Mandatory Prepayments and Voluntary Prepayment of Revolving Facility**

In addition to and without limiting any provision of any DIP Loan Document:

(a)      If a Change of Control occurs that has not been consented to in writing by Agent prior to the consummation thereof, on the date of such Change of Control, Borrower shall prepay the Loans and all other Obligations in full in cash together with accrued interest thereon to the date of prepayment and all other amounts owing to each Lender under the DIP Loan Documents.

(b)      If Borrower or any Credit Parties, in any transaction or series of related transactions, (i) sells any Collateral (other than sales of Inventory and collection of Accounts (but in no event sales of Accounts, whether pursuant to any factoring arrangement or otherwise) in the ordinary course of business), (ii) sells or issues any equity securities, capital stock or ownership interests, including, but not limited to, any sale or issuance undertaken in connection with or as part of a public offering of such Person's securities, (iii) receives any property damage insurance award or any other insurance proceeds of any kind, or (iv) incurs any Indebtedness except for Permitted Indebtedness, then it shall apply one hundred percent (100%) (or such lesser amount as is required to indefeasibly pay in cash in full the Obligations) of the net proceeds thereof to the prepayment of the Loans together with accrued interest and all other Obligations, such payment to be applied: first, to the extent such net proceeds relate to the sale of an asset encumbered by a Lien having priority over Agent's Lien in favor of a Person holding pre-petition Indebtedness secured by such Lien, to the holder of such Indebtedness, to the extent of such Indebtedness (and only to the extent such pre-petition Indebtedness and Liens securing same are valid, binding and enforceable and not subordinated, avoided, disallowed, unperfected, set aside or otherwise invalidated, whether pursuant to a judicial proceeding or otherwise); second, to all then unpaid fees, costs and expenses constituting Obligations pursuant to the terms of the DIP Loan Documents; third, to all accrued and unpaid interest on the outstanding principal balance of the Incremental Advances then due and owing; fourth, to the principal amount of the Incremental Advances; fifth, to all accrued and unpaid interest on the outstanding principal balance of the remaining Loans; sixth, to the principal balance of the remaining Loans (with a

corresponding permanent reduction in the Facility Cap); and seventh, as cash collateral (and held by Agent as such) for all Obligations in respect of Letter of Credit Usage, if any, in the manner and in the amount described in Section 9.1(e) (whether or not an Event of Default is then in existence); and eighth, to Borrower  provided, however, that except as set forth in Section 2.7(c), the reduction of the principal balance of the Loans shall not affect the amount or timing of principal payments (other than the extent to which reductions have been made with respect to such principal payments as allocated pursuant to this paragraph) required under this Agreement until the balance of such Loans is reduced to zero.

**2.10 Grant of Security Interest; Collateral**

(a)    To secure the payment and performance of the Obligations, Borrower, upon entry of the Interim Financing Order by the Bankruptcy Court, hereby grants to Agent, for the benefit of itself and Lenders, a continuing security interest in and Lien upon, and pledges to Agent, for the benefit of itself and Lenders, all of its rights, title and interests in and to the DIP Loan Collateral, any and all additions and accessions thereto, and any and all replacements, products and Proceeds (including insurance proceeds) thereof (the "**Collateral**"), which Liens and security interests shall have the priorities set forth in the Financing Orders.

(b)    Notwithstanding the foregoing provisions of this Section 2.10, such grant of a security interest shall not extend to, and the term "Collateral" shall not include, any Permits, contracts or General Intangibles of Borrower to the extent that (i) such Permits, contracts or General Intangibles are not assignable or capable of being encumbered as a matter of law or under the terms of any license or other agreement applicable thereto (but solely to the extent that any such restriction shall be enforceable under applicable law) without the consent of the licensor thereof or other applicable party thereto, and (ii) such consent has not been obtained; provided, however, that the foregoing grant of a security interest shall extend to, and the term "Collateral" shall include, each of the following: (a) any General Intangible which is in the nature of an Account or a right to the payment of money or a proceed of, or otherwise related to the enforcement or collection of, any Account or right to the payment of money, or goods which are the subject of any Account or right to the payment of money, (b) any and all proceeds of any General Intangible that is otherwise excluded to the extent that the assignment, pledge or encumbrance of such proceeds is not so restricted, and (c) upon obtaining the consent of any such licensor or other applicable party with respect to any such otherwise excluded Permits or General Intangible, such Permits or General Intangible as well as any and all proceeds thereof that might theretofore have been excluded from such grant of a security interest and from the term "Collateral."

(c)    As to all Collateral, including without limitation, all cash, cash equivalents, Commercial Tort Claims and Real Property the title to which is held by Borrower, or the possession of which is held by Borrower in the form of a leasehold interest, Borrower hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto Agent, for the benefit of itself and Lenders, all of the right, title and interest of Borrower in all of such Collateral, including without limitation, all cash, cash equivalents, Commercial Tort Claims and owned Real Property and in all such leasehold interests, together in each case with all of the right, title and interest of Borrower in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general

intangibles relating thereto and all proceeds thereof. Borrower acknowledges that, pursuant to the Financing Orders, the Liens granted in favor of Agent, for the benefit of itself and Lenders, in all of the Collateral shall be perfected without the recordation of any UCC financing statements, notices of Lien or other instruments of mortgage or assignment. Borrower further agrees that Agent is authorized to file or record financing statements with respect to the Collateral without the signature of Borrower in such form and in such offices as Agent reasonably determines appropriate to further evidence the perfection of the security interests of Agent under this Agreement and to use the collateral description "all assets of the Debtor" in any such financing statements.

(d)     [Intentionally Omitted.]

(e)     The Liens, lien priority, administrative priorities and other rights and remedies granted to Agent, for the benefit of itself and Lenders, in the Financing Orders and the other DIP Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided therein, and the administrative priority provided therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any other act or omission whatsoever until the full performance and irrevocable payment in full in cash of the Obligations and termination of this Agreement in accordance with the terms hereof.

**2.11 Collateral Administration**

(a)     All Collateral in which Borrower granted a Lien to Agent, for the benefit of itself and Lenders (except Deposit Accounts), will at all times be kept by Borrower at one of the locations set forth on Schedule 5.18 hereto and shall not, without thirty (30) calendar days prior written notice to Agent, be moved therefrom, and in any case shall not be moved outside the continental United States.

(b)     Borrower shall keep accurate and complete records of its Accounts and all payments and collections thereon and shall submit such records to Agent on such periodic basis as required under other provisions of this Agreement.

(c)     Whether or not an Event of Default has occurred, any of Agent's officers, employees, representatives or agents shall have the right, at any time during normal business hours, in the name of Agent, any designee of Agent or Borrower, to verify the validity, amount or any other matter relating to any Accounts of Borrower. Borrower shall cooperate fully with Agent in an effort to facilitate and promptly conclude such verification process.

(d)     To expedite collection, Borrower shall endeavor in the first instance to make collection of its Accounts. Agent, subject to the Financing Orders, shall have the right at all times after the occurrence and during the continuance of an Event of Default to notify (i) Account Debtors owing Accounts to Borrower that their Accounts have been assigned to Agent, for the benefit of itself and Lenders, and to collect such Accounts directly in its own name and to charge reasonable collection costs and expenses, including reasonable attorney's fees, to Borrower, and (ii) Account Debtors that Borrower has waived any and all defenses and

counterclaims it may have or could interpose in any such action or procedure brought by Agent to obtain a court order recognizing the security interest and Lien of Agent, for the benefit of itself and Lenders, in and to any Account or other Collateral and that Agent is seeking or may seek to obtain a court order recognizing the security interest and Lien of Agent in and to all Accounts and other Collateral.

(e)    As and when determined by Agent in its reasonable discretion, Agent will perform the searches described in clauses (i) and (ii) below against Borrower and Guarantors (the results of which are to be consistent with Borrower's representations and warranties under this Agreement), all at Borrower's expense:  (i) UCC searches with the Secretary of State of the jurisdiction of organization of Borrower and each Guarantor, the Secretary of State and local filing offices of each jurisdiction where Borrower and/or any Guarantors maintain their respective executive offices, a place of business or assets; and (ii) judgment, federal tax lien and state tax lien searches, in each jurisdiction searched under clause (i) above.

(f)    Borrower shall do anything further that may be lawfully and reasonably required by Agent to create and perfect Agent's Lien on any Collateral and effectuate the intentions of the DIP Loan Documents.  At Agent's request, Borrower shall immediately deliver to Agent all items for which Agent must receive possession to obtain a perfected security interest and all notes, certificates, and documents of title, Chattel Paper, warehouse receipts, Instruments, and any other similar instruments constituting Collateral.

### 2.12 Power of Attorney

Agent, for the benefit of itself and Lenders, is hereby irrevocably made, constituted and appointed the true and lawful attorney for Borrower (without requiring Agent to act as such) with full power of substitution to, after the occurrence and during the continuance of an Event of Default, do the following: (i) endorse the name of any such Person upon any and all checks, drafts, money orders, and other instruments for the payment of money that are payable to such Person and constitute collections on its or their Accounts; (ii) execute in the name of such Person any financing statements, schedules, assignments, instruments, documents, and statements that it is or they or are obligated to give Agent or any Lender under any of the DIP Loan Documents; and (iii) do such other and further lawful acts and deeds in the name of such Person that Agent may deem reasonably necessary or desirable to enforce any Account or other Collateral or to perfect Agent's security interest or lien in any Collateral or after the occurrence of an Event of Default which is continuing, enforce an Account or other Collateral.

### 2.13 Evidence of Loans

(a)    Each Lender shall maintain, in accordance with its usual practice, electronic or written records evidencing the indebtedness and obligations to such Lender resulting from each Loan made by such Lender from time to time, including without limitation, the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(b)    Agent shall maintain electronic or written records in which it will record (i) the amount of all Letter of Credit Usage and of each Loan made hereunder, the class and type

of each Loan made and any applicable interest rate periods, (ii) the amount of any principal and/or interest due and payable and/or to become due and payable from Borrower to each Lender hereunder and (iii) all amounts received by Agent hereunder from Borrower and each Lender's share thereof.

(c)     The entries made in the electronic or written records maintained pursuant to subsection (b) of this Section 2.13 (the "**Register**") shall be prima facie evidence of the existence and amounts of the obligations and indebtedness therein recorded; provided, however, that the failure of Agent to maintain such records or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans or Obligations in accordance with their terms.

(d)     Agent will account to Borrower monthly with a statement of Advances under the Revolving Facility, and any charges and payments made pursuant to this Agreement, and in the absence of manifest error, such accounting rendered by Agent shall be deemed final, binding and conclusive unless Agent is notified by Borrower in writing to the contrary within fifteen (15) calendar days of Receipt of each accounting, which notice shall be deemed an objection only to items specifically objected to therein.

(e)     Borrower agrees that:

(i)     upon written notice by Agent to the Borrower that a promissory note or other evidence of indebtedness is requested by Agent (for itself or on behalf of any Lender) to evidence the Loans and other Obligations owing or payable to, or to be made by, a Lender, the Borrower shall promptly (and in any event within three (3) Business Days of any such request) execute and deliver to Agent an appropriate promissory note or notes in form and substance reasonably acceptable to the Agent and Borrower, payable to the order of such Lender or in a principal amount equal to the amount of the Loans owing or payable to such Lender;

(ii)     all references to "Notes" in the DIP Loan Documents shall mean Notes, if any, to the extent issued (and not returned to the Borrower for cancellation) hereunder, as the same may be amended, modified, divided, supplemented and/or restated from time to time; and

(iii)     upon Agent's written request (for itself or on behalf of any Lender), and in any event within three (3) Business Days of any such request, Borrower shall execute and deliver to Agent new notes and/or divide the notes in exchange for then existing notes in such smaller amounts or denominations as Agent or a Lender shall specify in its sole and absolute discretion (including, without limitation, new Notes as a result of the mutilation, destruction, loss or theft of any Notes); provided, that the aggregate principal amount of such new Notes shall not exceed the aggregate principal amount of the Notes outstanding at the time such request is made; and provided, further, that such notes that are to be replaced shall then be deemed no longer outstanding hereunder and replaced by such new notes and returned to the Borrower within a reasonable period of time after Agent's receipt of the replacement notes.

## 2.14 Wind-Down Fund

(a)    Commencing in June 2015, and during each month thereafter, so long as no Event of Default has occurred and is continuing or would result therefrom and all payments have been made during such month necessary for Borrower to comply with Section 2.7(c), Borrower may fund from Excess Cash Payments a wind-down account (the "**Wind-Down Fund**") so long as any amount paid into the Wind-Down Fund in any month, when aggregated with all amounts paid into the Wind-Down Fund since the Closing Date, do not exceed (after giving effect to such payment) the amount set forth opposite such month in the table below

| Month | Maximum Cumulative Amount Funded into the Wind-Down Fund |
| --- | --- |
| June 2015 | $160,000 |
| July 2015 | $390,000 |
| August 2015 | $630,000 |
| September 2015 | $800,000 |
| October 2015 | $860,000 |
| November 2015 | $1,050,000 |
| December 2015 | $1,210,000 |
| January 2016 | $1,500,000 |
| February 2016 | $2,050,000 |
| March 2016 | $2,200,000 |
| April 2016 | $2,450,000 |
| May 2016 | $2,500,000 |
| June 2016 | $2,500,000 |
| July 2016 | $2,500,000 |
| August 2016 | $2,500,000 |

For the avoidance of doubt, in no event shall the aggregate amount deposited into the Wind-Down Fund since the Closing Date (on a cumulative basis) exceed $2,500,000 in the aggregate.

(b)    The Wind-Down Fund shall be (1) a separate account and hold only amounts paid into the Wind-Down Fund in accordance with this Section 2.14 and (2) established and maintained with and under the control of a Lender.  The Wind-Down Fund and all amounts from time to time on deposit in the Wind-Down Fund shall be additional security for the

payment and performance of the DIP Obligation and shall not be subject to any carve-out, including, without limitation, the Carve-Out.

(c)    Credit Parties may not access the Wind-Down Fund or any funds therein until the Obligations are paid in full and the any and all Commitments have been terminated; provided, however, that upon the occurrence and during the continuance of an Event of Default that results in either (i) the acceleration of the DIP Obligations or (ii) DIP Lenders no longer advancing any Incremental Loans, and so long as Borrower has used all cash on hand, Borrower may access amounts in the Wind-Down Fund, which shall only be used by Borrower to pay (A) payroll, payroll taxes and benefits, (B) hearing related costs, and (C) other actual operating expenses necessary to continue representing clients in existing cases. Borrower shall submit a written request to Agent to request funds from the Wind-Down Fund prior to payment in full of the DIP Obligations and termination of the DIP Credit Agreement, which written notice shall include (x) a detailed description and certification of an officer of Borrower regarding the use of the requested amounts, (y) evidence acceptable to Agent that Borrower has used all cash on hand and (z) the information set forth in clause (iii) of Appendix C.

(d)    Upon the occurrence of the Revolving Facility Maturity Date (other than as a result of Agent's or Lenders' acceleration of the Obligations as due to the occurrence of a Specified Event of Default), DIP Agent may, without further notice to or order of the Bankruptcy Court or further notice to any other Person, apply the amounts then on deposit in the Wind-Down Fund to the DIP Obligations in such order as determined by DIP Agent in its sole discretion.

## III.    FEES AND OTHER CHARGES

### 3.1    Commitment Fee

Upon entry of the Interim Financing Order, Borrower shall pay to Agent, for the ratable benefit of Lenders (based upon the Commitments of Lenders at Closing), a nonrefundable commitment fee equal to $100,000, which shall be deemed to be fully earned.

### 3.2    Unused Line Fee; Letter of Credit Fee; Agency Fee

(a)    Borrower shall pay to Agent, for the ratable benefit of Lenders, monthly an unused line fee (the "**Unused Line Fee**") in an amount equal to 0.75% per annum of the difference derived by subtracting (i) the daily average principal amount of the Advances under the Revolving Facility during the preceding month from (ii) the Facility Cap. The Unused Line Fee shall be payable monthly in arrears on the first day of each successive calendar month (starting with the first full month after which the Closing Date occurs).

(b)    Borrower shall pay to Agent, for the ratable benefit of Lenders, fees for each Letter of Credit and L/C Undertaking (the "**Letter of Credit Participation Fee**") for the period from and including the date of issuance of same to and excluding the date of expiration or termination thereof, equal to (i) the letter of credit fee charged by the L/C Issuer in respect of the applicable Letter of Credit, (ii) a fronting fee in an amount equal to one quarter of one percent (0.35%) of the original face amount of such Letter of Credit (calculate don an actual day, 360-day year basis, with a minimum fronting fee of $150.00 per Letter of Credit, which shall be due

and payable on the date of issuance of each such Letter of Credit and on each anniversary date of each such Letter of Credit;  plus (ii) 5.0% per annum (the "**LC Fee**") of the aggregate undrawn face amount of all outstanding Letters of Credit issued for the account of the Borrower; provided, however, while any Event of Default exists the LC Fee shall be increased by 5.0% per annum. The Letter of Credit Participation Fee is payable monthly in arrears on the first day of each month.  Borrower shall also pay on demand all issuance fees charged by the L/C Issuer in respect of each Letter of Credit and the normal and customary administrative charges for issuance, amendment, negotiation, renewal or extension of any such Letter of Credit and all other fees and expenses, if any, paid by Agent or any Lender to the applicable L/C Issuer.

(c)    Borrower shall pay to Agent an annual fee of $7,500 per Lender on the Closing Date upon the initial funding of the Loans, and on each annual anniversary thereafter while any of the Loans, Letters of Credit or Commitments remain outstanding; provided that this annual agency fee shall not exceed $30,000 in the aggregate for all Lenders in any year.

### 3.3  [Intentionally Omitted.]

### 3.4  Computation of Interest and Fees; Lawful Limits

All interest and fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed in each calculation period, as applicable.  In no contingency or event whatsoever, whether by reason of acceleration or otherwise, shall the interest and other charges paid or agreed to be paid hereunder for the use, forbearance or detention of money hereunder exceed the maximum rate permissible under applicable law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto.  If, due to any circumstance whatsoever, fulfillment of any provision hereof, at the time performance of such provision shall be due, shall exceed any such limit, then, the obligation to be so fulfilled shall be reduced to such lawful limit, and, if Agent or any Lender shall have received interest or any other charges of any kind which might be deemed to be interest under applicable law in excess of the maximum lawful rate, then such excess shall be applied first to any unpaid fees and charges hereunder, then to unpaid principal balance owed by Borrower hereunder, and if the then remaining excess interest is greater than the previously unpaid principal balance, Agent and Lenders shall promptly refund such excess amount to Borrower and the provisions hereof shall be deemed amended to provide for such permissible rate.  The terms and provisions of this Section 3.4 shall control to the extent any other provision of any DIP Loan Document is inconsistent herewith.

### 3.5  Default Rate of Interest

Automatically and for so long as any Event of Default shall have occurred and be continuing under Section 8.1(d) or (v)(ii) (or at the election of Agent or Requisite Lenders for so long as any other Event of Default shall have occurred and be continuing), the Applicable Rate of interest in effect at such time with respect to the Obligations shall be increased by 5.0% per annum (the "**Default Rate**").  Unless otherwise agreed to by Requisite Lenders, interest and LC Fees at the Default Rate shall accrue retroactively from the initial date of such Event of Default until that Event of Default ceases to exist and shall be payable on demand at Agent's election.

## IV.    CONDITIONS PRECEDENT

### 4.1  Conditions to Initial Advance and Closing

The obligations of Agent and Lenders to consummate the transactions contemplated herein, to make the Initial Advance or any Incremental Advance under the Revolving Facility, to cause the L/C Issuer to issue any Letter of Credit (and to enter into any L/C Undertaking in connection therewith), each on the Closing Date, are subject, in each case, to the satisfaction, in the sole judgment of Agent, of the following, each in form and substance satisfactory to Agent:

(a)    (i)  Borrower shall have delivered to Agent (A) the DIP Loan Documents to which it is a party, each duly executed by an Authorized Officer of Borrower and the other parties thereto, and (B) a Borrowing Certificate for the Initial Advance under the Revolving Facility and any Incremental Advance requested to be made upon entry of the Interim Financing Order executed by an Authorized Officer of Borrower, and (ii) each other Credit Party and each other Person party to a DIP Loan Document shall have delivered to Agent the DIP Loan Documents to which such Credit Party and/or Person is a party, each duly executed and delivered by such Credit Party and/or Person or an Authorized Officer of such Credit Party and/or Person, as applicable, and the other parties thereto;

(b)    Agent shall have received (i) a report of Uniform Commercial Code financing statement, tax and judgment lien searches performed with respect to Borrower and each Guarantor in each jurisdiction determined by Agent, and such report shall show no Liens on the Collateral (other than Permitted Liens), (ii) each document (including, without limitation, any Uniform Commercial Code financing statement) required by any DIP Loan Document or under law or requested by Agent to be filed, registered or recorded to create in favor of Agent, for the benefit of the Lenders, a perfected security interest upon the Collateral and (iii) evidence of each such filing, registration or recordation and of the payment by Borrower of any necessary fee, tax or expense relating thereto;

(c)    Agent shall have received (i) the Charter and Good Standing Documents, and (ii) a certificate of an Authorized Officer or of the corporate secretary or assistant secretary of Borrower and each other Credit Party (as applicable) dated the Closing Date, as to the incumbency and signature of the Persons executing the DIP Loan Documents, in form and substance acceptable to Agent;

(d)    The Bankruptcy Court shall have entered the Interim Financing Order in the Bankruptcy Case and such order shall be in full force and effect and shall not have been vacated, reversed, modified or stayed in any respect (and, if such order is the subject of a pending appeal, no further performance of any obligation of any party shall have been stayed pending appeal);

(e)    [Intentionally Omitted.]

(f)    Agent shall have received evidence of the provision for payment out of the proceeds of the Initial Advance, of all fees, charges and expenses payable to Agent and Lenders

on or prior to the Closing Date pursuant to the DIP Loan Documents and the Interim Financing Order;

(g)    [Intentionally Omitted.]

(h)    Borrower shall be in compliance with Section 6.5;

(i)    all corporate and other proceedings, documents, instruments and other legal matters in connection with the transactions contemplated by the DIP Loan Documents (including, but not limited to, those relating to corporate and capital structures of Borrower) shall have occurred;

(j)    except as set forth on Schedule 5.6, none of Borrower, any Guarantor or any principal or key management personnel of any such Person shall have been indicted or under active investigation by a U.S. Attorney for a felony crime;

(k)    Agent shall have received copies of all Permits required for Borrower and each Guarantor to conduct the business in which it is currently engaged or is contemplated pursuant to the DIP Loan Documents the absence of which to have could reasonably be expected to be, have or result in a Material Adverse Effect;

(l)    [Intentionally Omitted.]

(m)    Other than the filing of the Bankruptcy Case and Borrower's liquidation plan as reflected in the projections provided to Agent on or before the Closing Date, there shall not have occurred any Material Adverse Change or Material Adverse Effect from that which was reflected on the financial statements provided to Agent and Lenders on November 24, 2014 or any liabilities or obligations of any nature with respect to Borrower or any Guarantor which could reasonably be likely to have a Material Adverse Effect;

(n)    There are no inquiries, suits, surveys, proceedings or litigation pending or threatened which could reasonably be expected to have a Material Adverse Effect;

(o)    [Intentionally Omitted.]

(p)    Agent shall have received a Guaranty from SSDI Holdings, Inc. and a pledge of all of the equity interests in Borrower owned by SSDI Holdings, Inc.;

(q)    Agent shall have received such other DIP Loan Documents, certificates or information set forth on the closing checklist attached hereto as Exhibit D ("**Closing Checklist**") or as Agent may reasonably request, all in form and substance reasonably satisfactory to Agent except for those items listed therein as having a delivery date after the Closing Date;

(r)    Agent and Lenders shall have received, reviewed and approved the Budget;

(s)    [Intentionally Omitted]; and

(t)    Lenders shall have reviewed all of the foregoing deliveries and notified Agent that they are prepared to fund.

