**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq. (*pro hac vice*)
Andrew Behlmann, Esq. (*pro hac vice*)
Nicholas B. Vislocky, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel to the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Binder & Binder – The National Social Security Disability Advocates (NY), LLC, *et al.*,[1] | Case No. 14-23728 (RDD) |
|  | (Jointly Administered) |
| Debtors. |  |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) APPROVING ALTERNATIVE POST-PETITION SENIOR SECURED FINANCING**
**ON A FIRST-PRIORITY PRIMING BASIS, (II) AUTHORIZING USE OF CASH**
**COLLATERAL, (III) GRANTING ADEQUATE PROTECTION, AND (IV) MODIFYING**
**THE AUTOMATIC STAY**

The debtors and debtors-in-possession (collectively, the "Debtors") in the above-

captioned cases (the "Chapter 11 Cases") submit this motion (the "Motion") for entry of (a) an

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: (1) Binder & Binder - The National Social Security Disability Advocates (NY), LLC (1450); (2) SSDI Holdings, Inc. (3038); (3) Binder & Binder - The National Social Security Disability Advocates LLC (8580); (4) The Rep for Vets LLC (6421); (5) National Veterans Disability Advocates LLC (dba The Rep for Vets LLC) (7468); (6) The Social Security Express Ltd. (4960); (7) Binder & Binder - The National Social Security Disability Advocates (AZ), LLC (5887); (8) Binder & Binder - The National Social Security Disability Advocates (CA), LLC (1456); (9) Binder & Binder - The National Social Security Disability Advocates (CO), LLC (0945); (10) Binder & Binder - The National Social Security Disability Advocates (CT), LLC (0206); (11) Binder & Binder - The National Social Security Disability Advocates (FL), LLC (1455); (12) Binder & Binder - The National Social Security Disability Advocates (GA), LLC (4768);    (13) Binder & Binder - The National Social Security Disability Advocates (IL), LLC (1457); (14) Binder & Binder - The National Social Security Disability Advocates (MD), LLC (3760); (15) Binder & Binder - The National Social Security Disability Advocates (MO), LLC (2108); (16) Binder & Binder - The National Social Security Disability Advocates (NJ), LLC (1454); (17) Binder & Binder - The National Social Security Disability Advocates (NC), LLC (1460); (18) Binder & Binder - The National Social Security Disability Advocates (OH), LLC (7827); (19) Binder & Binder - The National Social Security Disability Advocates (PA), LLC (1453); (20) Binder & Binder - The National Social Security Disability Advocates (TX), LLC (1458); (21) Binder & Binder - The National Social Security Disability Advocates VA, LLC (7875); (22) Binder & Binder - The National Social Security Disability Advocates (WA), LLC (0225); (23) Binder & Binder - The National Social Security Disability Advocates LA, LLC (8426); (24) Binder & Binder - The National Social Security Disability Advocates (MI), LLC (8762); and (25) Binder & Binder - The National Social Security Disability Advocates (DC), LLC (5265); (together, the "Debtors").

interim order (the "Interim Order")[2] (i) authorizing the Debtors to obtain alternative post-petition senior secured financing (the "Alternative DIP Facility") from Stellus Capital Investment Corporation ("Stellus") on a priming first-lien basis, pursuant to sections 105, 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503(b), and 507 of the Bankruptcy Code, (ii) authorizing the Debtors to use the cash collateral ("Existing DIP Cash Collateral") of the Existing DIP Lenders (as defined below), (iii) authorizing the Debtors to provide the Existing DIP Lenders adequate protection pursuant to sections 361, 363, and 364 of the Bankruptcy Code, (iv) modifying the automatic stay, and (v) scheduling a final hearing pursuant to Bankruptcy Rule 4001 (the "Final Hearing"); and (b) following the Final Hearing, an order granting the relief requested herein on a final basis (the "Final Order" and collectively with the Interim Order, the "Alternative DIP Orders").  In support of this Motion, the Debtors rely upon the *Declaration of William A. Brandt, Jr. Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Chapter 11 Petitions and First Day Motions* (the "First-Day Declaration") [Docket No. 15] and the *Declaration of William A. Brandt, Jr. in Support of Debtors' Motion to Approve Alternative Post-Petition Financing* (the "Brandt  Declaration") filed concurrently herewith and respectfully state as follows:

## PRELIMINARY STATEMENT

The Debtors are the nation's largest provider of Social Security disability and veterans' benefits advocacy services.  As of the commencement of the Chapter 11 Cases, the Debtors had more than 57,000 active Social Security disability and veterans' benefits cases pending.  Prior to the commencement of the Chapter 11 Cases, the Debtors and their professionals engaged in extensive negotiations with the Debtors' pre-petition senior secured lenders to obtain post-

---

[2]    The Debtors are working with Stellus to finalize a form of Interim Order, and will file the same on the docket in the Chapter 11 Cases in advance of the hearing on this Motion.

petition financing.  Despite the Debtors' best efforts to negotiate a financing facility that would provide flexibility to enable the Debtors to explore all strategic alternatives, their pre-petition lenders were only willing to provide postpetition financing on terms that mandated a controlled liquidation, wherein the Debtors would adjudicate the 57,000 pending cases, aggressively pay down the existing lenders' secured debt, and rapidly reduce their office footprint and workforce, all without expending any funds to maintain the Debtors' business as a going concern.

Even though the terms of the Debtors' postpetition financing prohibit the Debtors from conducting any advertising, new clients continue to engage the Debtors at a rate of approximately 1,000 new cases per month.  The Debtors, in an exercise of their fiduciary duties, have determined that accepting new cases is essential to maintaining and enhancing the value of their business as a going concern, whether they ultimately determine to pursue a reorganization, a sale or a wind-down of the business.  At the same time, recent delays in federal disbursements under the Social Security disability program have temporarily slowed the Debtors' receipt of fee awards, negatively impacting the Debtors' cash flow.   As a result, the Debtors resumed negotiations with their pre-petition lenders in an attempt to obtain modifications to the existing DIP financing that both (a) enables the Debtors to weather the temporary slowdown in payments from the SSA and VA, and (b) provides the necessary incremental liquidity and flexibility to permit the Debtors to pursue a potential reorganization or other strategic alternatives that will maximize the value of their assets and recoveries for all stakeholders, rather than a "controlled liquidation" solely for the benefit of the Existing DIP Lenders.  Unfortunately, these negotiations have not been fruitful.  The Existing DIP Lenders have indicated a willingness to consider the Debtors' request to increase the size of the Existing DIP Facility (which will allow the Debtors to withstand the slowdown in cash receipts from the federal government), but have largely rejected

(or declined to respond to) the Debtors' other modification proposals, which are primarily intended to provide the Debtors with more flexibility by modifying existing covenants, events of default, remedies and milestones that control and dictate the ultimate outcome of these Chapter 11 Cases and effectively prohibit the Debtors from servicing new clients. The Debtors also requested modifications after receiving the DIP Default Letter (defined herein) asserting alleged events of default due to the slowdown in cash receipts from the SSA and VA and increased disbursements resulting from interest, fees, and other expenses charged by the Existing DIP Lenders that exceeded the amounts under the Debtors' DIP budget.

The Debtors are now at a critical juncture. Without an expansion in the availability under the Existing DIP Facility, the Debtors lack the necessary liquidity to fund their next payroll on February 17, 2015. Without relief from the provisions of the Existing DIP Facility, the Debtors will be unable to service new cases. The Existing DIP Lenders have suggested that they will increase the size of the Existing DIP Facility, but have neither committed to do so nor agreed to any of the Debtors' other proposed changes to the Existing DIP Facility. By contrast, Stellus, the Debtors' pre-petition mezzanine lender, responded to the Debtors' request for additional DIP funding and has offered to extend a $6 million alternative post-petition financing facility on terms and conditions that would relieve the Debtors of the pressure and distraction of endless negotiations and re-negotiations over the mere survival of their business. As security for the alternative financing facility, Stellus would be granted a priming first lien on all of the Debtors' assets other than causes of action arising under Chapter 5 of the Bankruptcy Code. As set forth more fully below, the Existing DIP Lenders would receive adequate protection against any potential diminution in the value of their interest in the Debtors' assets.

The alternative financing facility with Stellus should be approved because it will provide the Debtors with the liquidity necessary to weather the federal payment slowdown, while simultaneously enabling the Debtors to exercise their fiduciary duties by maintaining their business as a going concern.

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The legal bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503(b), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 4001-2 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules").

