**KATTEN MUCHIN ROSENMAN LLP**
John J. Ramirez
575 Madison Avenue
New York, New York 10022-2585
Tel. (212) 940-8800
Fax. (212) 940-8776
and
Kenneth J. Ottaviano (*pro hac vice*)
Karin H. Berg *(pro hac vice)*
525 West Monroe Street
Chicago, IL 60661-3693
Tel.  (312) 902-5200
Fax. (312) 902-1061

*Attorneys for U.S. Bank National Association*
*in its capacity as Agent and Lender*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| Binder & Binder – The National Social Security Disability Advocates (NY), LLC, *et al.*,[1] | : | Case No. 14-23728 (RDD) |
|  | : | (Jointly Administered) |
| Debtors. |  |  |

--------------------------------------------------------------x

**U.S. BANK'S PRELIMINARY OBJECTION TO DEBTORS' MOTION FOR ENTRY OF**
**INTERIM AND FINAL ORDERS (I) APPROVING ALTERNATIVE POST-PETITION**
**SENIOR SECURED FINANCING ON A FIRST-PRIORITY PRIMING BASIS, (II)**
**AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE**
<u>**PROTECTION, AND (IV) MODIFYING THE AUTOMATIC STAY**</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: (1) Binder & Binder - The National Social Security Disability Advocates (NY), LLC (1450); (2) SSDI Holdings, Inc. (3038); (3) Binder & Binder – The National Social Security Disability Advocates LLC (8580); (4) Binder & Binder - The National Social Security Disability Advocates (AZ), LLC (5887); (5) Binder & Binder - The National Social Security Disability Advocates (CA), LLC (1456); (6) Binder & Binder - The National Social Security Disability Advocates (CO), LLC (0945); (7) Binder & Binder - The National Social Security Disability Advocates (CT), LLC (0206); (8) Binder & Binder - The National Social Security Disability Advocates (FL), LLC (1455); (9) Binder & Binder - The National Social Security Disability Advocates (GA), LLC (4768); (10) Binder & Binder - The National Social Security Disability Advocates (IL), LLC (1457); (11) Binder & Binder - The National Social Security Disability Advocates (MD), LLC (3760); (12) Binder & Binder - The National Social Security Disability Advocates (MO), LLC (2108); (13) Binder & Binder - The National Social Security Disability Advocates (NJ), LLC (1454); (14) Binder & Binder - The National Social Security Disability Advocates (NC), LLC (1460); (15) Binder & Binder - The National Social Security Disability Advocates (OH), LLC (7827); (16) Binder & Binder - The National Social Security Disability Advocates (PA), LLC (1453); (17) Binder & Binder - The National Social Security Disability Advocates (TX), LLC (1458); (18) Binder & Binder - The National Social Security Disability Advocates VA, LLC (7875); (19) Binder & Binder - The National Social Security Disability Advocates (WA), LLC (0225); (20) Binder & Binder - The National Social Security Disability Advocates (LA), LLC (8426); (21) Binder & Binder - The National Social Security Disability Advocates (MI), LLC (8762); (22) Binder & Binder - The National Social Security Disability Advocates (DC), LLC (5265); (23) The Rep for Vets LLC (6421); (24) National Veterans Disability Advocates LLC (dba The Rep for Vets LLC) (7468); and (25) The Social Security Express Ltd. (4960) (collectively, the "<u>Debtors</u>").

U.S. Bank National Association ("US Bank"), in its capacity as administrative agent (in such capacity, the "Existing DIP Agent") under the Post-Petition Revolving Credit and Security Agreement dated December 23, 2014, among Debtors, the lenders party thereto from time to time (collectively, the "Existing DIP Lenders"), and the Existing DIP Agent (as amended, the "Existing DIP Loan Agreement" and the loans and credit accommodations provided thereunder, the "Existing DIP Facility"), submits this preliminary objection (this "Objection") to Debtors' Motion for Entry of Interim and Final Orders (I) Approving Alternative Post-Petition Senior Secured Financing on a First-Priority Priming Basis, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection, and (IV) Modifying the Automatic Stay (the "Priming Motion")[2] [Doc. No. 143], and in support of this Objection, respectfully states as follows:

## INTRODUCTION

The Priming Motion asks this Court to allow Debtors to stack $6 million on top of the $23 million that is currently owed to the Existing DIP Lenders, while providing absolutely no evidentiary basis for what courts in this district have long recognized to be an "extraordinary" and "last resort" request.  Instead of being grounded in or supported by actual evidence, the Priming Motion casts aspersions on the Existing DIP Lenders in an effort to mask the incontrovertible truth: Debtors' proposed course of action is to embrace the same business model that wholly failed prior to the petition date and landed Debtors in the position they are in today.  But the very same issues that doomed Debtors' business model and created a two year liquidity crisis prior to the petition date will only be exacerbated post-petition by (i) falling win rates, (ii) only nominal increases in average per case award amounts by Debtors' sole source of revenue, (iii) a Congress which, after only a few days on the job, attempted to push through a

---

[2] Capitalized terms used in this Objection, unless defined herein, shall have the meanings given such terms in the Priming Motion.

legislative rule change that is estimated to deplete the disability trust fund by 2016, and (iv) substantial increases in expenses now proposed by Debtors.

Symptomatic of Debtors' failed business model, Debtors have been in default of their loan obligations since May 2013. Debtors' defaults were caused by declining success / realization rates on cases handled for their clients (the "win rate"), only nominal increases in average per case award amounts in recent years, and by Debtors' continually expanding their overhead notwithstanding their declining revenues. Debtors ultimately responded by cutting their $16,000,000 annual advertising expenses in late Summer, 2014. Yet, even then, Debtors could not make the required payments to the Existing DIP Lenders or timely (if at all) make payments to their vendors. As a result, as documented in a series of projections prepared solely by Debtors and their advisors, Debtors formulated an orderly wind down plan, forecasting no need for post-petition borrowings and proposing a payment plan to the Existing DIP Lenders. Mere weeks before the petition date, however, Debtors changed their tune and projected a need for substantial post-petition borrowings and a longer payment plan. Even after borrowing an additional $3 million post-petition, within weeks of the petition date, Debtors were again in default. Now they have changed their projections yet again and allegedly need an additional $3 million, primarily because Debtors seek to return to their failed pre-petition business model. Ultimately, however, no amount of additional funds can resuscitate Debtors' failed business model because, despite Debtors' allegations to the contrary, the drivers of Debtors' business— the average award per case and the win rate, both of which are outside of Debtors' control—do not and cannot sustain Debtors' business model.

The first driver—and most critical element in understanding the revenue of Debtors' business—is the average award per case. Debtors' current average award amount is $4,100 per

case, which is up slightly from $3,940 in 2010.  This slight increase in average award per case was and continues to be insufficient to cover the increased costs of running Debtors' business as a going concern.  In fact, Debtors' revenue has cratered by over $21.5 million since 2010.  In order to conceal these and other serious and crippling problems with Debtors' business model, Debtors and their financial advisors have simply increased the projected average award amount per case to levels unsupported by Debtors' own historical data to justify their continued existence as a going concern.  After all, Debtors have nothing to lose if their projections are wrong, only the Existing DIP Lenders' collateral.

