**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq. (*pro hac vice*)
Nicholas B. Vislocky, Esq.
1251 Avenue of the Americas, 17th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Binder & Binder – The National Social Security Disability Advocates (NY), LLC, *et al.*,[1] | Case No. 14-23728 (RDD) |
| | (Jointly Administered) |
| Debtors. | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO POST-PETITION AGREEMENT AND (II) GRANTING RELATED RELIEF**

The debtors and debtors in possession (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases") submit this motion (the "Motion") for entry of an order (i) authorizing the Debtors to enter into a post-petition agreement, pursuant to sections 105 and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: (1) Binder & Binder - The National Social Security Disability Advocates (NY), LLC (1450); (2) SSDI Holdings, Inc. (3038); (3) Binder & Binder - The National Social Security Disability Advocates LLC (8580); (4) The Rep for Vets LLC (6421); (5) National Veterans Disability Advocates LLC (dba The Rep for Vets LLC) (7468); (6) The Social Security Express Ltd. (4960); (7) Binder & Binder - The National Social Security Disability Advocates (AZ), LLC (5887); (8) Binder & Binder - The National Social Security Disability Advocates (CA), LLC (1456); (9) Binder & Binder - The National Social Security Disability Advocates (CO), LLC (0945); (10) Binder & Binder - The National Social Security Disability Advocates (CT), LLC (0206); (11) Binder & Binder - The National Social Security Disability Advocates (FL), LLC (1455); (12) Binder & Binder - The National Social Security Disability Advocates (GA), LLC (4768);  (13) Binder & Binder - The National Social Security Disability Advocates (IL), LLC (1457); (14) Binder & Binder - The National Social Security Disability Advocates (MD), LLC (3760); (15) Binder & Binder - The National Social Security Disability Advocates (MO), LLC (2108); (16) Binder & Binder - The National Social Security Disability Advocates (NJ), LLC (1454); (17) Binder & Binder - The National Social Security Disability Advocates (NC), LLC (1460); (18) Binder & Binder - The National Social Security Disability Advocates (OH), LLC (7827); (19) Binder & Binder - The National Social Security Disability Advocates (PA), LLC (1453); (20) Binder & Binder - The National Social Security Disability Advocates (TX), LLC (1458); (21) Binder & Binder - The National Social Security Disability Advocates VA, LLC (7875); (22) Binder & Binder - The National Social Security Disability Advocates (WA), LLC (0225); (23) Binder & Binder - The National Social Security Disability Advocates LA, LLC (8426); (24) Binder & Binder - The National Social Security Disability Advocates (MI), LLC (8762); and (25) Binder & Binder - The National Social Security Disability Advocates (DC), LLC (5265); (together, the "Debtors").

30292/3
05/18/2015 35630777.3

363(c) of the Bankruptcy Code, and (ii) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The legal bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code").

## BACKGROUND

3. On December 18, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. The Office of the United States Trustee (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") on January 8, 2015 [Docket No. 80]. As originally appointed, the Committee consisted of: (i) Stellus Capital Investment Corporation, (ii) United Service Workers Union, Local 455 IUJAT & Related Funds, (iii) T&G Industries, Inc., (iv) WB Mason Co., and (v) Teaktronics, Inc. On January 30, 2015, the U.S. Trustee reconstituted the Committee and removed Stellus as a member [Docket No. 99].

**A.    Overview and Nature of the Debtors' Business**

5. Additional factual background regarding the Debtors' operations and capital structure and the commencement of these Chapter 11 Cases is set forth in the *Declaration of*

*William A. Brandt, Jr. Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Chapter 11 Petitions and First Day Motions* (the "First-Day Declaration") [Docket No. 15], which is incorporated herein by reference.[2]

6.  The Debtors are the nation's largest provider of social security disability and veterans' benefits advocacy services. As of the commencement of the Chapter 11 Cases, the Debtors had more than 57,000 active Social Security disability and veterans' benefits cases pending. While most other advocacy firms outsource cases that are not in their core region, the Debtors leverage their national footprint to service all of their cases in-house and provide the same level of advocacy expertise regardless of where a claimant is located. The Debtors have 40 years of experience helping disabled individuals obtain disability benefits through programs administered by the Social Security Administration ("SSA") as well as helping veterans apply for disability and related benefits through the Department of Veterans Affairs (the "VA").