### 4.2  Conditions to Each Advance

The obligations of Lenders to make any Advance including, without limitation, the Initial Advance, and to cause the L/C Issuer to issue any Letter of Credit (and to enter into any L/C Undertaking in connection therewith are, in each case, subject to the satisfaction, in the sole judgment of Agent, of the following additional conditions precedent:

(a)    In the case of an Advance or issuance of a Letter of Credit, Borrower shall have delivered to Agent a Borrowing Certificate for the Advance and/or issuance of Letter of Credit (together with a form of the Letter of Credit to be issued if applicable) executed by an Authorized Officer of Borrower, which shall constitute a representation and warranty by Borrower as of the Borrowing Date of such Advance (or date of issuance of such Letter of Credit, as applicable) that the conditions contained in this Section 4.2 have been satisfied; provided, however, that any determination as to whether to have an L/C Issuer issue any Letter of Credit, shall be made by Agent and Lenders in their sole discretion;

(b)    each of the representations and warranties made by Borrower in or pursuant to this Agreement shall be accurate in all material respects (unless a representation or warranty is already qualified by materiality or is subject to Material Adverse Effect or Material Adverse Change qualifiers, in which case such representation or warranty shall be true, correct and complete in all respects), before and after giving effect to such Advance and/or issuance of Letter of Credit, and no Default or Event of Default shall have occurred or be continuing or would exist after giving effect to the Advance under the Revolving Facility on such date or issuance of Letter of Credit on such date;

(c)    immediately after giving effect to the requested Advance or issuance of Letter of Credit, as applicable, the sum of the aggregate outstanding principal amount of Advances under the Revolving Facility plus the Letter of Credit Usage shall not exceed the lesser of (i) the Budget then in effect or (ii) the Facility Cap then in effect less the amount of the current Carve-Out that has not been funded;

(d)    Agent and Lenders shall have received all fees, charges and expenses payable to Agent and Lenders on or prior to such date pursuant to the DIP Loan Documents, including without limitation, all unpaid audit fees and expenses, and attorneys' fees and expenses; and

(e)    there shall not have occurred or exist any Material Adverse Change or Material Adverse Effect.

## V.    REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants as of the date hereof, the Closing Date, each Borrowing Date and each date an L/C Issuer issues a Letter of Credit as follows:

### 5.1  Organization and Authority

Each Credit Party is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of its state of formation.  Each Credit Party (i) has all requisite corporate or entity power and authority to own its properties and assets and to carry on its business as now being conducted and as contemplated in the DIP Loan Documents, (ii) is duly qualified to do business in every jurisdiction in which failure to so qualify would reasonably be likely to have a Material Adverse Effect, and (iii) subject to the entry of the Interim Financing Order, has all requisite power and authority (A) to execute, deliver and perform the DIP Loan Documents to which it is a party, (B) to borrow hereunder, (C) to consummate the transactions contemplated under the DIP Loan Documents, and (D) to grant the Liens with regard to the Collateral pursuant to the DIP Loan Documents to which it is a party, the Interim Financing Order and the Final Financing Order.  No Credit Party is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, or is controlled by such an "investment company."

### 5.2  DIP Loan Documents

Upon entry of the Interim Financing Order, the execution, delivery and performance by each Credit Party of the DIP Loan Documents to which it is a party, and the consummation of the transactions contemplated thereby, (i) have been duly authorized by all requisite action of each such Person and have been duly executed and delivered by or on behalf of each such Person; (ii) do not violate any provisions of (A) applicable law, statute, rule, regulation, ordinance or tariff, (B) any order of any Governmental Authority binding on any such Person or any of their respective properties, or (C) the certificate of incorporation or bylaws (or any other equivalent governing agreement or document) of any such Person, or any agreement between any such Person and its respective stockholders, members, partners or equity owners or among any such stockholders, members, partners or equity owners; (iii) are not in conflict with, and do not result in a breach or default of or constitute an event of default, or an event, fact, condition or circumstance which, with notice or passage of time, or both, would constitute or result in a conflict, breach, default or event of default under, any indenture, agreement or other instrument to which any such Person is a party, or by which the properties or assets of such Person are bound, the effect of which could reasonably be expected to be, have or reflect in a Material Adverse Effect (other than conflicts, breaches, and defaults the enforcement of which is stayed by virtue of the filing of the Bankruptcy Case, or the Financing Orders); (iv) except as set forth therein and in the Financing Orders, will not result in the creation or imposition of any Lien of any nature upon any of the properties or assets of any such Person, and (v) except as set forth on Schedule 5.2, do not require the consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority or any other Person, except for the entry of the Interim Financing Order.  When executed and delivered, and upon entry of the Interim Financing Order, each of the DIP Loan Documents to which any Credit Party is a party will constitute the legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms.

### 5.3  Subsidiaries, Capitalization and Ownership Interests

Except as set forth in <u>Schedule 5.3</u>, no Credit Party has any Subsidiaries, is engaged, owns an interest or participates in any joint venture, partnership or similar arrangement with any other Person, or is an Affiliate of any other Person.  <u>Schedule 5.3</u> sets forth the authorized and issued capitalization of each Credit Party, the number and class of equity securities and/or ownership, voting or partnership interests issued and outstanding of each Credit Party and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing).  The ownership or partnership interests of each Credit Party that is a limited partnership or a limited liability company are not certificated, the documents relating to such interests do not expressly state that the interests are governed by Article 8 of the Uniform Commercial Code, and the interests are not held in a securities account.  The outstanding equity securities and/or ownership, voting or partnership interests of each Credit Party have been duly authorized and validly issued and are fully paid and nonassessable, and each Person listed on <u>Schedule 5.3</u> owns beneficially and of record all the equity securities and/or ownership, voting or partnership interests it is listed as owning free and clear of any Liens other than Liens created by the Security Documents.  <u>Schedule 5.3</u> also lists the directors, members, managers and/or partners of each Credit Party.

### 5.4  Properties

Each Credit Party (i) is the sole owner and has good, valid and marketable title to, or a valid leasehold interest in, all of its properties and assets, including the Collateral, whether personal or real, subject to no transfer restrictions or Liens of any kind except for Permitted Liens, and (ii) is in compliance in all material respects with each lease to which it is a party or otherwise bound (other than breaches and defaults the enforcement of which is stayed by virtue of the filing of the Bankruptcy Case or leases for locations which will be rejected in the Bankruptcy Case).  <u>Schedule 5.4</u> lists all real properties (and their locations) owned or leased by or to, and all other assets or property that are leased or licensed by each Credit Party and all leases (including leases of leased real property) covering or with respect to such properties and assets.  Each Credit Party, as applicable, enjoys peaceful and undisturbed possession under all such leases and such leases are all the leases necessary for the operation of such properties and assets, are valid and subsisting and are in full force and effect.

### 5.5  Other Agreements

Except as set forth on <u>Schedule 5.5</u>, no Credit Party is (i) a party to any judgment, order or decree or any agreement, document or instrument, or subject to any restriction, which would affect its ability to execute and deliver, or perform under, any DIP Loan Document or to pay the Obligations (other than restrictions the enforcement of which is stayed by virtue of the filing of the Bankruptcy Case or the Financing Orders), (ii) in default in the performance, observance or fulfillment of any obligation, covenant or condition contained in any agreement, document or instrument to which it is a party or to which any of its properties or assets are subject, the enforcement of which default is not stayed by virtue of the filing of the Bankruptcy Case, and, if not remedied within any applicable grace or cure period would reasonably be likely to have a Material Adverse Effect, nor is there any event, fact, condition or circumstance which,

with notice or passage of time or both, would constitute or result in a conflict, breach, default or event of default (other than conflicts, breaches, defaults or events of default, the enforcement of which is stayed by virtue of the filing of the Bankruptcy Case) under, any of the foregoing which, if not remedied within any applicable grace or cure period would reasonably be likely to have a Material Adverse Effect; or (iii) a party or subject to any agreement, document or instrument with respect to, or obligation to pay any, management or service fee with respect to, the ownership, operation, leasing or performance of its business.

### 5.6  Litigation

Except as set forth in Schedule 5.6 and excluding pre-Petition Date litigation which is stayed by the provisions of Section 362 of the Bankruptcy Code, there is no action, suit, arbitration, proceeding or investigation pending or, to any Credit Party's knowledge, threatened against any Credit Party that (i) questions, seeks to enjoin, or could in any way prevent the validity of any of the DIP Loan Documents or the right of such Person to enter into any DIP Loan Document or to consummate the transactions contemplated thereby, (ii) would reasonably be likely to be or have, either individually or in the aggregate, any Material Adverse Change or Material Adverse Effect, or (iii) would reasonably be likely to result in any Change of Control or other change in the current ownership, control or management of Borrower or any of its Subsidiaries.  Borrower is not aware that there is any basis for the foregoing.  Except as set forth on Schedule 5.6, no Credit Party is a party or subject to any order, writ, injunction, judgment or decree of any Governmental Authority.  Except as set forth on Schedule 5.6 there is no action, suit, proceeding or investigation initiated by a Credit Party currently pending.  Except as set forth on Schedule 5.6, no Credit Party has any existing accrued and/or unpaid Indebtedness to any Governmental Authority or any other governmental payor.

### 5.7  Hazardous Materials

Each Credit Party is in compliance with all applicable Environmental Laws.  No Credit Party has been notified of any action, suit, proceeding or investigation (i) relating in any way to compliance by or liability of such Person under any Environmental Laws, (ii) which otherwise deals with any Hazardous Substance or any Environmental Law, or (iii) which seeks to suspend, revoke or terminate any license, permit or approval necessary for the generation, handling, storage, treatment or disposal of any Hazardous Substance.

### 5.8  Potential Tax Liability; Tax Returns; Governmental Reports

(a)    Except as disclosed in Schedule 5.8, no Credit Party (i) has received any oral or written communication from the Internal Revenue Service with respect to any investigation or assessment relating to such Person directly, or relating to any consolidated tax return which was filed on behalf of such Person, (ii) is not aware of any year which remains open pending tax examination or audit by the IRS (other than as automatically set forth under applicable regulations), and (iii) is not aware of any information that could give rise to an IRS tax liability or assessment.

(b)      Each Credit Party (i) has filed all federal, state, foreign (if applicable) and local tax returns and other reports which are required by law to be filed by such Person, (ii) has paid all taxes, assessments, fees and other governmental charges, including, without limitation, payroll and other employment related taxes, in each case that are due and payable, except only for items that such Person is currently contesting in good faith with adequate reserves under GAAP, which contested items are described on Schedule 5.8, and (iii) is not aware of any information that could give rise to a tax assessment or Lien in favor of any Governmental Authority for delinquent taxes, assessments, fees or other governmental charges.

### 5.9      Financial Statements and Reports

All financial statements and financial information relating to any Credit Party that have, since November 1, 2014, been or may hereafter be delivered to Agent or any Lender by Development Specialists, Inc. on behalf of any Credit Party or any of their respective Subsidiaries are accurate and complete in all material respects.  No Credit Party has any material obligations or liabilities of any kind not disclosed in such financial information or statements, and since the date of the most recent financial statements submitted to Agent and Lenders, other than the filing of the Bankruptcy Case and matters disclosed on Schedules provided to sections in this Article V, there has not occurred any Material Adverse Change, Material Adverse Effect or, to any Credit Party's knowledge, any other event or condition that would reasonably be likely to have a Material Adverse Effect.

### 5.10      Compliance with Law

(a)      Each Credit Party is presently taking all actions necessary to assure that it is in compliance with HIPAA, the Social Security Act and all other Requirements of Law, the violation of which would be reasonably likely to have a Material Adverse Effect.  Except as set forth on Schedule 0, each Credit Party (i) is in compliance with all Requirements of Law applicable to it and its business, assets or operations, including, without limitation, ERISA and Healthcare Laws, and (ii) is not in violation of any order of any Governmental Authority or other board or tribunal, except where noncompliance or violation could not reasonably be expected to result in a Material Adverse Change.  There is no event, fact, condition or circumstance which, with notice or passage of time, or both, would constitute or result in any noncompliance with, or any violation of, any of the foregoing, in each case except where noncompliance or violation could not reasonably be expected to result in a Material Adverse Change.  Except as set forth on Schedule 0, no Credit Party has received any notice that it is not currently in compliance in any respect with any of the requirements of any of the foregoing.  No Credit Party has (a) engaged in any Prohibited Transactions as defined in Section 406 of ERISA and Section 4975 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder, (b) failed to meet any applicable minimum funding requirements under Section 302 of ERISA in respect of its plans and no funding requirements have been postponed or delayed, (c) any knowledge of any event or occurrence which would cause the Pension Benefit Guaranty Corporation to institute proceedings under Title IV of ERISA to terminate any of the employee benefit plans, (d) any fiduciary responsibility under ERISA for investments with respect to any plan existing for the benefit of Persons other than its employees or former employees, or (e) withdrawn, completely or partially, from any multi-employer pension plans so as to incur

liability under the MultiEmployer Pension Plan Amendments of 1980. There exists no event described in Section 4043 of ERISA, excluding Subsections 4043(b)(2) and 4043(b)(3) thereof, for which the required thirty (30) day notice period has not been waived. To the best knowledge of the Credit Parties, there are no presently existing circumstances which likely would result in material violations of any of the Requirements of Law, including, without limitation, Healthcare Laws.

(b)     No Credit Party (i) is a Person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such Person in any manner violative of such Section 2, or (iii) a Person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other OFAC regulation or executive order.

(c)     Each Credit Party is in compliance with the Patriot Act.

**5.11 Intellectual Property**

Except as set forth on Schedule 5.11, no Credit Party owns, licenses or utilizes, and is not a party to, any patents, patent applications, trademarks, trademark applications, service marks, registered copyrights, copyright applications, copyrights, trade names, trade secrets, software, licenses or other Intellectual Property.

**5.12     Licenses and Permits; Labor**

Each Credit Party is in compliance with and has all Permits and Intellectual Property necessary or required by applicable law or Governmental Authority for the operation of such Person's businesses. All of the foregoing are in full force and effect and not in known conflict with the rights of others. No Credit Party is (i) in breach of or default under the provisions of any of the foregoing, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in a conflict, breach, default or event of default under, any of the foregoing which, if not remedied within any applicable grace or cure period would reasonably be likely to have a Material Adverse Effect, (ii) a party to or subject to any agreement, instrument or restriction that is so unusual or burdensome that it might have a Material Adverse Effect, and/or (iii) involved in any labor dispute, strike, or walkout.

**5.13     No Default**

There does not exist any Default or Event of Default.

**5.14     Disclosure**

No DIP Loan Document nor any other agreement, document, certificate, or statement furnished to Agent or any Lender by or on behalf of any Credit Party in connection

with the transactions contemplated by the DIP Loan Documents, nor any representation or warranty made by any Credit Party in any DIP Loan Document, contains any untrue statement of material fact or omits to state any fact necessary to make the statements therein not materially misleading. There is no fact known to any Credit Party which has not been disclosed to Agent and Lenders in writing which would reasonably be likely to have a Material Adverse Effect.

### 5.15      Existing Indebtedness; Investments, Guarantees and Certain Contracts

Except as contemplated by the DIP Loan Documents or as otherwise set forth on Schedule 5.15A, no Credit Party (i) has any outstanding Indebtedness that is not subject to the Automatic Stay or was incurred on or after the Petition Date, (ii) is subject or party to any mortgage, note, indenture, indemnity or guarantee of, with respect to or evidencing any Indebtedness of any other Person that is not subject to the Automatic Stay or was incurred on or after the Petition Date, or (iii) owns or holds any equity or long-term debt investments in, or has any outstanding advances to or any outstanding guarantees for the obligations of, or any outstanding borrowings from, any Person. Each Credit Party has performed all material obligations required to be performed by such Person pursuant to or in connection with any items listed on Schedule 5.15A and there has occurred no breach, default or event of default under any document evidencing any such items or any fact, circumstance, condition or event which, with the giving of notice or passage of time or both, would constitute or result in a breach, default or event of default thereunder. Schedule 5.15B sets forth all Indebtedness that is not subject to the Automatic Stay or was incurred on or after the Petition Date, with a maturity date during the Term of the Loan, and identifies such maturity date.

### 5.16      Other Agreements

Except as set forth on Schedule 5.16, (i) there are no existing or proposed agreements, arrangements, understandings or transactions between any Credit Party and any of its officers, members, managers, directors, stockholders, partners, other interest holders, employees or Affiliates or any members of their respective immediate families, and (ii) none of the foregoing Persons are directly or indirectly, indebted to or have any direct or indirect ownership, partnership or voting interest in, to any Credit Party's knowledge, any Affiliate of any Credit Party or any Person that competes with any Credit Party (except that any such Persons may own stock in (but not exceeding two percent (2%) of the outstanding capital stock of) any publicly traded company that may compete with a Credit Party.

Borrower and Guarantor represent and warrant to Agent and Lenders that they have not contracted with, and do not know of, any broker, to be paid by any Borrower or Guarantor, who has participated in the Revolving Facility or the transactions contemplated herein. Borrower and Guarantor shall indemnify and hold DIP Agent and DIP Lenders harmless from any claim for broker's fees or expenses in connection with the transactions contemplated hereby.

**5.17 Insurance**

Each Credit Party has in full force and effect such insurance policies as are customary in its industry and as may be required pursuant to Section 6.5 hereof.  All such insurance policies are listed and described on Schedule 5.17.

**5.18    Location of Offices, Records and Collateral**

Each Credit Party maintains its places of business and chief executive offices only at the locations set forth on Schedule 5.18, and all Accounts of Credit Parties arise, originate and are located, and all of the Collateral granted by Credit Parties and all books and records in connection therewith or in any way relating thereto or evidencing such Collateral are located and shall only be located, in and at such locations of Credit Parties.  All of the Collateral is located only in the continental United States.

**5.19    Non-Subordination; Lien and Claim Priority**

(a)    The Obligations are not subordinated in any way to any other obligations of any Credit Party or to the rights of any other Person.

(b)    Upon the entry of the Interim Financing Order and the Final Financing Order by the Bankruptcy Court, the Obligations of the Credit Parties will constitute allowed administrative expenses in the Bankruptcy Case, having priority in payment over all other administrative expenses and unsecured claims against the Credit Parties now existing or hereafter arising, of any kind or nature whatsoever, including without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject, as to priority, only to Permitted Expenses (including, without limitation, the Carve-Out) having priority of payment over the Obligations to the extent set forth in the Financing Orders and as otherwise provided in the Financing Orders.

(c)    Upon entry of each of the Interim Financing Order and the Final Financing Order by the Bankruptcy Court, the Liens and security interests granted to Agent, for the benefit of itself and Lenders, hereunder shall be deemed good, valid and duly perfected Liens and security interests in the Collateral, with the priorities set forth in the Financing Orders, subject to no enforceable transfer or other restrictions or Liens of any kind in favor of any other Person except for Permitted Liens and the Permitted Expenses (including, without limitation, the Carve-Out) and as otherwise provided in the Financing Orders and shall be perfected without the recordation of any UCC financing statements, notices of Lien, mortgages or other instruments of assignment.

**5.20**        **[Intentionally Omitted.]**

**5.21**        **Survival**

Credit Parties make the representations and warranties contained herein with the knowledge and intention that Agent and Lenders are relying and will rely thereon.  All such representations and warranties will survive the execution and delivery of this Agreement, the making of the Advances under the Revolving Facility and the issuance of any Letters of Credit.

## VI.    AFFIRMATIVE COVENANTS

Borrower covenants and agrees that, until full performance and satisfaction, and indefeasible payment in full in cash, of all the Obligations and termination of this Agreement:

### 6.1  Financial Statements, Financial Reports and Other Information

(a)        Financial Reports.  As soon as available and in any event within:  (x) thirty (30) days after the end of each fiscal month, consolidated balance sheets of Borrower and its Subsidiaries as of the end of such fiscal month and the related consolidated statements of income, retained earnings and cash flows for such fiscal month and for the portion of Borrower's fiscal year ended at the end of such fiscal  month, setting forth in each case in comparative form, (A) the figures for the corresponding fiscal month and the corresponding portion of Borrower's previous fiscal year and (B) Borrower's budgeted projections for such fiscal month and for the portion of Borrower's  fiscal year ended at the end of such fiscal month, all in reasonable detail and satisfactory in form to the Requisite Lenders, together with management's discussion and analysis concerning such statements, and all certified (subject to normal year-end adjustments and footnote disclosures) on behalf of Borrower as to fairness of presentation, GAAP and consistency by an Authorized Officer or the chief financial officer of Borrower.   With each such financial statement, Borrower shall also deliver a compliance certificate of its chief financial officer or other Authorized Officer, in the form annexed hereto as Exhibit B, stating that (A) such person has reviewed the relevant terms of the DIP Loan Documents and the condition of the Credit Parties, (B) no Default or Event of Default has occurred or is continuing, or, if any of the foregoing has occurred or is continuing, specifying the nature and status and period of existence thereof and the steps taken or proposed to be taken with respect thereto, and (C) Borrower is in compliance with all covenants attached as Annex I hereto and all covenants set forth in Sections 6.17(b) and 6.17(c).  Such certificate shall be accompanied by the calculations necessary to show compliance with the financial covenants in a form satisfactory to Agent

(b)        Other Materials.  Borrower shall furnish to Agent and each Lender as soon as available, and in any event within ten (10) calendar days after the preparation or issuance thereof or at such other time as set forth below:  (i) copies of licenses and permits required by any applicable federal, state, foreign or local law, statute ordinance or regulation or Governmental Authority for the operation of any Credit Party's business, (ii) copies of all reports and/or financial information provided to the Bankruptcy Court, the United States Trustee and any statutorily appointed or ad hoc committee in the Bankruptcy Case, (iii) when and as required thereby, the periodic reports set forth on Appendix C, and (iv) such additional information,

documents, statements, reports and other materials as Agent or any Lender may reasonably request from a credit or security perspective or otherwise from time to time.

(c)    Notices.    Borrower shall promptly, and in any event within five (5) calendar days after any Credit Party or any Authorized Officer of any Credit Party obtains knowledge thereof, notify Agent and each Lender in writing of (i) any pending or threatened litigation, suit, investigation, arbitration, dispute resolution proceeding or administrative proceeding brought or initiated by any Credit Party or otherwise affecting or involving or relating to any Credit Party or any of such Person's property or assets or any application or motion of any Person seeking relief from the automatic stay under Section 362 of the Bankruptcy Code with respect thereto in each case to the extent (A) the amount in controversy exceeds $200,000, or (B) to the extent any of the foregoing seeks injunctive or declarative relief that, if successful, is reasonably likely to have a Material Adverse Effect, (ii) any Default or Event of Default, which notice shall specify the nature and status thereof, the period of existence thereof and what action is proposed to be taken with respect thereto, (iii) any other development, event, fact, circumstance or condition that would reasonably be likely to have a Material Adverse Effect, in each case describing the nature and status thereof and the action proposed to be taken with respect thereto, (iv) any notice received by any Credit Party from any payor of a claim, suit or other action such payor has, claims or has filed against any Credit Party that, if successful, is reasonably likely to have a Material Adverse Effect, (v) any matter(s) affecting the value, enforceability or collectability of any of the Collateral, including, without limitation, claims or disputes in the amount of $100,000 or more, singly or in the aggregate, in existence at any one time, (vi) any notice given by any Credit Party to any other lender of such Person, which notice to Agent and each Lender shall be accompanied by a copy of the applicable notice given to the other Lender, (vii) receipt of any notice or request from any Governmental Authority or governmental payor regarding any liability or claim of liability, (viii) any Account becoming evidenced or secured by an Instrument or Chattel Paper, (ix) receipt of any notice from any Account Debtor under a material contract notifying any Credit Party of a material breach under or termination of such contract, (x) any Borrower becoming subject to reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority, (xi) any Credit Party becoming the subject of any government payor program investigation conducted by any federal or state enforcement agency, (xii) any Credit Party being served with or received any search warrant, subpoena, civil investigative demand or contact letter by or from any federal or state enforcement agency relating to an investigation, (xiii) any Credit Party becoming subject to any written complaint filed with or submitted to any Governmental Authority having jurisdiction over it or filed with or submitted to such Credit Party pursuant to such Credit Party's policies relating to the filing or submissions of such types of complaints, from employees, independent contractors, vendors, physicians, or any other Person that would indicate that such Credit Party has violated any law, regulation or law or (xiv) any notice provided or received by Borrower in connection with the Bankruptcy Case that is not otherwise filed on the docket in the Bankruptcy Case.

(d)    Consents.    Each Credit Party shall obtain and deliver from time to time all required consents, approvals and agreements from such third parties as Agent shall determine are reasonably necessary or desirable in its sole discretion, each of which must be satisfactory to Agent in its sole discretion, with respect to (i) the DIP Loan Documents and the transactions contemplated thereby, (ii) claims against any Credit Party or the Collateral, and/or (iii) any

agreements, consents, documents or instruments to which any Credit Party is a party or by which any properties or assets of any Credit Party or any of the Collateral is or are bound or subject.

(e)     Operating Budget.  Borrower shall furnish to Agent and each Lender on or prior to the Closing Date and for each fiscal year of Borrower thereafter not less than thirty (30) calendar days prior to the commencement of such fiscal year, consolidated month by month projected operating budgets, annual projections, profit and loss statements, balance sheets and cash flow reports of and for each Credit Party for such upcoming fiscal year (including an income statement for each month and a balance sheet as at the end of the last month in each fiscal quarter), in each case prepared in accordance with GAAP consistently applied with prior periods.