## BACKGROUND

3.      On December 18, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The Office of the United States Trustee (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") on January 8, 2015 [Docket No. 80].  As originally appointed, the Committee consisted of: (i) Stellus, (ii) United Service Workers Union, Local 455 IUJAT & Related Funds, (iii) T&G Industries, Inc., (iv) WB Mason

Co., and (v) Teaktronics, Inc.    On January 30, 2015, the U.S. Trustee reconstituted the Committee and removed Stellus as a member [Docket No. 99].

A.    **Overview and Nature of the Debtors' Business and Capital Structure**

5.    Additional factual background regarding the Debtors' operations and capital structure and the commencement of these Chapter 11 Cases is set forth in the First-Day Declaration and the DIP Motion, which are incorporated herein by reference.[3]

6.    The Debtors are the nation's largest provider of social security disability and veterans' benefits advocacy services.  While most other advocacy firms outsource cases that are not in their core region, the Debtors leverage their national footprint to service all of their cases in-house and provide the same level of advocacy expertise regardless of where a claimant is located.  The Debtors have 40 years of experience helping disabled individuals obtain disability benefits through programs administered by the Social Security Administration ("SSA") as well as helping veterans apply for disability and related benefits through the Department of Veterans Affairs (the "VA").

7.    There are two primary programs through which the SSA provides disability benefits: the Social Security Disability Insurance Program and the Supplemental Security Income Program.  Each of these programs provides monthly benefits to retired workers, their spouses and children, and survivors of deceased insured workers.  In addition, the federal government provides benefits for U.S. Armed Forces veterans with disabilities resulting from a disease or injury incurred or aggravated during active military service (and some disabilities that may arise post-service) through its Veterans Affairs Disability Benefits Program.  Since 1979, the Company has handled over 300,000 Social Security Disability Insurance Program,

---

[3]    All capitalized terms that are not expressly defined in this Motion shall have the meaning ascribed to such terms in the DIP Motion and/or Stellus Term Sheet (as defined herein).

Supplemental Security Income Program, and Veterans Affairs Disability Benefits Program cases ("SSA Cases").

**B.      Prepetition Secured Debt**

8.      Binder & Binder – The National Social Security Disability Advocates, LLC ("SSDA") is the borrower under a prepetition senior secured financing facility (the "Prepetition Facility") consisting of a revolving credit facility in the maximum principal amount of $8 million (the "Prepetition Revolver") and a term loan in the original principal amount of $29 million (the "Prepetition Term Loan").   All other Debtors, except for nine Debtors formed after the implementation of the Prepetition Facility (the "Non-Guarantor Debtors"),[4] have guaranteed SSDA's indebtedness under the Prepetition Facility (the Debtors other than SSDA and the Non-Guarantor Debtors are the "Guarantor Debtors").

9.      Capital One and U.S. Bank are the lenders under the Prepetition Facility.   U.S. Bank serves as administrative and collateral agent for the Prepetition Lenders.   As of the Petition Date, there were amounts outstanding of $6,499,733 under the Prepetition Revolver and $16,548,500 under the Prepetition Term Loan.   U.S. Bank, as agent for the Prepetition Lenders, holds a security interest in substantially all of the assets of SSDA and the Guarantor Debtors (the "Prepetition Collateral") as security for the Debtors' obligations under the Prepetition Facility (the "Prepetition Liens").

---

[4]    The Non-Guarantor Debtors include Binder & Binder - The National Social Security Disability Advocates (AZ), LLC (5887); Binder & Binder - The National Social Security Disability Advocates (CT), LLC (0206); Binder & Binder - The National Social Security Disability Advocates (MD), LLC (3760); Binder & Binder - The National Social Security Disability Advocates (MO), LLC (2108); Binder & Binder - The National Social Security Disability Advocates (OH), LLC (7827); Binder & Binder - The National Social Security Disability Advocates VA, LLC (7875); Binder & Binder - The National Social Security Disability Advocates (LA), LLC (8426); Binder & Binder - The National Social Security Disability Advocates (MI), LLC (8762); and Binder & Binder - The National Social Security Disability Advocates (DC), LLC (5265)

C.    **The Existing DIP Facility**

10.    On December 24, 2014, the Court entered an *Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Granting Liens, Security Interests and Superpriority Status; (III) Authorizing Use of Cash Collateral; (IV) Affording Adequate Protection: (V) Scheduling a Final Hearing; and (VI) Modifying the Automatic Stay* [Docket No. 50] (the "Existing Interim Order").

11.    On December 24, 2014, pursuant to the Existing Interim Order, the Debtors entered into a *Post-Petition Revolving Credit and Security Agreement* dated as of December 23, 2014 (as amended, restated, supplemented, or otherwise modified from time to time, the "Existing DIP Credit Agreement") with Capital One N.A. ("Capital One") as a lender, US Bank National Association as a lender and as agent ("US Bank" or "DIP Agent"), and the lenders from time to time party thereto (collectively with US Bank and Capital One, the "Existing DIP Lenders").    The Existing DIP Agreement provided for a post-petition revolving loan in the amount of $26 million, which included a complete roll-up of the $23 million of pre-petition indebtedness and an additional commitment of up to $3 million to fund the Debtors' operations during the Chapter 11 Cases (the "Existing DIP Facility").

12.    The Existing DIP Facility imposes numerous case controls and other limitations on the Debtors' operations that have proven to be impracticable given the circumstances the Debtors are currently facing.    Among others, such key terms include:

(a)    a requirement that the Debtors file a liquidating chapter 11 plan within six months after the petition date, *Existing DIP Credit Agreement* § 6.2(a);

(b)    an aggressive repayment schedule for the rolled-up prepetition debt, *Existing DIP Credit Agreement* § 2.7(c);

(c)    financial covenants that have proven overly strict in light of SSA payment volatility, *Existing DIP Credit Agreement* Annex I;

(d)     ambiguous borrowing limitations, *Existing DIP Credit Agreement* § 2.1(a);

(e)     wholesale prohibition of advertising, *Existing DIP Credit Agreement* § 8.1(z); and

(f)     aggressive workforce reduction and office footprint downsizing covenants, *Existing DIP Credit Agreement* § 6.17(b).

See Brandt Declaration, ¶ 24.

13.     On January 22, 2015, the Committee filed the *Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of Interim and Final Orders (I) Approving Post-Petition Senior Secured Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection, and (IV) Modifying the Automatic Stay* [Docket No. 93] (the "Committee's DIP Objection").  Among other things, the Committee objected to (a) the Existing DIP Lenders' demand that the rolled-up obligations under the Prepetition Facility be paid in full upon confirmation of a plan, (b) the aggressive repayment schedule, (c) the plan milestones that essentially guaranteed the Chapter 11 Cases were a controlled liquidation, (d) the prohibition on advertising and other going concern activities, and (e) the structure of the wind-down fund created under the Existing DIP Facility.

14.     On January 26, 2015, the Existing DIP Lenders issued a notice that Events of Default had occurred under the Existing DIP Credit Agreement (the "DIP Default Letter").  The DIP Default Letter alleged that, as of the Test Period (as defined in the Existing Credit Agreement) ending January 17, 2015, the Debtors were in default of the financial covenants set forth in clauses 1(d)(i) and (ii) of Annex I to the Existing DIP Credit Agreement, including clauses (1)(d)(i) (cash receipts) and (1)(d)(ii) (cash disbursements).[5]

---

[5]     Notably, the alleged cash disbursements covenant default related solely to the Debtors' payment of interest, fees and expenses, including fees paid to various advisors to the Existing DIP Lenders that were charged by the Existing DIP Lenders in excess of the amounts set forth in the Debtors' budget.

15.    In light of the Debtors' determination that additional funding is necessary due to the federal payment slowdown, the impracticability of certain covenants in the Existing DIP Credit Agreement due to the federal payment slowdown, the various issues raised in the Committee's DIP Objection, the alleged defaults asserted in the DIP Default Letter, and the Existing DIP Lenders' failure, even after multiple requests by the Debtors, to provide a proposed final financing order sufficiently in advance of the previously scheduled final hearing, the hearing to consider final approval of the Existing DIP Facility was adjourned from January 29, 2015 until February 10, 2015. The parties agreed that the January 29 hearing would be used as a status conference.  During that status conference, the Debtors discussed the need to modify the Existing DIP Credit Agreement and engaged in negotiations with the Existing DIP Lenders and the Committee regarding those modifications.

16.    On February 3, 2015, the Court entered an *Order (A) Extending and Amending the Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Granting Liens, Security Interests and Superpriority Status, (III) Authorizing Use of Cash Collateral, (IV) Affording Adequate Protection; (V) Scheduling a Final Hearing, and (VI) Modifying the Automatic Stay, and (B) Approving Amendment to the DIP Loan Agreement* (the "Second Interim DIP Order") [Docket No. 122], thereby extending the approval of the Existing DIP Facility granted in the Existing Interim Order through February 18, 2015.