The second driver is Debtors' win rates, which Debtors project will remain constant or decrease slightly over the next few years.  But Debtors offer no evidence to suggest that this is even remotely possible because, as with the average award amount, this too is completely outside of Debtors' control.  To the contrary, Debtors' own figures indicate that win rates may erode even further.  Indeed, Debtors' win rates on cases have dramatically fallen from 73% in June of 2013 to 65% as of December 31, 2014.  Moreover, industry-wide win rates have similarly been drastically declining since 2005.  Accordingly, Debtors' self-serving aggrandizement about the 1,000 new cases per month they have received since the petition date needs to be evaluated in terms of the current and anticipated win rates, resulting in the inescapable fact that ***35% of those new cases will generate zero revenue***.  The sunk costs associated with those cases will be borne entirely by the Existing DIP Lenders.

Debtors' business model is also affected by the Social Security Administration's ("SSA") and Veterans Administration's ("VA") timely processing of new claims and payment awards, the slowing of either of which can negatively affect Debtors' business, as evidenced by Debtors' current liquidity crisis.  Debtors placing blame on the current "slowdown" for all of their

financial woes, however, is misplaced because, as evidenced by past slowdowns, even when payments resumed, Debtors' revenues still decreased. The "current slowdown" does, however, highlight yet another fundamental flaw in Debtors' proposed plan: Debtors projections are unreliable. Yet Debtors project, through what can only be described as gazing into a crystal ball, that payments will resume in a matter of weeks. However, a crystal ball is unnecessary, as Debtors' historical performance is instructive: Debtors and their financial advisors breached their cash receipts covenant and variance even before the ink was dry on the Existing DIP Loan Agreement. Rather than acknowledge that both their business model and projections are flawed and unreliable, as they have repeatedly done in the past, Debtors seek to shift the blame to the government and even berate the Existing DIP Lenders for issuing a reservation of rights letter—a letter that Debtors conveniently fail to note did not trigger or result in the exercise of any rights or remedies. The simple and undeniable truth is that no one that is involved in these cases knows the extent of the current "slowdown".

Based on the foregoing, it is clear that Debtors and their financial advisors have no control over or insight into the revenue of this business. Nevertheless, they now seek to revert back to their prepetition, failed business model of increasing expenses by adding employees, while providing other employees with an across the board pay raise, and increasing advertising expenses. It is the same story that Debtors have repeated for almost two years: wait for an increase in the average award per case and/or an increase in the win rates, and everything will be fine. This strategy failed in the past, and it shows no signs of success this time around given Debtors' most recent historical data and the threats from the new Congress. Debtors point to the new cases that have come in as evidence that their business model will now, miraculously, succeed. This is nothing more than the classic bait and switch, as Debtors previously curtailed

advertising and notwithstanding new cases coming in after that time, Debtors' revenues continued to deteriorate.

Finally, the Priming Motion's contention that Debtors were strong armed by the Existing DIP Lenders into the current post-petition financing agreement belies the hard facts of these cases. Debtors and Existing DIP Lenders examined the many issues with this business and collectively decided that the best recovery for all constituencies was a liquidation, which by definition does not include advertising. The Existing DIP Lenders agreed to provide the post-petition financing on those terms offering Debtors additional time for an orderly wind-down to maximize the return for all stakeholders. As a part of these negotiations, Debtors repeatedly assured the Existing DIP Lenders that they could and would comply with the terms of the post-petition financing, offering numerous projections and assurances to convince the Existing DIP Lenders to fund these cases. It is Debtors, not the Existing DIP Lenders, that are trying to re-trade this longstanding, agreed upon deal, using a priming fight to extract more money and to waste it on a business model that has abjectly failed for at least the past two years.

Accordingly, the Priming Motion should be denied because it fails to provide any evidence of a sufficient equity cushion or other adequate protection and is based on untenable projections that are neither supported by historical data nor grounded in reality.

## BACKGROUND

### I.    Prepetition Lending Relationship and Debtors' Failing Business.

1.      Debtors provide the Court with no historical information on their businesses, as such information would show Debtors' failed business model. However, such information, which is set forth below, is vital to the Court's consideration of Debtors' request for a priming

loan.  The information that follows will be supported by documentary and testimonial evidence at the plenary hearing mandated to be conducted on the Priming Motion.

2.      The Existing DIP Agent's and the Existing DIP Lenders' financial relationship with Binder & Binder – The National Social Security Disability Associates, LLC ("SSDA") goes back to August 2010, when they provided financing to SSDA and its subsidiaries in connection with H.I.G. Capital's acquisition of Debtors from the two founding brothers, Charles Binder and Harry Binder.  At that time, the Existing DIP Lenders and SSDA entered into a Loan Agreement on August 27, 2010 (the "Prepetition Loan Agreement"), pursuant to which the Existing DIP Agent and the Existing DIP Lenders provided SSDA with a revolving credit facility in the maximum amount of $8,000,000 and a term loan in the aggregate original principal amount of $29,000,000.

3.      Almost immediately thereafter, Debtors' financial performance deteriorated, with revenues declining year after year.  In fact, Debtors' revenues dropped by $21.5 million from 2010 to 2014, with a sharp decrease of $10 million from 2012 to 2013 as a result of, among other things, declining win rates on cases, relatively no increase in the average award values, and government disruptions, including slower case processing and payments.  Revenues dropped again in 2014 by another $8.4 million, as Debtors' win rates continued to erode to 65% in 2014, a dramatic drop considering that Debtors enjoyed a win rate in mid-2013 of 73%.

4.      In an effort to curtail its deteriorating financial performance, between 2010 and 2013, Debtors took measures to implement a new financial system as well as cut their advertising in half.  Despite these advertising cuts, the amount of new cases remained relatively flat.  Even with no increase in the number of new cases per month, Debtors' response was, surprisingly, to increase employee headcount and labor costs, which, coupled with decreases in the win rate and

7

only moderate increases in the average award per case, offset the cutbacks in advertising. As a result, Debtors' financial performance continued to deteriorate.

5.    Just as they do now in the Priming Motion, Debtors blamed their financial woes, which started in 2010, squarely on workflow and payment slowdown by the federal government, whom they continue to rely on as their sole revenue source.[3]

6.    By late 2013, Debtors faced a mounting "liquidity crisis". (Brandt Decl. ¶¶ 29, 31.)  As a result, by December 31, 2013, Debtors were unable to service the debt on the Prepetition Loan Agreement and have not made any of the required mandatory quarterly amortization payments since September 30, 2013.[4]  (*Id*. ¶ 31.)  In fact, since October 2013 leading up to the Petition Date, Debtors were only able to make monthly interest payments of $190,000 on the Prepetition Loan Agreement, which abruptly stopped in August 2014.[5] Notwithstanding these payment failures, Debtors still saw their cash reserves deteriorate.