7.  There are two primary programs through which the SSA provides disability benefits: the Social Security Disability Insurance Program and the Supplemental Security Income Program. Each of these programs provides monthly benefits to retired workers, their spouses and children, and survivors of deceased insured workers. In addition, the federal government provides benefits for U.S. Armed Forces veterans with disabilities resulting from a disease or injury incurred or aggravated during active military service (and some disabilities that may arise post-service) through its Veterans Affairs Disability Benefits Program. Since 1979, the Company has handled over 300,000 Social Security Disability Insurance Program, Supplemental Security Income Program, and Veterans Affairs Disability Benefits Program cases ("SSA Cases"). The Debtors, in an exercise of their fiduciary duties, have determined that

---

[2] All capitalized terms that are not expressly defined in this Motion shall have the meaning ascribed to such terms in the First Day Declaration.

-3-

accepting new cases is essential to maintaining and enhancing the value of their business as a going concern, whether they ultimately determine to pursue a reorganization or a sale.

**B.      The Debtors' Brand, Marketing and Intellectual Property**

8.    The Debtors are the premier providers of SSA and VA disability advocacy services. This is attributable to, in addition to their reputation for success, their marketing campaigns and advertising efforts over the last decade. Notwithstanding the Debtors' agreement to cease advertising in October of 2014 at the request of the pre-petition secured lenders and the filing of their chapter 11 petitions in December of 2014, the Debtors have continued to receive new SSA and VA cases. While new case originations are not running at pre-petition levels, the Debtors continue to receive approximately 1,000 new cases per month. This is a testament to the resiliency of the Debtors' brand and the success of their pre-petition marketing campaigns.

9.    Critical to the success of the pre-petition marketing campaigns was the involvement of third-parties, including marketing consultants and actors to provide talent related services. One such third-party, Mr. Dick Summer, provided both consulting and talent related services.

10.    Mr. Summer assisted the Company pre-petition in developing both external marketing campaigns, as well as internal training materials. Further, Mr. Summer provided voice-over services for advertising spots, including radio and television commercials, automated phone systems and answering messages, and internal training media and materials.

**C.      The Consulting and Voiceover Agreement**

11.    As part of their efforts to preserve the brand value of the Company going forward, the Debtors have negotiated an agreement with Mr. Summer (the "Consulting and Voiceover Agreement") pursuant to which he will continue to perform the same services he provided pre-

-4-

petition, as well as affirmatively assign to the Debtors all intellectual property previously created in connection with his services, as well as any intellectual property created in the future in connection with the Consulting and Voiceover Agreement, a copy of which is attached hereto as **Exhibit A**. The Debtors have negotiated beneficial terms under the Consulting and Voiceover Agreement including consideration that is significantly less than that under Mr. Summers' pre-petition agreement.

12. A summary of the key terms of the Consulting and Voiceover Agreement, together with references to the related pages of the Consulting and Voiceover Agreement, is as follows:

    (a) **Parties** - Binder & Binder – The National Social Security Disability Advocates, LLC, a Delaware limited liability company (the "Company"), and Mr. Dick Summer. [pg. 1]

    (b) **Term** - The initial term of this agreement shall end the earlier of (i) June 1, 2016; (ii) immediately upon the Talent's inability to perform the Services (including as a result of the Talent's death or other health related issues); (iii) following written notice from the Talent to the Company at least sixty (60) days prior to the proposed date of termination and (iv) following written notice from the Company to the Talent at least sixty (60) days prior to the proposed date of termination (the "Termination Date"). [pg. 2]

    (c) **Services** - The Talent agrees to provide advertising consulting services and spoken voiceover and related content and material for use in connection with the Company's operations, including, but not limited to, automated telephone and answering systems, training media, marketing materials, newsletters, and advertising spots, activities, surveys, and campaigns, including for use in connection with the Company's radio and television shows, commercials and infomercials (collectively, the "Services"). [pgs. 2-3]