### 6.2  Payment of Obligations

Borrower shall make full and timely indefeasible payment in cash of the principal of and interest on the Loans, Advances and all other Obligations.

### 6.3  Conduct of Business and Maintenance of Existence and Assets

Borrower shall, and shall cause each Credit Party to, (i) conduct its business in accordance with good business practices customary to the industry, (ii) engage principally in the same or similar lines of business substantially as heretofore conducted, (iii) collect its Accounts in the ordinary course of business, (iv) maintain all of its material properties, assets and equipment used or useful in its business in good repair, working order and condition (normal wear and tear excepted and except as may be disposed of in the ordinary course of business and in accordance with the terms of the DIP Loan Documents and otherwise as determined by Borrower using commercially reasonable business judgment), (v) from time to time to make all necessary or desirable repairs, renewals and replacements thereof, as determined by Borrower using commercially reasonable business judgment, (vi) maintain and keep in full force and effect its existence and all material Permits and qualifications to do business and good standing in each jurisdiction in which the ownership or lease of property or the nature of its business makes such Permits or qualification necessary and in which failure to maintain such Permits or qualification could reasonably be likely to have a Material Adverse Effect, and (vii) remain in good standing and maintain operations in all jurisdictions in which currently located except in connection with closings as contemplated by Section 6.17(c).

### 6.4  Compliance with Legal and Other Obligations

Borrower shall, and shall cause each Credit Party to, (i) comply with all Requirements of Law applicable to it or its business, assets or operations, including applicable requirements which where promulgated pursuant to the Social Security Act, and any other applicable Healthcare Law, (ii) perform in accordance with its terms each contract, agreement or other arrangement to which it is a party or by which it or any of the Collateral is bound, except where the failure to comply, pay or perform could not reasonably be expected to result in a Material Adverse Change, and (iii) maintain and comply with all Permits necessary to conduct its business and comply with any new or additional requirements that may be imposed on it or its

business that are necessary to conduct its business and in which failure to maintain such Permits and comply with such requirements could reasonably be likely to have a Material Adverse Effect.

### 6.5  Insurance

Borrower will, and it will cause each Subsidiary to, insure all of its Property of the character usually insured by Persons engaged in the same or similar businesses similarly situated, against loss or damage of the kind customarily insured against by such Persons and with coverages in amounts the same as or similar to those of businesses similarly situated, and carry liability insurance and other insurance of a kind and in an amount generally carried by Persons engaged in the same or similar businesses similarly situated. All insurance required by this Section 6.5 shall (a) be with insurers rated A-XI or better by A.M. Best Company (or accorded a similar rating by another nationally or internationally recognized insurance rating agency of similar standing if A.M. Best Company is not then in the business of rating insurers or rating foreign insurers) or such other insurers as may from time to time be reasonably acceptable to the Agent, (b) be satisfactory in form and substance to Agent, (c) name Agent, for the benefit of Lenders, as loss payee and additional insured thereunder, and (d) expressly provide that they cannot be altered, amended, modified or canceled without thirty (30) Business Days prior written notice to Agent and that they inure to the benefit of Agent, for the benefit of Lenders, notwithstanding any action or omission or negligence of or by a Credit Party or any insured thereunder.  All such insurance may be subject to reasonable deductibles, exclusions and co-insurance and other provisions as are customary for a business engaged in activities similar to those of Credit Parties.  On or before March 30 of each calendar year, Borrower shall deliver to the Agent a certificate of an Authorized Officer of Borrower specifying the details of all insurance then in effect and certifying that all of the premiums therefor which are then due and payable have been paid in full.  UNLESS BORROWER PROVIDES EVIDENCE OF THE INSURANCE COVERAGE REQUIRED UNDER THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS, THE AGENT MAY PURCHASE INSURANCE AT BORROWER'S EXPENSE TO PROTECT THE AGENT'S INTEREST IN THE COLLATERAL.  THIS INSURANCE MAY, BUT NEED NOT, PROTECT BORROWER'S INTERESTS. THE COVERAGE THAT THE AGENT PURCHASES MAY NOT PAY ANY CLAIM THAT BORROWER MAY MAKE OR ANY CLAIM THAT IS MADE AGAINST BORROWER IN CONNECTION WITH THE COLLATERAL. BORROWER MAY LATER CANCEL ANY INSURANCE PURCHASED BY THE AGENT, BUT ONLY AFTER PROVIDING EVIDENCE THAT BORROWER HAS OBTAINED INSURANCE AS REQUIRED BY THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS. IF THE AGENT PURCHASES INSURANCE FOR THE COLLATERAL, BORROWER WILL BE RESPONSIBLE FOR THE COSTS OF THAT INSURANCE, INCLUDING THE INSURANCE PREMIUM, INTEREST AND ANY OTHER CHARGES THE AGENT MAY IMPOSE IN CONNECTION WITH THE PLACEMENT OF INSURANCE, UNTIL THE EFFECTIVE DATE OF THE CANCELLATION OR EXPIRATION OF THE INSURANCE. THE COSTS OF THE INSURANCE MAY BE ADDED TO THE BORROWER'S OBLIGATIONS. THE COSTS OF THE INSURANCE MAY BE MORE THAN THE COST OF INSURANCE BORROWER MAY BE ABLE TO OBTAIN ON ITS OWN.

**6.6  True Books**

Borrower shall, and shall cause each Credit Party to, (i) keep true, complete and accurate books of record and account in accordance with commercially reasonable business practices in which true and correct entries are made of all of its and their dealings and transactions in all material respects; and (ii) set up and maintain on its books such reserves as may be required by GAAP with respect to doubtful accounts and all taxes, assessments, charges, levies and claims and with respect to its business, and include such reserves in its monthly as well as year end financial statements.

**6.7  Inspection; Periodic Audits**

Borrower shall, and shall cause each Credit Party to, permit the representatives of Agent, at the sole expense of Borrower, from time to time during normal business hours upon reasonable notice, to (i) visit and inspect any of its offices or properties or any other place where Collateral is located to inspect the Collateral and/or to examine or audit all of its books of account, records, reports and other papers, (ii) make copies and extracts therefrom, and (iii) discuss its business, operations, prospects, properties, assets, liabilities, condition and/or Accounts with its officers and independent public accountants (and by this provision such officers and accountants are authorized to discuss the foregoing).

**6.8  Further Assurances; Post Closing**

At Borrower's cost and expense, Borrower shall, and shall cause each Credit Party to, (i) take such further actions, obtain such consents and approvals and duly execute and deliver such further agreements, assignments, instructions or documents as Agent may request with respect to the purposes, terms and conditions of the DIP Loan Documents and the consummation of the transactions contemplated thereby, and (ii) without limiting and notwithstanding any other provision of any DIP Loan Document, execute and deliver, or cause to be executed and delivered, such agreements and documents, and take or cause to be taken such actions, and otherwise perform, observe and comply with such obligations, as are set forth on Schedule 6.8.

**6.9  Payment of Indebtedness**

Except as otherwise prescribed in the DIP Loan Documents, or to the extent excused pursuant to the Bankruptcy Code, and, with respect to Subordinated Debt, subject to any applicable Subordination Agreement or subordination provisions, Borrower shall, and shall cause each Credit Party to, pay, discharge or otherwise satisfy at or before maturity (subject to applicable grace periods and, in the case of trade payables, to ordinary course payment practices and time period for payment permitted under this Agreement) all of its material enforceable obligations and liabilities for Indebtedness that is not subject to the Automatic Stay or is incurred after the Petition Date, except when the amount or validity thereof is being contested in good faith by appropriate proceedings and such reserves as Agent may deem proper and necessary in its sole discretion shall have been made.

### 6.10 Lien Searches

If Liens other than Permitted Liens exist, Borrower immediately shall, and shall cause each Credit Party to, take, execute and deliver all actions, documents and instruments necessary to release and terminate such Liens.

### 6.11 Use of Proceeds

Borrower shall use the proceeds from the Revolving Facility only for the purposes set forth in the second "WHEREAS" clause of this Agreement, subject to variances permitted under this Agreement, and as provided in the Financing Orders.

### 6.12 Collateral Documents; Security Interest in Collateral

Borrower shall, and shall cause each Credit Party to, (i) if requested by Agent, execute, obtain, deliver, file, register and/or record any and all financing statements, continuation statements, stock powers, instruments and other documents, or cause the execution, filing, registration, recording or delivery of any and all of the foregoing, that are necessary or required under law or otherwise or reasonably requested by Agent to be executed, filed, registered, obtained, delivered or recorded to create, maintain, perfect, preserve, validate or otherwise protect the pledge of the Collateral to Agent, for the benefit of Lenders, and Agent's perfected Lien on the Collateral, and Borrower irrevocably grants Agent, for the benefit of Lenders, the right, at Agent's option, to file any or all of the foregoing, (ii) immediately upon learning thereof, report to Agent any reclamation, return or repossession of goods in excess of $50,000 (individually or in the aggregate), and (iii) defend the Collateral and Agent's perfected Lien thereon against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to Agent, and pay all reasonable costs and expenses (including, without limitation, in-house documentation and diligence fees and legal expenses and reasonable attorneys' fees and expenses) in connection with such defense, which may at Agent's discretion be added to the Obligations.

### 6.13 [INTENTIONALLY OMITTED.]

### 6.14 Taxes and Other Charges

(a)     All payments and reimbursements to each Lender or Agent made under any DIP Loan Document shall be free and clear of and without deduction for all taxes, levies, imposts, deductions, assessments, charges or withholdings, and all liabilities with respect thereto of any nature whatsoever, excluding, in the case of each Lender and Agent, taxes to the extent imposed on such Lender's or Agent's net income.  If Borrower shall be required by law to deduct any such amounts from or in respect of any sum payable under any DIP Loan Document to any Lender or Agent, then the sum payable to such Lender or Agent, as the case may be, shall be increased as may be necessary so that, after making all required deductions, such Lender or Agent, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made.  Notwithstanding any other provision of any DIP Loan Document, if at any time after the Closing (i) any change in any existing law, regulation, treaty or directive or

in the interpretation or application thereof, (ii) any new law, regulation, treaty or directive enacted or any interpretation or application thereof, or (iii) compliance by Agent or any Lender with any request or directive (whether or not having the force of law) from any Governmental Authority:  (A) subjects Agent or any Lender to any tax, levy, impost, deduction, assessment, charge or withholding of any kind whatsoever with respect to any DIP Loan Document, or changes the basis of taxation of payments to Agent or any Lender of any amount payable thereunder (except for net income taxes, or franchise taxes imposed in lieu of net income taxes, imposed generally by federal, state or local taxing authorities with respect to interest or commitment fees or other fees payable hereunder or changes in the rate of tax on the overall net income of any Lender or Agent, as the case may be), or (B) imposes on Agent or any Lender any other condition or increased cost in connection with the transactions contemplated thereby or participations therein; and the result of any of the foregoing is to increase the cost to Agent or any Lender of making or continuing any Loan hereunder or to reduce any amount receivable hereunder, then, in any such case, Borrower shall promptly pay to Agent or such Lender, as the case may be, any additional amounts necessary to compensate Agent or such Lender, as the case may be, on an after-tax basis, for such additional cost or reduced amount as reasonably determined by Agent or such Lender.  If Agent or any Lender becomes entitled to claim any additional amounts pursuant to this <u>Section 6.14</u>, Agent or such Lender shall promptly notify Borrower of the event by reason of which Agent or such Lender has become so entitled, and each such notice of additional amounts payable pursuant to this <u>Section 6.14</u> submitted by Agent or any Lender to Borrower shall, absent manifest error, be final, conclusive and binding for all purposes.

(b)     Borrower shall promptly, and in any event within five (5) Business Days after any Credit Party or any Authorized Officer of any Credit Party obtains knowledge thereof, notify Agent in writing of any oral or written communication from the Internal Revenue Service or otherwise with respect to any (i) tax investigations, relating to Borrower or any other Credit Party directly, or relating to any consolidated tax return which was filed on behalf Borrower or any other Credit Party, (ii) notices of tax assessment or possible tax assessment, (iii) years that are designated open pending tax examination or audit, and (iv) information that could give rise to an IRS tax liability or assessment.

**6.15** **[Intentionally Omitted.]**

**6.16** **Taxes**

Without limiting or being limited by any other provision of any DIP Loan Document, Borrower at all times shall, and shall cause each Credit Party to, retain and use a Person acceptable to Agent to process, manage and pay its post-petition payroll taxes and shall cause to be delivered to Agent within ten (10) calendar days after the end of each calendar month a report of its post-petition payroll taxes for the immediately preceding calendar month and evidence of payment thereof.

**6.17** **Other Covenants**

(a)     The Borrower shall use its best efforts to cause an order to be entered by the Bankruptcy Court (in form and substance reasonably acceptable to Agent) on or before the

date that is 60 days following the Petition Date, approving the KEIP, with any material modifications for which Borrower has obtained Agent's prior written consent in connection with the Bankruptcy Court approval of the KEIP.

(b)    Measured as of the last day of each month, or as of the pay period nearest to that day, Borrower shall cause the total number of employees employed by Credit Parties or any third party on any Credit Party's behalf, or otherwise for the benefit of a Credit Party, not to exceed the number set forth opposite the dates indicated below, subject as of each measurement date to an allowed 10% variance:

| Month Ended | Maximum Number of Employees |
|---|---|
| December 31, 2014 | 956 |
| January 31, 2015 | 955 |
| February 28, 2015 | 923 |
| March 31, 2015 | 923 |
| April 30, 2015 | 908 |
| May 31, 2015 | 854 |
| June 30, 2015 | 762 |
| July 31, 2015 | 709 |
| August 31, 2015 | 699 |
| September 30, 2015 | 709 |
| October 31, 2015 | 705 |
| November 30, 2015 | 705 |
| December 31, 2015 | 686 |
| January 31, 2016 | 458 |
| February 29, 2016 | 458 |
| March 31, 2016 | 458 |
| April 30, 2016 | 458 |
| May 31, 2016 | 444 |

| June 30, 2016 | 429 |
|---|---|

(c)  Measured as of the dates set forth in the table below, Borrower shall cause the total number of leases for non-residential real property in effect that have not expired or been rejected or otherwise terminated not to exceed the number of leased locations set forth opposite such date in the table below; provided that Borrower shall have a 30 day cure period:

| **Month Ended** | **Maximum Number of Leased Locations** |
|---|---|
| December 31, 2014 | 25 |
| June 30, 2015 | 18 |
| December 31, 2015 | 9 |
| June 30, 2016 | 7 |

(d)  On or before February 28, 2015, any contract with a third-party to provide voice-over or similar talent related services shall have either (a) terminated in accordance with its terms or (b) been rejected by the Credit Parties pursuant to an order entered by the Bankruptcy Court.

### 6.18 Financing Orders

Borrower shall, and shall cause each Credit Party to, at all times comply with all terms and conditions of the Financing Orders.

### 6.19 Delivery to Lender of Documentation Regarding Any Proposed Sale of Assets

Borrower shall, and shall cause each Credit Party to, promptly deliver to Agent and Lenders all written proposals, term sheets, commitment letters, letters of intent, purchase agreements and related documents and materials as to any proposed sale of the assets of any Credit Party or any subsidiary of any Credit Party.

### 6.20 Plan

Borrower shall obtain approval and effectuate a plan contemplating a controlled liquidation that repays the Obligations in full on terms at least equivalent to those set forth in the DIP Loan Documents and is otherwise in form and substance acceptable to Borrower and acceptable to Agent and Lenders in their sole and absolute discretion (the "**Plan**"), in accordance with the following timeline (it being understood and agreed that Borrower shall not file or solicit any Plan for which Agent and Lenders have not provided their prior written consent):

(a)      Within six months of the Petition Date, Borrower shall file the Plan and related disclosure statement, which disclosure statement shall be in form and substance acceptable to Borrower and acceptable to Agent and Lenders in their sole and absolute discretion (the "**Disclosure Statement**");

(b)      Within seven months of the Petition Date, Borrower shall cause an order to be entered by the Bankruptcy Court (in form and substance acceptable to Borrower and acceptable to Agent and Lenders in their sole and absolute discretion) (i) approving the Disclosure Statement as containing adequate information required under Section 1125 of the Bankruptcy Code, and (ii) authorizing the use of the Disclosure Statement for soliciting votes on the Plan and establishing solicitation procedures (the "**Disclosure Statement Order**");

(c)      Within seven Business Days of the Bankruptcy Court's entry of the Disclosure Statement Order, Borrower shall distribute the Disclosure Statement and the Plan and solicit acceptance of the Plan;

(d)      Within eight months of the Petition Date, Borrower shall use their best efforts to cause an order to be entered by the Bankruptcy Court approving the Plan that is acceptable in form and substance to Borrower, Agent and Lenders in their sole discretion (the "**Confirmation Order**"); and

(e)      Borrower shall cause the Plan to become effective within fourteen Business Days following entry of the Confirmation Order.

## VII.   NEGATIVE COVENANTS

Borrower covenants and agrees that, until full performance and satisfaction, and indefeasible payment in full in cash, of all of the Obligations and termination of all Commitments and this Agreement:

### 7.1   Financial Covenants

Borrower shall not, and shall cause the Credit Parties not to, violate the financial covenants set forth on Annex I, which is incorporated herein and made a part hereof.  Borrower shall demonstrate its compliance with the financial covenants and the covenants set forth in Section 6.17(b) and 6.17(c) by submitting to Agent a compliance certificate in the form set forth in Exhibit B hereto at such times as compliance is measured.

### 7.2   Permitted Indebtedness

Borrower shall not, and shall not permit any Credit Party to, create, incur, assume or suffer to exist any Indebtedness that is not subject to the Automatic Stay or is incurred on or after the Petition Date, except the following (collectively, "**Permitted Indebtedness**"): (i) Indebtedness under the DIP Loan Documents (including Indebtedness constituting reimbursement obligations in respect of Letters of Credit issued under Section 2.1(c)), (ii) any Indebtedness not otherwise described in this Section 7.2 and set forth on Schedule 7.2, (iii) Capitalized Lease Obligations existing on the Closing Date, (iv) accounts payable to trade creditors and current operating expenses (other than for borrowed money) incurred after the

Petition Date which are not aged more than ninety (90) calendar days from the billing date, in each case incurred in the ordinary course of business and paid within such time period, unless the same are being contested in good faith and by appropriate and lawful proceedings and such reserves, if any, with respect thereto as are required by GAAP and deemed adequate by Borrower's independent accountants shall have been reserved; and (v) borrowings incurred in the ordinary course of business and not exceeding $100,000 individually or in the aggregate outstanding at any one time, <u>provided</u>, <u>however</u>, that such Indebtedness shall be on an unsecured basis, subordinated in right of repayment and remedies to all of the Obligations and to all of Agent's and each Lender's rights pursuant to a Subordination Agreement in form and substance satisfactory to Agent.  Borrower shall not, and shall not permit any Credit Party to, make prepayments on any existing or future Indebtedness to any Person other than to Agent or any Lender or to the extent specifically permitted by this Agreement or any subsequent agreement between Borrower, Agent and Lenders.

### 7.3  Permitted Liens

Borrower shall not, and shall not permit any Credit Party to, create, incur, assume or suffer to exist any Lien upon, in or against, or pledge of, any of the Collateral or any of its properties or assets or any of its shares, securities or other equity or ownership or partnership interests, whether now owned or hereafter acquired, except the following (collectively, "**Permitted Liens**"): (i) Liens under the DIP Loan Documents or otherwise arising in favor of Agent, for the benefit of itself and/or the Lenders, (ii) Liens imposed by law for taxes (other than payroll taxes), assessments or charges of any Governmental Authority for claims not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained by such Person in accordance with GAAP to the satisfaction of Agent in its sole discretion, (iii) (A) statutory Liens of landlords (provided that any such landlord has executed a Landlord Waiver and Consent in form and substance satisfactory to Agent) and of carriers, warehousemen, mechanics or materialmen, and (B) other Liens imposed by law or that arise by operation of law in the ordinary course of business from the date of creation thereof, in each case only for amounts not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained by such Person in accordance with GAAP to the satisfaction of Agent in its sole discretion, provided that such Liens are subordinated to the Liens granted to Agent, for the benefit of itself or the Lenders, under the DIP Loan Documents and the Financing Orders, (iv) Liens (A) incurred or deposits made in the ordinary course of business (including, without limitation, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, leases, contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations, or (B) arising as a result of progress payments under government contracts, (v) Liens securing Indebtedness permitted under <u>Section 7.2(iii)</u> so long as such Liens existed as of the Closing Date and only attach to the property leased under the applicable Capitalized Lease Obligation or purchased in respect of the applicable purchase money Indebtedness and not to any other property of the Borrower, any other Credit Party or any of their respective Subsidiaries, and (vi) other Liens in existence as of the Petition Date not otherwise described above and disclosed on <u>Schedule 7.3</u>.

**7.4  Investments; New Facilities or Collateral; Subsidiaries**

Borrower, directly or indirectly, shall not, and shall not permit any Credit Party to, directly or indirectly, (i) merge with, purchase, own, hold, invest in or otherwise acquire obligations or stock or securities of, or any other interest in, or all or substantially all of the assets of, any Person or any joint venture (other than Credit Parties' investments in their Subsidiaries as of the Closing Date set forth in Schedule 5.3), or (ii) make or permit to exist any loans, advances or guarantees to or for the benefit of any Person or assume, guarantee, endorse, contingently agree to purchase or otherwise become liable for or upon or incur any obligation of any Person (other than those created by the DIP Loan Documents and Permitted Indebtedness and other than (A) trade credit extended in the ordinary course of business, (B) advances for business travel and similar temporary advances made in the ordinary course of business to officers, directors and employees of the Credit Parties, and (C) the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business).  Borrower, directly or indirectly, shall not, and shall not permit any Credit Party to, purchase, own, operate, hold, invest in or otherwise acquire any facility, property or assets or any Collateral that is not located at the locations set forth on Schedule 5.18 unless Borrower shall provide to Agent at least twenty (20) calendar days prior written notice, except for such laptop computers and other assets that are required by employees who are working from their residences or are traveling for work.  Each Credit Party shall have no Subsidiaries other than those Subsidiaries, if any, existing at Closing and set forth in Schedule 5.3.

**7.5  Dividends; Redemptions; Restricted Payments**

Borrower shall not, and shall not permit any Credit Party to, (i) declare, pay or make any dividend or Distribution on any shares of capital stock or other securities or interests (other than dividends or Distributions paid to a Borrower or payable in its stock, or split-ups or reclassifications of its stock to the extent approved by the Bankruptcy Court pursuant to an order entered by the Bankruptcy Court that is acceptable to Borrower, Agent and Lenders in their sole discretion), (ii) apply any of its funds, property or assets to the acquisition, redemption or other retirement of any capital stock or other securities or interests or of any options to purchase or acquire any of the foregoing, (iii) otherwise make any payments or Distributions to any stockholder, member, partner or other equity owner in such Person's capacity as such, or (iv) make any payment of any management, service, consulting or related or similar fee.

**7.6  Transactions with Affiliates**

Borrower shall not, and shall not permit any Credit Party to, enter into or consummate any transaction of any kind with any of its Affiliates other than another Borrower and: (i) salary, bonus, employee stock option and other compensation and employment arrangements with directors or officers in the ordinary course of business; provided, that no payment of any bonus shall be permitted if a Default or Event of Default has occurred and remains in effect or would be caused by or result from such payment, (ii) Distributions and dividends permitted pursuant to Section 7.5, and (iii) payments permitted under and pursuant to written agreements entered into by and between a Credit Party and one or more of its Affiliates that both (A) reflect and constitute transactions on overall terms at least as favorable to such

Credit Party as would be the case in an arm's-length transaction between unrelated parties of equal bargaining power, and (B) are subject to such terms and conditions (including, without limitation, subordination to the Obligations) as determined by Agent in its sole discretion; provided, that notwithstanding the foregoing Borrower shall not, and shall not permit any Credit Party to, (Y) enter into or consummate any transaction or agreement pursuant to which it becomes a party to any mortgage, note, indenture or guarantee evidencing any Indebtedness of any of its Affiliates or otherwise to become responsible or liable, as a guarantor, surety or otherwise, pursuant to agreement for any Indebtedness of any such Affiliate, or (Z) make any payment to any of its Affiliates in excess of $10,000 in the aggregate, in each case without the prior written consent of Agent.  In addition, Borrower may continue its ordinary course shared services arrangements with Binder & Binder PC solely with respect to legal services that Binder & Binder PC provides in connection with appeals of disability cases for Borrower's clients, provided that on or before March 1, 2015 Borrower shall either have terminated that arrangement or entered into a new shared services agreement with Binder & Binder PC on terms reasonably acceptable to Agent and Borrower.