**D.    Events Precipitating the Need for Alternative Financing**

17.    Since the Petition Date, multiple factors have contributed to the Debtors' need for additional postpetition financing.  First, the payment of fees from the SSA on account of successfully adjudicated SSA Cases has slowed significantly, a trend affecting the entire industry.  In only a few weeks, the Debtors' accounts receivable has increased by approximately

$3 million, and stands almost 30% above their historical average.  It is the Debtors'

understanding, based upon discussions with their contacts at the SSA, that this slowdown is

temporary in nature.

18.     Second, notwithstanding the Existing DIP Lenders' prohibition on advertising, the

Debtors have not experienced the projected reduction in new SSA Cases.  The Debtors estimate

that they are being retained in approximately 1,000 new SSA Cases per month.  As a result, the

Debtors have determined that it is necessary, and in fact, beneficial to maintain staffing levels

above those included in projections provided to the Existing DIP Lenders to ensure the proper

and timely adjudication of those SSA Cases.  Paradoxically, by maintaining the staffing levels

necessary to sustain their business as a going concern, the Debtors are likely to trigger a default

under the Existing DIP Credit Agreement.

19.     The Debtors engaged the Existing DIP Lenders to determine if they had an

interest in providing additional funding and relief from onerous covenants, but the Existing DIP

Lenders instead continued to press provisions the Court previously declined to approve and

struck *sua sponte* from the Interim Order, including treatment of the Existing DIP Lenders'

rolled-up pre-petition debt under 1129(a) and a 506(c) waiver.  The Debtors could not accede to

those demands and, therefore, were left with no choice but to seek financing from another

source.

20.     The onerous nature of the existing covenants is further evidenced by the DIP

Default Letter.  As provided by the DIP Default Letter, as of the Test Period ending January 17,

2015, the Existing DIP Lenders assert that the Debtors are in default of the financial covenants

related to cash receipts and cash disbursements, respectively.  <u>See</u> Annex I of the Existing Credit

Agreement, §§ (1)(d)(i) and (ii),

-11-

21.    These declarations of default are clear evidence of the overreaching and onerous terms the Debtors have been strong-armed into agreeing and under which they are attempting to operate.  First, cash receipts are wholly out of the Debtors' control but, as government receivables, are considered to be money good – a sentiment which has been shared by the Existing DIP Lenders on multiple occasions – yet the Existing DIP Lenders have declared a default based solely on payment timing issues.

22.    Perhaps more importantly and, yet, no less surprising, the cash disbursement line items the Debtors allegedly breached resulted from their payment of fees and expenses of the Existing DIP Lenders in amounts that exceeded the budget.  In other words, the Existing DIP Lenders demanded payment of fees and expenses in excess of budgeted amounts, then declared the Debtors in default for making the very payments mandated by the Existing DIP Lenders themselves.  While this may be a technical default, it is symptomatic of the distrust and unworkable structure of the Existing DIP Facility and the overall relationship.

23.    In an effort to continue with the Existing DIP Facility, the Debtors sought an extension of the Interim Order, temporary waiver of the defaults, and further lending up to the limit of the Existing DIP Facility.  The Existing DIP Lenders agreed, enabling the Debtors to make payroll for the week of February 2, 2015, and providing additional time for the Existing DIP Lenders and Debtors to renegotiate the structure and terms of the Existing DIP Facility going forward.  The Court approved and entered the Second Interim DIP Order on February 3, 2015 [Docket No. 122].

24.    Taking into account the onerous and impracticable provisions of the Existing DIP Credit Facility, the Committee's DIP Objection, concerns raised by the United States Trustee, and the DIP Default Letter, it was the Debtors' hope to negotiate a global deal in the interest of

all parties, as it has a fiduciary duty to do. The Debtors engaged the Existing DIP Lenders in numerous and extensive conversations, provided a complete list of problematic terms and provisions with suggested modifications, and then continued to attempt to revise such proposals to come to resolution. Unfortunately, the Debtors were unable to reach agreement with the Existing DIP Lenders and were forced to seek an alternative source of funding.

### E.    The Alternative DIP Facility

25.    The ability to obtain postpetition financing under the Alternative DIP Facility is essential to the Debtors' continued ability to operate in chapter 11 and preserve the value of their estates. The Debtors have determined that, given the nature of their collateral, it is unlikely that they would be successful "shopping" the marketplace for a replacement DIP lender willing to extend credit on a junior secured or administrative priority basis, or to extend sufficient credit to replace the entire Existing DIP Facility, including the $23,000,000 of pre-petition debt which has been rolled-up on an interim basis into the postpetition loan. Following extensive negotiations, the Debtors have received a commitment for alternative postpetition financing from Stellus. This proposal would provide for a new $6 million term loan to the Debtors secured by a first-priority priming lien on all of the Debtors' assets. Under this proposal, $3 million would be repaid to the Existing DIP Lenders upon entry of the Interim Order, thereby repaying in full the postpetition amounts advanced under the Existing DIP Facility. Because the Debtors have been unable to obtain the Existing DIP Lenders' consent to enter into the Alternative DIP Facility, the Debtors are in the unfortunate position of proceeding on a contested basis.

26.    Pursuant to Bankruptcy Rules 4001(c)(1)(B)(i)-(xi) and 4001(b)(1)(B)(i)-(iv) and Local Bankruptcy Rule 4001(b)(1)(B)(i)-(iv) and 4001-2(a)(i), a summary of the key terms of the

Alternative DIP Facility, together with references to the related pages of the term sheet annexed

hereto as **Exhibit 1** (the "Alternative DIP Term Sheet"), is as follows:[6]

| CONCISE STATEMENT OF MATERIAL TERMS OF THE ALTERNATIVE DIP FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[7] | |
|---|---|
| **TERM** | **DESCRIPTION** |
| **Borrowers** *Bankruptcy Rule 4001(c)(1)(B)* Term Sheet p.2 | Binder & Binder − The National Social Security Disability Advocates LLC, a Delaware limited liability company, and its subsidiaries, jointly and severally, in their capacities as borrowers and debtors-in-possession |
| **Guarantors** *Bankruptcy Rule 4001(c)(1)(B)* Term Sheet p.2 | SSDI Holdings, Inc., in its capacity as a guarantor and debtor in possession. The guaranty shall be secured by a first priority security interests in and liens on all assets of the guarantor. |
| **DIP Lenders** *Bankruptcy Rule 4001(c)(1)(B)* Term Sheet p.2 | Stellus Capital Investment Corporation and certain of its affiliates |
| **Use of Proceeds** *Bankruptcy Rule 4001(c)(1)(B)* Term Sheet pp. 3-4 | Proceeds of the DIP Credit Facility will be used for the following, but in each case in accordance with and subject to the Budget: in each case in accordance with the terms of the DIP Loan Documents, the Interim Order and the Final Order, (A) to repay that portion of the Existing DIP Facility utilized for Post-Petition Working Capital, which amount is estimated at approximately $3,000,000, (B) to pay working capital and other general corporate needs of Borrowers in the ordinary course of business, including adequate protection payments in respect of the remaining outstanding Existing DIP Facility; (C) to pay costs and expenses of administration of the Bankruptcy Case; including professional fees and expenses; (D) to pay postpetition fees and expenses of the DIP Agent and DIP Lenders related to the DIP Credit Facility, including payment of DIP Agent's reasonable attorneys' fees; (E) to fund the Operating Cash Reserve Account; and (F) to pay fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee or agent thereof and to pay professional fees of professionals retained by the Borrowers and any statutory committee, if formed. |
| **Amount and Structure of DIP Credit Facility** *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-* | A two draw term loan credit facility (the "DIP Credit Facility") in an aggregate principal amount not to exceed $6,000,000. The indebtedness and obligations of Borrowers under the DIP Credit Facility shall be joint and several. The proceeds of the DIP Loans available to Borrowers under the DIP Credit Facility shall be used for purposes identified in the Budget and subject to variances as set forth below and compliance with the terms and conditions set forth below, which shall not otherwise exceed $6,000,000. The DIP Credit Facility is |

---

[6]    The Debtors and Stellus have begun negotiating and preparing the definitive documentation for the DIP Credit Facility, and anticipate filing the form of credit agreement for the Alternative DIP Facility (the "Alternative DIP Credit Agreement") on the docket prior to the final hearing on this Motion. The DIP Term Sheet and the above summary are qualified in all respects by the Alternative DIP Credit Agreement and Interim Order, which will supersede the DIP Term Sheet.