7.    Debtors' grave financial situation resulted in material events of default under the Prepetition Loan Agreement.  As a result, in May 2013, the Existing DIP Agent advised Debtors that an overadvance of almost $4.9 million existed under the Prepetition Loan Agreement, which at one point ballooned to over $6.8 million.  After sending an initial reservation of rights letter due to the continued decline in Debtors' financial performance, the Existing DIP Agent sent thirteen additional reservation of rights letters regarding additional events of default, including

---

[3] As far back as the first quarter of 2013, Debtors blamed their declining revenue on the federal sequestration, which caused workflow disruptions at the SSA that curtailed Debtors' cash flow by slowing the processing of new claims and the payment of existing claims.  (Declaration of William A. Brandt, Jr. pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Chapter 11 Petitions and First Day Motions [Doc. No. 15] ("Brandt Decl.") ¶ 29.) Further delays and liquidity issues were caused by the federal government shutdown in October 2013.  (*Id*.)

[4] Specifically, on December 31, 2013, rather than making the required $1,312,500 amortization payment, Debtors paid a paltry $114,000.  Debtors also made two nominal payments of $50,000 in July 2014.  The only other payment received was as a result of the Existing DIP Lenders' sweep of cash in September 2014.

[5] Indeed, the monthly interest payments resumed only after the Existing DIP Lenders exercised their setoff rights.

8

multiple financial covenant violations as well as Debtors' consistent failure to make the quarterly mandatory amortization payments on the prepetition loans.[6]

8.      During the nineteen months that elapsed between the Existing DIP Agent sending the initial reservation of rights letter and the Petition Date, and the Existing DIP Lenders attempted numerous times in good faith, but ultimately in vain, to negotiate a restructuring of the prepetition indebtedness with SSDA, the other Debtors, and Debtors' principals, including H.I.G. Capital, Charles Binder, and Harry Binder, and even entered into multiple pre-negotiation letters with the various parties and provided numerous term sheets proposing restructuring terms, each of which were ultimately rejected by Debtors.  During this time, even though material events of default had and were continuing to occur, Debtors' conflicted board of directors refused to take any action as a result of the internal disputes between the H.I.G. members of the board and the two Binder brothers, and little progress was made towards an amendment or a forbearance.  This internal strife blocked a very promising refinancing opportunity and several new equity infusion proposals.  Despite these issues, the Existing DIP Lenders gave Debtors ample time and space to resolve their internal management struggles and turn around their dismal performance.

9.      In July 2014, Debtors retained Development Specialists, Inc. ("DSI") as financial advisor.  (Brandt Decl. ¶ 2.)  Mr. Brandt, the President and Chief Executive Officer of DSI, was formally appointed by SSDA's Board of Directors to serve as its Chief Restructuring Officer (the "CRO") on September 26, 2014.  (Id. ¶ 1, 2.)  It quickly became clear that Debtors' existing business model did not work, and creditors could not be paid.  As a result, in consultation with DSI and in the exercise of its business judgment, Debtors determined that based upon the

---

[6] Specifically, Debtors failed to make the $1,312,500 quarterly payments due on December 31, 2013 and March 31, 2014 and the $1,531,250 quarterly payments due on June 30, 2014 and September 30, 2014.

"significant operational and liquidity pressures over the past twelve months" that a financial restructuring through a chapter 11 proceeding was necessary. (*Id*. ¶ 98.)

## II.    Negotiations Regarding Existing DIP Facility.

10.    In connection with their decision to file for chapter 11 bankruptcy protection, in September 2014, Debtors, with active assistance from DSI and Mr. Brandt, approached the Existing DIP Lenders with a request for use of cash collateral post-petition supported by projections.  Although Debtors initially requested, and their projections supported, use of cash collateral with no post-petition lending of funds, mere weeks prior to the bankruptcy filing, Debtors modified their projections and beseeched the Existing DIP Lenders for a post-petition DIP loan.  Relying upon Debtors' and DSI's projections, which the Existing DIP Lenders would later learn were wholly unreliable and misleading, and upon Debtors' commitment to a liquidation as a means to provide Debtors time to orderly wind-down their business and maximize their recovery for all of Debtors' stakeholders, the Existing DIP Lenders acceded to Debtors' request for a $3 million post-petition loan.  Shortly thereafter, Debtors and the Existing DIP Lenders negotiated the Existing DIP Loan Agreement, whose now allegedly "onerous" terms, conditions, and milestones were based upon those same projections and financial information that Debtors provided to the Existing DIP Lenders in order to induce them to extend the post-petition financing, all while assuring the Existing DIP Lenders that Debtors would be able to perform.

11.    On December 18, 2014 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which was necessitated, among other things, by Debtors' inability to make payroll as a result of not only Debtors' liquidity issues, but their payment of substantial retainers to professionals shortly before the Petition Date.

12.     On December 19, 2014, Debtors filed their motion (the "Financing Motion") for Entry of Interim and Final Orders (I) Approving Post-Petition Senior Secured Financing, (II) Authorizing Use of Cash Collateral; (III) Granting Adequate Protection; and (IV) Modifying the Automatic Stay [Doc. No. 14].

13.     On December 24, 2014, this Court entered the Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Granting Liens, Security Interests and Superpriority Status; (III) Authorizing Use of Cash Collateral; (IV) Affording Adequate Protection; (V) Scheduling a Final Hearing; and (VI) Modifying the Automatic Stay (the "Interim Financing Order") [Doc. No. 50].  In reliance upon the Interim Financing Order, the Existing DIP Lenders and Debtors entered into the Existing DIP Loan Agreement.  Through the Existing DIP Loan Agreement, the terms of which were the product of months of negotiations between the parties and based upon projections that Debtors assured the Existing DIP Lenders they would meet, the Existing DIP Lenders provided Debtors with a post-petition revolving credit facility of $26 million, comprised of the $23 million pre-petition secured indebtedness as well as an additional $3 million revolving commitment to fund Debtors' liquidation during the chapter 11 cases.

14.     On January 8, 2015, the U.S. Trustee appointed the Official Unsecured Creditors Committee (the "Committee") [Doc. No. 80].  The Committee filed its Objection to the Financing Motion on January 22, 2015 [Doc. No. 93].  But on January 30, 2015, the U.S. Trustee reconstituted the Committee, removing Stellus Capital Investment Corporation ("Stellus") from the Committee [Doc. No. 99], leaving only four unsecured creditors on the committee whose claims amount to a mere $302,397.78.  (*See* Sch. F, Debtors' Schedules of Assets and Liabilities.)