    (d) **Consideration** - $75,000 per year (the "Annual Fee"), which amount shall be payable in equal monthly installments. [pg. 2]

    (e) **Non-Compete** - Mr. Summer shall not directly or indirectly own any interest in, manage, control, participate in, consult with, render services for, become employed by, or in any manner engage in any social security or veteran disability advocacy business, within any geographical area in which the Company or its subsidiaries or affiliates engage or have immediate plans to engage; and will not directly or indirectly contact or

        solicit any employees of the Company with whom he worked or had contact for the purpose of causing, inviting, or encouraging any such employee to alter or terminate his or her employment or business relationship with the Company for a period of two (2) years after termination to the Consulting and Voiceover Agreement, subject to certain limitations. [pgs. 3-4]

    (f)    **Assignment** - To the extent any prior assignment is deemed ineffective for any reason, Mr. Summer hereby irrevocably and unconditionally conveys and assigns to the Company all of his right, title, and interest in and to the Existing Voiceovers and the Intellectual Property Rights therein. Mr. Summer hereby irrevocably and unconditionally conveys and assigns to the Company all of his right, title, and interest in and to any Voiceovers created on or after the Effective Date of this Agreement including all of his right, title, and interest in and to any Intellectual Property Rights relating thereto. Such grant includes rights and permission to use Mr. Summer's Likeness on Media (as those terms are defined in the Consulting and Voiceover Agreement). [pgs. 2, 4]

## RELIEF REQUESTED

13. By this Motion, the Debtors request entry of an Order (i) authorizing the Debtors to enter into the Consulting and Voiceover Agreement and (ii) granting other related relief.

## BASIS FOR RELIEF

14. This Court is vested with authority to grant the relief requested by the Debtors pursuant to section 363(c) of the Bankruptcy Code as the transaction is in the ordinary course of the Debtors' business. The Debtors seek to enter into the Consulting and Voiceover Agreement as a transaction within its normal scope of business operations. Debtors in possession need not specifically seek authorization to conduct activities or use funds that constitute property of the estate with respect to ordinary course transactions. See, e.g., 11 U.S.C. § 363(c)(1); compare § 363(b)(1) (providing that a debtor in possession need only seek notice and a hearing to conduct activities or use property of the estate <u>outside</u> the ordinary course of the debtor's business) (emphasis added). To the extent this Court deems the requested relief to be outside the ordinary course of the Debtors' business, this Court is nevertheless empowered to authorize the Debtors'

entry into the Consulting and Voiceover Agreement pursuant to Bankruptcy Code section 363(b).  See In re Ionosphere Clubs, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("Section 363(b) gives the court broad flexibility in tailoring its orders to meet a wide variety of circumstances.").

**I.      The Relief Requested Is In the Ordinary Course of the Debtors' Business.**

15.     Section 363(c) of the Bankruptcy authorizes a debtor to enter into transactions and use property of the estate in the ordinary course of business without notice and hearing.  11 U.S.C. § 363(c)(1).[3]  The purpose of section 363 is to facilitate the Debtors' reorganization without excessive judicial involvement and necessarily provides the Debtors with discretion to exercise reasonable judgment in ordinary business matters.  In re Johns-Manville Corp., 60 B.R. 612, 616 (Bank. S.D.N.Y. 1986) *rev'd on other grounds*, 801 F.2d 60 (2d Cir. 1986).  The Bankruptcy Code does not define "ordinary course of business."  However, "through a synthesis of case law, courts have developed a workable analytical framework for determining whether an activity is within the debtors' 'ordinary course of business.'"  Id.  To determine whether notice and hearing are required, courts employ both the "vertical" and "horizontal" dimension tests.  Id.

16.     The vertical dimension, or creditor's expectation, test examines the transaction from a hypothetical creditor's vantage point and questions "whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit."  Id. at 616-17; see also Armstrong World Industries, Inc. v. James A. Phillips, Inc. (In re James A. Phillips), 29 B.R. 391, 394 (S.D.N.Y. 1983) ("the touchstone of 'ordinariness' is ... the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business.").  The focus, therefore, is on the

---

[3] The Bankruptcy Code states that a chapter 11 debtor may not use cash collateral unless "(A) each entity that has an interest in such collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section,"  11 U.S.C. § 363(c)(2). At the February 24, 2015 hearing on interim approval of the Debtors' Alternative DIP Facility, this Court found that the Debtors' pre-petition secured lenders were adequately protected . *See February 24, 2015 Hearing Transcript [\_\_\_]*.