### 7.7  Charter Documents; Fiscal Year; Name; Jurisdiction of Organization; Dissolution; Use of Proceeds

Borrower shall not, and shall not permit any Credit Party to, (i) amend, modify, restate or change its certificate of incorporation or formation or bylaws or similar charter documents in a manner that would be adverse to Agent or Lenders; (ii) change its fiscal year; (iii) change its name or change its jurisdiction of organization; (iv) amend, alter or suspend or terminate or make provisional in any material way, any Permit material to any Credit Party's business without the prior written consent of Agent, which consent shall not be unreasonably withheld; (v) other than the filing of the Bankruptcy Case pursuant to a Plan that meets the requirements of Section 6.20 or in connection with the closures contemplated by Section 6.17(c), wind up, liquidate or dissolve (voluntarily or involuntarily) or commence or suffer any proceedings seeking or that would result in any of the foregoing, or (vi) use any proceeds of any Advance for "purchasing" or "carrying" "margin stock" as defined in Regulations U, T or X of the Board of Governors of the Federal Reserve System.

### 7.8  Truth of Statements

Borrower shall not, and shall not permit any Credit Party to, furnish to Agent or any Lender any certificate or other document that contains any untrue statement of a material fact or that omits to state a material fact necessary to make it not misleading in light of the circumstances under which it was furnished.

### 7.9  IRS Form 8821

Borrower shall not, and shall not permit any Credit Party to, alter, amend, restate, or otherwise modify, or withdraw, terminate or re-file the IRS Form 8821 required to be filed pursuant to the Conditions Precedent in Section 4.1 hereof.

### 7.10 Transfer of Assets

Notwithstanding any other provision of this Agreement or any other DIP Loan Document to the contrary, Borrower shall not, and shall not permit any Credit Party to, sell, lease, transfer, assign or otherwise dispose of any interest in any properties or assets (other than sales of Inventory in the ordinary course of business), or agree to do any of the foregoing at any future time, except that Borrower and any of its Subsidiaries may lease (as lessee) real or personal property or surrender all or a portion of a lease of the same, in each case in the ordinary course of business (so long as such lease does not create or result in and is not otherwise a Capitalized Lease Obligation prohibited under this Agreement).

### 7.11 Chapter 11 Claims

Borrower shall not incur, create, assume, suffer to exist or permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) which is superior to or *pari passu* with those granted to Agent or Lenders by this Agreement or the Financing Orders other than the Carve-Out.

### 7.12 OFAC

No Credit Party is and (i) will not be or become a Person whose property or interests in property are blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079(2001), (ii) will not engage in any dealings or transactions prohibited by Section 2 of such executive order, or otherwise be associated with any such Person in any manner violative of Section 2 of such executive order, or (iii) otherwise will become a Person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other OFAC regulation or executive order.

### 7.13 Capital Expenditures

Borrower shall not make any Capital Expenditures other than in accordance with the Budget approved by Agent and Lenders.

### 7.14 Consent to Amendment of Financing Orders

Borrower shall not and shall not permit any Credit Party to seek to amend, supplement or modify any of the terms of the Interim Financing Order or the Final Financing Order, unless such amendment, supplement or modification (i) is first submitted to counsel for Agent and Lenders, (ii) is in form and substance acceptable to Agent and Lenders in their sole discretion, and (iii) is not entered into without first obtaining the express, written consent of Agent and Lenders for such amendment, supplement or modification having been obtained.

### 7.15 Other Court Filings and Applications

Borrower shall not and shall not permit any Credit Party to apply to the Bankruptcy Court for authority to take any action that is prohibited by the terms of any of the

DIP Loan Documents or refrain from taking any action that is required to be taken by the terms of any of the DIP Loan Documents or permit any indebtedness or claim to be pari passu with or senior to any of the Obligations, except as provided by this Agreement or the Financing Orders.

### 7.16 Holding Company Status

Borrower shall not permit Holdco to engage in any business or activity other than (i) ownership of equity interests in Borrower, (ii) maintenance of its organizational existence, (iii) participation in tax, accounting and other administrative activities as the parent of the consolidated group of companies comprised of Holdco and its Subsidiaries, and (iv) activities incidental to the foregoing.

## VIII.  EVENTS OF DEFAULT

### 8.1  Events of Default.

The occurrence of any one or more of the following shall constitute an "Event of Default":

(a)    (i) Borrower shall fail to pay any amount of principal or interest on the Obligations or provided for in any DIP Loan Document when due (whether on any payment date, at maturity, by reason of acceleration, by required prepayment or otherwise) or (ii) Borrower shall fail to pay any other amount due under any DIP Loan Document when due (whether on any payment date, at maturity, by reason of acceleration, by required prepayment or otherwise) which is not cured within five Business Days of from the earlier of (i) Receipt by such Person of written notice thereof, and (ii) the time at which a Credit Party or any Authorized Officer thereof knew or became aware of such failure;

(b)    any representation, statement or warranty made or deemed made by Borrower, any Guarantor or any other Person (other than Agent or any Lender) in any DIP Loan Document or in any other certificate, document, report or opinion delivered in conjunction with any DIP Loan Document to which it is a party, shall not be true and correct in all material respects or shall have been false or misleading in any material respect on the date when made or deemed to have been made (except to the extent already qualified by materiality, dollar thresholds or Material Adverse Effect qualifiers, in which case it shall be true and correct in all respects and shall not be false or misleading in any respect);

(c)    Borrower or any Guarantor or other party thereto other than Agent or any Lender shall be in violation, breach or default of, or shall fail to perform, observe or comply with any covenant, obligation or agreement set forth in, any DIP Loan Document or any Financing Order and such violation, breach, default or failure shall not be cured within the applicable period, if any, set forth in the applicable DIP Loan Document or Financing Order; provided that, with respect to the affirmative covenants set forth in Article VI (other than (x) Sections 6.1(a), 6.2, 6.5 (with respect to the expiration of insurance), 6.7, 6.11, 6.17(a), 6.17(b), and 6.18 for which there shall be no cure period and (y) Section 6.17(c) for which there shall be a cure period as set forth in such section) there shall be a fifteen (15) calendar day cure period (to the extent capable of cure) commencing from the earlier of (i) Receipt by such Person of written notice of

such breach, default, violation or failure, and (ii) the time at which such Person or any Authorized Officer thereof knew or became aware of such failure, violation, breach or default;

(d)    (i) any of the DIP Loan Documents ceases to be in full force and effect, or (ii) any Lien created thereunder or under any Financing Order ceases to constitute a valid perfected Lien on the Collateral having the priority set forth in the Financing Orders in accordance with the terms thereof, or Agent ceases to have a valid perfected security interest in any of the Collateral or any securities pledged to Agent, for the benefit of itself and Lenders, pursuant to the Security Documents, or the Financing Orders having the priority set forth in the Financing Orders;

(e)    one or more tax assessments, judgments or decrees for post-petition obligations is rendered against Borrower or a Guarantor in an amount in excess of $10,000 individually or $30,000 in the aggregate, which is/are not satisfied, vacated or discharged of record within thirty (30) calendar days of such obligation becoming due but no Advances will be made before the judgment is stayed, vacated or discharged;

(f)    (i) any default occurs (other than defaults in existence on the Petition Date or occasioned by the filing of the Bankruptcy Case), which is not cured or waived, (w) under any agreement, document or instrument relating to Permitted Indebtedness, (x) in the payment of any amount with respect to any Indebtedness (other than the Obligations) of Borrower or a Guarantor in excess of $150,000, (y) in the performance, observance or fulfillment of any provision contained in any agreement, contract, document or instrument to which Borrower or any Guarantor is a party or to which any of their properties or assets are subject or bound under or pursuant to which any Indebtedness was issued, created, assumed, guaranteed or secured and such default continues for more than any applicable grace period and the maturity of any such Indebtedness is accelerated, or (z) in the performance, observance or fulfillment of any provision contained in any agreement, contract, document or instrument involving obligations of $50,000 or more between Borrower or a Guarantor and Agent or any Lender or any Affiliate of Agent or any Lender (other than the DIP Loan Documents) which continues beyond any applicable grace period and has not been waived, or (ii) any Indebtedness of Borrower or any Guarantor in excess of $150,000 subsequent to the Petition Date is declared to be due and payable or is required to be prepaid (other than by a regularly scheduled payment) prior to the stated maturity thereof, or any obligation of such Person for the payment of Indebtedness (other than the Obligations) is not paid when due or within any applicable grace period, or any such obligation becomes or is declared to be due and payable before the expressed maturity thereof, or there occurs an event which, with the giving of notice or lapse of time, or both, would cause any such obligation to become, or allow any such obligation to be declared to be, due and payable;

(g)    an order is entered by the Bankruptcy Court in the Bankruptcy Case appointing, or Borrower files an application for an order seeking the appointment of, in either case, without express prior written consent of Agent (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the execution of the business (*i.e.*, powers beyond those set forth in Section 1106(a) (3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(h)    without the prior written consent of Agent, any Credit Party shall file a motion for an order converting any Bankruptcy Case to a Chapter 7 case;

(i)    Borrower files or supports any plan other than (i) the Plan or (ii) a plan that provides for the indefeasible Payment in Full of the Obligations pursuant to the terms of such plan and that is otherwise satisfactory to Agent and Lenders in their sole discretion;

(j)    an order is entered by the Bankruptcy Court confirming a plan in the Bankruptcy Case which is inconsistent with the terms of the Financing Order or which does not (i) contain a provision for termination of the Agreement and Payment in Full of all Obligations of Borrower hereunder and under the other DIP Loan Documents or before the effective date of such plan or plans prior to the entry thereof and (ii) provide for the continuation of the Liens and security interests granted to Agent, for the benefit of itself and Lenders, and priorities thereof until such plan effective date unless the Obligations have been paid in full and the Agreement has been terminated;

(k)    a Credit Party shall file a motion for an order dismissing the Bankruptcy Case that does not contemplate or contain a provision for termination of the Agreement and Payment in Full of all Obligations hereunder prior to entry thereof;

(l)    an order is entered by the Bankruptcy Court in the Bankruptcy Case, without the prior written consent of the Agent (i) to revoke, reverse, stay modify, supplement or amend the Financing Orders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to Borrower or any Guarantor equal or superior to the priority of Agent or any Lender in respect to the Obligations, except for Permitted Expenses (including, without limitation, the Carve-Out), or (iii) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien or (iv) to allow for any payment by or on behalf of any Credit Party for any period that is not contemplated and expressly provided for in the Budget for such period.

(m)    an order is entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the Automatic Stay to any unsecured creditor of Borrower or allowing any secured creditor of Borrower to enforce its remedies against the Collateral; provided, however, that any relief from stay allowing an unsecured creditor to pursue claims that (i) will be wholly covered by insurance (other than liabilities for Borrower not to exceed $75,000) or (ii) relates to an unsecured claim of less than $75,000 individually or in the aggregate in any calendar quarter shall not constitute an Event of Default;

(n)    (i) Borrower shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of Agent, claims or rights against such Person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any Lien or security interest created by this Agreement or the Financing Orders shall, for any reason, cease to be valid, (iii) any action is commenced by any Credit Party which contests any provision of the Financing Orders or the Prepetition Credit Facility or the validity, perfection, priority or enforceability of any of the Liens and security interests of Agent or any Prepetition Secured Party or (iv) any action, including, without limitation, an adversary proceeding, is commenced by any party in interest against Agent, any Lender, Prepetition Agent, Prepetition L/C Issuer, any

Prepetition Secured Party or any of their respective interests for any reason, <u>provided</u> that the commencement of a Challenge Action prior to the expiration of the Investigation Period (each as defined in the Financing Orders) with respect to the Prepetition Credit Facility shall not constitute an Event of Default and Credit Parties shall continue to strictly comply with, and Agent and Lenders shall have the right to strictly enforce all covenants, conditions, and provisions of the DIP Loan Documents, including, without limitation, Sections 2.7(a) and (c) of this Agreement (it being understood and agreed that any challenge to the Incremental Commitments, Incremental Advances, or any Liens granted to secure the foregoing shall constitute an immediate Event of Default for all purposes under this Agreement and the other DIP Loan Documents);

(o)     without the prior written consent of Agent, the determination of any Credit Party, whether by vote of such Person's Board of Directors or otherwise, to suspend the operation of such Person's business in the ordinary course, sell substantially all of any Credit Party's assets so as to constitute Borrower's business, unless the proceeds of such sale will indefeasibly pay the Obligations in full (except with respect to *de minimis* assets to the extent contemplated by the Budget), or the filing of a motion or other application in the Bankruptcy Case, seeking authority to do any of the foregoing;

(p)     (i) any Change of Control occurs or any agreement or commitment to cause or that may result in any such Change of Control is entered into, (ii) any Material Adverse Effect or Material Adverse Change occurs or is reasonably expected to occur, or (iii) Borrower or any Guarantor ceases a material portion of its business operations as currently conducted;

(q)     (i) Borrower or any Guarantor or any officer, director or any other representative thereof has engaged in any type of activity which may reasonably be expected to result in forfeiture of any property to any Governmental Authority or (ii) Borrower or any Guarantor makes any payment in excess of $250,000 to any Governmental Authority to satisfy any claim by such Governmental Authority and such payment is not expressly permitted to be paid pursuant to the Financing Orders or the Budget;

(r)     uninsured damage to, or loss, theft or destruction of, any portion of the Collateral occurs that exceeds $250,000 in the aggregate;

(s)     Borrower or any Guarantor or any of their respective directors or officers is criminally indicted or convicted (i) of a felony or (ii) under any law that may reasonably be expected to lead to a forfeiture of any Collateral;

(t)     the issuance of any process for levy, attachment or garnishment or execution upon or prior to any judgment against Borrower or any Guarantor or any of their property or assets which is not stayed in the Bankruptcy Case by Bankruptcy Code;

(u)     Borrower or any Guarantor does, or enters into or becomes a party to any agreement or commitment to do, or cause to be done, any of the things described in this <u>Article VIII</u> or otherwise prohibited by any DIP Loan Document (subject to any cure periods set forth therein);

(v)    (i) the subordination provisions of any Subordination Agreement and/or the subordination provisions contained in or otherwise pertaining to any other agreement or instrument governing any Subordinated Debt shall for any reason be revoked or invalidated, or otherwise cease to be in full force and effect (or any Person other than a holder of any Subordinated Debt shall contest in any manner the validity or enforceability thereof, deny that it has any further liability or obligation thereunder, or take any action in violation thereof or fail to take any action required by the terms thereof), or (ii) the Obligations for any reason shall not have the priority contemplated by this Agreement, the Financing Orders, any Subordination Agreement or any such subordination provisions;

(w)    any provision of any DIP Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against Borrower or other Credit Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by Borrower, any other Credit Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or Borrower shall deny in writing that it has any liability or obligation purported to be created under any DIP Loan Document;

(x)    if at any time during the Bankruptcy Case, Borrower is prohibited from the use of cash collateral within the meaning of Section 363 of the Bankruptcy Code;

(y)    the Interim Financing Order is not entered by the Bankruptcy Court by December 24, 2014 or the Final Financing Order is not entered by the Bankruptcy Court by January 30, 2015;

(z)    the payment of any advertising costs or expenses or any other disbursements relating to or constituting advertising, excluding any amounts paid pursuant to existing case referral programs or practices;

(aa)    the lapse or termination of Credit Parties' exclusive periods to file and solicit a plan pursuant to section 1121 of the Bankruptcy Code;

(bb)    any Guarantor shall attempt to terminate its Guaranty or assert any defense or disclaimer to its liability under its Guaranty, or any Guaranty shall be deemed to be defective or unenforceable; or

(cc)    the filing of a motion by a Credit Party in the Bankruptcy Case without the express written consent of Agent and Lenders, to obtain additional financing from a party other than Lenders under Section 364(d) of the Bankruptcy Code or to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code unless the proceeds from such financing or use of cash collateral are used to immediately repay, in full in cash, the Obligations and this Agreement is terminated.

**8.2  Remedies.**

If an Event of Default shall have occurred and be continuing, and in any such event, notwithstanding any other provision of any Loan Document, Agent may, without notice or

demand, do any of the following, in each case subject to the Financing Orders: (i) terminate Lenders' Commitments and obligations to make Advances hereunder and to arrange for L/C Issuers to issue Letters of Credit pursuant to Section 2.1(c), whereupon the same shall immediately terminate and (ii) declare all or any of the Notes, all interest thereon and all other Obligations to be due and payable immediately (except in the case of an Event of Default under Section 8.1(d) or (v)(ii), in which event all of the foregoing shall automatically and without further act by Agent or any Lender be immediately due and payable without further order of, or application to, the Bankruptcy Court, commencing from the earlier of (A) Receipt by the applicable Person of written notice of such breach or violation or of any event, fact or circumstance constituting or resulting in any of the foregoing, and (B) the time at which such Person or any Authorized Officer thereof knew or became aware, or should have known or been aware, of such breach or violation and resulting Event of Default or of any event, fact or circumstance constituting or resulting in any of the foregoing), in each case without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Borrower.

## IX.    RIGHTS AND REMEDIES AFTER DEFAULT

### 9.1  Rights and Remedies

(a)    In addition to the acceleration provisions set forth in Article VIII above, upon the occurrence and continuation of an Event of Default, subject to the Financing Orders, Agent shall have the right to exercise any and all rights, options and remedies provided for in the DIP Loan Documents, under the UCC, the Bankruptcy Code, the Financing Orders or at law or in equity, subject, however, to the terms, conditions and requirements of the Financing Orders (i) apply any property of Borrower held by Agent, for the benefit of itself and Lenders, or any Lender to reduce the Obligations, (ii) foreclose the Liens created under the Security Documents, (iii) realize upon, take possession of and/or sell any Collateral or securities pledged with or without judicial process, (iv) exercise all rights and powers with respect to the Collateral as any Credit Party might exercise, (v) collect and send notices regarding the Collateral, with or without judicial process, (vi) by its own means or with judicial assistance, enter any premises at which Collateral and/or pledged securities are located, or render any of the foregoing unusable or dispose of the Collateral and/or pledged securities on such premises without any liability for rent, storage, utilities, or other sums, and Borrower shall not, and shall cause each other Credit Party not to, resist or interfere with such action, (vii) at Borrower's expense, require that all or any part of the Collateral be assembled and made available to Agent at any place designated by Agent, (viii) reduce or otherwise change the Facility Cap, the maximum amount of Letter of Credit Usage permitted under the Revolving Facility and/or any component of the foregoing, and/or (ix) to the extent applicable, apply funds from the Wind-Down Fund, and/or (x) relinquish or abandon any Collateral or securities pledged or any Lien thereon.    Notwithstanding any provision of any DIP Loan Document, Agent, in its sole discretion, shall have the right, at any time that Borrower or any other Credit Party fails to do so in violation of a Loan Document and any applicable cure period has expired, and from time to time, without prior notice, to: (i) obtain insurance covering any of the Collateral to the extent required hereunder; (ii) pay for the performance of any of Obligations; (iii) to the extent not stayed by the filing of the Bankruptcy Case, discharge taxes or Liens on any of the Collateral that are in violation of any DIP Loan

Document unless Borrower is in good faith with due diligence by appropriate proceedings contesting those items; and (iv) pay for the maintenance and preservation of the Collateral.  Such expenses and advances shall be added to the Obligations until reimbursed to Agent and shall be secured by the Collateral, and such payments by Agent shall not be construed as a waiver by Agent or Lenders of any Event of Default or any other rights or remedies of Agent and Lenders.

(b)        Borrower agrees that written notice received by it at least ten (10) calendar days before the time of any intended public sale, or the time after which any private sale or other disposition of Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition.  If permitted by applicable law, any perishable Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Agent without prior notice to Borrower.  At any sale or disposition of Collateral or securities pledged, Agent may (to the extent permitted by applicable law) purchase all or any part thereof free from any right of redemption by any Borrower which right is hereby waived and released.  Borrower covenants and agrees not to, and not to permit or cause any of its Subsidiaries to, interfere with or impose any obstacle to Agent's exercise of its rights and remedies with respect to the Collateral.  Agent and Lenders, in dealing with or disposing of the Collateral or any part thereof, shall not be required to give priority or preference to any item of Collateral or otherwise to marshal assets or to take possession or sell any Collateral with judicial process.

(c)        Borrower hereby grants to Agent, for the benefit of itself and Lenders, after the occurrence and during the continuance of an Event of Default, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to Borrower) to use, assign, license or sublicense any Intellectual Property now owned or hereafter acquired by Borrower, and wherever the same may be located, including in such license reasonable access as to all media in which any of the licensed items may be recorded or stored and to all computer programs and used for the compilation or printout thereof, in each case in connection with the exercise of Agents and Lenders' remedies hereunder and under the other Loan Documents.  All proceeds received by Agent or Lenders in connection with such license will be used by Agent or Lenders to satisfy the Obligations.

(d)        In addition to the acceleration provisions set forth in Article VIII above, upon the occurrence and continuation of an Event of Default, Borrower shall take any action that Agent, for the benefit of itself and Lenders, may request in order to enable Agent to obtain and enjoy the full rights and benefits granted to Agent hereunder.  Without limiting the generality of the foregoing, upon the occurrence and continuation of any Event of Default, at the request of Agent and at Borrower's sole cost and expense, Borrower shall execute all documents and take all other actions requested by Agent to enable Agent or any Lender, its designee, any receiver, trustee or similar official or any purchaser of all or any part of the Collateral to obtain from any Person any required authority necessary to operate the business of Borrower.

(e)        Upon the occurrence and continuance of an Event of Default, Agent may demand (which demand shall be deemed to have been delivered automatically upon any acceleration of the Loans and other obligations hereunder pursuant to Article VIII hereof or upon payment in full of the Advances), and Borrower shall thereupon deliver to Agent, for the benefit of itself and Lenders, an amount of cash equal to one hundred five percent (105%) of the amount of Letter of Credit Usage as additional collateral security for the Obligations in respect of any

outstanding Letter of Credit Usage. Agent, for the benefit of itself and Lenders, may at any time apply any or all of such cash and cash collateral to the payment of any or all of the Obligations in respect of any Letter of Credit Usage. Pending such application, Agent may (but shall not be obligated to) invest the same in an interest bearing account in Agent's name, under which deposits are available for immediate withdrawal, at such bank or financial institution as Agent may, in its discretion, select.

**9.2  Application of Proceeds**

In addition to any other rights, options and remedies Agent and Lenders have under the DIP Loan Documents, the Bankruptcy Code, the UCC, the Financing Orders, at law or in equity, all dividends, interest, rents, issues, profits, fees, revenues, income and other proceeds collected or received from collecting, holding, managing, renting, selling, or otherwise disposing of all or any part of the Collateral or any proceeds thereof upon exercise of its remedies hereunder shall be applied in the following order of priority:  (i) first, to the extent such proceeds relate to the sale of Collateral encumbered by a Lien having priority over Agent's Lien in favor of a Person holding prepetition Indebtedness secured by such Lien, to the holder of such prepetition Indebtedness, to the extent of such prepetition Indebtedness (and only to the extent such prepetition Indebtedness and Liens securing such prepetition Indebtedness are at law valid, binding and enforceable and not subordinated, avoided, disallowed, unperfected, set aside or otherwise invalidated, whether pursuant to a judicial proceeding or otherwise); (ii) second, to the payment of all costs and expenses of such collection, storage, lease, holding, operation, management, sale, disposition or delivery and of conducting Borrower's business and of maintenance, repairs, replacements, alterations, additions and improvements of or to the Collateral, and to the payment of all sums which Agent or Lenders may be required or may elect to pay, if any, for taxes, assessments, insurance and other charges upon the Collateral or any part thereof, and all other payments and Advances that Agent or Lenders may be required or authorized to make under any provision of this Agreement in the order provided in Section 2.9(b) (including, without limitation, in each such case, in-house documentation and diligence fees and legal expenses, search, audit, recording, professional and filing fees and expenses and reasonable attorneys' fees and all expenses, liabilities and advances made or incurred in connection therewith); (iii) third, to the payment of all Obligations as provided herein in the order provided in Section 2.9(b) (including cash collateralization of Letter of Credit Usage in the manner and in such amount as described in Section 9.1(e)); (iv) fourth, to the satisfaction of Indebtedness secured by any subordinate security interest of record in the Collateral if written notification of demand therefore is received before distribution of the proceeds is completed, provided, that, if requested by Agent, the holder of a subordinate security interest shall furnish reasonable proof of its interest, and unless it does so, Agent need not address its claims; and (vi) fifth, to the payment of any surplus then remaining to Borrower, unless otherwise provided by law or directed by a court of competent jurisdiction; provided that Borrower shall be liable for any deficiency if such proceeds are insufficient to satisfy the Obligations or any of the other items referred to in this section.  In carrying out the foregoing, (x) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category; and (y) each of the Lenders shall receive an amount equal to its Pro Rata Share of amounts available to be applied pursuant to clauses (ii) and (iii); provided that the principal amount of and accrued

and unpaid interest on the Incremental Advances shall be repaid prior to the principal amount of and accrued and unpaid interest on the Initial Advance.