[7]    Capitalized terms used in the Concise Statement but not otherwise defined in this Motion have the meanings ascribed thereto in the Alternative DIP Term Sheet. The description of the key terms of the Alternative DIP Facility in this section is intended only as a summary. Parties are encouraged to review the Alternative DIP Term Sheet (and the Alternative DIP Credit Agreement and proposed Interim Order, once filed) for the complete terms of the DIP Credit Facility.

| CONCISE STATEMENT OF MATERIAL TERMS OF THE ALTERNATIVE DIP FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[7] | |
|---|---|
| TERM | DESCRIPTION |
| *2(a)(1)* <br><br> Term Sheet pp. 2-3 | conditioned upon DIP Agent, for the benefit of DIP Lenders, obtaining a first priority perfected lien on, and security interest in, all of Borrowers' and Guarantor's personal and real property assets as provided in the "Collateral, Security and Superpriority Claims" paragraph below.  DIP Agent and DIP Lenders shall be entitled to assign and/or participate the DIP Credit Facility with additional lenders. <br><br> Upon entry of the Interim Order, to the extent the conditions precedent to the Closing shall have been satisfied, but prior to entry of the Final Order, amounts under the DIP Credit Facility will be limited to $4,500,000 ("Initial DIP Loan").  DIP Loans will be made for the purposes provided in the "Use of Proceeds" paragraph below not inconsistent with the Budget. <br><br> Following the disbursement of the Initial DIP Loan, one additional DIP Loan may be drawn, for up to the remaining amount of the DIP Credit Facility, within 5 business days of the entry of a Final Order.  The DIP Obligations shall be due and payable in full on the DIP Termination Date. |
| **Maturity and Termination Date** <br> *Bankruptcy Rule 4001(c)(1)(B)* <br><br> Term Sheet p. 3 | The DIP Credit Facility shall mature (the "DIP Termination Date") on the earliest to occur of: (a) March 17, 2015, unless the DIP Credit Agreement and the DIP Loan Documents are executed and delivered in a form acceptable to the DIP Agent and the Borrowers (including entry of a Final Order in form acceptable to the DIP Agent) on or before such date, in which case such maturity date shall be extended to March 31, 2016, or such later date as Borrowers, DIP Agent and DIP Lenders agree, (b) the effective date of a sale of substantially all of the assets of any Borrower or Guarantor pursuant to section 363 of the Bankruptcy Code, (c) the effective date of a plan of reorganization or liquidation, (d) the conversion of the Bankruptcy Case to a proceeding under Chapter 7 of the Bankruptcy Code, (e) the dismissal of the Bankruptcy Case or (f) acceleration of maturity of the DIP Credit Facility by DIP Agent or DIP Lenders due to the occurrence of an event of default under the DIP Loan Documents (as defined below). <br><br> All outstanding indebtedness under the DIP Credit Facility and all other DIP Obligations (as defined below) shall be due and payable in full on the DIP Termination Date. |
| **Fees** <br> *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(3)* <br><br> Term Sheet p.5 | On the date of Closing, Borrowers shall pay DIP Agent, for the ratable benefit of DIP Lenders, a commitment fee of $150,000, which shall be fully earned on the date of Closing and shall be non-refundable. |
| **Interest Rates** <br> *Bankruptcy Rule 4001(c)(1)(B)* <br><br> Term Sheet p. 5 | Interest on the outstanding balance of the DIP Credit Facility (including, without limitation, all DIP Loans) shall be payable monthly in arrears at a fixed annual rate of ten percent (10%). <br><br> Interest on the outstanding balance of the DIP Credit Facility shall be calculated each month on the basis of the actual number of days elapsed and a 360-day year. <br><br> From and after the occurrence of a default or an event of default under any of the DIP Loan Documents, a default rate of interest of an additional two percent (2.0%) per annum over the rate otherwise applicable shall be payable on demand on the outstanding balance (including any accrued and unpaid interest, fees and reimbursements) of the DIP Credit Facility; provided, that until such time as the DIP Credit Agreement and the DIP Loan Documents are executed and delivered in a form acceptable to both the DIP Agent (in its sole discretion) and Borrowers (in their sole discretion), then the applicable default rate of |

| CONCISE STATEMENT OF MATERIAL TERMS OF THE ALTERNATIVE DIP FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[7] | |
|---|---|
| **TERM** | **DESCRIPTION** |
| | interest shall be increased by an additional three percent (3%) per annum, for a total of five percent (5%) over the otherwise applicable rate. |
| **Prepayments**<br>*Local Rule 4001-2(a)(13)*<br><br>Term Sheet pp. 5-6 | Commencing June 30, 2015 and continuing on the last day of each month thereafter, the Borrowers shall make a monthly amortization payment of $500,000 in respect of the DIP Obligations.  In addition to the foregoing, the Borrowers shall, on Tuesday of each week, remit all outstanding cash on-hand as of the close of business on Monday of such week which exceeds $1,500,000 in aggregate, as follows: (i) to replenish the Operating Cash Reserve Account up to a maximum amount of $1,500,000, and (ii) to reduce the DIP Obligations until the principal balance of the DIP Obligations is at or below the thresholds set forth below as of the dates set forth below (the "Thresholds"):<br><br>|  Date | Threshold |<br>|---|---|<br>| Each week until Dec. 31, 2015 | $1,500,000 |<br>| Each week from January 1, 2016 through January 31, 2016 | $1,000,000 |<br>| Each week from February 1, 2016 through February 29, 2016 | $500,000 |<br><br>Any Excess Cash that exists at any time after reducing the DIP Obligations to the applicable Thresholds above shall be paid in respect of the Existing DIP Obligations as additional adequate protection payments (the "Cash Sweep Adequate Protection Payments"). |
| **Collateral and Priority**<br>*Bankruptcy Rule 4001(c)(1)(B)(ii);*<br>*Local Rule 4001-2(a)(4)*<br><br>Term Sheet pp. 5-6 | To secure the DIP Credit Facility and advances made by DIP Agent and DIP Lenders to Borrowers and the obligations of Borrowers and Guarantor to DIP Agent and DIP Lenders, DIP Agent, on its behalf and on behalf of the DIP Lenders, will receive a fully-perfected, first-priority security interest in, and priming lien on, all of the existing and after-acquired (pre-petition and post-petition) tangible and intangible assets of Borrowers and Guarantor (collectively, the "DIP Collateral") subject to mutually acceptable permitted liens ("Permitted Liens"), including, without limitation, accounts receivable, inventory, machinery, equipment, real estate, general intangibles and all claims that the Loan Parties have or may have against any person or entity (other than claims pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code) (the "Chapter 5 Actions").  Such priming lien shall, for avoidance of doubt, be senior to any liens granted in connection with the Existing DIP Facility (including any portion of the Existing DIP Facility that is not repaid with the proceeds of the DIP Credit Facility) other than with respect to the Chapter 5 Actions (which will be excluded from the DIP Collateral).<br><br>All obligations of Borrowers under the DIP Credit Facility and Guarantor under the DIP Guaranties, including, without limitation, all DIP Loans, all interest and fees in connection therewith and all other indebtedness, obligations and liabilities of Borrowers and Guarantor to DIP Agent and DIP Lenders (collectively, the "DIP Obligations") shall be (a) secured: (i) pursuant to section 364(d) of the Bankruptcy Code, by a first-priority, senior priming perfected lien on, and security interest in, all property of Borrowers and Guarantor, subject only to Permitted Liens; and (ii) pursuant to section 364(c) of the Bankruptcy Code, by a first-priority, perfected lien on, and security interest in, all property of Borrowers and Guarantor that is not subject to any valid, duly-perfected lien of any party (such liens and security interests, collectively, the "DIP Liens"); and (b) accorded priority under section 364(c) of the Bankruptcy Code over any and all administrative expenses of the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code (including for avoidance of doubt any administrative expenses in connection with the Existing DIP Facility).  The foregoing notwithstanding, however, the security shall be subject to a carve-out for the U.S. Trustee's |