III.    **Debtors' Poor Financial Performance Continues Post-petition.**

15.    Contrary to Debtors' unsupported assertions in the Priming Motion, Debtors' financial outlook has only worsened since the Petition Date.  Even though Debtors have already borrowed and spent almost $3 million in additional post-petition financing, increasing their overall outstanding secured debt load to roughly $26 million, Debtors face yet another liquidity crisis.  Consistent with their past financial underperformance, Debtors again blame the federal government.  While Debtors allege that the delays in the payments from the SSA and VA have only "temporarily slowed", Debtors offer no evidentiary support that the current, crippling slow-down in the SSA's payment of awards is temporary. (Priming Motion at 3.)  Nor do they provide any evidence that an acceleration of these payments would cure Debtors' perpetual cash flow crisis or fix Debtors' failed business model.

16.    As a result of this most recent liquidity crisis, resulting once again from Debtors' continued inability to perform in accordance with their own projections, within weeks of executing the Existing DIP Loan Agreement, Debtors were in default as a result of their failure to maintain sufficient cash receipts and their exceeding certain cash disbursement limitations for the Test Period ending on January 17, 2015.  On January 26, 2015, the Existing DIP Lenders issued a default letter (the "Post-Petition Default Notice"), notifying Debtors that they were already in default under the Existing DIP Loan Agreement.  (A true and accurate copy of the Post-Petition Default Notice is attached hereto as **Exhibit 1**.)

17.    While rebuking the Existing DIP Lenders for issuing the Post-Petition Default Notice, alleging the notice itself is symptomatic of the Existing DIP Lenders and Debtors' strained relationship, Debtors fail to acknowledge that the notice neither resulted in the exercise of *any* rights or remedies.  Indeed, Existing DIP Lenders made clear in the Post-Petition Default

Notice that they were willing to discuss the events of default and next steps.[7] (*See id.*)  To the contrary, shortly thereafter, the Existing DIP Lenders agreed to enter into an amendment to the Existing DIP Loan Agreement with Debtors extending the final financing order's maturity date until February 18, 2015.  The Court entered a second interim financing order approving this extension on February 3, 2015 [Doc. No. 122].  Simply put, even though Debtors had already defaulted on the Existing DIP Loan Agreement, the Existing DIP Lenders continued to negotiate in good faith with Debtors regarding a final financing order.

18.     The Existing DIP Lenders granted the extension in order to give Debtors additional time to compile a list of modifications that the Existing DIP Lenders had continuously requested since Debtors advised the Existing DIP Lenders about their continued liquidity crisis on January 16, 2015.  (*See* Email dated Jan. 16, 2015 from W. Brandt, a true and correct copy of which is attached hereto as **Exhibit 2**.)  The Existing DIP Lenders only received the elusive list of requested modifications on February 9, 2015, and only following repeated requests. Consistent with Debtors' *modus operandi*, the list of modifications requested an increase of the DIP Loans in excess of what was originally requested based, once again, upon new "updated" projections.

19.     Within twenty-four hours following Debtors' delivery of the list of modifications, which the Existing DIP Lenders had requested for over two weeks, Debtors sought an immediate response from the Existing DIP Lenders.  When the Existing DIP Lenders were unable to comply with Debtors' unreasonable and unrealistic requests, Debtors continued to threaten a possible priming financing from Stellus in an attempt to force a re-trade of their prepetition financing deal

---

[7] Indeed, if the Existing DIP Lenders had not delivered the Post-Petition Default Letter, invariably Debtors would have alleged that the Existing DIP Lenders have, as a result of their inaction, waived such defaults, placing the Existing DIP Lenders in the proverbial "catch 22".

with the Existing DIP Lenders, while simultaneously refusing to provide a final (or even close to final) term sheet from Stellus from which the Existing DIP Lenders could adequately evaluate Debtors' proposals.  Debtors demanded this blank check even though they never provided the Existing DIP Lenders with a concrete plan or any evidence (nor have they provided this Court with such a plan or evidence) that they can survive as a going concern while they remain in a long, drawn out, and expensive reorganization.

**IV.    Proposed Alternative Priming DIP Financing and Lack of Adequate Protection.**

20.    On February 10, 2015, Stellus and Debtors entered into a term sheet (the "Term Sheet") that proposes—less than *two* months into these chapter 11 cases—to double Debtors' post-petition financing request from $3 million to $6 million.  (Priming Motion at 4.)  Overall, the Term Sheet offers Debtors, without limitation, a $6 million term loan credit facility that would prime the Existing DIP Lenders and grant Stellus a superpriority claim and first-priority, senior priming perfected lien on all of Debtors' property under section 364(d) of the Bankruptcy Code.[8]  (Priming Motion Ex. 1.)

21.    Late that same night, Debtors filed the Priming Motion, brazenly asking this Court to approve an interim order allowing for funding of $4.5 million of the priming loan (75% of the total request) based solely on the alleged need to fund Debtors' payroll on February 17th, without providing this Court with a scintilla of evidence to support the need for such funding, let alone this large amount.  (Priming Motion at 4, 15.)

22.    Specifically, the Priming Motion and the Stellus Term Sheet, without limitation: (i) proposes to double Debtors' original $3 million request for post-petition financing to $6 million while priming the Existing DIP Lenders, (ii) demands that this Court grant $4.5 million

---

[8] Indeed, the first time Debtors received a copy of the final Stellus term sheet was when the Existing DIP Lenders received a copy of the Priming Motion after it was filed with the Court.

of this requested amount through an interim order and on an expedited basis for the alleged purpose of satisfying Debtors' February 17th payroll, and (iii) dramatically and unsustainably increases Debtors' operational and professional expenses and fees, including the reintroduction of advertising expenses.   Notably, Debtors are required to pay to Stellus interest at a rate of 10% per annum, which Debtors would be required to pay once the $4.5 million is advanced, even though Debtors have no need for the entire $4.5 million.   The proposed adequate protection package includes: (i) an alleged, but unsubstantiated, equity cushion, (ii) interest payments (at the non-default rate)[9] and monthly principal payments of $500,000 starting June 2015 that Debtors provide no proof that they will be able to pay, and (iii) the granting of replacement liens that are admittedly junior to the proposed Stellus lien.   However, Debtors offer no evidence to support the viability of the proposed adequate protection other than untenable projections because they are neither supported by historical data nor grounded in reality, rendering the proposed adequate protection illusory.

23.    But, Debtors' projections regarding their ability to meet a payroll deadline less than a week away turned out again to be faulty.   Mere days after claiming that they needed this Court to approve 75% of their total request on an expedited basis, Debtors recanted their story and miraculously located sufficient funds.   As such, this Court continued the hearing on the Priming Motion until February 24, 2015.

24.    Further evidencing the Existing DIP Lenders' good faith negotiations during this arduous process, even though the Existing DIP Loan Agreement was set to mature on February 18, 2015, the Existing DIP Lenders entered into a second amendment to the Existing DIP Loan Agreement, further extending the final financing order's maturity date until February 26, 2015,

---

[9] The Post-Petition Default Rate specifically included a reservation of rights with respect to the default rate of interest.

rather than exercising any of the rights or remedies that the Existing DIP Lenders would be entitled to given Debtors numerous defaults and obstreperous negotiation tactics.