Debtors' internal operations and workings. Johns-Manville, 60 B.R. at 617. In addition, the horizontal dimension test employs an industry wide perspective, involving a comparison of the particular debtor's business to other like businesses. Id. at 618. As the Manville Court has stated,

> the showing that a transaction was conducted in the ordinary course of business should be easily met. Since this showing is required merely to assure that neither the debtor nor the creditor do anything to gain an advantage over other creditors, an extensive showing that such transactions occurred often, or even regularly, is not necessary. The transaction need not have been common; it need only be ordinary. A transaction can be ordinary and still occur only occasionally."

Id. (citing In re Economy Milling Co., 37 B.R. 914, 922 (D.S.C. 1983)).

17. Here, it is abundantly clear that the Debtors' entry into the Consulting and Voiceover Agreement is in the ordinary course of the Debtors' business. The Consulting and Voiceover Agreement calls for services related to marketing and operating the Debtors' business consistent with pre-petition agreements and, but for a reduction in compensation, is substantially similar to the prior agreement with Mr. Summer. A hypothetical creditor would certainly have a reasonable expectation that such an agreement would be continued or, alternatively, an agreement of similar character would replace it for the business to continue operating as it did pre-petition. Further, the consideration for such services is 70% less than the prior agreement. Creditors are in no way exposed to any risk beyond what they previously considered when they extended credit. The vertical dimension test is clearly satisfied in this regard.

18. To enter into an agreement with a third-party to provide marketing consult and related media and materials is certainly within the realm of expectation for a business of the Debtors' size and industry. The Debtors operate on a national scale, with over 50,000 active cases. The scope of services and structure of the Consulting and Voiceover Agreement is

substantially similar to the pre-petition agreement which helped the Debtors establish their brand and reputation. While the proposed transaction is not one in which the Debtors routinely engage, it is consistent with prior transactions and is not uncommon. As such, it passes the horizontal dimension test and is certainly within the Debtors' ordinary course of business.

19. The Consulting and Voiceover Agreement is generally the same as the corresponding pre-petition agreement, with the same parties, a similar nature of transaction, and for the same purpose. Without question, the expectation of the Debtors' creditors includes the Debtors entering into the Consulting and Voiceover Agreement. For the foregoing reasons, the Debtors submit that they are authorized to enter into the Consulting and Voiceover Agreement without further order of this Court. However, out of an abundance of caution, the Debtors seek Court approval to enter into the Consulting and Voiceover Agreement to avoid any future challenge to the validity of the Debtors' actions in executing the Consulting and Voiceover Agreement as a transaction within the ordinary course of business.

II.  **Entry Into the Consulting and Voiceover Agreement is Authorized as a Sound Exercise of the Debtors' Business Judgment.**

20. The Debtors submit that, to the extent that the agreement could be deemed outside of the ordinary course of the Debtors' business, this Court is authorized pursuant to section 363(b) of the Bankruptcy Code to approve the Debtor's entry into the Consulting and Voiceover Agreement because the transaction is a sound exercise of the Debtors' business judgment.

21. Section 363(b)(1) of the Bankruptcy Code authorizes the trustee to use property of the estate other than in the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1). Furthermore, a debtor's decision to use property of the estate outside the ordinary course of business must be based upon the Debtors' sound business judgment. *See In re*

*Chateaugay Corp.*, 973 F.2d 141, 143 (2d. Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d. Cir. 1983).

22.     It is within the Debtors' sound business judgment to enter into the Consulting and Voiceover Agreement. As more fully described above, the Debtors' brand and reputation holds significant value in terms of the ongoing operations and restructuring of their business. The marketing campaigns and training materials previously created, and to be created by Mr. Summer in the future, are valuable to the ongoing operation of the Debtors' business and to the value of the Debtors' estates.