### 9.3  Rights and Remedies not Exclusive

As among Agent and the Lenders on one hand and the Credit Parties and their respective Subsidiaries on the other hand, Agent and Lenders shall have the right in their sole discretion to determine which rights, Liens and/or remedies Agent and/or Lenders may at any time pursue, relinquish, subordinate or modify, and such determination will not in any way modify or affect any of Agent's or Lenders' rights, Liens or remedies under any DIP Loan Document, the Financing Orders, the Bankruptcy Code, applicable law or equity.  The enumeration of any rights and remedies in any DIP Loan Document or the Financing Orders is not intended to be exhaustive, and all rights and remedies of Agent and Lenders described in any DIP Loan Document or Financing Orders are cumulative and are not alternative to or exclusive of any other rights or remedies which Agent and Lenders otherwise may have.  The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.

### 9.4  Receiver

In addition to any other rights, options and remedies Agent and Lenders have under the DIP Loan Documents, the Bankruptcy Code, the UCC, the Financing Orders, at law or in equity, Agent shall have the right to apply for the appointment of a receiver by any court of competent jurisdiction, and the Credit Parties shall not object or contest such application or request.

## X.    WAIVERS AND JUDICIAL PROCEEDINGS

### 10.1 Waivers

Except as expressly provided for herein, Borrower hereby waives setoff, counterclaim, demand, presentment, protest, all defenses with respect to any and all instruments and all notices and demands of any description, and the pleading of any statute of limitations as a defense to any demand under any DIP Loan Document.  Borrower hereby waives any and all defenses and counterclaims it may have or could interpose in any action or procedure brought by Agent or any Lender to obtain an order of court recognizing the assignment of, or Lien of Agent, for the benefit of Lenders, in and to, any Collateral.  With respect to any action hereunder, Agent and Lenders conclusively may rely upon, and shall incur no liability to Borrower in acting upon, any request or other communication that Agent or a Lender reasonably believes to have been given or made by a person authorized on Borrower's behalf, whether or not such person is listed on the incumbency certificate delivered pursuant to Section 4.1 hereof.  In each such case, Borrower hereby waives the right to dispute Agent's or any Lender's action based upon such request or other communication, absent manifest error.  In no event shall Agent or any Lender be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).  Each of Borrower and each other Credit Party signatory hereto hereby waives, releases and agrees (and shall cause each other Credit Party to waive, release and agree) not to sue upon any such claim for any special, indirect,

consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

### 10.2 Delay; No Waiver of Defaults

No course of action or dealing, renewal, release or extension of any provision of any DIP Loan Document or the Financing Orders, or single or partial exercise of any such provision, or delay, failure or omission on Agent's or any Lender's part in enforcing any such provision shall affect the liability of Borrower or any Guarantor or operate as a waiver of such provision or affect the liability of Borrower or any Guarantor or preclude any other or further exercise of such provision. No waiver by any party to any DIP Loan Document of any one or more defaults by any other party in the performance of any of the provisions of any DIP Loan Document shall operate or be construed as a waiver of any future default, whether of a like or different nature, and each such waiver shall be limited solely to the express terms and provisions of such waiver. Notwithstanding any other provision of any DIP Loan Document, by completing the Closing under this Agreement and/or by making Advances, neither Agent nor any Lender waives any breach of any representation or warranty under any DIP Loan Document, and all of Agent's and Lenders' claims and rights resulting from any such breach or misrepresentation are specifically reserved.

### 10.3 Jury Waiver

EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THE DIP LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO THE DIP LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.

## XI.   EFFECTIVE DATE AND TERMINATION

### 11.1 Termination and Effective Date Thereof

Subject to Agent's right to terminate and cease Lenders' Commitments and obligations to make Advances and arranging for the issuance of Letters of Credit by L/C Issuers upon or after any Event of Default, this Agreement shall continue in full force and effect until the full performance and indefeasible payment in cash of all Obligations, unless terminated sooner as provided in this <u>Section 11.1</u>. Borrower may terminate this Agreement at any time upon not less than forty-five calendar days' prior written notice to Agent and upon full performance and indefeasible payment in full in cash of all Obligations (and termination of all Letters of Credit

with no unpaid Obligations in respect thereof) on or prior to such fourteen (14) calendar day after Receipt by Agent of such written notice. All of the Obligations shall be immediately due and payable upon any such termination on the termination date stated in any notice of termination (the "**Termination Date**"); provided that, notwithstanding any other provision of any DIP Loan Document, the Termination Date shall be effective no earlier than the first Business Day of the month following the expiration of the fourteen calendar days' prior written notice period. Notwithstanding any other provision of any DIP Loan Document, no termination of this Agreement shall affect Agent's or any Lender's rights or any of the Obligations existing as of the effective date of such termination, and the provisions of the DIP Loan Documents shall continue to be fully operative until the Obligations have been fully performed and indefeasibly paid in cash in full. The Liens granted to Agent, for the benefit of itself and Lenders, hereunder, under the Financing Orders, under the other Security Documents and the financing statements filed pursuant thereto and the rights and powers of Agent, on behalf of itself and Lenders, shall continue in full force and effect notwithstanding the fact that Borrower's borrowings hereunder may from time to time be in a zero credit position until all of the Obligations have been fully performed and indefeasibly paid in full in cash and all commitments to lend hereunder have terminated.

### 11.2 Survival

All obligations, covenants, agreements, representations, warranties, waivers and indemnities made by Borrower in any DIP Loan Document and Financing Orders shall survive the execution and delivery of the DIP Loan Documents, the Closing, the making of the Advances and any termination of this Agreement until all Obligations are fully performed and indefeasibly paid in full in cash. The obligations and provisions of Sections 3.4, 3.5, 10.1, 10.3, 11.1, 11.2, 13.4, 13.7 and 13.10 and Article XII shall survive termination of the DIP Loan Documents and any payment, in full or in part, of the Obligations.

## XII.    AGENT PROVISIONS; SETTLEMENT

### 12.1 Appointment

U.S. Bank is hereby appointed by the Lenders as Agent under this Agreement, the Notes and the other DIP Loan Documents. Agent agrees to act as such upon the express conditions contained in this Agreement.

### 12.2 Powers.

Agent shall have and may exercise such powers hereunder as are specifically delegated to Agent by the terms of this Agreement and the other DIP Loan Documents, together with such powers as are reasonably incidental thereto. Agent shall have no implied duties to any of the Lenders, nor any obligation to any of the Lenders to take any action under this Agreement or any of the other DIP Loan Documents, except such action specifically provided by this Agreement or such other DIP Loan Documents to be taken by Agent. Without limiting the generality of the foregoing, Agent shall not be required to take any action with respect to any Default or Event of Default, except as expressly provided in Article VIII or in Section 12.6.

**12.3 General Immunity.**

Neither Agent nor any of its directors, officers, employees, agents, attorneys, or advisors shall be liable to any of the Lenders for any action taken or not taken by it in connection with this Agreement or any of the other DIP Loan Documents (a) with the consent or at the request of the Requisite Lenders or (b) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, nonappealable order.

**12.4  No Responsibility for Loans. Recitals, Etc.**

Neither Agent nor any of its directors, officers, employees, agents or advisors shall (a) be responsible for or have any duty to ascertain, inquire into or verify any recitals, reports, statements, representations or warranties contained in this Agreement or any of the other DIP Loan Documents or furnished pursuant hereto or thereto, (b) be responsible for any Loans or Letters of Credit hereunder, (c) be bound to ascertain or inquire as to the performance or observance of any of the terms of this Agreement or any of the other DIP Loan Documents, (d) be responsible for the satisfaction of any condition specified in Article IV, except receipt of items required to be delivered to Agent, (e) be responsible for the validity, effectiveness, genuineness or enforceability of this Agreement or any of the other DIP Loan Documents or (f) be responsible for the creation, attachment, perfection or priority of any security interests or liens purported to be granted to the Agent or any of the Lenders pursuant to this Agreement or  any of the other DIP Loan Documents.

**12.5  Right to Indemnity.**

Notwithstanding any other provision contained in this Agreement to the contrary, to the extent Borrower fails to reimburse the Agent pursuant to Section 13.4 or Section 13.7, or if any Default or Event of Default shall occur under this Agreement, Lenders shall ratably in accordance with their  respective Pro  Rata Shares of  the  aggregate principal amount of outstanding Loans, or in accordance with its Pro Rata Share of the  Commitments if no Loans are outstanding, indemnify Agent and hold it harmless from and against any and all liabilities, losses (except losses occasioned solely by failure of Borrower to make any payments or to perform any obligations required by this Agreement (excepting those described in Section 13.4 or Section 13.7), the Notes, or any of the other DIP Loan Documents), costs and/or expenses, including, without limitation, any liabilities, losses, costs and/or expenses arising from the failure of any Lender to perform its obligations hereunder or in respect of this Agreement, and also including, without limitation, reasonable attorneys' fees and expenses, which Agent may incur, directly or indirectly, in connection with this Agreement, the Notes or any of the other DIP Loan Documents, or any action or transaction related hereto or thereto; provided only that Agent shall not be entitled to such indemnification for any losses, liabilities, costs and/or expenses directly and solely resulting from its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable order.  This indemnity shall be a continuing indemnity, contemplates all liabilities, losses, costs and expenses related to the execution, delivery and performance of this Agreement, the Notes and the other DIP Loan Documents, and  shall survive the satisfaction and  payment of the Obligations and the termination of this Agreement.

**12.6  Action Upon Instructions of Required Lenders.**

Agent agrees, upon the written request of the Requisite Lenders, to take any action of the type specified in this Agreement or any of the other  DIP Loan  Documents  as being  within  the  Agent's    rights,  duties,  powers  or  discretion.  Notwithstanding the foregoing, Agent shall be fully justified in failing or refusing to take any action hereunder, unless it shall first be indemnified to its satisfaction by the Lenders pro rata against any and all liabilities, losses, costs and expenses (including, without limitation, attorneys' fees and expenses) which may be incurred by it by reason of taking or continuing to take any such action, other than any liability which may arise out of Agent's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, nonappealable order.  Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder in accordance with written instructions signed by the Required Lenders, and such instructions and any action taken or failure to act pursuant thereto shall be binding on all of the Lenders and on all holders of the Notes.  In the absence of a request by the Requisite Lenders, Agent shall have authority, in its good faith discretion, to take or not to take any action, unless this Agreement or any of the other DIP Loan Documents specifically requires the consent of the Requisite Lenders or of all of the Lenders.

**12.7  Employment of Agents and Counsel.**

Agent may execute any of its duties as Agent hereunder by or through employees, agents and attorneys-in-fact and shall not be answerable to any of the Lenders, except as to money or securities received by it or its authorized agents, for the default or misconduct of any such agents or attorneys-in-fact selected by it in good faith and with reasonable care. Agent shall be entitled to advice and opinion of legal counsel concerning all matters pertaining to the duties of the agency hereby created.  In connection with the negotiation, drafting and execution of this Agreement and the other DIP Loan Documents, or in connection with future legal representation relating to loan administration, amendments, modifications, waivers, or enforcement of remedies, Katten Muchin Rosenman LLP has only represented and shall only represent U.S. Bank in  its capacities as Agent and as a Lender.  Each Lender other than U.S. Bank acknowledges that Katten Muchin Rosenman LLP does not represent such Lender in connection with any such matters.

**12.8    Reliance on Documents: Counsel.**

Agent shall be entitled to rely upon any note, notice, consent, certificate, affidavit, letter, telegram, statement, paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, and, in respect to legal matters, upon the opinion of legal counsel selected by the Agent.

**12.9    May Treat Payee as Owner.**

Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof shall have been filed with Agent.  Any request, authority or consent of any person, firm or corporation who at the time of making such request or giving such authority or consent is the holder of any such

Note shall be conclusive and binding on any subsequent holder, transferee or assignee of such Note or of any Note issued in exchange therefor.

### 12.10    Agent's Reimbursement.

Each Lender agrees to reimburse the Agent pro rata in accordance with its Pro Rata Share of the aggregate principal amount of outstanding Loans for (a) any out-of-pocket costs and expenses not reimbursed by Borrower for which the Agent is entitled to reimbursement by Borrower under this Agreement or any of the other DIP Loan Documents and (b) any other out-of-pocket costs and expenses not reimbursed by Borrower and incurred by Agent on behalf of the Lenders in connection with the preparation, execution, delivery, amendment, modification, extension, renewal and/or enforcement of this Agreement and/or any of the other DIP Loan Documents.

### 12.11    Rights as a Lender.

With respect to its Commitments, the Loans made by it and the Notes issued to it, the Agent shall have the same rights and powers hereunder as any Lender and may exercise the same as though it were not the Agent, and the terms "Lender" and "Lenders" shall, unless the context otherwise indicates, include U.S. Bank in its individual capacity. Agent may accept deposits from, lend money to, issue letters of credit for the account of and generally engage in any kind of banking or trust business with Borrower and its Subsidiaries and Affiliates as if it were not Agent.

### 12.12    Independent Credit Decision.

Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender and based on the financial statements provided by Borrower and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the other DIP Loan Documents. Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other DIP Loan Documents.

### 12.13    Resignation of Agent.

Subject to the appointment of a successor Agent, Agent may resign as Agent for the Lenders under this Agreement and the other DIP Loan Documents at any time by thirty (30) days' notice in writing to the Lenders and the Borrower. Such resignation shall take effect upon appointment of such successor Agent. Subject to the consent of Borrower (which consent shall not be unreasonably withheld or delayed or required following the occurrence and during the continuance of an Event of Default), the Requisite Lenders shall have the right to appoint a successor Agent who shall be entitled to all of the rights of, and vested with the same powers as, the original Agent under this Agreement and the other DIP Loan Documents. In the event a successor Agent shall not have been appointed within the thirty (30) day period following the giving of notice by Agent, subject to the consent of Borrower (which consent shall not be unreasonably withheld or delayed or required following the occurrence and during the

continuance of an Event of Default), Agent may appoint its own successor. Resignation by the Agent shall not affect or impair the rights of the Agent under Sections 12.5 and 12.10 hereof with respect to all matters preceding such resignation.

### 12.14    Delivery of Documents.

Agent agrees to promptly provide each Lender with  copies  of  (a)  this Agreement  and  the  other  DIP Loan  Documents (including any amendments thereto), (b) any default notices sent by Agent to Borrower or any other Credit Party with respect to this Agreement or any of the other DIP Loan Documents, (c) any waivers or consents signed by Agent or otherwise sent by Agent to Borrower or any other Credit Party with respect to this Agreement or any of the other DIP Loan Documents, (d) any notices of default sent by Borrower, any other Credit Party or any Lender to the Agent with respect to this Agreement or any of the other DIP Loan Documents and (e) any requests for any amendments, waivers or consents sent to the Agent by Borrower or any other Credit Party with respect to this Agreement or any of the other DIP Loan Documents.  Agent agrees to provide each Lender within seven (7) Business Days after written request by such Lender, and at the expense of such Lender, as the case may be, a copy of such other information, reports, certificates and/or other materials prepared by Borrower or otherwise required by the DIP Loan Documents and which are in the possession of Agent which are reasonably requested by such Lender, as the case may be, in writing.

### 12.15    Duration of Agency.

The agency established by Section 12.1 hereof shall continue, and Sections 12.1 through and including this Section 12.15 shall remain in full force and effect, until all of the Obligations shall have been paid in full, no Letters of Credit remain outstanding and the Lenders' commitments to make Loans and/or extend credit to or for the benefit of the Borrower shall have terminated or expired.

### 12.16    Set-off and Sharing of Payments

In addition to any rights and remedies now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuation of any Event of Default, each Lender is hereby authorized by the Credit Parties at any time or from time to time, to the fullest extent permitted by law, with notice to Agent and without notice to Borrower or any other Person other than Agent (such notice being hereby expressly waived) to set off and to appropriate and to apply any and all (a) balances (general or special, time or demand, provisional or final) held by such Lender at any of its offices for the account of any Credit Party (regardless of whether such balances are then due to any Credit Party), and (b) other Property at any time held or owing by such Lender to or for the credit or for the account of any Credit Party, against and on account of any of the Obligations which are not paid when due; provided, that no Lender or any such holder shall exercise any such right without prior written notice to Agent.  Any Lender that has exercised its right to set-off or otherwise has received any payment on account of the Obligations shall, to the extent the amount of any such set off or payment exceeds its Pro Rata Share of payments obtained by all of the Lenders on account of such Obligations, purchase for cash (and the other Lenders or holders of the Loans

shall sell) participations in each such other Lender's or holder's Pro Rata Share of Obligations as would be necessary to cause such Lender to share such excess with each other Lenders or holders in accordance with their respective Pro Rata Shares; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such purchasing Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery. Each Credit Party agrees, to the fullest extent permitted by law, that (a) any Lender or holder may exercise its right to set-off with respect to amounts in excess of its Pro Rata Share of the Obligations and may sell participations in such excess to other Lenders and holders, and (b) any Lender so purchasing a participation in the Loans made or other Obligations held by other Lenders may exercise all rights of set-off, bankers' lien, counterclaim or similar rights with respect to such participation as fully as if such Lender were a direct holder of Loans and other Obligations in the amount of such participation.

**12.17   Return of Payments; Defaulting Lenders**

(a)    **Return of Payments**.

(i)    If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from any Credit Party and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender without set-off, counterclaim or deduction of any kind.

(ii)    If Agent determines at any time that any amount received by Agent under this Agreement must be returned to any Credit Party or paid to any other Person pursuant to any Debtor Relief Law or otherwise, then, notwithstanding any other term or condition of this Agreement, Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to Borrower or such other Person, without set-off, counterclaim or deduction of any kind.

(b)    **Defaulting Lenders**.  Neither the failure of any Defaulting Lender to make any Advance or purchase any participation required to be made or purchased by it in accordance with the terms of this Agreement nor the status of any Revolving Lender as a Defaulting Lender shall relieve any other Revolving Lender (each such other Revolving Lender, an "**Other Lender**") of its obligations to make such Advance or purchase such participation on such date, but neither any Other Lender nor Administrative Agent shall be responsible for the failure of any Defaulting Lender to make an Advance to be made, or to purchase a participation to be purchased, by such Defaulting Lender, and no Other Lender shall have any obligation to Administrative Agent or any other Lender for the failure by such Defaulting Lender. Notwithstanding anything set forth herein to the contrary, a Defaulting Lender (of the type described in clause (a) of the definition of Defaulting Lender) shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender" or a "Revolving Lender" (or be included in the calculation of "Requisite Lenders" hereunder) for any voting or consent rights under or with respect to any Loan Document; provided that the foregoing shall not permit, without the consent of such Defaulting Lender, (i) an increase in the principal amount of such Defaulting Lender's Commitment, (ii) the reduction of the principal of, rate of interest on (other than reducing or waiving Default Interest) or Fees payable with respect

to any Loan or Letter of Credit Obligations of such Defaulting Lender or (iii) unless all other Lenders affected thereby are treated similarly, the extension of any scheduled payment date or final maturity date of the principal among of any Loan of such Defaulting Lender (it being understood and agreed that payments pursuant to <u>Section 2.9</u> are not "scheduled").

## XIII.  MISCELLANEOUS

### 13.1 Governing Law; Jurisdiction; Service of Process; Venue

The DIP Loan Documents shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to its choice of law provisions and, to the extent applicable, the Bankruptcy Code.  Any judicial proceeding against Borrower with respect to the Obligations, any DIP Loan Document or any related agreement must be brought in the Bankruptcy Court or, if the Bankruptcy Court does not have jurisdiction, any federal or state court of competent jurisdiction located in the State of New York.  By execution and delivery of each DIP Loan Document to which it is a party, Borrower (i) accepts the non-exclusive jurisdiction of the aforesaid courts and irrevocably agrees to be bound by any judgment rendered thereby, (ii) waives personal service of process, (iii) agrees that service of process upon it may be made by certified or registered mail, return receipt requested, pursuant to <u>Section 13.5</u> hereof, (iv) waives any objection to jurisdiction and venue of any action instituted hereunder and agrees not to assert any defense based on lack of jurisdiction, venue or convenience, and (v) agrees that this loan was made in New York, that Agent has accepted in New York DIP Loan Documents executed by Borrower and that Lenders have disbursed Advances under the DIP Loan Documents in New York.  Nothing shall affect the right of Agent or any Lender to serve process in any manner permitted by law or shall limit the right of Agent or any Lender to bring proceedings against Borrower in the courts of any other jurisdiction having jurisdiction.  Any judicial proceedings against Agent or any Lender involving, directly or indirectly, the Obligations, any DIP Loan Document or any related agreement shall be brought only in a federal or state court located in the State of New York.  All parties acknowledge that they participated in the negotiation and drafting of this Agreement and that, accordingly, no party shall move or petition a court construing this Agreement to construe it more stringently against one party than against any other.

### 13.2 Successors and Assigns; Participations; New Lenders

(a)      The DIP Loan Documents shall inure to the benefit of each Lender, Agent, Transferees and all future holders of the Loan, any Note, the Obligations and/or any of the Collateral, and each of their respective successors and assigns.  Each DIP Loan Document shall be binding upon the Persons' other than Lenders and Agent that are parties thereto and their respective successors and assigns, and no such Person may assign, delegate or transfer any DIP Loan Document or any of its rights or obligations thereunder without the prior written consent of Agent and each Lender.  No rights are intended to be created under any DIP Loan Document for the benefit of any third party donee, creditor or incidental beneficiary of any Borrower or Guarantor, including, but not limited to, any trustee or examiner succeeding to the rights of Borrower pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code.  Nothing contained in any DIP Loan Document shall

be construed as a delegation to Agent or any Lender of any other Person's duty of performance. BORROWER ACKNOWLEDGES AND AGREES THAT A LENDER AT ANY TIME AND FROM TIME TO TIME MAY (I) DIVIDE AND RESTATE ANY NOTE, AND/OR (II) SELL, ASSIGN OR GRANT PARTICIPATING INTERESTS IN OR TRANSFER ALL OR ANY PART OF SUCH LENDER'S RIGHTS OR OBLIGATIONS UNDER ANY DIP LOAN DOCUMENT, LOANS, ANY NOTE AND/OR THE OBLIGATIONS TO OTHER PERSONS, WITH THE PRIOR WRITTEN CONSENT OF AGENT (EACH SUCH TRANSFEREE, ASSIGNEE OR PURCHASER, A "**TRANSFEREE**"); provided, that such Transferee and such assigning Lender shall execute and deliver to Agent for acceptance and recording in the Register, a Lender Addition Agreement, which shall be in form and substance acceptable to Agent in its Permitted Discretion.  Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Lender Addition Agreement, (i) the Transferee thereunder shall be a party hereto and, to the extent provided in such Lender Addition Agreement, have the same rights and benefits with respect to the Financing Orders, Loans, Obligations, any Notes, Collateral and/or DIP Loan Documents held by it as fully as if the original holder thereof, and (ii) the assigning Lender shall be relieved of its obligations hereunder with respect to its Commitment or assigned portion thereof, as the case may be, to the extent that such obligations shall have been expressly assumed by the Transferee pursuant to such Lender Addition Agreement (and, in the case of a Lender Addition Agreement covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such assigning Lender shall cease to be a party hereto but shall nevertheless continue to be entitled to the benefits of Sections 13.4 and 13.7).  Notwithstanding any other provision of any DIP Loan Document, Agent may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any DIP Loan Document. Borrower hereby acknowledges and agrees that any assignment will give rise to a direct obligation of Borrower to the Transferee and that the Transferee shall be a "Lender" hereunder and under the other Loan Documents; provided that, notwithstanding anything to the contrary in any DIP Loan Document, Borrower shall not be obligated to pay under this Agreement to any Transferee any sum in excess of the sum which Borrower would have been obligated to pay to such Lender had such transfer or participation not been effected.  Borrower may not sell, assign or transfer any interest in this Agreement, any of the other DIP Loan Documents, or any of the Obligations, or any portion thereof, including Borrower's rights, title, interests, remedies, powers, and duties hereunder or thereunder.