| CONCISE STATEMENT OF MATERIAL TERMS OF THE ALTERNATIVE DIP FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[7] | |
|---|---|
| **TERM** | **DESCRIPTION** |
| | fees and professional fees of Loan Parties' professionals and professionals retained by the statutory committee appointed in the Bankruptcy Case, in accordance with the procedures to be mutually acceptable to Borrowers, DIP Agent and DIP Lenders (the "Carve Out").<br><br>The DIP Liens on the DIP Collateral of Borrowers and Guarantor shall be effective and perfected as of the entry of the Interim Order and without necessity of the execution, filing or recording of mortgages, security agreements, pledge agreements, control agreements, financing statements or other agreements.  However, the DIP Agent may, in its discretion, require the execution, filing or recording of any or all of the documents described in the preceding sentence. |
| **Adequate Protection**<br>*Bankruptcy Rule 4001(c)(i)(B)(v);*<br>*Local Rule 4001-2(a)(5)* | Adequate protection to be provided to lenders of the Existing DIP Facility (the "Existing DIP Lenders") will include (i) repayment of the Post-Petition Working Capital Advances upon Closing and entry of the Interim Order; (ii) payment of interest to Existing DIP Lenders at the contract rate in the Existing DIP Facility Credit Agreement; (iii) adequate protection payments in the amount of $500,000 per month, commencing June 30, 2015 (the "Adequate Protection Payments") plus the additional Cash Sweep Adequate Protection Payments as defined below; and (iv) junior liens on new cases that Borrowers accept commencing on date of entry of Interim Order approving the Alternative DIP Facility (as defined herein). |
| **Indemnification of any Entity**<br>*Bankruptcy Rule 4001(c)(1)(B)(ix)*<br><br>Term Sheet p.11 | Other than for acts of gross negligence, fraud or willful misconduct by the indemnified parties herein, Borrowers and Guarantor agree to indemnify DIP Agent, DIP Lenders, their respective directors, managers officers, employees, agents, auditors, accountants, appraisers, consultants, counsel and affiliates from, and agree to hold each of them harmless against, any and all losses, liabilities, claims, damages or expenses including amounts paid in settlement, incurred by any of them arising out of or by reason of any investigation, litigation or other proceeding brought or threatened by any third party relating to any loan made or proposed to be made, or any other transaction contemplated, hereunder. |
| **Carve-Out**<br>*Local Rule 4001-2(a)(5)*<br><br>Term Sheet p.5 | The security for the DIP Credit Facility shall be subject to a carve-out for the U.S. Trustee's fees and professional fees of Loan Parties' professionals and professionals retained by a statutory committee, if any, in an amount and subject to procedures acceptable to Borrowers, DIP Agent and DIP Lenders. |
| **Conditions to Closing**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(2),2(h)*<br><br>Term Sheet pp. 9-10 | The DIP Loan Documents will contain customary and appropriate conditions for financings of this type and other conditions deemed by DIP Agent and DIP Lenders in their reasonable discretion to be appropriate, and in any event including, without limitation, the following:<br><br>(1)  The DIP Note and Interim Order shall be in form and substance satisfactory to DIP Agent, DIP Lenders, Borrowers and their counsel in their respective sole discretion;<br><br>(2)  DIP Agent shall have received an initial 13-week cash flow forecast setting forth all forecasted receipts and disbursements on a weekly basis for the 13-week period beginning the week of February 2, 2015, broken down by week, including the anticipated weekly uses of the proceeds of the DIP Credit Facility for such period, which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and capital expenditures, fees and expenses relating to the DIP Credit Facility, fees and expenses related to the Bankruptcy Case, and working capital and other general corporate needs, which forecast shall be in form and substance satisfactory to DIP Agent in its sole discretion and acceptable to Borrowers and Guarantor (the "Initial DIP Budget" |

| CONCISE STATEMENT OF MATERIAL TERMS OF THE ALTERNATIVE DIP FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[7] | |
|---|---|
| **TERM** | **DESCRIPTION** |
| | and together with the Updated DIP Budget, the "Budget"); |
| | (3)  DIP Agent, for the benefit of DIP Lenders, shall have a valid and perfected lien on, and security interest in, the DIP Collateral on the basis and with the priority set forth herein; |
| | In addition to the satisfaction of the conditions on the Closing, the DIP Credit Agreement will contain additional conditions for the additional DIP Loan contemplated hereby customary for financings of this type, including, without limitation, the following: |
| | (1)  The DIP Credit Agreement and the DIP Loan Documents shall have been executed and delivered in a form acceptable to the DIP Agent, DIP Lenders and Borrowers (in their respective sole discretion) and the Final Order in form acceptable to the DIP Agent, DIP Lenders and Borrowers shall have been entered in each case; |
| | (2)  Immediately prior to and following the funding of any DIP Loan, there shall exist no event of default or any event that, with the passing of time or the giving of notice or both, would become an event of default under the DIP Loan Documents; |
| | (3)  No event of default shall have occurred; |
| | (4)  The representations and warranties of the Loan Parties in the DIP Loan Documents shall be true and correct in all material respects; |
| | (5)  The making of such DIP Loan shall not be enjoined, temporarily, preliminarily or permanently by any court of competent jurisdiction; and |
| | (6)  The Interim Order (with respect to DIP Loans made prior to entry of the Final Order) or the Final Order, as the case may be, shall be in full force and effect and shall not have been reversed, vacated or stayed. |
| **Covenants**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(8)*<br><br>Term Sheet pp. 6 | Except as specifically provided in the Initial DIP Note or contemplated hereunder, affirmative and negative covenants, representations and warranties, and events of default customary and appropriate for debtor-in-possession financings of this type will be negotiated between the Borrowers and the DIP Agent in connection with the execution of the DIP Credit Agreement.  Without limiting other covenants that may be discussed, the Debtors, DIP Agent and DIP Lenders agree that the following covenants shall be included:<br><br>(1)  Financial Covenants:  During any Test Period there will be (i) a permitted variance to Budget amounts for line item disbursements of the greater of fifteen percent (15%) or $10,000 for any single line item contained in the Budget and (ii) a permitted variance to Budget amounts for cash receipts of fifteen percent (15%).<br><br>(2)  Funding Advertising:  The payment of any advertising costs or expenses or any other disbursements relating to or constituting advertising, excluding any amounts paid pursuant to existing case referral programs or practices, not more than [$TBD] per month is permitted;<br><br>(3)  Event of Default If Adversary Proceeding Filed:  Any action, including, without limitation, an adversary proceeding, is commenced by the Debtors against DIP Agent or DIP Lender or any of their respective interests for any reason using DIP |

| CONCISE STATEMENT OF MATERIAL TERMS OF THE ALTERNATIVE DIP FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[7] | |
|---|---|
| **TERM** | **DESCRIPTION** |
| | Collateral. |
| | (4) Employee Covenants:  Measured as of the last day of each month, or as of the pay period nearest to that day, Borrower shall cause the total number of employees employed by Credit Parties or any third party on any Credit Party's behalf, or otherwise for the benefit of a Credit Party, not to exceed [TBD, based on ongoing evaluation by the Debtors and DIP Agent in light of potential reorganization, rather than required wind-down], subject as of each measurement date to a variance to be negotiated. |
| | For the avoidance of doubt, the following covenants and events of default <u>will not be incorporated</u> in their current form as provided for in the Existing DIP Facility (although certain other covenants may be retained subject to more flexible formulations/cushions/variances to be negotiated by the Borrowers, DIP Agent and DIP Lenders): |
| | (5) KEIP Requirement:  The Borrower shall use its best efforts to cause an order to be entered by the Bankruptcy Court (in form and substance reasonably acceptable to Agent) on or before the date that is 60 days following the Petition Date, approving the KEIP, with any material modifications for which Borrower has obtained Agent's prior written consent in connection with the Bankruptcy Court approval of the KEIP; |
| | (6) Summer Contract:  On or before February 28, 2015, any contract with a third-party to provide voice-over or similar talent related services shall have either (a) terminated in accordance with its terms or (b) been rejected by the Credit Parties |
| | Without limiting the foregoing, the DIP Credit Agreement will contain additional terms, provisions and covenants customary for financings of this type and other terms, provisions and covenants deemed by DIP Agent and DIP Lenders in their discretion to be appropriate and acceptable to Borrowers and Guarantor, and in any event including, without limitation, the following: |
| | (1) On or before February 18, 2015, entry of an interim order by the Bankruptcy Court approving the DIP Credit Facility (the "<u>Interim Order</u>"), which Interim Order shall be in form and substance acceptable to DIP Agent, DIP Lenders, Borrowers and Guarantor. |
| | (2) Entry of a final order by the Bankruptcy Court approving the DIP Credit Facility (the "<u>Final Order</u>") on or before March 17, 2015, which Final Order shall be in form and substance acceptable to DIP Agent, DIP Lenders, Borrowers and Guarantor. |
| | (3) Loan Parties shall cause DSI and any appropriate officers to participate in weekly calls with DIP Agent to discuss status and updates with respect to, among other things, the reports provided to DIP Agent. |
| | (4) On or before March 6, 2015, the Loan Parties shall deliver to DIP Agent, a deposit account control agreement, deposit account services agreement or investment or securities account control agreement, as applicable, with respect to all deposit |