## ARGUMENT

**I.      Debtors Have Not Provided Sufficient Adequate Protection to Support the Requested Priming Stellus DIP Loan.**

25.      Although the Bankruptcy Code provides for postpetition financing on a priming basis, granting such priming financing "is ***extraordinary and is allowed only as a last resort***." *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D. N.Y. 2010) (emphasis added) (citing *Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994)).   "Given the fact that super priority financing displaces liens on which creditors have relied in extending credit, a court that is asked to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected."  *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (quoting *In re First South Savings Assoc.*, 820 F.2d 700, 710 (5th Cir. 1987)).

26.      To be sure, a priming postpetition financing should not be granted, and indeed "is impermissible unless there is adequate protection to existing lien holders."  *YL West*, 423 B.R. at 441.  Specifically, Bankruptcy Code section 364(d)(1) provides that "the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien *only if*—

> (A)     the trustee is unable to obtain such credit otherwise; and
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."

Adequate protection may be provided by (1) periodic payments, (2) additional or replacement lien, or (3) other "indubitable equivalent" of the creditor's lien interest.  11 U.S.C. § 361(d)(1)

(emphasis added); *see also YL West*, 423 B.R. at 441 (citing 11 U.S.C. § 361); *In re Swedeland*, 16 F.3d at 564.

27.    In situations such as this one, where the secured lender to be primed has not consented to such priming liens, the burden is on the debtor to show that the secured lender's interest in the collateral to be primed is adequately protected.  11 U.S.C. § 364(d)(2); *YL West*, 423 B.R. at 441; *In re Swedeland*, 16 F.3d at 564.  In this case, Debtors have not shown that the Existing DIP Lenders' interests in the collateral will be adequately protected.

28.    "The purpose of adequate protection is to ensure that 'creditor receives the value for which he bargained prebankruptcy.'"  *Id*. at 442 n. 46 (quoting *In re Swedeland*, 16 F.3d at 564); *In re Phoenix Steel Corp.*, 39 B.R. 218, 224 (D. Del. 1984) ("The concept of adequate protection does not envision a court stripping a secured creditor of the benefit of its bargain. . . . [T]he purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for." (citations omitted)).  "In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing."  *Mosello*, 195 B.R. at 288 (quoting *In re Swedeland*, 16 F.3d at 564).  Courts have noted that an "important question in determining the adequacy of protection under section 364(d)(1)(B) is whether the interest of the secured creditor whose lien is to be primed is being unjustifiably jeopardized."  *Id*. at 289 (citation omitted).

29.    Moreover, the adequate protection offered by the debtor "must not be illusory and, particularly in the context of the use of cash collateral, must be of the most indubitable equivalence." *In re Goode*, 235 B.R. 584 at 590; *see also In re Waste Conversion Techs., Inc.*, 205 B.R. 1004, 1007 (D. Conn. 1997).

30.    In this case, Debtors woefully fail to provide the Existing DIP Lenders with the required adequate protection, much less a plan that can be "quantified or verified by objective evidence," and as a consequence, the Priming Motion should be denied. *Mosello*, 195 B.R. at 290 (this Court denying priming financing when the proposed plan "***cannot be quantified or verified by objective evidence***." (emphasis added)).

31.    Indeed, the Priming Motion does not provide *any* evidentiary basis showing that the Existing DIP Lenders are adequately protected by the Alternative DIP Facility.  Specifically, other than unsupported assertions, the Priming Motion offers no evidence (i) regarding the existence or valuation of the alleged equity cushion, (ii) that Debtors can survive as a going concern, (iii) that Debtors will ever be able to rectify the liquidity crisis that started in at least 2011 and caught up with and crippled them in 2013, (iv) that an additional $3 million in post-petition financing, which would be on top of the $3 million of post-petition financing that they burned through in the last two months, will be sufficient to fix their cash flow issues, (v) that Debtors' win rates will not further erode (particularly given the consistent historical decreases not only of Binder's win rates, but of the win rates for the industry as a whole), (vi) that the average award per case will substantially exceed $4,100 in the foreseeable future, or (vii) that Debtors will be able to pay the Alternative DIP Facility's markedly increased *monthly* payments, especially given Debtors' failure to service comparable *quarterly* payments under the Prepetition Loan Agreement since October 2013.  Overall, the Priming Motion provides this Court with no evidentiary record by which it could make any factual findings: no evidence, no facts, and no figures.  This Court should not grant such "extraordinary" and "last resort" relief based on a barren evidentiary landscape.

A.    **Debtors' unsupported valuation regarding the equity cushion is insufficient to satisfy their burden of proof regarding adequate protection, and the Priming Motion should be denied.**

32.    Debtors claim that the existence of an equity cushion that "dramatically exceeds" the $23 million owed to the Existing DIP Lenders pre-petition provides the Existing DIP Lenders with adequate protection.  (Priming Motion ¶ 37.)  But Debtors offer no evidence regarding the amount or valuation of the alleged equity cushion beyond a self-serving representation by Debtors' counsel.  (*Id.*)  Based on that fact alone, the Priming Motion does not satisfy Debtors' burden of proof and should be denied.

33.    Even taking Debtors' self-serving statement at face value, while the Priming Motion contends that the Existing DIP Lenders would have a $4 million equity cushion under the Alternative DIP Facility (Priming Motion ¶ 50), ***the Borrowers' own historical data reveals that the existing equity cushion is less than 5%***, which is insufficient to constitute adequate protection.  "[C]ase law almost uniformly concludes that: (1) an equity cushion of twenty percent (20%) or more constitutes adequate protection; (2) an equity cushion of less than eleven percent (11%) is insufficient; and (3) a range of twelve percent (12%) to twenty percent (20%) has divided the Courts."  *In re C.B.G. Ltd.*, 150 B.R. 570, 573 (Bankr. M.D. Pa. 1992) (holding that a 16% equity cushion in debtor's partially developed property that would be further reduced to less than 14% if debtor's proposed emergency financing of $600,000 were approved, did not constitute adequate protection) (citing *In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987)); *Suntrust Bank v. Den-Mark Const., Inc.*, 406 B.R. 683, 700-702 (E.D.N.C. 2009) (reversing bankruptcy court on the grounds of clear error for granting debtor's priming motion because slim equity cushion of at most 11% and speculative possibility of enhancement of existing lender's collateral through postpetition financing did not constitute adequate protection); *Bank Rhode*

*Island v. Pawtuxet Valley Prescription & Surgical Ctr., Inc.*, 386 B.R. 1 (D.R.I. 2008) (holding

4% equity cushion insufficient); *see also In re Fortune Smooth (U.S.) Ltd.*, 1993 WL 261478, *6

(Bankr. S.D.N.Y. July 06, 1993) (granting creditor with equity cushion of 14.89% relief from

automatic stay because equity cushion did not amount to adequate protection when it would

decline in the immediate future and given the uncertainty of the commercial real estate market

and in so doing, stating "[i]t is generally agreed that an equity cushion of twenty percent (20%)

or more constitutes adequate protection, and an equity cushion of less than eleven percent (11%)

is not sufficient with courts splitting as to whether an equity cushion between those two figures

constitutes adequate protection.").