23.     Further, the Consulting and Voiceover Agreement prohibits Mr. Summer from providing similar services to potential competitors for a period of two years after its expiration. The marketing materials and recognizable voice of Mr. Summer have been important to the development of the Debtors' brand. The value of the Debtors' marketing and related materials based on Mr. Summer's contribution is thereby increased by such non-compete provisions.

24.     Lastly, as of the Petition Date, questions have been raised regarding the ownership of certain materials and related intellectual property connected to Mr. Summer's services pre-petition. To the extent there was or is any dispute over the ownership of previously created materials or related intellectual property, the Consulting and Voiceover Agreement resolves such dispute in favor of the Debtors. The Consulting and Voiceover Agreement affirmatively establishes that all materials, whether related to external marketing or internal operating materials or systems, and all related intellectual property previously created and going forward are unequivocally the property of the Debtors.

25.     After appropriate investigation and analysis, the Debtors have determined that entering in to the Consulting and Voiceover Agreement will help to preserve the Debtors' brand

and the value of the Debtors' estate. Accordingly, the Debtors should be granted authority to enter into the Consulting and Voiceover Agreement.

### REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

26. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Pursuant to Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

### NOTICE

27. Notice of this Motion has been given to (i) counsel to Stellus Capital Investment Corporation, Moore & Van Allen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202, Attn: Stephen E. Gruendel (stevegruendel@mvalaw.com); (ii) counsel to US Bank, Katten Muchin Rosenman LLP, 525 West Monroe Street, Chicago, Illinois 60661, Attn: Kenneth J. Ottaviano (kenneth.ottaviano@kattenlaw.com); (iii) counsel to Capital One, McCarter & English, LLP, Four Gateway Center, 100 Mulberry St., Newark, New Jersey 07102, Attn: Joseph Lubertazzi, Jr. (jlubertazzi@mccarter.com); (iv) counsel to the Official Committee of Unsecured Creditors, Klestadt Winters Jureller Southard & Stevens, LLP, Attn: Tracy L. Klestadt (tklestadt@klestadt.com); (v) the Office of the United States Trustee for the Southern District of New York; and (vi) those parties who have filed a notice of appearance and request for service of pleadings in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

**WHEREFORE**, the Debtors respectfully request entry of the proposed Order, attached as **Exhibit B** hereto, and such other and further relief as the Court deems appropriate.

Dated: May 17, 2015

        Respectfully submitted,

        **LOWENSTEIN SANDLER LLP**

        By: *Nicholas B. Vislocky*
            Kenneth A. Rosen, Esq.
            Mary E. Seymour, Esq.
            Nicholas B. Vislocky, Esq.
            1251 Avenue of the Americas, 17th Floor
            New York, NY 10020
            (212) 262-6700 (Telephone)
            (212) 262-7402 (Facsimile)

        *Counsel to the Debtors and Debtors In Possession*

# EXHIBIT A

## CONSULTING AND VOICEOVER AGREEMENT

This VOICEOVER AGREEMENT (this "**Agreement**") is made as of June 1, 2015 (the "**Effective Date**"), by and between Binder & Binder – The National Social Security Disability Advocates, LLC, a Delaware limited liability company (the "**Company**"), and Mr. Dick Summer, an individual residing at _____ (the "**Talent**").

WHEREAS, the Talent has provided and continues to provide spoken voiceovers and related content and material for use in connection with the Company's operations, including, but not limited to, automated telephone and answering systems, training media, marketing materials, newsletters, and advertising spots, activities, surveys, and campaigns, including for use in connection with the Company's radio and television shows, commercials and infomercials (collectively, the "**Voiceovers**");

WHEREAS, in consideration for the Voiceovers and the Talent's consulting services, the Company has paid the Talent pursuant to that certain letter agreement dated June 27, 2011;

WHEREAS, the Company is not currently engaged in broadcast advertising; and

WHEREAS, the Company and the Talent desire to continue the Services (as defined below) and confirm the ownership of all rights in the Voiceovers are and shall be vested with the Company and that the Company has all rights necessary to exploit the Voiceovers.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be bound hereby, the Company and the Talent agree as follows:

Description of Engagement.  The Talent agrees to provide advertising consulting services and spoken voiceover and related content and material for use in connection with the Company's operations, including, but not limited to, automated telephone and answering systems, training media, marketing materials, newsletters, and advertising spots, activities, surveys, and campaigns, including for use in connection with the Company's radio and television shows, commercials and infomercials (collectively, the "**Services**").  The Services will include providing the Company with creative aspects of TV advertising (including voiceover, production, etc.) and such other related services as reasonably requested by the Company.  The Services will be performed on an as needed basis, at times which are mutually agreeable to the Talent and the Company.  The Talent understands and acknowledges that given the nature of the Services, his voice may be viewed by the general public as the "spokesperson" of the Company and as such, he understands that the performance of the Services is personal to him and cannot be assigned or delegated by him.

Independent Contractor.  The parties acknowledge and agree that the Talent is, and shall remain at all times during the term of the engagement an independent contractor.  The Company and Talent agree that the Talent shall not become a partner, agent, joint venture or principal of the Company.  Accordingly, except as to matters as to which the Talent been given express pre-authorization to represent and bind the Company, the Talent shall not have any authority to

-1-

represent or bind the Company. Further, the Talent shall not be entitled to the rights and benefits afforded to the Company's employees, including, but not limited to, disability or unemployment insurance, workers' compensation, medical or disability insurance, vacation or sick leave or any other employment benefit.

Term of Engagement. The initial term of this agreement shall end the earlier of (i) June 1, 2016; (ii) immediately upon the Talent's inability to perform the Services (including as a result of the Talent's death or other health related issues); (iii) following written notice from the Talent to the Company at least sixty (60) days prior to the proposed date of termination and (iv) following written notice from the Company to the Talent at least sixty (60) days prior to the proposed date of termination (the "**Termination Date**"). For the avoidance of doubt, the obligations of the Talent included herein, including but not limited to those in paragraph 9 of this Agreement, shall extend beyond the Termination Date as contemplated by this Agreement.

Compensation for the Services. Talent acknowledges that he has been paid in full by the Company for the Services rendered prior to the Effective Date and for the assignment to the Company in accordance with Section 5 below of all rights to the Existing Voiceovers (defined below) arising therefrom. As additional consideration for such assignment, and in consideration for performance of the Services outlined hereunder, the Company shall pay the Talent an annual fee of $75,000 per year (the "**Annual Fee**"), which amounts shall be payable in equal monthly installments. Notwithstanding the foregoing, should the Company engage in broadcast advertising (which does not include internet marketing or advertising campaigns), the Annual Fee shall be subject to reasonable re-negotiation by the Talent.

Existing Voiceovers. The Talent hereby acknowledges and confirms that (i) he has irrevocably and unconditionally conveyed and assigned to the Company all of his right, title, and interest in and to all Voiceovers created prior to the Effective Date of this Agreement ("**Existing Voiceovers**"), including all of the Talent's right, title, and interest in and to any copyrights or other proprietary or intellectual property rights throughout the world (collectively, "**Intellectual Property Rights**") pertaining to the Existing Voiceovers, and (ii) such assignments were effective as of the date each such Existing Voiceover was provided to the Company. Notwithstanding the foregoing, to the extent any such prior assignment is deemed ineffective for any reason, the Talent hereby irrevocably and unconditionally conveys and assigns to the Company all of the Talent's right, title, and interest in and to the Existing Voiceovers and the Intellectual Property Rights therein.

Future Voiceovers. The Talent hereby irrevocably and unconditionally conveys and assigns to the Company all of his right, title, and interest in and to any Voiceovers created on or after the Effective Date of this Agreement ("**Future Voiceovers**"), including all of the Talent's right, title, and interest in and to any Intellectual Property Rights relating thereto.