(b)     Agent, on behalf of Borrower, shall maintain at its address referred to in Section 13.5 a copy of each Lender Addition Agreement delivered to it and the Register for the recordation of the names and addresses of the Lenders and the Commitment of, and the principal amount of the Loans owing to, and the Notes, if any, evidencing such Loans owned by, each Lender from time to time.    Anything contained in this Agreement to the contrary notwithstanding, each of Borrower, Agent and Lenders shall treat each Person whose name is recorded in such Register as the owner of the Loans, the Notes and the Commitments recorded therein for all purposes of this Agreement.  The Register shall be available for inspection by Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(c)     Notwithstanding anything in this Agreement to the contrary, no assignment under Section 13.2(a) of any rights or obligations under or in respect of the Loans or

the Notes evidencing such Loans shall be effective unless and until (i) Agent shall have recorded the assignment pursuant to Section 13.2(b) and (ii) the assignor Lender or the Transferee has paid to Agent a processing fee in the amount of $3,500 (provided no such processing fee shall be required to be paid in connection with an assignment by a Lender to another Lender).  Upon its receipt of a Lender Addition Agreement executed by an assigning Lender and an Transferee, Agent shall (i) promptly accept such Lender Addition Agreement and (ii) on the effective date determined pursuant thereto record the information contained therein in the Register and give prompt notice of such acceptance and recordation to Lenders and Borrower.  On or prior to such effective date, the assigning Lender shall surrender any outstanding Notes held by it all or a portion of which are being assigned, and Borrower, at its own expense, shall, upon the request of Agent, the assigning Lender or the Transferee, as applicable, execute and deliver to Agent, within five (5) Business Days of any request, new Notes to reflect the interest held by the assigning Lender and its Transferee.

### 13.3 Application of Payments

To the extent that any payment made or received with respect to the Obligations is subsequently invalidated, determined to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian, Committee or any other Person under any Debtor Relief Law, common law or equitable cause or any other law, then the Obligations intended to be satisfied by such payment shall be revived and shall continue as if such payment had not been received by Agent or any Lender.  Any payments with respect to the Obligations received shall be credited and applied in such manner and order as Agent shall decide in its sole discretion.

### 13.4 Indemnity

Borrower shall indemnify Agent and each Lender, and their respective Affiliates and its and their respective managers, members, officers, employees, Affiliates, agents, representatives, successors, assigns, accountants and attorneys (collectively, the "**Indemnified Persons**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel and in-house documentation and diligence fees and legal expenses) which may be imposed on, incurred by or asserted against any Indemnified Person with respect to or arising out of, or in any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, any DIP Loan Document or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of such Indemnified Person.  If any Indemnified Person uses in-house counsel for any purpose for which Borrower is responsible to pay or indemnify, Borrower expressly agrees that its indemnification obligations include the allocable costs of in-house counsel for the work performed.  Agent agrees to give Borrower reasonable notice of any event of which Lender becomes aware for which indemnification may be required under this Section 13.4, and Agent may elect (but is not obligated) to direct the defense thereof, provided that the selection of counsel shall be subject to Borrower's consent, which consent shall

not be unreasonably withheld or delayed.   Any Indemnified Person may, in its reasonable discretion, take such actions as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such Indemnified Person or the Collateral.   Notwithstanding the foregoing, if any insurer agrees to undertake the defense of an event (an "**Insured Event**"), Agent agrees not to exercise its right to select counsel to defend the event if that would cause Borrower's insurer to deny coverage; provided, however, that each Indemnified Person reserves the right to retain counsel to represent such Indemnified Person with respect to an Insured Event at its sole cost and expense.   To the extent that Agent or any Lender obtains recovery from a third party other than an Indemnified Person of any of the amounts that Borrower has paid to Agent or any Lender pursuant to the indemnity set forth in this Section 13.4, then Agent and/or such Lender shall promptly pay to Borrower the amount of such recovery.   Any sums owing by Borrower under this Section 13.4 may be charged to Borrower's account as an Advance and paid to the applicable Indemnified Person if Borrower fails to pay such amounts within ten days following written request therefor under this Section 13.4.

**13.5 Notice**

Any notice or request under any DIP Loan Document shall be given to any party to this Agreement at such party's address set forth beneath its signature on the signature page to this Agreement, or at such other address as such party may hereafter specify in a notice given in the manner required under this Section 13.5.   Any notice or request hereunder shall be given only by, and shall be deemed to have been received upon (each, a "**Receipt**"):   (i) registered or certified mail, return receipt requested, on the date on which received as indicated in such return receipt, (ii) delivery by a nationally recognized overnight courier, one (1) Business Day after deposit with such courier, or (iii) facsimile transmission, in each case upon telephone or further electronic communication from the recipient acknowledging receipt (whether automatic or manual from recipient), as applicable.

Nothing in this Agreement or in any other DIP Loan Document shall be construed to limit or affect the obligation of the Borrower or any other Person to serve upon the Agent or Lenders in the manner prescribed by the Bankruptcy Code any pleading or notice required to be given to Agent or Lenders pursuant to the Bankruptcy Code.    Any sums owing by Borrower under this Section 13.4 may be charged to Borrower's account as an Advance and paid to the applicable Agent or Lender if Borrower fails to pay such amounts within ten days following written request therefor under this Section 13.5.

**13.6 Severability; Captions; Counterparts; Facsimile Signatures**

If any provision of any DIP Loan Document is adjudicated to be invalid under applicable laws or regulations, such provision shall be inapplicable to the extent of such invalidity without affecting the validity or enforceability of the remainder of the DIP Loan Documents which shall be given effect so far as possible.   The captions in the DIP Loan Documents are intended for convenience and reference only and shall not affect the meaning or interpretation of the DIP Loan Documents.   The DIP Loan Documents may be executed in one or more counterparts (which taken together, as applicable, shall constitute one and the same

instrument) and by facsimile transmission, which facsimile signatures shall be considered original executed counterparts. Each party to this Agreement agrees that it will be bound by its own facsimile signature and that it accepts the facsimile signature of each other party.

### 13.7 Expenses

Borrower shall pay, whether or not the Closing occurs, all reasonable costs and expenses incurred by Agent, Lenders and/or its Affiliates, including, without limitation, documentation and diligence fees and expenses, all search, audit, appraisal, recording, professional and filing fees and expenses and all other out-of-pocket charges and expenses (including, without limitation, UCC and judgment and tax lien searches and UCC filings and fees for post-Closing UCC and judgment and tax lien searches and wire transfer fees and audit expenses), and reasonable attorneys' fees and expenses, (i) in any effort to enforce, protect or collect payment of any Obligation or to enforce any DIP Loan Document or any related agreement, document or instrument, (ii) in connection with entering into, negotiating, preparing, reviewing and executing the DIP Loan Documents and/or any related agreements, documents or instruments, (iii) arising in any way out of administration of the Obligations, the syndication of the Loans or the taking or refraining from taking by Agent or any Lender of any action requested by Borrower, (iv) in connection with instituting, maintaining, preserving, enforcing and/or foreclosing on Agent's Liens in any of the Collateral or securities pledged under the DIP Loan Documents, whether through judicial proceedings or otherwise, (v) in defending or prosecuting any actions, claims or proceedings arising out of or relating to Agents and/or Lenders' transactions with Borrower, (vi) in seeking, obtaining or receiving any advice with respect to its rights and obligations under any DIP Loan Document and any related agreement, document or instrument, and/or (vii) in connection with any modification, restatement, supplement, amendment, waiver or extension of any DIP Loan Document and/or any related agreement, document or instrument. All of the foregoing shall be charged to Borrower's account and shall be part of the Obligations. If Agent, any Lender or any of their Affiliates uses in-house counsel for any purpose under any DIP Loan Document for which Borrower is responsible to pay or indemnify, Borrower expressly agrees that its Obligations include the allocable costs of in-house counsel for the work performed. Without limiting the foregoing, Borrower shall pay all taxes (other than taxes based upon or measured by a Lender's income or revenues or any personal property tax), if any, in connection with the issuance of any Note and the filing and/or recording of any documents and/or financing statements. Any sums owing by Borrower under this Section 13.7 may be charged to Borrower's account as an Advance and paid to the applicable Indemnified Person if Borrower fails to pay such amounts within ten days following written request therefor under this Section 13.7.

### 13.8 Entire Agreement

This Agreement, the Financing Orders and the other DIP Loan Documents to which Borrower is a party constitute the entire agreement between Borrower, Agent and Lenders with respect to the subject matter hereof and thereof, and supersede all prior agreements and understandings, if any, relating to the subject matter hereof or thereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing signed by Borrower, Agent and Lenders. No provision of this

Agreement may be changed, modified, amended, restated, waived, supplemented, discharged, canceled or terminated orally or by any course of dealing or in any other manner other than by an agreement in writing signed by Agent, Lenders and Borrower. Each party hereto acknowledges that it has been advised by counsel in connection with the negotiation and execution of this Agreement and is not relying upon oral representations or statements inconsistent with the terms and provisions hereof. Each party hereto expressly disclaims reliance upon any facts, promises, undertakings or representations, written or oral, made by any other party, or its agents, representatives or attorneys prior to the execution of this Agreement.

### 13.9 Approvals

Unless expressly provided herein to the contrary, any approval, consent, waiver or satisfaction of Agent or Lenders with respect to any matter that is subject of any DIP Loan Document may be granted or withheld by Agent or Lenders, as applicable, in their sole and absolute discretion.

### 13.10   Publicity

Borrower hereby agrees that Agent and each Lender or any Affiliate of Agent or such Lender may (i) disclose a general description of transactions arising under the DIP Loan Documents for advertising, marketing or other similar purposes and (ii) use Borrower's or any Guarantor's name, logo or other indicia germane to such party in connection with such advertising, marketing or other similar purposes.

### 13.11   Release of Agent and Lenders

Notwithstanding any other provision of any DIP Loan Document, Borrower voluntarily, knowingly, unconditionally and irrevocably, with specific and express intent, for and on behalf of itself, its managers, members, directors, officers, employees, stockholders, Affiliates, agents, representatives, accountants, attorneys, successors and assigns and their respective Affiliates (collectively, the "**Releasing Parties**"), hereby fully and completely releases and forever discharges the Indemnified Parties and any other Person or insurer which may be responsible or liable for the acts or omissions of any of the Indemnified Parties, or who may be liable for the injury or damage resulting therefrom (collectively, with the Indemnified Parties, the "**Released Parties**"), of and from any and all actions, causes of action, damages, claims, obligations, liabilities, costs, expenses and demands of any kind whatsoever, at law or in equity, matured or unmatured, vested or contingent, that any of the Releasing Parties has against any of the Released Parties as of the date of the Closing, including, without limitation, under or in connection with the Prepetition Credit Facility. Each Credit Party waives the benefits of any law, which may provide in substance: "A general release does not extend to claims which the creditor does not know or suspect to exist in its favor at the time of executing the release, which if known by it must have materially affects its settlement with the debtor." Borrower acknowledges that the foregoing release is a material inducement to each Lender's decision to extend to Borrower the financial accommodations hereunder and has been relied upon by each Lender in agreeing to make the Advances.

Release of claims in favor of Pre-petition Agent, Pre-petition L/C Issuer, Pre-petition Lenders, DIP Agent and DIP Lenders, including, without limitation, any claims pursuant to or arising under sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code.

**13.12    Acknowledgements**

Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement, the other DIP Loan Documents, and the Financing Orders;

(b)    Neither Agent nor any Lender has any fiduciary relationship to Borrower or any Guarantor, and the relationship between the Borrower and any Guarantor on the one hand and the Agent and Lenders on the other hand is solely that of debtor and creditor; and

(c)    no joint venture exists between the Borrower or any Guarantor on the one hand and Agent or any Lender on the other hand.

**13.13    Certificates of Lenders.**

Any Lender claiming reimbursement or compensation pursuant to this <u>Article XIII</u> shall deliver to Borrower (with a copy to Agent) a certificate setting forth in reasonable detail the amount payable to such Lender hereunder and such certificate shall be conclusive and binding on Borrower in the absence of manifest error.

**13.14    Bankruptcy Court Orders Paramount**

In the event of any direct conflict between the terms and conditions of this Agreement (and/or any DIP Loan Document) and the specific terms and conditions of the Financing Orders, the terms and conditions of the Financing Orders shall prevail. Nothing set forth in this Agreement shall require the Borrower or any Guarantor to act or fail to act in a manner that would violate the Bankruptcy Code or any order of the Bankruptcy Court, without prejudice to Agent's ability to declare the occurrence of an Event of Default based upon such action or failure to act. In the event of any inconsistency between this Agreement and any of the other DIP Loan Documents (other than the Financing Orders), this Agreement shall control.

**13.15    Acknowledgement of Joint and Several Liability**

Each Borrower acknowledges that it is jointly and severally liable for all of the Obligations under the DIP Loan Documents and the Financing Orders. Each Borrower expressly understands, agrees and acknowledges that (i) Borrowers are all Affiliates by common ownership, (ii) each Borrower desires to have the availability of one common credit facility instead of separate credit facilities, (iii) each Borrower has requested that Lenders extend such a common credit facility on the terms herein provided, (iv) Lenders will be lending against, and relying on a Lien upon, all of Borrower's assets even though the proceeds of any particular loan made hereunder may not be advanced directly to a particular Borrower, (v) each Borrower will nonetheless benefit by the making of all such loans by Lenders and the availability of a single credit facility of a size greater than each could independently warrant, and (vi) all of the

representations, warranties, covenants, obligations, conditions, agreements and other terms contained in the DIP Loan Documents shall be applicable to and shall be binding upon each Borrower.

### 13.16   Borrower Representative

Each Borrower hereby designates, appoints, authorizes and empowers Binder & Binder – The National Social Security Disability Advocates LLC as its agent and authorized representative ("**Borrower Representative**") to request and obtain Advances on its behalf and to take all actions on its behalf under the provisions of this Agreement and the other Loan Documents, including submitting on behalf of each Borrower, Borrowing Certificates and making representations and warranties on each Borrower's behalf in connection therewith, obtaining such Advances and executing agreements, documents or certificates on each Borrower's behalf as Agent may require or request.  Agent and Lenders may rely upon such authority granted hereby and shall not incur any liability to any Borrower as a result thereof. Each Borrower shall be bound by all actions taken by Borrower Representative.

### 13.17   Amendments, Lender Consent

(a)      Any provision of this Agreement, the Notes or any of the other DIP Loan Documents to which the Borrower is a party may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the applicable Borrower(s) and the Requisite Lenders (and, if the rights or duties of the Agent in its capacity as Agent are affected thereby, by the Agent); provided that no such amendment or waiver shall increase the Commitment of any Lender unless signed by such Lender, and no such amendment or waiver shall, unless signed by each Lender, (a) reduce the principal amount of or rate of interest on any Loan or any fees under this Agreement (other than any fees relating to the Letters of Credit other than any letter of credit commitment fees), (b) postpone the date fixed for any payment of principal of or interest on any Loan or any fees under this Agreement, (c) change the percentage of the Commitments or of the aggregate principal amount of Loans which shall be required for the Lenders or any of them to take any action or obligations under this Section or any other provision of this Agreement, (d) change the definition of "Requisite Lenders", (e) voluntarily subordinate any lien or release any portion of the Collateral (except as contemplated by the applicable DIP Loan Document(s)), in either case having a book value of  $100,000.00 or more, (f)  voluntarily release  any Credit Party, (g) amend  Section 2.16, (h) amend Section 2.9, (i) amend Section 6.14 or  (j) amend this Section 13.17.  Notwithstanding any provision contained in this Agreement to the contrary, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent under this Agreement or  any  other  DIP Loan Documents, except that the Commitment of such  Defaulting Lender may not  be increased or extended without the consent of such Defaulting Lender. Lenders hereby authorize Agent to enter into such amendments, restatements, supplements or other modification to the other DIP Loan Documents as are deemed necessary by Agent to protect and preserve the Liens on the Collateral created or purported to be created thereunder or to reflect to give effect to any transaction permitted thereunder.

(b)      If any Lender (i) defaults in its obligation to fund Loans hereunder or (ii) does not consent to any waiver, consent or modification requested by any Credit Party (but only

where consent of all of the Lenders is required for such waiver, consent or modification and such Credit Party obtains the waiver, consent or modification from all other Lenders), then the consenting Lenders may, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in this Agreement), all of is interests, rights and obligations under this Agreement with respect to any Loans to one or more consenting Lenders which shall assume such obligations and which accept such assignment; provided that the non-consenting Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts then payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts).  No Lender shall be require to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the consenting Lenders to require such assignment and delegation cease to apply.

(c)     In the event Agent requests the consent of a Lender and does not receive a written denial thereof within five (5) Business Days after such Lender's receipt of such request, then such Lender will be deemed to have given such consent so long as such request contained in a notice stating that such failure to respond within five (5) Business Days would be deemed to be a consent by such Lender.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGE]**

IN WITNESS WHEREOF, each of the parties has duly executed this Post-Petition Revolving Credit and Security Agreement as of the date first written above.

**U.S. BANK NATIONAL ASSOCIATION**, as Agent and a Lender

By: _____

Name: _____

Its: _____

Address for Notices:

U.S. Bank National Association
Special Assets Group
461 Fifth Avenue
New York, New York  10017
Attention: Karen Boyer, Senior Vice President
Telephone: (646) 935-4558
Fax:  (646) 935-4533

**CAPITAL ONE, N.A.**, as a Lender

By: _____

Name: _____

Its: _____

Address for Notices:

_____

_____

_____

Attention: _____, _____

Telephone: _____

Fax: _____

**BORROWER:**

**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES LLC**, a Delaware limited liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer


**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (CA), LLC**, a California limited liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer


**BINDER & BINDER THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (CO), LLC**, a Colorado limited liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer


**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (FL), LLC**, a Florida limited liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (GA), LLC**, a Georgia limited liability company


By:_____
Name: William A. Brandt, Jr.
Its: _Chief Restructuring Officer


**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (IL), LLC**, an Illinois limited liability company


By:_____
Name: William A. Brandt, Jr.
Its: _Chief Restructuring Officer


**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (NC), LLC**, a North Carolina limited liability company


By:_____
Name: William A. Brandt, Jr.
Its: _Chief Restructuring Officer


**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (NJ), LLC**, a New Jersey limited liability company


By:_____
Name: William A. Brandt, Jr.
Its: _Chief Restructuring Officer

**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (NY), LLC**, a New York limited liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (PA), LLC**, a Pennsylvania limited liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (TX), LLC**, a Texas limited liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (WA), LLC**, a Washington limited liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

**THE SOCIAL SECURITY EXPRESS LTD.**, a New York corporation

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

[Signature Page to Post-Petition Revolving Credit and Security Agreement]

**THE REP FOR VETS LLC**, a Florida limited
liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

**NATIONAL VETERANS DISABILITY
ADVOCATES LLC**, a Florida limited liability
company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

**BINDER & BINDER – THE NATIONAL
SOCIAL SECURITY DISABILITY
ADVOCATES (AZ), LLC**, an Arizona limited
liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

**BINDER & BINDER – THE NATIONAL
SOCIAL SECURITY DISABILITY
ADVOCATES (CT), LLC**, a Connecticut limited
liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

**BINDER & BINDER – THE NATIONAL
SOCIAL SECURITY DISABILITY
ADVOCATES (DC), LLC**, a District of Columbia
limited liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

[Signature Page to Post-Petition Revolving Credit and Security Agreement]

**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (LA), LLC**, a Louisiana limited liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (MD), LLC**, a Maryland limited liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (MI), LLC**, a Michigan limited liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (MO), LLC**, a Missouri limited liability company

By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer

**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES (OH), LLC**, an Ohio limited liability company


By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer


**BINDER & BINDER – THE NATIONAL SOCIAL SECURITY DISABILITY ADVOCATES VA, LLC**, a Virginia limited liability company


By:_____
Name: William A. Brandt, Jr.
Its:  Chief Restructuring Officer


Address for Notices:

_____
_____
_____
Attention: _____, _____
Telephone: _____
Fax:  _____

[Signature Page to Post-Petition Revolving Credit and Security Agreement]

**SCHEDULES**

Schedule 2.4    --    Borrower's Account(s)

Schedule 5.2    --    Required Consents

Schedule 5.3    --    Capitalization, Organization Chart (including all subsidiaries, authorized/issued capitalization, owners, directors, officers and managers) and Joint Ventures

Schedule 5.4    --    Real and Personal Property Owned or Leased; Leases

Schedule 5.5    --    Other Agreements

Schedule 5.6    --    Litigation

Schedule 5.8    --    Taxes

Schedule 5.10 --    Compliance with Law

Schedule 5.11 --    Intellectual Property

Schedule 5.15A--    Existing Indebtedness

Schedule 5.15B --    Indebtedness Maturing During Term

Schedule 5.16    --    Other Agreements

Schedule 5.17 --    Insurance

Schedule 5.18 --    Places of Business

Schedule 6.8    --    Further Assurances/Post Closing

Schedule 7.2    --    Permitted Indebtedness

Schedule 7.3    --    Permitted Liens

**ANNEX I**

**FINANCIAL COVENANTS**

1)      Compliance with Budget

(a)      Borrower shall not expend any funds or monies for any purpose other than those line items set forth in the Budget.  Borrower's actual Cash Payments (as verified by bank account records) for any measurement period covered by the Budget set forth in (c) below may not exceed the budgeted amount (both as to individual line items and as to total disbursements) through the conclusion of such  measurement period set forth in (c) below, plus, the applicable variance set forth in (d) below.

(b)      Borrower shall comply with the cash receipt projections set forth in the Budget for any measurement period covered by the Budget set forth in (c) below and verified by the actual amounts of cash posted to the Borrower's deposit account at Agent, plus the applicable variance set forth in (d) below.  Variances shall be determined by comparing the actual results to the applicable total receipts projections set forth in the Budget.

(c)      For each four week period covered by the Budget ("**Test Period**"), compliance shall be measured every four weeks.

(d)      During any Test Period there will be (i) a permitted variance to Budget amounts for line item disbursements of the greater of ten percent (10%) or $10,000 for any single line item contained in the Budget and (ii) a permitted variance to Budget amounts for cash receipts of twelve percent (12%).  Except as provided above, there shall be no other variance to the Budget.

101921159_6

# ANNEX II

## LENDERS / COMMITMENTS

**Lenders**

**U.S. BANK NATIONAL ASSOCIATION**              **Commitment $**_____

_____                    Initial Commitment
_____                         $_____
Attention: _____
Telephone: _____                    Incremental Commitment
FAX: _____                            $_____
E-Mail: _____

**CAPITAL ONE, N.A.**                            **Commitment $**_____

_____                    Initial Commitment
_____                         $_____
_____
Attention: _____                    Incremental Commitment
Telephone: _____                          $_____
FAX: _____
E-Mail: _____

**Total:**                                       **$**_____

# APPENDIX A

## DEFINITIONS

"<u>Accounts</u>" shall mean all "accounts" (as defined in the UCC) of Borrower (or, if referring to another Person, of such other Person), including without limitation, accounts, accounts receivables, monies due or to become due and obligations in any form (whether arising in connection with contracts, contract rights, Instruments, General Intangibles or Chattel Paper), in each case whether arising out of goods sold or services rendered or from any other transaction and whether or not earned by performance, now or hereafter in existence, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"<u>Account Debtor</u>" shall mean any Person who is obligated under an Account.

"<u>Advance</u>" shall mean a borrowing under the Revolving Facility, including the Initial Advance and Incremental Advances.  Any amounts paid by any Lender on behalf of Borrower or any other Credit Party under any DIP Loan Document shall be an Advance for purposes of this Agreement.

"<u>Affiliate</u>" shall mean, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of five percent (5%) or more of any class of the outstanding voting stock, securities or other equity or ownership interests of such Person. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.  "Affiliate" shall include any Subsidiary.

"<u>Agent</u>" shall have the meaning ascribed to such term in the recitals hereof.

"<u>Applicable Rate</u>" shall mean, with respect to any Obligation, the rate of interest applicable from time to time to such Obligation under this Agreement.

"<u>Authorized Officer</u>" shall have the meaning given such term in <u>Section 2.4(e)</u>.

"<u>Automatic Stay</u>" shall mean the Automatic Stay imposed under Section 362 of the Bankruptcy Code.

"<u>Bankruptcy Case</u>" shall have the meaning ascribed to such term in the recitals hereof.

Appendix A-1

"Bankruptcy Code" shall have the meaning ascribed to such term in the recitals hereof.

"Bankruptcy Court" shall have the meaning ascribed to such term in the recitals hereof.

"Bankruptcy Rule" shall mean the Federal Rules of Bankruptcy Procedure.

"Base Rate" shall mean, for any day, a rate of interest per annum equal to the highest of: (a) Prime Rate for such day, (b) the Fed Funds Rate for such day plus 0.50% and (c) the Daily LIBOR Rate in effect for such day and reset each Eurodollar Business Day plus 2.00%. The Base Rate shall be reset daily on each Business Day.

"Borrower" shall have the meaning ascribed to such term in the recitals hereof.