| CONCISE STATEMENT OF MATERIAL TERMS OF THE ALTERNATIVE DIP FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[7] | |
|---|---|
| **TERM** | **DESCRIPTION** |
| | accounts and investment accounts maintained or established by any Loan Party. |
| | (5) The Loan Parties shall obtain approval and effectuate a plan of reorganization, in form and substance acceptable to Borrowers, DIP Agent and DIP Lenders (the "Plan of Reorganization"), in accordance with the following timeline: |
| | (6) Within twelve months of the Petition Date, Borrowers shall file the Plan of Reorganization and related disclosure statement, which disclosure statement shall be in form and substance acceptable to Borrowers, DIP Agent and DIP Lenders (the "Disclosure Statement"); |
| | (7) Within thirteen months of the Petition Date, Borrowers will use their best efforts to cause an order to be entered by the Bankruptcy Court (in form and substance acceptable to the Borrowers, DIP Agent and DIP Lenders) (i) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code, and (ii) authorizing the use of the Disclosure Statement for soliciting votes on the Plan of Reorganization and establishing solicitation procedures (the "Disclosure Statement Order"); |
| | (8) Within seven business days of the Bankruptcy Court's entry of the Disclosure Statement Order, Borrowers shall distribute the Disclosure Statement and the Plan of Reorganization and solicit acceptance of the Plan of Reorganization; |
| | (9) Within fourteen months of the Petition Date, Borrowers shall use their best efforts to cause an order to be entered by the Bankruptcy Court (in form and substance acceptable to Loan Parties, DIP Agent and DIP Lenders) approving the Plan of Reorganization (the "Confirmation Order"); and |
| | (10) The Plan of Reorganization shall become effective within fourteen business days following entry of the Confirmation Order. |
| **Events of Default** <br> *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001- 2(a)(10)* <br><br> Term Sheet pp. 7-8 | The DIP Credit Agreement will contain events of default customary and appropriate for financings of this type, provided that the Events of Default set forth in the Existing DIP Facility will be modified as shown in Exhibit B to the Alternative DIP Term Sheet. |
| **Change of Control** <br> *Local Rule 4001-2(a)(11)* <br><br> Term Sheet p.6 | Change of control is an event of default. |
| **Deadline or Requirement for Sale of Property** <br> *Local Rule 4001-2(a)(12)* | Not applicable. |
| **Restrictions on Funding Certain Activities** <br> *Local Rule 4001-2(a)(9)* | TBD |

| TERM | DESCRIPTION |
|---|---|
| **CONCISE STATEMENT OF MATERIAL TERMS OF THE ALTERNATIVE DIP FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2[7]** | |
| **Funding of Non-Debtor Affiliates with Cash Collateral or Loan** *Local Rule 4001-2(a)(15)* | Not applicable. |
| **Automatic Stay** *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* Term Sheet p.8 | The DIP Credit Agreement will contain remedies following the occurrence of a default or "termination event" that are customary for financings of this type. Such provisions may be similar to those set forth in the Existing DIP Facility (and related loan documents), but will be negotiated in good faith by the parties. For avoidance of doubt, the remedy set forth in <u>Section 9.4</u> of the Existing DIP Facility permitting the Agent to apply for the appointment of a receiver by any court of competent jurisdiction, without objection or contest by the Debtors, shall not be included in the DIP Credit Agreement. |

## RELIEF REQUESTED

27.    By this Motion, the Debtors request (a) entry of the Interim Order (i) approving the Alternative DIP Facility on a first priority priming basis, (ii) authorizing the Debtors to use the Existing DIP Cash Collateral, (iii) authorizing the Debtors to provide adequate protection to the Existing DIP Lenders for the priming liens and use of the Existing DIP Cash Collateral, (iv) modifying the automatic stay, and (v) scheduling the Final Hearing; and (b) following the Final Hearing, entry of a Final Order.

## BASIS FOR RELIEF

28.    The Court should approve the Alternative DIP Facility on a first-priority priming basis on the terms set forth herein and in the Alternative DIP Term Sheet (and, once finalized, the Alternative DIP Credit Agreement and Alternative DIP Orders) because (a) the Debtors are unable to obtain financing on an unsecured, administrative priority, or junior secured basis; (b) the terms of the Existing DIP Credit Facility are proving to be impracticable and detrimental to the Debtors' Chapter 11 Cases; and (c) approval of the Alternative DIP Facility and

authorization to use the Existing DIP Cash Collateral are in the best interests of the Debtors'
estates and all of the stakeholders in the Chapter 11 Cases.

**I.      The Alternative DIP Facility Should be Approved**

29.     Approval of the Alternative DIP Facility is necessary to provide the Debtors with
immediate and ongoing access to additional liquidity to pay their current and ongoing operating
expenses, including wages and salaries, taxes, vendor obligations, and other operational costs
such as rent and utilities.  The inability to access additional liquidity would bring the Debtors'
operations – and the tens of thousands of claimants' cases currently pending – to an immediate
halt, to the severe detriment of the Debtors' estates, claimants, creditors, employees, and all other
stakeholders, including the Existing DIP Lenders.  The funding to be provided by the Alternative
DIP Facility and the use of the Existing DIP Cash Collateral will enable the Debtors to continue
to service claimants and resolve cases, pay employees and vendors, and otherwise continue to
operate their business in the ordinary course during the Chapter 11 Cases, thereby preserving and
enhancing the value of their estates for the benefit of all stakeholders.  Absent the ability to pay
employees in the ordinary course of business, the Debtors would face the prospect of wholesale
attrition of the very personnel responsible for performing the services that generate the Debtors'
cash flow.  Such a scenario would likely force the Chapter 11 Cases into immediate dismissal or
conversion, destroying estate value and causing severe prejudice to claimants whose disability
benefits cases would be disrupted.

30.     Most significantly, the liquidity and flexibility provided by the Alternative DIP
Facility will provide the Debtors with breathing room to explore their strategic options as a going
concern, rather than simply winding down their existing caseload solely to repay the Existing

DIP Lenders. Accordingly, the Debtors submit that the Alternative DIP Credit Facility is essential to preserve estate value for the benefit of all stakeholders.

31.    As a condition of its willingness to extend credit under the Alternative DIP Facility, Stellus requires a first-priority lien upon all of the Debtors' assets and a superpriority administrative claim, pursuant to sections 364(c)(1)–(3) and 364(d) of the Bankruptcy Code. Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d)(1).

32.    A debtor satisfies the first prong of section 364(d)(1) by demonstrating that (1) it was unable to procure financing on an unsecured basis; (2) it was unable to procure financing on a junior basis to existing liens; and (3) there is no other unencumbered property in the estate on which a debtor can grant a lien. See In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Although a debtor must seek to obtain credit without priming a senior lien, debtors are not required to seek alternate financing from every source possible. Id. at 630-31. Rather, a debtor need only demonstrate that it undertook sufficient efforts to obtain financing without the need to grant a senior lien. Id. at 631 (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position"); In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 n. 44 (Bankr. S.D.N.Y. 2010) (noting that courts require only a showing of "reasonable effort" to obtain alternative credit with lesser security); see also Snowshoe Co., 789 F.2d at 1088

(unsuccessful contact with other financial institutions in the geographic area was sufficient to demonstrate that credit was unavailable absent senior lien).

33.    To satisfy the second prong of Section 364(d)(1), a debtor must demonstrate that it will adequately protect the existing lender's interest in its collateral.  The purpose of adequate protection "is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."  495 Cent. Park Ave., 136 B.R. at 631 (citations omitted); see also Contrarian Funds LLC v. Aretex LLC (In re Westpoint Stevens, Inc.), 600 F.3d 231, 257 (2d Cir. 2010) (internal quotations and citations omitted) ("Adequate protection is generally defined as a method by which a secured creditor may apply to the Bankruptcy Court to protect its interests against the diminution in value of [its] security during a bankruptcy proceeding.").

34.    Although the Bankruptcy Code does not expressly define adequate protection, "it suggests a broad and flexible definition" and "confers upon 'the parties and the courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its interest in the property involved.'"  495 Cent. Park Ave., 136 B.R. at 631 (citation omitted).  Thus, adequate protection is not a "one size fits all" formulation.  See In re Hubbard Power & Light, 202 B.R. 680, 686 (Bankr. E.D.N.Y. 1996); In re Yellowstone Mountain Club, LLC, No. 08-61570, 2008 WL 5875447, at *8 (Bankr. D. Mont. Dec. 17, 2008) ("'[A]dequate protection' [is] a concept which is to be decided flexibly on the proverbial 'case-by-case' basis.") (citation and internal quotation marks omitted).