34.     Furthermore, even if this Court were to accept Debtors' unsupported equity

cushion valuation, it only amounts to an equity cushion of 13.8%, which is in the lower half of

the range that has divided courts and is less than the equity cushions rejected by the *C.B.G. Ltd.*

and *Fortune Smooth* courts.

> **B.      Debtors' new plan to reorganize as a going concern is too speculative and
> unlikely to be successful such that the proposed adequate protection is
> illusory at best, and as a result, the Priming Motion should be denied.**

35.     Regardless of the percentage of Debtors' equity cushion, the Alternative DIP

Facility does not provide the Existing DIP Lenders with adequate protection because maintaining

the status quo will not result in a successful reorganization.  Debtors' unsupported assertions to

the contrary are nothing more than wishful thinking, rendering any offered adequate protection

illusory.

36.     While courts look initially to the existence of an equity cushion, many "courts

have adopted a more 'holistic approach' by analyzing all relevant facts[.]" *YL West*, 423 B.R. at

441-42.  "[A]n equity cushion may provide adequate protection but that an equity cushion alone

will not be determinative." *In re Stoney Creek Tech., LLC*, 364 B.R. 882, 891 (Bankr. E.D. Pa.

2007).   Courts do not look at an equity cushion alone because "[a]n equity cushion that will

protect a prepetition secured creditor while its collateral is used in a reorganization does not

necessarily protect a creditor whose liens have been subordinated." *Stoney Creek*, 364 B.R. at

891 n. 26.   Accordingly, courts have established, without limitation, the following factors to

determine whether an equity cushion alone may provide adequate protection:

> (1) Does the accrual of interest erode the equity cushion; (2) Is the property increasing or
> decreasing in value; (3) Has the debtor shown an inability to obtain refinancing since the
> filing; (4) Has the debtor offered any other method of adequate protection; (5) Do current
> economic conditions suggest a realistic prospect for successful reorganization or
> rehabilitation under Chapter 11; (6) Has the debtor's conduct of the litigation been more
> than a deliberate delaying tactic."

*In re Timber Products, Inc.*, 125 B.R. 433, 433-34 (Bankr. W.D. Pa. 1990); *Stoney Creek*, 364

B.R. at 891.

37.   The "most significant" factor in determining adequate protection is the debtor's

"prospects for a successful reorganization." *Stoney Creek*, 364 B.R. at 891.  To this end, courts

have denied priming financing even with an equity cushion of over 20% when the debtor could

not prove that it could operate profitably, the court believed that the debtor would default on its

priming financing, or when the equity cushion was insufficient in size given the associated risks.

*See Stoney Creek*, 364 B.R. at 891-92 (denying priming financing motion even with a 42%

equity cushion because debtor "cannot operate profitably, will default on its obligations to

[priming lender] and [prepetition lender] will be impaired by its second lien position from

realizing the value of its collateral.  The [proposed] DIP Loan is a stopgap measure that will not

restore Debtor to economic health before it becomes due, if at all."); *Shaw Indus.*, 300 B.R. at

865-66 (denying priming financing motion even with a 25% equity cushion because "debtor's

future operational plans may result in rapid deterioration of the collateral.   Where an equity

21

cushion is insufficient in size or likely to erode, it cannot, standing alone, constitute adequate protection."); *Timber Products*, 125 B.R. at 437-40 (denying priming financing motion even with a 27% equity cushion when reorganization plan contained no contingencies for emergencies, was overly optimistic, and assumed a gross margin nearly double that of the industry average).

38.    Similarly, this court has denied priming financing when debtor's proposed course of action "is beset by uncertainty and risk, and the ultimate outcome … is a matter of speculation based upon assumption which cannot be quantified or verified by objective evidence." *Mosello*, 195 B.R. at 290 (denying proposed priming financing that was too risky and speculative regarding debtor's ability to develop real estate, as it was not adequate protection for creditor's interest); *YL West*, 423 B.R. at 440-42 (denying priming financing because proposed project was "highly speculative" and contained "numerous contingencies"). This is because, as the Third Circuit noted, "Congress did not contemplate that a creditor could find its priority position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects." *In re Swedeland*, 16 F.3d at 567.

39.    But this is exactly what Debtors are trying to the force upon the Existing DIP Lenders through the Priming Motion: an inherently risky reorganization plan with little chance of success that is devoid of many essential details and based entirely upon speculative assumptions unsupported by any evidence. Accordingly, as in the *Mosello, YL West, Stoney Creek, Shaw Industries* and *Timber Products* cases, the Priming Motion should be denied because Debtors' newfound desire to reorganize as a going concern while maintaining their status quo operations, which failed prepetition, coupled with decreasing win rates and only minimal increases in average awards, shows little to no prospect for success. As such, Debtors' offered adequate protection is illusory and rings hollow.

40.    The operational risks associated with the Priming Motion and Term Sheet are too great and borne entirely by the Existing DIP Lenders.  Debtors defaulted on the Existing DIP Loan Agreement less than one month after the Petition Date and are in the midst of an ongoing two-year liquidity crisis with no realistic end in sight.  Moreover, Debtors admit that because they are wholly reliant on the federal government for their cash flow that "cash receipts are wholly out of the Debtor's control[.]"  (Priming Motion ¶ 21.)   As such, Debtors have already doubled their request for post-petition financing from $3 million to $6 million a mere two months into this case after already spending the first $3 million.  Even so, the Priming Motion fails to show this Court: (i) when Debtors will regain control over their cash receipts or (ii) if the additional $3 million will even be sufficient for Debtors to survive their seemingly perpetual liquidity crisis—which due to the length of the crisis, has to be deemed the new status quo—as a part of a newfound desire to reorganize as a going concern.   As such, the Alternative DIP Financing is exactly the type of "stop gap" measure that the *Stoney Creek* court rejected and that this Court should also reject.