Likeness. The Talent hereby acknowledges and confirms that the Company has, and hereby grants and conveys to the Company, an unconditional, irrevocable, perpetual, transferable, worldwide, fully-paid, royalty free rights and permission throughout the world to use the Talent's image and likeness, voice, and oral statements, and all variations of the foregoing (collectively, the Talent's "**Likeness**"), on websites, digital videos, videotape, firm, CD-Rom, DVD, CD, DAT, tape, or any other media now known or later developed ("**Media**") in

connection with the Company's operations, including, but not limited to, automated telephone and answering systems, training media, marketing materials, newsletters, and advertising spots, activities, surveys, and campaigns, including for use in connection with the Company's radio and television shows, commercials and infomercials, as currently conducted or as may be conducted in the future, including by any future assign. This grant includes, without limitation, the right to use, reproduce, publicly perform, and distribute the Talent's Likeness as embodied in any Voiceover, including the right to create, distribute, and perform automated telephone and answering systems, training media, marketing materials, newsletters, and advertising spots, activities, surveys, and campaigns, including for use in connection with the Company's radio and television shows, commercials and infomercials, on the Internet, on radio, or on Television, comprising the Voiceovers. This grant shall also include, without limitation, the right to produce, change, edit or alter, from time to time, any Voiceover or Media in which the Talent's Likeness is included, individually or with others, for the purpose of promoting or furthering the products, services, or other business activities of the Company.

<u>Waiver</u>. The Talent hereby waives any and all right which he may have to inspect or approve the finished Media that may be produced in connection with the rights granted hereby or the use to which such Media may be applied. The Talent hereby releases, discharges and agrees to defend and hold harmless the Company and its affiliates, and their legal representatives, licensees and assigns, and all parties acting under the Company's permission or with authority from the Company, from and against any liability of whatsoever kind, including, without limitation, liability for invasion of any personal property or privacy right, copyright infringement, and liability by reason of the Company or its affiliate's use of the Voiceovers and the Talent's Likeness as provided herein, including by reason of any distortion, alteration, or changes or use in composite or other form, whether intentional or not, which may occur or be produced in the making of Media authorized hereby, or in any processing thereof, as well as any publication thereof, irrespective of the effect or consequences resulting therefrom.

<u>Exclusive Nature of the Services; Noncompete</u>. Given the Talent's role as "spokesperson" of the Company, he acknowledges the Company's interest in protecting its brand and goodwill and ensuring the high standards of both. Therefore, the Talent agrees as follows:

**A.** during his engagement with the Company as an independent contractor and for a period of two (2) years after termination of this Agreement pursuant to paragraph 3, subsections (i), (ii), or (iii), the Talent agrees that he shall not directly or indirectly own any interest in, manage, control, participate in, consult with, render services for, become employed by, or in any manner engage in any social security or veteran disability advocacy business, within any geographical area in which the Company or its subsidiaries or affiliates engage or have immediate plans to engage; and

**B.** the Talent agrees that during his engagement with the Company as an independent contractor, and for a period of two (2) years after termination of this Agreement pursuant to paragraph 3, subsections (i), (ii), or (iii), he will not directly or indirectly contact or solicit any employees of the Company with whom he worked or had contact for the purpose of causing, inviting, or encouraging any such employee to alter or terminate his or her employment or business relationship with the Company.

-3-

For the avoidance of doubt, should the Company terminate this Agreement pursuant to paragraph 3, subsection (iv), the Talent shall not be limited by the provisions of subparagraphs 9(a) or (b) beyond his engagement with the Company. The Talent understands that the intent of these provisions is not to, and he agrees that these provisions do not, deprive him of an opportunity to earn a living, but rather these provisions are intended to protect the value of the Services provided by him to the Company and the goodwill and brand recognition created thereby.

Ownership. The Company shall be the sole and exclusive owner of all right, title and interest to any and all Intellectual Property Rights resulting from the Services provided by the Talent under this Agreement. The Talent agrees that all Media using his Likeness produced by the Company or any of the other parties granted rights hereunder shall be owned by the Company and that the Company shall be entitled to all rights, including without limitation the copyright, therein. If the Talent should receive or obtain any sample, print, or other copy of any such Media, the Talent shall not authorize its use or reproduction by anyone else. Talent hereby irrevocably makes all assignments necessary to fully vest sole ownership of the Voiceovers in the Company. Talent shall reasonably assist the Company, at the Company's expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce and defend any rights assigned. Talent hereby irrevocably designates and appoints the Company as its agent and attorney-in-fact, coupled with an interest, to act for and on Talent's behalf to execute and file any document and to do all other lawfully permitted acts to further the foregoing with the same legal force and effect as if executed by Talent. From the Effective Date forward, title to all Voiceovers shall vest in Company automatically upon creation, and Talent will not have any ownership, license or other interest in any Intellectual Property Rights created as a result of this Agreement or the Services. Talent agrees and acknowledges that, to the extent allowed under applicable law, all works created hereunder shall be considered to be "works made for hire" as that phrase is defined in the U.S. Copyright Act of 1976, as amended.