"Borrower Representative" shall have the meaning given such term in Section 13.16.

"Borrowing Certificate" shall mean a Borrowing Certificate substantially in the form of Exhibit A.

"Borrowing Date" shall have the meaning given such term in Section 2.4(a).

"Budget" shall mean the Budget attached hereto as Exhibit C to this Agreement, updated and amended from time to time subject to approval by Agent in its sole and absolute discretion and compliance with the covenants set forth in Annex I to this Agreement.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which the Federal Reserve or Agent is closed.

"Capital Expenditures" shall mean, for any applicable period of measurement, the sum (without duplication) of all expenditures (whether paid in cash or accrued as liabilities) during such period of measurement that are or should be treated as capital expenditures under GAAP.

"Capital Lease" shall mean, as to any Person, a lease of any interest in any kind of property or asset by that Person as lessee that is, should be or should have been recorded as a "capital lease" in accordance with GAAP.

"Capitalized Lease Obligations" shall mean all obligations of any Person under Capital Leases, in each case, taken at the amount thereof accounted for as a liability in accordance with GAAP.

"Carve-Out" shall have the meaning ascribed to such terms in the Financing Orders.

"Cash Payments" shall mean, for any Budget period, Borrower's aggregate cash disbursements for such period.

Appendix A-2

"Change of Control" shall mean, with respect to Borrower, any of its Subsidiaries or any Guarantor (other than a Guarantor that is an individual), the occurrence of any of the following: (i) any merger, consolidation, reorganization, recapitalization or share or interest exchange involving any such Person, except a merger among any Borrower and/or a Borrower's subsidiaries, (ii) any holder of Borrower's or any of its Subsidiaries' capital stock, securities or equity, partnership or ownership interests on the date hereof ceases to own 100% of the capital stock, securities or equity, partnership or ownership interests held by such Person on the date hereof, (iii) a direct or indirect sale, transfer or other conveyance or disposition, in any single transaction or series of transactions, of all or substantially all of its assets, except to a Borrower, (iv) the initial public offering of its securities, (v) with respect to Borrower, the failure of Borrower to own 100% of the equity securities of its Subsidiaries, (vi) the failure of SSDI Holdings, Inc. to own, directly or indirectly, 100% of the equity securities in Binder & Binder – The National Social Security Disability Advocates, LLC.

"Charter and Good Standing Documents" shall mean, for Borrower and each Guarantor (other than a Guarantor that is an individual) (i) a copy of the certificate of incorporation or formation (or other charter document), or similar organizational documents certified by an authorized officer of Borrower and such Guarantor, (ii) a certificate of good standing as of a date acceptable to Agent issued by the applicable Governmental Authority of the jurisdiction of incorporation or organization of Borrower and such Guarantor, and (iii) copies of the resolutions of the Board of Directors or managers (or other applicable governing body or member) or, if required, stockholders, members or other equity owners authorizing the execution, delivery and performance of the DIP Loan Documents to which Borrower and such Guarantor is a party, certified by an authorized officer of such Person as of the Closing Date.

"Claim" shall have the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

"Closing" shall mean the satisfaction, or written waiver by Lender, of all of the conditions precedent set forth in the Agreement required to be satisfied prior to the consummation of the transactions contemplated hereby.

"Closing Date" shall mean December 23, 2014.

"Closing Checklist" shall have the meaning given such term in Section 4.1(q).

"Collateral" shall have the meaning provided in Section 2.10(a) of this Agreement (and, for the avoidance of doubt, unless specifically provided for otherwise herein or the context requires a different meaning, "Collateral" as used herein shall mean all DIP Loan Collateral of all Credit Parties).

"Commitment" or "Commitments" shall mean the amount set forth opposite such Lender's name on Annex II, under the heading "Commitment Amount," as such amount may be reduced, modified or terminated from time to time pursuant to this Agreement, which amount shall be the sum of such Lender's Initial Commitment and Incremental Commitment.

"Computer Hardware and Software" shall mean, with respect to any Person, all of such Person's rights (including rights as licensee and lessee) with respect to (a) computer and

Appendix A-3

other electronic data processing hardware, including all integrated computer systems, central processing units, memory units, display terminals, printers, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware; (b) all software and all software programs designed for use on the computers and electronic data processing hardware described in clause (a) above, including all operating system software, utilities and application programs in any form (source code and object code in magnetic tape, disk or hard copy format or any other listings whatsoever) and any other software; (c) any firmware associated with any of the foregoing; (d) any other software; and (e) any documentation for or related to hardware, software and firmware described in clauses (a), (b), (c) and (d) above, including flow charts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes.

"Copyrights" shall mean, with respect to any Person, all of such Person's now existing or hereafter acquired right, title, and interest in and to: (i) copyrights, rights and interests in copyrights, works protectable by copyright, all applications, registrations and recordings relating to the foregoing as may at any time be filed in the United States Copyright Office or in any similar office or agency of the United States, any State thereof, any political subdivision thereof or in any other country, and all research and development relating to the foregoing; and (ii) all renewals of any of the foregoing.

"Confirmation Order" shall have the meaning given such term in Section 6.20(d).

"Credit Parties" shall mean, collectively, Borrower and Guarantors.

"Daily LIBOR Rate" shall mean, as of any Business Day, the quotient of (a) a rate per annum equal to the British Bankers' Association interest settlement rates for deposits in U.S. Dollars for an interest period of one (1) month as of 11:00 a.m. (London time) on such Business Day (or, if such Business Day is not a Eurodollar Business Day, as of 11:00 a.m. (London time) on the immediately preceding Eurodollar Business Day) as published on Reuters Screen LIBOR 01 Page, or if Reuters Screen LIBOR01 Page is not available, as published by Bloomberg Financial Services, Dow Jones Market Services, Telerate or any similar service selected by the Agent divided by (b) one minus the applicable LIBOR Reserve Percentage. The Daily LIBOR Rate shall be reset daily on each Business Day.

"Debtor Relief Law" shall mean, collectively, the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally, as amended from time to time.

"Default" shall mean any event, fact, circumstance or condition that, with the giving of applicable notice or passage of time or both, would constitute or be or result in an Event of Default.

"Default Rate" shall have the meaning given such term in Section 3.5.

"Defaulting Lender" shall mean any Lender (a) that has failed to fund any portion of its Loans or participations in Letters of Credit, or has otherwise failed to make any other

Appendix A-4

payments, required to be made by it under this Agreement or the other Loan Documents within two (2) Business Days after any such amounts are required to be funded or paid by it under this Agreement or the other Loan Documents (provided that such Lender shall cease to be a Defaulting Lender with respect to this clause (a) upon satisfaction in full of all outstanding funding and payment obligations of such Lender under this Agreement and the other Loan Documents), (b) that has given oral or written notice to Borrower, Agent or any Lender or has otherwise publicly announced that such Lender believes it will, or intends to, fail to fund any portion of its Loans or participations in any Letters of Credit or fail to fund or make any loans or other payments required to be made by it under this Agreement and the other Loan Documents or under any other committed loan facility (provided that such Lender shall cease to be a Defaulting Lender with respect to this clause (b) upon delivery to Agent of a written rescission of such notice or announcement), or (c) with respect to which one or more Lender-Related Distress Events has occurred with respect to such Person or any Person that directly or indirectly controls such Lender and Agent has determined that such Lender may become a Defaulting Lender.  For purposes of this definition, control of a Person shall have the same meaning as in the second sentence of the definition of Affiliate.

"DIP Loan Collateral" shall mean the "DIP Collateral" as defined in the Financing Orders.

"DIP Loan Documents" shall mean, collectively and each individually, the Agreement, the Notes, the Security Documents, the Subordination Agreements, the Uniform Commercial Code Financing Statements, the Borrowing Certificates, the Financing Orders, and all other agreements, documents, instruments and certificates heretofore or hereafter executed or delivered to Agent or any Lender in connection with any of the foregoing or the Loans, as the same may be amended, modified or supplemented from time to time.

"Disclosure Statement" shall have the meaning given such term in Section 6.20(a).

"Disclosure Statement Order" shall have the meaning given such term in Section 6.20(b).

"Distribution" shall mean any fee, payment, bonus or other remuneration of any kind, and any repayment of or debt service on loans or other indebtedness.

"Environmental Laws" shall mean, collectively and each individually, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Superfund Amendment and Reauthorization Act of 1986, the Resource Conservation and Recovery Act, the Toxic Substances Control Act, the Clean Air Act, the Clean Water Act, any other "Superfund" or "Superlien" law and all other federal, state and local and foreign environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances, in each case, as amended, and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of Governmental Authorities with respect thereto.

Appendix A-5

"Equipment" shall mean all "equipment" (as defined in the UCC) of Borrower (or, if referring to another Person, of such other Person), now owned or hereafter acquired, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"Eurodollar Business Day" shall mean any Business Day on which commercial banks are open for international business (including dealings in dollar deposits) in London.

"Event of Default" shall mean the occurrence of any event set forth in Article VIII.

"Excess Cash Payment" shall have the meaning given such term in Section 2.7(a).

"Excess Cash Payment Date" shall have the meaning given such term in Section 2.7(a).

"Facility Cap" shall have the meaning given the term in the Recitals of this Agreement.

"Fed Funds Rate" shall mean, for any day, an interest rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published for such day (or, if such day is not a Business Day, for the immediately preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations at approximately 9:00 a.m. (Minneapolis, MN time) on such day on such transactions received by the Agent from three (3) Federal funds brokers of recognized standing selected by Agent in its sole discretion.

"Final Financing Order" shall mean an order that is entered by the Bankruptcy Court in the Bankruptcy Case pursuant to Sections 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), which authorizes the Credit Parties to incur post-petition secured indebtedness under the Revolving Facility and all guaranties in accordance with the DIP Loan Documents, confers status as a Superpriority Claim upon all of the Obligations and is otherwise in form and substance satisfactory in all respects to Agent and Lenders.

"Financing Orders" shall mean, collectively, the Interim Financing Order and the Final Financing Order.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time  as applied by nationally recognized accounting firms.

"Government Account" shall be defined to mean all Accounts arising out of or with respect to any Government Contract.

"Government Contract" shall be defined to mean all contracts with the United States Government or with any agency thereof, and all amendments thereto.

"Governmental Authority" shall mean any federal, state, municipal, national, local or other governmental department, court, commission, board, bureau, agency or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, whether of the United States or a state, territory or possession thereof, a foreign sovereign entity or country or jurisdiction or the District of Columbia.

"Guarantor" shall have mean Holdco and any other Person that guaranties any or all of the Obligations.

"Guaranty" shall mean, collectively and each individually, all guarantees of the Obligations executed by any Guarantors.

"Hazardous Substances" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, hazardous wastes, hazardous or toxic substances or related materials as defined in or subject to any applicable Environmental Law.

"Healthcare Laws" shall mean:

(d)    Any and all federal, state and local fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7(b)), the Stark Law (42 U.S.C. § 1395nn and §1395(q)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code and the regulations promulgated pursuant to such statutes;

(e)    HIPAA;

(f)    the Social Security Act;

(g)    Any Requirements of Law relating to the billing or submission of claims, collection of accounts receivable, underwriting the cost of, or provision of management or administrative services in connection with, any and all of the foregoing, by any Borrower; and

(h)    Any and all other applicable laws, regulations, manual provisions, policies and administrative guidance, each of (a) through (d) as may be amended from time to time.

"HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104-191) and the regulations promulgated thereunder.

"Holdco" shall mean SSDI Holdings, Inc.

"Incremental Advance" shall mean all Advances by Lenders, other than the Initial Advance.

"Incremental Commitment" shall mean the amount set forth opposite such Lender's name on Annex II as its Incremental Commitment, as such amount may be reduced, modified or terminated from time to time pursuant to this Agreement.  The aggregate amount of all Incremental Commitments of the Lenders as of the Closing shall be $3,000,000.

"Indebtedness" of any Person shall mean, without duplication, (a) all items which, in accordance with GAAP, would be included in determining total liabilities as shown on the liability side of the balance sheet of such Person as of the date as of which Indebtedness is to be determined, including any lease which, in accordance with GAAP would constitute Indebtedness, (b) all indebtedness secured by any mortgage, pledge, security, Lien or conditional sale or other title retention agreement to which any property or asset owned or held by such Person is subject, whether or not the indebtedness secured thereby shall have been assumed, (c) all indebtedness of others which such Person has directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), discounted or sold with recourse or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire, or in respect of which such Person has agreed to supply or advance funds (whether by way of loan, stock, equity or other ownership interest purchase, capital contribution or otherwise) or otherwise to become directly or indirectly liable.

"Indemnified Person" shall have the meaning given such term in Section 13.4.

"Initial Advance" shall mean an Advance in the amount of the Prepetition Senior Debt, including, without limitation, the Prepetition Loans plus all accrued and unpaid interest, fees, costs, expenses, indemnities and premiums thereon or with respect thereto and all other amounts due and payable thereon or with respect thereto.

"Initial Commitment" shall mean the amount set forth opposite such Lender's name on Annex II as its Initial Commitment, as such amount may be reduced, modified or terminated from time to time pursuant to this Agreement.

"Insured Event" shall have the meaning given such term in Section 13.4.

"Intellectual Property" shall mean all present and future:  trade secrets, know-how and other proprietary information; Trademarks, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; Copyrights (including Copyrights for computer programs) and all tangible and intangible property embodying the Copyrights, unpatented inventions (whether or not patentable); Patents; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; the right to sue for all past, present and future infringements of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

Appendix A-8

"Interest Settlement Date" shall have the meaning given such term in Section 12.5(a)(iii).

"Interim Financing Order" shall mean an order that is entered by the Bankruptcy Court in the Bankruptcy Case pursuant to Sections 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), which authorizes Borrower, on an interim basis, to incur post-petition secured indebtedness under the Revolving Facility in accordance with the DIP Loan Documents, confers status as a Superpriority Claim upon all of the Obligations and is otherwise in form and substance satisfactory in all respects to Agent and Lenders.

"Inventory" shall mean all "inventory" (as defined in the UCC) of Borrower (or, if referring to another Person, of such other Person), now owned or hereafter acquired, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"KEIP" shall mean a Key Employee Incentive Program on terms reasonably acceptable to Borrower and Agent.

"Lender Addition Agreement" shall mean an agreement among Agent, a Lender and such Lender's assignee regarding their respective rights and obligations with respect to assignments of Loans and other interests under this Agreement and the other DIP Loan Documents, in form and substance acceptable to Agent in its Permitted Discretion.

"Lender-Related Distress Event" shall mean, with respect to any Lender or any Person that directly or indirectly controls such Lender (each, a "Distressed Person"), (a) a voluntary or involuntary case with respect to such Distressed Person under Title 11 of the United States Code or any similar bankruptcy laws of its jurisdiction of formation, (b) a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, (c) such Distressed Person is subject to a forced liquidation, merger, sale or other change of majority control supported in whole or in part by guaranties or other support (including, without limitation, the nationalization or assumption of majority ownership or operating control by) the U.S. government or other Governmental Authority, (d) such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt or (e) such Distressed Person becomes or is insolvent as determined by Agent.

"Lenders" shall have the meaning ascribed to such term in the recitals hereof.

"Letter of Credit" shall have the meaning ascribed to such term in Appendix B and, as used in this Agreement, shall include the letter of credit the subject of any L/C Undertaking.

"Letter of Credit Participation Fee" shall have the meaning given such term in Section 3.2(b).

Appendix A-9

"Letter of Credit Usage" shall mean, as of any date of determination, the sum without duplication of (i) the aggregate undrawn amount of all outstanding Letters of Credit, plus (ii) all amounts which have been paid or made available by the L/C Issuer or by any Lender under in respect of any Letter of Credit, in each instance, to the extent not reimbursed, plus (iii) the aggregate amount of all drawn Letters of Credit, in each case as of such date of determination.

"LC Fee" shall have the meaning given such term in Section 3.2(b).

"L/C Issuer" shall mean any Person that, at the request of Agent, agrees to become an issuer of a Letter of Credit (or a letter of credit the subject of an L/C Undertaking) for purposes of  Section 2.1(c).

"L/C Undertaking" shall have the meaning ascribed to such term in Appendix B.

"LIBOR Reserve Percentage" shall mean for any day that percentage (expressed as a decimal) which is in effect on such day, as prescribed by The Board of Governors of the Federal Reserve System (or any successor), for determining the maximum reserve requirement (including, without limitation, any basic, supplemental, emergency, special or marginal reserves) for a member bank of the Federal Reserve System with respect to "Eurocurrency liabilities" as defined in Regulation D or with respect to any other category of liabilities which includes deposits by reference to which the interest rate on LIBOR loans is determined, whether or not any of the Lenders has any Eurocurrency liabilities subject to such reserve requirement at such time.

"Lien" shall mean any mortgage, pledge, security interest, easement, option, right of offset encumbrance, restriction on use, restraint or transfer, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof), or any other arrangement pursuant to which title to the property is retained by or vested in some other Person for security purposes.

"Loan" or "Loans" shall mean, individually and collectively, all Advances under the Revolving Facility.

"Material Adverse Effect" or "Material Adverse Change" shall mean any event, condition or circumstance or set of events, conditions or circumstances or any change(s) which (i) has, had or would reasonably be likely to have any material adverse effect upon or change in the validity or enforceability of any DIP Loan Document, (ii) has been or would reasonably be likely to be material and adverse to the value of any of the Collateral, to the priority of the Agent's or any Lender's security interest in the Collateral, or to the business, operations, prospects, properties, assets, liabilities or condition of Borrower and/or any other Credit Party, either individually or taken as a whole, or (iii) has materially impaired or would reasonably be likely to materially impair the ability of any Borrower or any other Credit Party to pay any portion of the Obligations or to otherwise perform the Obligations or to consummate the transactions under the DIP Loan Documents executed by such Person.

"Measurement Day" shall have the meaning given such term in Section 2.7(a).

Appendix A-10

"Mortgage" shall mean any deed of trust, mortgage, deed to secure debt or other document creating a Lien on real property or any interest in real property.

"Note" or "Notes" shall mean all promissory notes issued pursuant to Section 2.13.

"Obligations" shall mean all present and future obligations, Indebtedness and liabilities of Borrower and/or Guarantors to Agent and/or any Lender at any time and from time to time of every kind, nature and description, direct or indirect, secured or unsecured, joint and several, absolute or contingent, due or to become due, matured or unmatured, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, whether under any of the DIP Loan Documents or otherwise relating to the Notes, Loans and/or any other obligations of Borrower, and/or Guarantors to Agent and/or any Lender, including, without limitation, all obligations, liabilities and Indebtedness owing to Agent and/or any Lender in respect of Advances, any Letter of Credit or L/C Undertaking, all amounts payable to Agent or Lenders pursuant to Section 3.5 of this Agreement and all other applicable fees, charges and expenses and/or all amounts paid or advanced by Agent or Lenders on behalf of or for the benefit of any Borrower and/or Guarantor for any reason at any time, including in each case obligations of performance as well as obligations of payment and interest that accrue after the commencement of any proceeding under any Debtor Relief Law by or against any such Person.

"OFAC" shall mean the U.S. Department of Treasury's Office of Foreign Asset Control.

"Other Lender" shall have the meaning given such term in Section 12.17(b).

"Paid in Full" and "Payment in Full" mean, with respect to the Prepetition Debt, the Obligations, all amounts owing with respect thereto (including any interest accruing thereon after the commencement of any proceeding under any Debtor Relief Law by or against Borrower, whether or not allowed as a claim against Borrower in such proceeding, but excluding as yet unasserted contingent obligations), have been fully, finally and completely paid in cash.

"Patriot Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56, as amended.

"Patents" shall mean, with respect to any Person, all of such Person's now existing or hereafter acquired right, title and interest in and to: (i) all patents, patent applications, inventions, invention disclosures and improvements, and all applications, registrations and recordings relating to the foregoing as may at any time be filed in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, any political subdivision thereof or in any other country, and all research and development relating to the foregoing; and (ii) the reissues, divisions, continuations, renewals, extensions and continuances-in-part of any of the foregoing.

"Payment Office" shall mean initially the address set forth beneath Agent's name on the signature page of the Agreement, and thereafter, such other office of Agent, if any, which it may designate by notice to Borrower to be the Payment Office.

"Permit" shall mean any permit, approval, authorization, license, agreement, accreditation, certification, contract, provider and supplier number, registration, certification, certificate of authority certificate of need, variance, permission, franchise, qualification, order, filing or consent required from a governmental authority or other entity under an applicable law, ordinance, policy, manual provision, guidance, principle of common law, statute, rule or regulation, or any determination of an arbitrator or a court or other governmental authority, in each case to the extent applicable to or binding upon a Credit Party or any of its assets.

"Permitted Discretion" shall mean a determination or judgment made by Agent in good faith in the exercise of reasonable (from the perspective of a secured lender) business judgment.

"Permitted Expenses" shall mean, subject to the terms and conditions set forth in the Financing Orders, (i) Professional Fees and Expenses of any Professional Person (other than those paid with the Carve-Out), (ii) the Carve-Out, (iii) quarterly fees required to be paid by Borrower to the Office of the United States Trustee pursuant to 28 U.S.C. Section 1930(a)(6) and (iv) fees to be paid to the clerk of the Bankruptcy Court.

"Permitted Indebtedness" shall have the meaning given such term in Section 7.2.

"Permitted Liens" shall have the meaning given such term in Section 7.3.

"Person" shall mean an individual, a partnership, a corporation, a limited liability company, a business trust, a joint stock company, a trust, an unincorporated association, a joint venture, a Governmental Authority or any other entity of whatever nature.

"Petition Date"  shall mean the date of the Borrower's filing of its voluntary petition for relief pursuant to the Bankruptcy Code.

"Plan" shall have the meaning given such term in Section 6.20.

"Prepayment" shall have the meaning given such term in Section 3.3(b).

"Prepetition Credit Facility" shall mean the Loan Agreement dated as of August 27, 2010 (as amended, modified, and supplemented from time to time, the "Prepetition Credit Agreement") by and among the Prepetition Secured Parties and Binder & Binder – The National Social Security Disability Advocates, LLC and all related agreements and documents (collectively, with the Prepetition Credit Agreement, the "Prepetition Financing Documents").

"Prepetition Loans" shall mean the loans under the Prepetition Credit Facility.

"Prepetition Secured Parties" shall mean, collectively, the Agent, the Lenders and the L/C Issuer, as each is defined in the Prepetition Credit Agreement.

"Prepetition Senior Debt" shall mean all debts, liabilities and other obligations of Borrower or any other obligor on the Petition Date and that arise under the Prepetition Credit Facility, whether direct or indirect, absolute or contingent or due or to become due, including without limitation all interest thereon accruing after the petition date and all legal fees and

collection expenses heretofore or hereafter incurred in collecting any of debts, liabilities or other obligations, including, without limitation, all Obligations under (and as defined in ) the Prepetition Credit Facility.

"Prime Rate" shall mean the interest rate announced from time to time by U.S. Bank as its "prime rate" on commercial loans (which rate shall fluctuate as and when said prime rate shall change). Borrower acknowledges that such "prime rate" is a reference rate and does not necessarily represent the lowest or best rate offered by U.S. Bank or any other Lender to its customers.

"Professional Fees and Expenses" shall have the meaning provided therefore in the Financing Orders.

"Professional Persons" shall have the meaning provided therefore in the Financing Orders.

"Property" shall mean all types of real, personal or mixed property and all types of tangible or intangible property.

"Pro Rata Share" shall, for purposes of any Incremental Advance or reimbursement obligation for a Letter of Credit, mean,  with respect to any Lender as to all Lenders, the percentage obtained by dividing (i) the Incremental Commitment of that Lender under the Revolving Facility by (ii) all such Incremental Commitments of all Lenders under the Revolving Facility; provided, however, that if any such Incremental Commitment of a Lender is terminated pursuant to the terms hereof, the "Pro Rata Share" means the percentage obtained by dividing (x) the aggregate amount of such Lender's outstanding Incremental Advances under the Revolving Facility by (y) the aggregate amount of all outstanding Incremental Advances under the Revolving Facility, in any case as such percentage may be adjusted by assignments permitted pursuant to this Agreement, and for all other purposes, including for purposes of any interest and fees payable to Lenders hereunder, shall mean, with respect to any Lender as to all Lenders, the percentage obtained by dividing (i) the Commitment of that Lender under the Revolving Facility by (ii) all such Commitments of all Lenders under the Revolving Facility; provided, however, that if any such Commitment of a Lender is terminated pursuant to the terms hereof, the "Pro Rata Share" means the percentage obtained by dividing (x) the aggregate amount of such Lender's outstanding Advances under the Revolving Facility by (y) the aggregate amount of all outstanding Advances under the Revolving Facility, in any case as such percentage may be adjusted by assignments permitted by this Agreement.