(i)    **The Debtors were unable to obtain financing on an unsecured or junior secured basis.**

35.    The Debtors can satisfy both prongs of section 364(d)(1).  First, the Debtors were unable to obtain financing on an unsecured or junior secured basis.  In entering into the Existing DIP Facility, the Debtors determined that no lender would be willing to extend credit absent a

senior lien.  In seeking financing to replace or supplement the Existing DIP Facility, the Debtors determined that, given the nature of their collateral, it is unlikely that they would be successful "shopping" the marketplace for a replacement DIP lender willing to extend credit on a junior secured or administrative priority basis, or to extend sufficient credit to replace the entire Existing DIP Facility, including the $23,000,000 of pre-petition debt which has been rolled-up into the post-petition loan.  While the Debtors have received more than a dozen expressions of interest both to purchase various assets and/or provide financing going forward, none were viable.  See Brandt Declaration, ¶ 33.  No party, including Stellus, expressed a willingness to extend credit on a junior secured, administrative expense, or unsecured basis, due to, among other things, the $23 million of rolled-up secured debt.  In an effort to find a middle ground, the Debtors even suggested a participation interest in the Existing DIP Facility or lending on a *pari passu* basis; however, these suggestions were met with disinterest.  Id. at ¶ 33.  Lastly, pursuant to the Existing Interim Order and Existing DIP Credit Agreement, there are no unencumbered assets of the Debtors that could be offered as collateral for the Alternative DIP Facility.  Id. at ¶ 33.  The Debtors, despite reasonable efforts, have been unable to procure alternative postpetition financing without security and other protections equivalent to those proposed in the Alternative DIP Facility.

> **(ii)** **The Debtors will provide the Existing DIP Lenders with adequate protection of the value of their interests in the Existing DIP Cash Collateral.**

36.     The Debtors can also satisfy the second prong of section 364(d) because the Existing Lender Adequate Protection will adequately protect the Existing DIP Lenders' interests in the Existing DIP Cash Collateral.

37.     First, the value of the Existing DIP Cash Collateral dramatically exceeds the $23 million balance that will remain owing under the Existing DIP Facility after the $3 million of postpetition advances are repaid with the proceeds of the Alternative DIP Facility.    See Transcript of Dec. 22, 2014 Hearing (the "Dec. 22 Tr.") at 79:18-21 (undisputed representation by Debtors' counsel that the Prepetition Facility was oversecured by approximately $10 million as of the Petition Date).  This substantial equity cushion alone constitutes adequate protection of the Existing DIP Lenders' interests.    See Wilmington Trust Co. v. AMR Corp. (In re AMR Corp.), 490 B.R. 470, 478 (S.D.N.Y. 2013) ("It is well-settled that the existence of an equity cushion can be sufficient, in and of itself, to constitute adequate protection."); see also In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("The exist[ence] of an equity cushion seems to be the preferred test in determining whether priming of a senior lien is appropriate under section 364.") (internal quotations omitted).

38.     Second, the Alternative DIP Facility will enable the Debtors to preserve, enhance, and realize the value of the Existing DIP Cash Collateral, thereby providing adequate protection in and of itself.  See Transcript of December 23, 2014 Telephonic Hearing (the "Dec. 23 Tr.") at 16:17-25; see also 495 Central Park Ave., 136 B.R. at 631 (holding that value derived from new postpetition borrowings used to preserve and improve a debtor's property constituted adequate protection).  The incremental liquidity available under the Alternative DIP Facility will enable the Debtors to continue adjudicating SSA/VA Cases, thereby preserving and enhancing the value of the Existing DIP Cash Collateral and enabling the Debtors to continue to collect the proceeds thereof.  Moreover, the Alternative DIP Facility will enable the Debtors to continue accepting new cases, which not only maintain, but enhance the value of their estates.

39.    Finally, as additional adequate protection above and beyond the substantial equity cushion and preservation of collateral value, the Existing DIP Lenders will (a) retain a lien on all of the Debtors' assets and a superpriority administrative expense claim and (b) be granted a lien on the proceeds of new cases, each subject only to the liens and claims securing the Alternative DIP Facility and the Carve-Out, and the Debtors will pay to the Existing DIP Lenders (x) interest at the contractual rate provided for under the Existing DIP Facility and (y) periodic principal repayments in the amount of $500,000 per month, beginning on July 31, 2015.

40.    Consummation of the Alternative DIP Facility is in the best interest of the Debtors' estates, their employees, claimants, and creditors, and all other parties-in-interest in these Chapter 11 Cases and is consistent with the Debtors' exercise of their business judgment and fiduciary duty.  The Debtors are unable to obtain alternative credit without the protections provided by the Alternative DIP Facility, and have provided for adequate protection of the Existing DIP Lenders' interests in the Existing DIP Cash Collateral.    Accordingly, the Alternative DIP Facility should be approved.

41.    The terms and conditions of the Alternative DIP Facility are fair and reasonable, and were negotiated extensively, in good faith, and at arms' length between the Debtors and Stellus.  Accordingly, Stellus and all obligations incurred under the Alternative DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.  11 U.S.C. § 364(e).

### (iii)    Approval of the Alternative DIP Facility does not violate the interim orders approving the Existing DIP Facility.

42.    Approval of the Alternative DIP Facility does not violate the Existing Interim Order because the Alternative DIP Facility provides for payment in full of all postpetition advances made under the Existing DIP Facility and permits the Debtors the opportunity to exercise rights under section 1129(b) of the Bankruptcy Code which were expressly preserved by

revisions made to the Interim Order by the Court. Essentially, the Alternative DIP Facility restores the Existing DIP Lenders to no worse a position than they were in immediately before advancing any new funds under the Existing DIP Facility.

43.     On its face, the Existing DIP Facility is a $26 million facility. However, only $3 million of that amount consist of new advances. The remaining $23 million consists of a roll-up of prepetition debt. At the interim approval hearing on the Existing DIP Facility, the Court repeatedly expressed grave concern about the propriety of a roll-up in these Chapter 11 Cases, where the Existing DIP Lenders, who were also the prepetition lenders, were only contributing $3 million of new money for the sole purpose of realizing the value of collateral that they would otherwise be unable to recover outside of chapter 11. See Dec. 22 Tr. at 87:12-13, 15-16, 18-20; 96:11-14; 100:24-25. The Court further expressed concern that the Existing DIP Lenders refused to permit the rolled-up debt to be treated pursuant to Section 1129(b) of the Bankruptcy Code in an eventual plan, as required by law. See Dec. 23 Tr. at 11:24-12:7, 13:24-15:5. The Court ultimately approved the Existing DIP Facility, but *sua sponte* included provisions in the Existing Interim Order preserving the Debtors' rights to treat the rolled-up amounts under Section 1129(b) of the Bankruptcy Code. See Existing Interim Order at § 16.

44.     The Debtors anticipate that the Existing DIP Lenders may object to approval of the Alternative DIP Facility on the basis that the Existing Interim Order prohibits the approval of alternate financing secured by liens senior to liens granted under the Existing Interim Order unless the Existing DIP Facility is indefeasibly paid in full. Such an objection would run contrary to the Court-ordered reservation of the Debtors' rights under section 1129(b). Under the Alternative DIP Facility, the Debtors propose to immediately repay to the Existing DIP Lenders *all* new money the Existing DIP Lenders advanced under the Existing DIP Facility, plus

interest accrued thereon, upon entry of an interim order approving the Alternative DIP Facility. The Alternative DIP Facility further provides for adequate protection of the Existing DIP Lenders' "rolled up" prepetition secured claim in the form of an equity cushion, funding to continue business operations and to preserve, enhance, and collect the Existing Secured Lenders' collateral, and adequate protection payments of interest and principal, in order to continue to preserve the Debtors' rights to treat the Existing DIP Lender's pre-petition claim under section 1129 of the Bankruptcy Code. Any requirement that the "rolled up" portion of the Existing DIP Facility be paid on the approval of the Alternate DIP proposal would vitiate the protections afforded to the Debtors and their estates in the Interim Order.