41.    In addition, the Priming Motion and Stellus Term Sheet would substantially increase Debtors' operating expenses through additional advertising expenses, employee expenses, and professional expenses, while also substantially increasing Debtors' monthly debt service payments as a part of the drawn out and expensive reorganization that Debtors' revenues cannot support  Without limitation, these increased expenses include: (i) increased labor costs of $7,000,000 during the new projected operating period; (ii) any increased salary and health benefits proposed as a part of the modification to the Collective Bargaining Agreements; (iii) increased administrative expenses resulting from a much longer time period in Chapter 11; (iv) the expense of the proposed claims administrator; (v) the 10% interest rate on the new proposed

post-petition loan, including mandatory interest on monies that Debtors do not need to borrow: and (vi) increased interest rate on the pre-petition debt of $23 million as well as increased interest expense from a much longer pay out period.  Debtors could not even service their quarterly debt payments of at least $1.3 million for the since September 2013, had only been paying monthly interest payments of $190,000, which abruptly stopped in August 2014,[10]  and Debtors were still unable to successfully operate as a going concern.  The Alternative DIP Facility will eventually require Debtors to make ***monthly payments of almost $1.3 million when prepetition Debtors could not even make quarterly payments in this amount under the same business model***.  Thus, while the Priming Motion offers adequate protection payments, these payments are illusory, as there is no evidence to suggest that Debtors will be able to make them. Rather than suggesting a meaningful reorganization, all of this speaks to the continued, dire nature of Debtors' financial predicament, the utter impracticability of the Alternative DIP Facility, and the need for the liquidation that Debtors and the Existing DIP Lenders initially agreed to before Debtors attempted to re-trade the deal post-petition.

42.    In response, Debtors claim, unsupported by any evidence, that their financial predicament is the function of SSA and VA "temporarily slowing" payment of awards.  But this claim is exactly the type of "speculation based upon assumption which cannot be quantified or verified by objective evidence" that this court decried in the *Mosello* case.  Debtors have been down this exact road for the past two years and history has shown the exact opposite to be true. As admitted in Mr. Brandt's Declaration, Debtors' financial woes have resulted at least partially from the federal government's consistently slow payment of awards.  (Brandt. Decl. ¶ 29.)  This problem has not been rectified over the past two years, which has in fact seen federal

---

[10] Indeed, the monthly interest payments resumed only after the Existing DIP Lenders exercised their setoff rights

sequestration, a government shutdown and the current, slower payment in awards that must now be considered to be the new normal. (*Id*. ¶¶ 29, 31.) Debtors offer no evidence to the contrary, nor do they even attempt to prognosticate meaningfully on when, let alone if, the current slowdown will be rectified and even if rectified, whether it would resolve their perpetual liquidity crisis.

43.     Moreover, SSA disability system has recently been specifically targeted by the new Congress for increased oversight and scrutiny, making Debtors' ability to collect upon their existing accounts' receivable and to monetize their current and future cases even more difficult than it was prepetition. Thus, even if Debtors' cases increase in 2015, there is no evidence that these cases would result in favorable awards in the near future or with increased award rates. In fact, SSA award rates (*i.e.,* the percentage of awarded applications divided by the total number of applications decided) and allowance rates (*i.e.,* similar rate excluding nonmedical determinations from its base) have been declining since 2005.[11] Similarly, rates for medical decisions at the initial adjudicative, reconsideration, and the hearing levels have all declined since 2005.[12]

44.     In addition to heightened scrutiny of the industry has a whole, Debtors have specifically found themselves in the federal government's crosshairs and are, upon information and belief, currently involved in an ongoing investigation.

45.     Accordingly, there is little chance that win rates on cases and award values for this industry, and more specifically for these Debtors, will ever rebound or stay relatively even as set forth in Debtors' projections. As such, Debtors' unsupported assumptions to the contrary

---

[11] Award rates have decreased from 43.3% to 31.4% in 2012 (a 27% drop) and allowance rates have decreased from 58.2% to 52.9% (a 9% drop). *Annual Statistical Report on the Social Security Disability Insurance Program, 2013*, SSA Publication No. 13-11826 (December 2014) at 146.

[12] The allowance rate at the initial adjudicative level have decreased from 25.6% to 22.6% in 2012 (an 11% drop), at the reconsideration level have decreased from 8.7% to 6.2% in 2012 (a 29% drop) and at the hearing level have decreased from 66% to 55.1% in 2012 (a 10.9% drop). *Id*. at 148-53.

must be rejected. Rather, the present state of this industry, coupled with Debtors' woeful financial history, show that Debtors' proposed course of reorganizing as a going concern, which is based upon the same failed business model, is unlikely to succeed. Thus, Debtors cannot offer adequate protection, regardless of the size of the equity cushion or speculative adequate protection payments.

46. To this end, this matter is inapposite and distinguishable from *In re Central Park*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992), which Debtors cite in their Priming Motion. Specifically, the *Central Park* court granted a motion to borrow $625,000 and granted a priming lien when the debtor proposed a renovation to commercial real estate that would increase its value by approximately $800,000. *Id*. at 631. In addressing the issue of adequate protection, the *Central Park* court focused on the certitude by which the proposed renovations would increase the secured creditor's collateral and determined that there was "***no question*** the property would be improved by the proposed renovations." *Id*. (emphasis added). But this is not the case here, as questions abound and there is no certainty that Debtors' proposed course of action will improve the Existing DIP Lenders' collateral. Rather, as discussed above: (i) Debtors' plan is to proceed along the exact same path that has historically proven to be a failure; (ii) it is based upon speculative and unfounded assumptions regarding the win rates on cases and award values and reimbursement rates; (iii) there is no evidence that the Alternative DIP Financing will function as anything more than a stop gap loan; and (iv) there is ample evidence that Debtors are highly likely to default on the Alternative DIP Financing given their increased expenses, increased debt service payments and foreseeable liquidity issues associated with a reorganization.

47. Rather, the present matter is substantially similar to this court's decisions in *Mosello* and *YL West* as well as the decisions in the *Stoney Creek*, *Shaw Industries* and *Timber*

26

*Products*, all of which denied priming motions because the debtors offered inherently risky plans

based upon speculative assumptions rather than solid evidence.  This Court should likewise deny

the Priming Motion.

**II.**	**Entering An Interim Order That Allows For Funding Of $4.5 Million Of The Requested $6 Million Priming Loan Is Not "Necessary To Avoid Immediate And Irreparable Harm To The Estate Pending A Final Hearing" And Must Be Denied Under Federal Bankruptcy Rule of Procedure 4001(c)(2).**

48.	As a part of the requested Alternative DIP Financing, Debtors ask that this Court

to permit funding of $4.5 million of the requested $6 million priming loan as a part of an interim

order.  While a court may conduct a hearing and allow the financing on an interim basis, "the

court may authorize the obtaining of credit ***only to the extent necessary to avoid immediate and***

***irreparable harm to the estate pending a final hearing***."  Fed. R. Bankr. P. 4001(c)(2)

(emphasis added).

49.	Debtors filed their Priming Motion coupled with a motion to shorten the notice

period late in the evening of February 10th.  [Doc. Nos. 143, 144.]  The matter was initially set to

be heard before this Court in the afternoon on February 17th.  [Doc. No. 152.] The Priming

Motion alleges that Debtors need $4.5 million to be funded and approved as a part of an interim

order at the February 17th hearing in order to satisfy Debtors' February 17th payroll.  (Priming

Motion at 4, 15.)  But mere days later, Debtors' projections changed yet again, and Debtors

determined that they could in fact make payroll.  As such, at Debtors' request, the Court

continued the hearing on the Priming Motion to February 24th at 10:00a.m.