Confidentiality. For the purposes of this Agreement, "Confidential Information" means any confidential or other proprietary information that is disclosed by or on behalf of Company to Talent, whether disclosed orally or in writing, whether disclosed before or after the Effective Date, and whether or not marked or otherwise designated as confidential, including, without limitation, information relating to Company's customers, potential customers, suppliers, financial and business information, technological information, specifications, business and product plans; all Voiceovers; and the terms and conditions of this Agreement. Notwithstanding the foregoing, Confidential Information does not include information which: (i) is or becomes public knowledge without any action by, or involvement of, Talent or any of its employees or independent contractors; (ii) is publicly disclosed by Talent with the prior, written approval of Company; or (iii) is independently developed by Talent without use of or access to Confidential Information. Talent shall: (i) observe complete confidentiality with respect to, and not to disclose, or permit any third party or entity access to, any Confidential Information without prior written permission of Company; and (ii) not utilize, except as required to perform its obligations under this Agreement, any Confidential Information. If Talent is requested to disclose any of the Confidential Information pursuant to any judicial or governmental order, Talent will not disclose the Confidential Information without first giving Company written notice of the request and sufficient opportunity to contest the order.

Representations and Warranties. The Talent represents, warrants and covenants, as of the Effective Date and at all times thereafter, that:

**A.** the Services have been and will be performed in a professional and workmanlike manner, in compliance with all applicable laws and regulations;

**B.** (i) there is no conflict of interest between the Talent's current or contemplated employment or business activities, if any, and the activities to be performed hereunder, (ii) the Talent is not a party to any agreement, contract or understanding, and no facts or circumstances exist, which would restrict or prohibit the Talent from undertaking or performing any of the obligations under this Agreement, and (iii) the Talent will advise the Company immediately if a conflict or potential conflict of interest arises in the future;

**C.** the Talent has the full right to assign the Voiceovers to the Company as provided for herein;

**D.** all work under this Agreement has been and shall be the Talent's original work and, to the best knowledge of the Talent, none of the Services or Voiceovers nor any development, use, production, distribution or exploitation thereof will infringe, misappropriate or violate any intellectual property or other right of any person or entity (including, without limitation, Talent); and

Indemnification. The Talent shall indemnify and hold harmless the Company from and against any and all claims, damages, liabilities, settlements, attorneys' fees and expenses, as incurred, on account of any breach of this Agreement by, or the negligence or willful misconduct of, the Talent.

No Obligations. Nothing contained herein shall create any obligation on the part of the Company or its successors or assignees to make any use of the Voiceovers or any rights granted herein. In addition, the Talent acknowledges and agrees that the Company or its successors or assignees shall not owe the Talent any royalties or other monetary obligations with respect to any of the Voiceovers, the Intellectual Property Rights therein, or the right to use the Talent's likeness as provided in this Agreement.

Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any action in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

Governing Law. This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of New York (without giving effect to principles of conflicts of laws). Each party expressly and irrevocably consents to the jurisdiction of each such court (and each appellate court thereof).

Assignment.  This agreement shall be binding upon and inure to the benefit of the parties hereto and the Company's successors and assigns.  The Company may assign this agreement without the prior written consent of the Talent.  This Agreement is personal to the Talent and may not be assigned or otherwise transferred by the Talent and any attempt to do so shall be null and void.

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto.

**Binder & Binder – The National Social Security Disability Advocates, LLC**

Signature:_____

Name:_____

Title:_____

Date:_____

**Mr. Dick Summer, Individually**

Signature:_____

Date:_____