"Real Property" shall mean all of Borrower's right, title and interest in and to its owned and leased premises and all buildings, fixtures and improvements situated thereon or related thereto.

"Receipt" shall have the meaning given such term in Section 13.5.

"Register" shall have the meaning given such term in Section 2.13.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System, as from time to time amended.

Appendix A-13

"Released Parties" shall have the meaning given such term in Section 13.11.

"Releasing Parties" shall have the meaning given such term in Section 13.11.

"Requirements of Law" shall mean, as to any Credit Party, any law, ordinance, policy, manual provision, guidance, principle of common law, statute, rule or regulation, or any determination of an arbitrator or a court or other governmental authority, in each case applicable to or binding upon such Credit Party or any of its assets, or to which such Credit Party or any of its assets is subject, including, without limitation, the Americans with Disabilities Act of 1990, the Social Security Act, any Healthcare Law, and any certificate of occupancy, zoning ordinance, building, environmental or land use requirement, or labor, employment, occupational safety or health law, rule or regulation (including those applicable to the disposal of medical waste).

"Requisite Lenders" shall mean at any time (a) if the Commitments under the Revolving Facility have not terminated, Lenders then holding fifty-one percent (51%) or more of the sum of the Commitments then in effect, or (b) if the Commitments under the Revolving Facility have terminated, Lenders then holding fifty-one percent (51%) or more of the sum of the aggregate unpaid principal amount of all Loans then outstanding; provided, however, that if there are two or fewer Lenders, Requisite Lenders shall mean all of the Lenders (but shall exclude any Defaulting Lender). The Commitments of, and the total outstanding Loans held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Requisite Lenders. For purposes of this definition, all Lenders that are Affiliates and each Lender and its related funds shall be deemed to constitute one, single Lender.

"Revolving Facility" shall have the meaning given such term in the recitals hereof.

"Revolving Facility Maturity Date" shall have the meaning given such term in Section 2.2.

"Sale" shall mean the sale of all or substantially all of any Credit Party's assets.

"Security Documents" shall mean the Notes, this Agreement, all Guaranties, all mortgages securing all or any part of the Obligations, Uniform Commercial Code Financing Statements and all other agreements, documents or instruments necessary to create or perfect the Liens in the Collateral or pursuant to which any Person grants to Agent, for the benefit of Lenders, or any Lender collateral in any form as security for the Obligations, as such may be modified, amended or supplemented from time to time.

"Settlement Date" shall have the meaning given such term in Section 12.5(a)(ii).

"Social Security Act" means the Social Security Act of 1965 as set forth in Title 42 of the United States Code, as amended, and any successor statute thereto, as interpreted by the rules and regulations issued thereunder, in each case as in effect from time to time.

"Specified Event of Default" means any Event of Default other than Events of Default arising under any of the following clauses of Section 8.1: (g), (h), (i), (s), (w), (z), or (cc).

101921159_6

"Subordinated Debt" shall mean any Indebtedness, contingent equity, earnout or other obligations of Borrower that is unsecured and subordinated, by written contract in form and substance satisfactory to Agent, in right of repayment, Liens, security and remedies to all of the Obligations and to all of Lenders' rights, Liens and remedies.

"Subordination Agreement" shall mean, collectively and each individually, any subordination agreements to which Agent or any Lender and other service providers or creditors of any Borrower are a party.

"Subsidiary" shall mean, (i) as to Borrower, any Person in which more than 50% of all equity, membership, partnership or other ownership interests is owned directly or indirectly by Borrower or one or more of its Subsidiaries, and (ii) as to any other Person, any Person in which more than 50% of all equity, membership, partnership or other ownership interests is owned directly or indirectly by such Person or by one or more of such Person's Subsidiaries.

"Superpriority Claim" shall have the meaning provided therefore in the Financing Orders.

"Term" shall mean the period commencing on the date set forth on the first page hereof and ending on August 31, 2016.

"Termination Date" shall have the meaning given such term in Section 11.1.

"Trademarks" shall mean, with respect to any Person, all of such Person's now existing or hereafter acquired right, title, and interest in and to: (i) trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos, other business identifiers, prints and labels on which any of the foregoing have appeared or appear, all applications, registrations and recordings relating to the foregoing as may at any time be filed in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, any political subdivision thereof or in any other country, and all research and development relating to the foregoing; (ii) all renewals thereof; and (iii) all designs and general intangibles of a like nature.

"Transferee" shall have the meaning given such term in Section 13.2.

"UCC" shall mean the Uniform Commercial Code as in effect in the State of Maryland from time to time.

"Unused Line Fee" shall have the meaning given such term in Section 3.2(a).

"U.S. Bank" shall have the meaning ascribed to such term in the recitals hereof.

"U.S. Dollars" and $ shall mean lawful money of the United States of America.

"Wind-Down Fund" shall have the meaning given such term in Section 2.14.

## APPENDIX B

## LETTERS OF CREDIT

(a)      Subject to the terms and conditions of this Agreement, Agent and Lenders agree to cause the L/C Issuer from time to time during the Term (but in no event after the Revolving Facility Maturity Date) to issue standby letters of credit for the account of Borrower (each standby letter of credit a "Letter of Credit") or to purchase participations or execute indemnities or reimbursement obligations (each such undertaking, an "L/C Undertaking") with respect to Letters of Credit which comply with the provisions of this Appendix B issued by an L/C Issuer for the account of Borrower (each Letter of Credit or L/C Undertaking, as the context requires, constituting or relating to a standby letter of credit is referred to in this Agreement as a "Standby Letter of Credit"); provided, however, that the L/C Issuer will not be required to issue, purchase or execute a requested Standby Letter of Credit if any of the following would result after giving effect thereto:  (i) the Letter of Credit Usage would exceed the lesser of (A) the Facility Cap in effect at such time, minus the amount of Advances then outstanding and the outstanding Letter of Credit Usage or (B) the aggregate face amount of all Standby Letters of Credit then outstanding would exceed $_____.  If an L/C Issuer is obligated to advance funds under a Standby Letter of Credit (an "L/C Disbursement"), Borrower immediately shall reimburse such L/C Issuer for such L/C Disbursement by paying to Agent an amount equal to such L/C Disbursement not later than 1:00 p.m. (New York City time) on the date that such L/C Disbursement is made, if Borrower shall have received written or telephonic notice of such L/C Disbursement prior to 12:00 p.m. (New York City time) on such date, or, if such notice has not been received by Borrower prior to such time on such date, then not later than 1:00 p.m. (New York City time), on the first Business Day that Borrower has such notice prior to 12:00 p.m. (New York City time), and, in the absence of such reimbursement, such L/C Disbursement immediately and automatically shall be deemed to be an Advance hereunder and, thereafter, shall bear interest at the Applicable Rate for Advances.  To the extent any L/C Disbursement is deemed to be an Advance hereunder, Borrower's obligation to reimburse such L/C Disbursement shall be discharged and replaced by the resulting Advance.  The Standby Letters of Credit that have not been drawn upon shall not bear interest (but shall be subject to any applicable fees, costs and expenses charged in respect thereof by the applicable L/C Issuer or otherwise in accordance with the provisions of the Agreement).

(b)      Borrower may from time to time upon notice not later than 12:00 noon (New York City time), at least five (5) Business Days in advance, request L/C Issuer to assist Borrower in establishing or opening a Standby Letter of Credit by delivering to L/C Issuer, with a copy to Agent, at the Payment Office, the L/C Issuer's standard form of standby letter of credit application (the "Standby Letter of Credit Application") completed to the satisfaction of the L/C Issuer (in the exercise of its Permitted Discretion), and such other certificates, documents and other papers and information as Agent or L/C Issuer may reasonably request.  If requested by Agent, any Lender or L/C Issuer, Borrower also shall be an applicant under the application with respect to any Letter of Credit that is to be the subject of an L/C Undertaking.  Borrower acknowledges that the issuance of any Letter of Credit shall occur no sooner than five (5) Business Days following the submission of a Standby Letter of Credit Application to, and to the satisfaction of, the L/C Issuer.

(c)      Each Standby Letter of Credit (and any letter of credit the subject of an L/C Undertaking) shall, among other things, (i) be in form and substance acceptable to the L/C Issuer and Agent, including the requirement that the amounts payable thereunder must be payable in Dollars, (ii) provide for the payment of sight or time drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein, and (iii) have an expiry date not later than six (6) months after such Standby Letter of Credit's date of issuance and in no event later than thirty (30) days prior to the last day of the Term.  Each Standby Letter of Credit Application and each Standby Letter of Credit shall be subject to the International Standby Practices (ISP98) issued by the Institute for International Banking Law and Practice, Inc., and any amendments or revision thereof.

(d)      In connection with the issuance of any Standby Letter of Credit, Borrower shall indemnify, save and hold Agent, each Lender and each L/C Issuer harmless from any loss, cost, expense or liability, including, without limitation, payments made by Agent, any Lender or any L/C Issuer, and reasonable out-of-pocket expenses and reasonable attorneys' fees incurred by Agent, any Lender or any L/C Issuer arising out of, or in connection with, any Standby Letter of Credit to be issued for the account of Borrower, except for any such losses, costs, expenses or liabilities arising out of Agent's, any Lender's or such L/C Issuer's gross negligence or willful misconduct.  Borrower shall be bound by the L/C Issuer's regulations and reasonable good faith interpretations of any Standby Letter of Credit issued or created for Borrower's account, although this interpretation may be different from Borrower's own; and, neither Agent, any Lender, any L/C Issuer, nor any of its correspondents shall be liable for any error, negligence, or mistakes, whether of omission or commission, in following Borrower Representative's instructions or those contained in any Standby Letter of Credit or of any modifications, amendments or supplements thereto or in issuing or paying any Standby Letter of Credit, except for, and solely to the extent of, Agent's, such Lender's, such L/C Issuer's or such correspondents' gross negligence or willful misconduct.

(e)      Borrower shall authorize and direct the L/C Issuer (including with respect to the letter of credit the subject of an L/C Undertaking) to name Borrower as the "Account Party" therein and to accept and rely upon the L/C Issuer's instructions and agreements with respect to all matters arising in connection with the Standby Letters of Credit and the applications therefore.

(f)      If by reason of (i) any change in any applicable law, treaty, rule, or regulation or any change in the interpretation or application thereof by any Governmental Authority, or (ii) compliance by any L/C Issuer, any Lender or Agent with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Federal Reserve Board as from time to time in effect (and any successor thereto):

(1)      any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Standby Letter of Credit issued hereunder, or

(2)      there shall be imposed on any L/C Issuer, Agent or any Lender any other condition regarding any Standby Letter of Credit issued pursuant hereto;

Appendix B-2

and the result of the foregoing is to increase, directly or indirectly, the cost to any L/C Issuer, Agent or any Lender of issuing, making, guaranteeing, or maintaining any Letter of Credit or to reduce the amount receivable in respect thereof by any L/C Issuer, Agent or any Lender, then, and in any such case, Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Borrower, and Borrower shall pay on demand such amounts as Agent may specify to be necessary to compensate Agent, the applicable Lender and/or the applicable L/C Issuer for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the Applicable Rate for Advances.  The determination by Agent of any amount due pursuant to this Appendix B, as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(g)    If any portion of the Letter of Credit Usage, whether or not then due and payable, remains unpaid or outstanding on the Revolving Facility Maturity Date or such earlier date as this Agreement may be terminated, Borrower shall:  (A) provide cash collateral therefore in the manner described in Section 9.1(e); or (B) cause all such Standby Letters of Credit and guaranties thereof, if any, to be canceled and returned; or (C) deliver a stand-by letter (or letters) of credit in guarantee of such portion of the Letter of Credit Usage, which stand-by letter (or letters) of credit shall be of like tenor and duration (plus thirty (30) additional days) as, and in an amount equal to at least 105% of the aggregate maximum amount then available to be drawn under, such Standby Letters of Credit to which such outstanding Letter of Credit Usage relate and shall be issued by a Person, and shall be subject to such terms and conditions, as are satisfactory to Agent in its Permitted Discretion.

Appendix B-3

## APPENDIX C

### PERIODIC REPORTS

(i)     Copies of all bank statements and reconciliation reports for each Borrower's depository accounts maintained at any bank, financial institution or otherwise other than a Lender;

(ii)    Weekly, on each Excess Cash Payment Date, a report of Borrower's daily cash balance as of the immediately preceding Measurement Day;

(iii)   Weekly, on Wednesday of each week (or the immediately preceding Business Day if such Wednesday is not a Business Day) the following reports, in each case for the immediately preceding calendar week:

    (A)    reports specifying actual cash receipts and Cash Payments with respect to the prior week;

    (B)    a report setting fort the actual performance compared to the Budget on both an aggregate basis and a line-item by line-item basis, stating all variances and providing a narrative discussion and analysis by management with respect to any and all variances;

    (C)    an accounts receivable aging reports; and

    (D)    a report specifying as of the end of the immediately preceding week (i) the number of employees employed by Credit Parties, any third party on a Credit Party's behalf, or otherwise for the benefit of a Credit Party, and (ii) the number of non-residential real property locations leased by Borrower.

(vii)   On Wednesday of the fourth week after the Closing Date and on Friday of each fourth week thereafter, a Budget for the next succeeding 13-week period, prepared on a weekly basis and otherwise in form and substance reasonably satisfactory to the Agent, which Budget, when delivered and as so updated, shall be (A) consistent with the Budget delivered to the Agent on or prior to the Closing Date and attached as Exhibit C attached to this Agreement, (B) prepared on a reasonable basis and in good faith, and (C) based upon assumptions believed by the Borrower to be reasonable at the time made and upon the best information than reasonably available to the Borrower, and shall be accompanied by a certificate of an Authorized Officer certifying as to the matters set forth in subclauses (A), (B) and (C) above.  Each updated Budget shall be subject to review and approval by Agent in writing.  To the extent a Budget is not approved, Borrower may submit a revised Budget for Agent's review and written approval, it being understood and agreed that Agent and Lenders shall have no obligation to fund any Advances if a Budget has not been approved for the week in which such Advance is requested.

**Schedule 2.4**

**Borrower's Account(s)**

101921159_6

**Schedule 5.2**

**Required Consents**

**Schedule 5.3**

**Capitalization, Organization Chart (including all subsidiaries, authorized/issued capitalization, owners, directors, officers and managers) and Joint Ventures**

**Schedule 5.4**

**Real and Personal Property Owned or Leased; Leases**

**Schedule 5.5**

**Other Agreements**

**Section 5.6**

**Litigation**

**Section 5.8**

**Taxes**

**Schedule 5.10**

**Compliance with Law**

## Schedule 5.11

## Intellectual Property

**Schedule 5.15A**

**Existing Indebtedness**

**Schedule 5.15B**

**Indebtedness Maturing During Term**

**Schedule 5.16**

**Other Agreements**

**Schedule 5.17**

**Insurance**

**Schedule 5.18**

**Places of Business**

**Schedule 6.8**

**Post-Closing**

1.   On or before December 31, 2014, the Credit Parties shall:

    a.   Deliver to Agent, a deposit account control agreement, deposit account services agreement or investment or securities account control agreement, as applicable, with respect to all deposit accounts and investment accounts maintained or established by any Credit Party, each in form and substance acceptable to Agent in its reasonable discretion;

    b.   Deliver to Agent duly-executed trademark and copyright security agreements, each in form and substance acceptable to Agent in its reasonable discretion; and

    c.   Borrower and Guarantor shall each have executed and filed IRS Form 8821 with the appropriate office of the Internal Revenue Service.

2.   On or before January 9, 2015, the Credit Parties shall:

    a.   Deliver to Agent a current a certificate of good standing for (i) Binder & Binder – The National Social Security Disability Advocates (MD), LLC, (ii) Binder & Binder – The National Social Security Disability Advocates (TX), LLC, (iii) Binder & Binder – The National Social Security Disability Advocates (WA), LLC and (iv) Binder & Binder – The National Social Security Disability Advocates (CA), LLC, each issued by the applicable Governmental Authority of the jurisdiction of incorporation or organization of each foregoing Borrower.

3.   On or before January 23, 2015, the Credit Parties shall:

    a.   Deliver to Agent original certificates of all insurance policies of Borrower confirming that they are in effect and that the premiums due and owing with respect thereto have been paid in full and endorsements naming Agent, for the benefit of itself and Lenders, as loss payee or additional insured, as appropriate.

**Schedule 7.2**

**Permitted Indebtedness**

**Schedule 7.3**

**Permitted Liens**

101921159_6

**POST-PETITION REVOLVING CREDIT AND SECURITY AGREEMENT**

**between**

_____

**and**

**U.S. BANK NATIONAL ASSOCIATION, as Agent**

**and**

**the Lenders from time to time party thereto**

**Dated as of**
**December _____, 2014**

# POST-PETITION REVOLVING CREDIT AND SECURITY AGREEMENT

## TABLE OF CONTENTS

Page

I.    DEFINITIONS ................................................................................................ 2

II.   ADVANCES, PAYMENT AND INTEREST............................................... 3

2.1   The Revolving Facility; Letters of Credit ...................................... 3
2.2   The Advances; Maturity................................................................. 4
2.3   Interest on the Advances ............................................................... 4
2.4   Revolving Facility Disbursements; Requirement to Deliver Borrowing Certificate ....... 4
2.5   [Intentionally Omitted] ................................................................. 6
2.6   Promise to Pay; Manner of Payment ............................................. 6
2.7   Mandatory Prepayments ............................................................... 6
2.8   Payments by Agent ....................................................................... 8
2.9   Other Mandatory Prepayments and Voluntary Prepayment of Revolving Facility ......... 8
2.10  Grant of Security Interest; Collateral ........................................... 9
2.11  Collateral Administration ............................................................. 10
2.12  Power of Attorney ........................................................................ 11
2.13  Evidence of Loans ........................................................................ 11
2.14  Wind-Down Fund ........................................................................ 13

III.  FEES AND OTHER CHARGES ................................................................. 14

3.1   Commitment Fee ........................................................................... 14
3.2   Unused Line Fee; Letter of Credit Fee ......................................... 14
3.3   Early Termination Fee .................................................................. 15
3.4   Computation of Interest and Fees; Lawful Limits ........................ 15
3.5   Default Rate of Interest................................................................. 15

IV.   CONDITIONS PRECEDENT ..................................................................... 16

4.1   Conditions to Initial Advance and Closing .................................. 16
4.2   Conditions to Each Advance ........................................................ 18

V.    REPRESENTATIONS AND WARRANTIES ............................................ 18

5.1   Organization and Authority.......................................................... 19
5.2   DIP Loan Documents .................................................................... 19
5.3   Subsidiaries, Capitalization and Ownership Interests .................. 20
5.4   Properties ..................................................................................... 20
5.5   Other Agreements ........................................................................ 20
5.6   Litigation ...................................................................................... 21
5.7   Hazardous Materials ..................................................................... 21
5.8   Potential Tax Liability; Tax Returns; Governmental Reports ...... 21
5.9   Financial Statements and Reports ................................................ 22
5.10  Compliance with Law .................................................................. 22
5.11  Intellectual Property ..................................................................... 23
5.12  Licenses and Permits; Labor ........................................................ 23
5.13  No Default..................................................................................... 23
5.14  Disclosure..................................................................................... 23
5.15  Existing Indebtedness; Investments, Guarantees and Certain Contracts ...... 24

[Signature Page to Post-Petition Revolving Credit and Security Agreement]

|      | 5.16 | Other Agreements | 24 |
|      | 5.17 | Insurance | 25 |
|      | 5.18 | Names; Location of Offices, Records and Collateral | 25 |
|      | 5.19 | Non-Subordination; Lien and Claim Priority | 25 |
|      | 5.20 | Accounts | **Error! Bookmark not defined.** |
|      | 5.21 | Survival | 26 |
| VI.  | AFFIRMATIVE COVENANTS | | 26 |
|      | 6.1  | Financial Statements, Borrowing Certificate, Financial Reports and Other Information | 26 |
|      | 6.2  | Payment of Obligations | 28 |
|      | 6.3  | Conduct of Business and Maintenance of Existence and Assets | 28 |
|      | 6.4  | Compliance with Legal and Other Obligations | 28 |
|      | 6.5  | Insurance | 29 |
|      | 6.6  | True Books | 30 |
|      | 6.7  | Inspection; Periodic Audits | 30 |
|      | 6.8  | Further Assurances; Post Closing | 30 |
|      | 6.9  | Payment of Indebtedness | 30 |
|      | 6.10 | Lien Searches | 31 |
|      | 6.11 | Use of Proceeds | 31 |
|      | 6.12 | Collateral Documents; Security Interest in Collateral | 31 |
|      | 6.13 | [INTENTIONALLY OMITTED.] | 31 |
|      | 6.14 | Right of First Refusal | **Error! Bookmark not defined.** |
|      | 6.15 | Taxes and Other Charges | 31 |
|      | 6.16 | [INTENTIONALLY OMITTED.] | 32 |
|      | 6.17 | Taxes | 32 |
|      | 6.18 | Other Covenants | 32 |
|      | 6.19 | Financing Orders | 34 |
|      | 6.20 | Delivery to Lender of Documentation Regarding Any Proposed Sale of Assets | 34 |
|      | 6.21 | Plan | 34 |
| VII. | NEGATIVE COVENANTS | | 35 |
|      | 7.1  | Financial Covenants | 35 |
|      | 7.2  | Permitted Indebtedness | 35 |
|      | 7.3  | Permitted Liens | 36 |
|      | 7.4  | Investments; New Facilities or Collateral; Subsidiaries | 37 |
|      | 7.5  | Dividends; Redemptions; Restricted Payments | 37 |
|      | 7.6  | Transactions with Affiliates | 37 |
|      | 7.7  | Charter Documents; Fiscal Year; Name; Jurisdiction of Organization; Dissolution; Use of Proceeds | 38 |
|      | 7.8  | Truth of Statements | 38 |
|      | 7.9  | IRS Form 8821 | 38 |
|      | 7.10 | Transfer of Assets | 39 |
|      | 7.11 | Chapter 11 Claims | 39 |
|      | 7.12 | OFAC | 39 |
|      | 7.13 | Capital Expenditures | 39 |
|      | 7.14 | Consent to Amendment of Financing Orders | 39 |
|      | 7.15 | Other Court Filings and Applications | 39 |
| VIII.| EVENTS OF DEFAULT | | 40 |
|      | 8.1  | Events of Default. | 40 |
|      | 8.2  | Remedies. | 44 |

IX.    RIGHTS AND REMEDIES AFTER DEFAULT .................................................. 45

9.1    Rights and Remedies ................................................................................. 45
9.2    Application of Proceeds ............................................................................ 47
9.3    Rights and Remedies not Exclusive .......................................................... 48

X.    WAIVERS AND JUDICIAL PROCEEDINGS .................................................. 48

10.1    Waivers ..................................................................................................... 48
10.2    Delay; No Waiver of Defaults ................................................................... 49
10.3    Jury Waiver ............................................................................................... 49

XI.    EFFECTIVE DATE AND TERMINATION ...................................................... 49

11.1    Termination and Effective Date Thereof ................................................... 49
11.2    Survival ..................................................................................................... 50

XII.    AGENT PROVISIONS; SETTLEMENT ......................................................... 50

12.1    Agent ............................................................................**Error! Bookmark not defined.**
12.2    Amendments, Lender Consent ................................................................... 63
12.3    Set-off and Sharing of Payments ............................................................... 50
12.4    Disbursement of Funds under Revolving Facility ..........**Error! Bookmark not defined.**
12.5    Settlements; Payments; and Information .......................**Error! Bookmark not defined.**
12.6    Dissemination of Information ........................................**Error! Bookmark not defined.**

XIII.    MISCELLANEOUS ...................................................................................... 56

13.1    Governing Law; Jurisdiction; Service of Process; Venue ............................ 56
13.2    Successors and Assigns; Participations; New Lenders ................................ 56
13.3    Application of Payments ............................................................................ 58
13.4    Indemnity .................................................................................................. 58
13.5    Notice ........................................................................................................ 59
13.6    Severability; Captions; Counterparts; Facsimile Signatures ...................... 59
13.7    Expenses .................................................................................................... 60
13.8    Entire Agreement ...................................................................................... 60
13.9    Approvals .................................................................................................. 61
13.10    Confidentiality and Publicity .................................................................... 61
13.11    Release of Agent and Lenders ................................................................... 61
13.12    Acknowledgements .................................................................................... 62
13.13    Certificates of Lenders. .............................................................................. 62
13.14    Bankruptcy Court Orders Paramount ........................................................ 62
13.15    Acknowledgement of Joint and Several Liability ....................................... 62
13.16    Borrower Representative ............................................................................ 63

101921159_6