45.     In addition, as recognized by the Court at the status conference on January 29, 2015, the roll-up provisions were only approved on an interim basis, and were subject to modification at a final hearing after considering the positions of the Committee and other parties-in-interest. Modification of the roll-up provisions of the Existing Interim Order and the bar against granting additional liens for alternate DIP financing is appropriate here as the additional liquidity and flexibility provided by the Alternative DIP Facility is necessary to preserve the value of the Debtors' estates for all parties-in-interest, including the Existing DIP Lenders. In the absence of approval of the Alternate DIP Facility, the Debtors will have no funds to continue operations and will not be able to continue to operate to service existing or new cases or to collect their receivables. In addition, modification of the Existing Interim Order will not prejudice the Existing DIP Lenders as they will be returned to no worse a position than they were in immediately before making any advances under the Existing DIP Facility – all new money advances will be repaid with interest and the Existing DIP Lenders will still hold a claim for their prepetition secured debt.

46.    For the foregoing reasons, the Debtors submit that the approval of the Alternate DIP does not violate the Interim Order and should be approved.

## II.    The Debtors should be authorized to use the Existing DIP Cash Collateral.

47.    A chapter 11 debtor may not use cash collateral unless "(A) each entity that has an interest in such collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  The Debtors require the use of the Existing DIP Cash Collateral to fund their operations.  In the absence of the continued authorization to use Existing DIP Cash Collateral, the Debtors' ability to continue operating in the ordinary course of business will be jeopardized, causing immediate and irreparable harm to the Debtors' estates, claimants, employees, and all other stakeholders by virtue of the loss of significant going-concern value.  Thus, the Debtors' continued use of Existing DIP Cash Collateral is essential in order to enable the Debtors to meet the obligations of their ordinary operating costs and expenses during the pendency of the Chapter 11 Cases.  Among other things, the continued use of Existing DIP Cash Collateral will enable the Debtors to maintain business relationships with their vendors and claimants, pay their employees, and satisfy other ordinary operational costs that are essential to preserve estate value by continuing to operate their business in the ordinary course.

48.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Permissible forms of adequate protection include periodic cash payments, additional liens, replacement liens, and other forms of relief.  11 U.S.C. § 361.  The purpose of adequate protection is to protect a

secured creditor from diminution in the value of its property interest in its collateral during the period of use, sale, or lease.  In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); see also Delbridge v. Production Credit Assoc. and Fed. Land Bank, 104 B.R. 824, 827-28 (E.D. Mich. 1989); In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990).  The appropriate form of adequate protection must be determined on a case-by-case basis.  See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472, 474 (8th Cir. 1985).

49.    In connection with their entry into the Alternative DIP Facility, the Debtors anticipate that the Existing DIP Lenders will not consent to the Debtors' continued use of the Existing DIP Cash Collateral.   To the extent this Court authorizes the Debtors to obtain alternative post-petition financing on a first priority priming basis, the Debtors propose to provide the Existing DIP Lenders with additional adequate protection with respect to the use of the Existing DIP Cash Collateral.   Accordingly, the Court should authorize the Debtors to use Cash Collateral on the terms set forth in the Alternative DIP Term Sheet (and, once finalized, the Alternative DIP Credit Agreement and Alternative DIP Orders).

50.    As discussed above, the Existing DIP Lenders will receive adequate protection of their interests in the Existing DIP Cash Collateral in the form of (a) a substantial equity cushion of approximately $10 million, or $4 million more than the amount the Debtors seek to borrow under the Alternative DIP Facility, (b) preservation and enhancement of collateral value through the ability to continue operating the Debtors' business, (c) liens and claims junior only to the liens and claims securing the Alternative DIP Facility and the Carve-Out, and (d) periodic payments of principal and interest (collectively, the "Existing Lender Adequate Protection").  See ¶¶ 40-42 above.   The Debtors respectfully submit that the Existing Lender Adequate

Protection will sufficiently protect the Existing DIP Lenders' interest in the Existing DIP Cash Collateral from any diminution in value and should be approved.

### III.   The Automatic Stay Should be Modified on a Limited Basis.

51.   A limited modification of the automatic stay imposed by Section 362(a) of the Bankruptcy Code is necessary to effectuate the relief sought herein.  Specifically, the Alternative DIP Orders should modify the automatic stay to (i) permit the Debtors to grant the liens and claims described herein; (ii) permit the Debtors and Stellus to take such actions as may be necessary to ensure the perfection and priority thereof; (iii) permit Stellus to exercise remedies pursuant to the Interim Order and, following entry of a Final Order, the Final Order and the Alternative DIP Credit Agreement (subject, in each instance, to the applicable notice periods); and (iv) implement the terms of the proposed Alternative DIP Orders immediately.  Stay modifications of this kind are ordinary and standard features of postpetition debtor-in-possession financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances.  Accordingly, in conjunction with approval of the Alternative DIP Facility, the Debtors respectfully request that the Court modify the automatic stay as set forth herein.

### REQUEST FOR INTERIM APPROVAL

52.   Bankruptcy Rule 4001 provides that final hearings on motions to use cash collateral or obtain post-petition financing may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on such motions and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

53.   Pursuant to Bankruptcy Rule 4001, the Debtors request that the Court conduct an expedited preliminary hearing on the Motion and on an interim basis (i) approve the Alternative

DIP Facility and (ii) authorize the Debtors to use the Cash Collateral of the Existing DIP Lenders and Alternative DIP Lenders, in order to (a) maintain and finance the ongoing operations of the Debtors in the ordinary course of business during the pendency of the Chapter 11 Cases and (b) avoid immediate and irreparable harm and prejudice to the Debtors' estates, all parties in interest, and the public. Furthermore, the Debtors request that the Court schedule the Final Hearing on the relief requested herein.

54.    Absent authorization from the Court to use the Existing DIP Cash Collateral and access the Alternative DIP Facility on an interim basis pending a Final Hearing, the Debtors will be immediately and irreparably be harmed as a result of an inability to operate their business in the ordinary course. Without the liquidity provided by the Alternative DIP Facility, the Debtors' businesses will be brought to an immediate halt leading to the loss of significant value and the Debtors' ability to maintain business relationships with their vendors, suppliers, and patients and to meet payroll and other operating expenses will be compromised. The Alternative DIP Facility will enable the Debtors to explore their strategic options as a going concern, while simultaneously relieving the Debtors of the recurring liquidity crises created by the terms of the Existing DIP Facility. In short, serious, immediate and irreparable harm to the Debtors and their estates would occur, with disastrous consequences for the Debtors, their estates, and creditors, if the Debtors do not obtain the immediate relief requested herein.

### REQUEST FOR FINAL HEARING

55.    Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable but within approximately thirty (30) days of entry of an Interim Order approving the Alternative DIP Facility, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

## REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

56.     To implement the foregoing successfully, the Debtors seek a waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use,

sale, or lease of property under Bankruptcy Rule 6004(h).  Pursuant to Rule 6004(h), "[a]n order

authorizing the use, sale, or lease of property other than cash collateral is stayed until the

expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth

above, the proposed granting of Adequate Protection Liens and the Adequate Protection

Superpriority Claim is essential to prevent potentially irreparable damage to the Debtors'

operations, value, and ability to reorganize.  Accordingly, the Debtors submit that ample cause

exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it

applies.

## NOTICE

57.     Notice of this Motion has been given to (i) Counsel to Capital One, McCarter &

English, LLP, Four Gateway Center, 100 Mulberry St., Newark, New Jersey 07102, Attn: Joseph

Lubertazzi, Jr. (jlubertazzi@mccarter.com); (ii) Counsel to US Bank, Katten Muchin Rosenman

LLP, 525 West Monroe Street, Chicago, Illinois 60661, Attn: Kenneth J. Ottaviano

(kenneth.ottaviano@kattenlaw.com); (iii) Counsel Stellus Capital Investment Corporation,

Moore & Van Allen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina

28202, Attn: Stephen E. Gruendel (stevegruendel@mvalaw.com); (iv) AON Risk Services –

Jacksonville, 13901 Sutton Park Drive S, STE 300, Jacksonville, Florida 32224; (v) AFCO

Credit Corporation, 14 Wall Street, Suite 8A-19, New York, New York 10005; (vi) the Office of

the United States Trustee for the Southern District of New York; (vii) Counsel to the Official

Committee of Unsecured Creditors, Klestadt Winters Jureller Southard & Stevens, LLP, Attn:

Tracy L. Klestadt (tklestadt@klestadt.com); (viii) the Internal Revenue Service; and (ix) those

parties who have filed a notice of appearance and request for service of pleadings in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order and, following the Final Hearing, entry of a Final Order.

Dated:  February 10, 2015

Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

 */s/ Kenneth A. Rosen*
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq. (*pro hac vice*)
Andrew Behlmann, Esq. (*pro hac vice*)
Nicholas B. Vislocky, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel to the Debtors*
*and Debtors-in Possession*