50.	Debtors have not offered any evidence to show that they need $4.5 million of the

requested $6 million priming loan at this time through an interim order.  As was made

abundantly clear last week, Debtors' projections are wholly unreliable and their unsubstantiated

need (or rather their desire) for yet another loan to fund payroll, this time on the backs of the

Existing DIP Lenders, cannot be trusted.  Given Debtors' history of crying wolf, real, substantiated evidence must be required at this juncture.

51.      Moreover, Debtors have not offered any evidence to show that they need a $4.5 million priming loan to be entered on an interim basis "to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(c)(2).  Debtors' initially stated impetus for the $4.5 million is no more.  Rather, Debtors' request is a blatant overreach that attempts to garner 75% of the requested Alternative DIP Financing up front, while minimizing the importance and effect of a final evidentiary hearing.  This Court should not allow Debtors to skirt the proper notice and hearing requirements, while failing to provide concrete evidence of a specific need for millions of dollars given the "extraordinary relief" that is being requested.  Accordingly, the request for an interim order allowing for funding of $4.5 million of the requested $6 million priming loan must be denied.

**III.    Similarly, The Priming Motion Fails To Satisfy Debtors' Burden of Proof On The Issue Of Adequate Protection Regarding Debtors' Request To Use The Existing DIP Lenders' Cash Collateral.**

52.      In light of the Existing DIP Lenders' perfected security interests in and liens on substantially all of Debtors' revenue producing assets, including any cash proceeds from accounts receivable collections and sales, any cash generated by Debtors is the Existing DIP Agent's and the Existing DIP Lenders' Cash Collateral.  Section 363(c)(2) of the Bankruptcy Code provides, in part:

> The [debtor in possession] may not use, sell or lease cash collateral under paragraph (1) of this subsection unless –
>
> (A)  each entity that has an interest in such cash collateral consents; or
>
> (B)  the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

28

Under section 363(c), a debtor may obtain court approval to use cash collateral only upon showing that the secured creditor's property interest in the cash collateral is "adequately protected." If Debtors cannot offer such adequate protection, they must be prohibited from using the Cash Collateral absent consent.

53.    Adequate protection of a secured lender's interest in cash collateral is *mandatory*. *See* 11 U.S.C. § 363(e) ("[A]t any time . . . the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."); *Reisner v. Dayton Country Club Co. (In re Magness)*, 972 F.2d 689 (6th Cir. 1992); *In re Heatron*, 6 B.R. 493, 495 (Bankr. W.D. Mo. 1980); 3 *Collier on Bankruptcy* ¶ 363.05 (3d ed. rev. 2005) ("[I]f a trustee seeks to use cash collateral and cannot obtain the consent of the entity with an interest in the collateral, adequate protection must be furnished before the cash collateral can be used.").

54.    Debtors bear the burden of coming forward with an adequate protection package. 11 U.S.C. § 363(p)(1) ("the [debtor in possession] has the burden of proof on the issue of adequate protection"); *In re Swedeland*, 16 F.3d at 564; *see generally* 3 *Collier on Bankruptcy* ¶ 363.06 (3d ed. rev. 2005). Indeed, "the [d]ebtors' standard in cash collateral cases is a high one." *First Bank of Miller v. Wieseler*, 45 B.R. 871, 876 (D.S.D. 1985). The debtor, and not the court, must frame the adequate protection package. *In re Blehm Land and Cattle Co.*, 859 F.2d 137 (10th Cir. 1988); see also H.R. Rep. No. 595, 95th Cong., 1st Sess. 339 (1977) ("the debtor in possession will provide or propose a protection method").

55.    In proposing an adequate protection package, Debtors must provide more than mere speculation regarding the protection being offered. *See, e.g., In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996) (finding insufficient evidence of adequate protection based on debtor's projection of future transactions); *Wieseler*, 45 B.R. at 876 (rejecting debtors' proffer of

a replacement lien in future crops, finding that the debtors "must go beyond simply estimating what they hope they can harvest and what they hope the market will bring for it"); *In re Lundell Farms*, 86 B.R. 582, 592 (Bankr. W.D. Wisc. 1988).

56.    Debtors try to offer the same unsubstantiated and faulty alleged adequate protection to justify their request to use the Existing DIP Lenders' cash collateral.    Again, Debtors provide absolutely no admissible evidence to support their request.    An evidentiary hearing is required.    And even if Debtors' unsupported assertions are taken at face value, Debtors fail to provide the Existing DIP Lenders with adequate protection for the same myriad of reasons articulated regarding their request for priming financing.    Accordingly, this Court should not allow Debtors to use the Existing DIP Lenders' cash collateral, and it should deny the Priming Motion.

## CONCLUSION

57.    Debtors' alleged need for additional borrowings is, for the most part, self-created resulting from Debtors' decision to increase expenses.    Setting aside the fundamental issues plaguing Debtors' business model, the Existing DIP Lenders cannot have any faith in Debtors' proposed plan or ascertain Debtors' actual need for additional borrowings because Debtors' projections, which now include $2.2 million of increased professional expenses in addition to other increased expenses, have been wrong time and time again.    To the extent borrowings are required for immediate needs, Debtors should identify only those immediate needs, and the financial analysis required to make this determination should be done in a manner such that informed conclusions can be made by all parties in interest.

58.    Ultimately, the allegations in the Priming Motion that the Existing DIP Lenders have exerted undue pressure on Debtors to force Debtors to agree to onerous and unconscionable

provisions in the Existing DIP Loan Agreement are unfounded. Rather, Debtors have trumped up those claims in a slight of hand to divert attention from Debtors' fundamental, underlying issues with its business model—that given the historical decreases in the win rate on cases, only modest increases in the award values since 2010, and inability to determine whether the two-year "government slowdown" is, indeed, temporary, any claimed adequate protection, whether an equity cushion, replacement liens, or monthly payments, is not supported by objective evidence. Accordingly, the relief requested in the Priming Motion should be denied or, in the alternative, as noted above, to the extent borrowings are required to satisfy immediate needs, Debtors should identify only those immediate needs, and the financial analysis required for proceedings of this type should be done in a manner such that informed conclusions can be made by all parties in interest.

**WHEREFORE**, for the reasons stated above, U.S. Bank respectfully requests that this

Court enter an order denying the Priming Motion and granting such other and further relief as

this Court deems just, proper and equitable.

Dated: February 19, 2015

Respectfully submitted,

By:  _/s/Kenneth J. Ottaviano_

Kenneth J. Ottaviano (*pro hac vice*)
Karin H. Berg *(pro hac vice)*
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661-3693
Tel:  312-902-5200
Fax:  312-902-1061

-and-

John J. Ramirez
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022-2585
Tel. (212) 940-8800
Fax. (212) 940-8776

*Counsel for U.S. Bank National Association*